# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01744-CFC |
| | ) | |
| WALMART INC. *et al.*, | ) | **CONFIDENTIAL** |
| | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF UNITED STATES' DISCOVERY DISPUTE LETTER

Dear Judge Tennyson,

The United States seeks an order compelling Walmart to make available the deidentified dispensing data Walmart has already produced in *In re National Prescription Opiate Litig.*, Case No. 17-MD-2804 (N.D. Ohio), and related state-court opioid litigation (collectively "the MDL Data"), *see* Ex. A at 29-37, for prescriptions dispensed from June 2013 to December 2020, as well as the 45 transactional dispensing data fields for the fills identified in the United States' 10/25/2024 red-flag prescriptions Excel file.[1] The MDL Data is a subset of the data sought in the United States' first motion to compel and Requests 1 and 2. Ex. B at 1-3, 17-18. The Court denied that motion but made clear that "something less than all [the data], more than just in the complaint[,] . . . probably should be produced." Ex. C at 18:18-19; *see also id.* at 43:15-18 ("I want to make sure if I agreed with you, you're not going to then refuse to engage with them if they try to come back with something less than what I rejected."). Notwithstanding the Court's admonition—and the United States' repeated offers to circumscribe its data requests, *e.g.* Ex. D, E—Walmart has refused to produce any more dispensing data and produced only a limited number of additional fields for the fills it believes are explicitly referenced in the Complaint. Walmart has refused to even *describe* key aspects of the MDL Data.

Under the lenient standard for relevancy, *see Minerva Surg., Inc. v. Hologic, Inc.*, 2019 WL 5092254, at *3 (D. Del. Oct. 11, 2019), the MDL Data is relevant for at least three reasons. <u>First</u>, the MDL Data is relevant to determining whether particular prescriptions (*including those prescriptions Walmart concedes were specifically alleged in the Complaint*) were invalid and whether Walmart would have known that when filling the prescription. The data, for example, bears on whether the combinations of red flags posed by certain prescriptions were uncommon relative to other prescriptions filled by Walmart. Put differently, the MDL Data is relevant to determining whether the prescriptions at issue fell outside the standard of care, and whether the Walmart pharmacy or pharmacist would have known as much. <u>Second</u>, it is relevant to identifying additional violations falling within the scope of the claims alleged in the Complaint. <u>Third</u>, it is relevant to determining Walmart's culpability and the public harm, which are factors in assessing the amount of the civil penalty. *E.g. Advance Pharm., Inc. v. U.S.*, 391 F.3d 377, 399 (2d Cir. 2004) (collecting cases).

Walmart has not—and cannot—dispute the first basis of relevance. Walmart has requested from Delaware's prescription drug monitoring program ("PMP") *all* controlled substance dispensing data for *all* pharmacies in the state from June 2013 to February 2024. Ex. F at 2; Ex. G. Walmart has propounded similar requests to other state PMPs and federal programs like Medicare, describing the requested data as relevant to "the appropriate standard of care[:] both sides seek to show what a 'legitimate medical purpose' means in particular circumstances, and being able to show that a patient was treated similarly by Walmart, other pharmacies, and federal pharmacies is vital to Walmart's defense." Ex. H at 1. Being able to show that a red-flag prescription was not "similar[]" to other prescriptions filled by Walmart is at least as "vital"—and relevant—to the United States' case.

Walmart already has produced the MDL Data, so making it available to the United States would impose minimal burden. In any event, Walmart's own data requests establish that any burden would be proportionate to the needs of the litigation. Walmart's request for PMP data from just Delaware encompasses nearly 21 million prescriptions. Ex. G. In comparison, the universe of

---

[1] The United States also seeks hard copy records but has not moved to compel such records.

prescriptions included in the MDL Data is commensurate with, and may be dwarfed by, the data Walmart has sought. Walmart nevertheless claims that "introducing millions of new prescription records into this case" would unfairly burden Walmart. But those prescriptions have always been in the case, *see, e.g.*, D.I. 109, ¶¶ 5, 482, 489, 513, 521-22, and the relevant inquiry is the burden of producing the data, not the theoretical burden Walmart believes the data may introduce to preparing its defense. *See* Fed. R. Civ. P. 26(b)(1). Walmart also claims it would be burdensome to "reinsert" patient information into the deidentified data. Ex. I at 2. The United States, however, has not asked for patient information to be reinserted, and Walmart cannot use its data production preferences as the reason to not produce the data.[2]

Given the lack of undue burden associated with producing the data and its clear relevance, the only "reasonable assumption" is that Walmart is refusing to produce it "because the information sought is unfavorable to its interest." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 947 (9th Cir. 2001). Tellingly, Walmart has not objected to making available hundreds of thousands of documents it produced in the MDL, Ex. A at 1-28; Walmart just does not want the United States to have any more dispensing data, perhaps because Walmart knows it will disclose more violations. That is not a valid basis for resisting discovery. Rather than advancing a cognizable burden or relevance argument, Walmart continues to argue that the meanings of the terms "violation" in the CSA's civil penalties provision, 21 U.S.C. § 842(c)(1), and "claim" in Fed. R. Civ. P. 26(b)(1) are "coterminous," such that discovery may extend to only the prescriptions that Walmart believes are explicitly referenced in the Complaint. In correspondence with Walmart and prior briefing, the United States has explained that this argument conflicts with surviving allegations in the Complaint, finds no support in the authorities upon which Walmart relies, and runs contrary to case law. Ex. B at 2-3, 138-141; Ex. K at 3-4. More fundamentally, Walmart's attempt to unilaterally limit its discovery responses to those fills it believes are explicitly alleged amounts to an improper back-door effort to strike allegations of nationwide violations. Walmart could have moved to dismiss these nationwide allegations, but it did not.[3]

The United States also requests that, for the fills identified in the United States' October 25, 2024, amended interrogatory response, Walmart produce the data fields used in the MDL. Ex. L. For example, Walmart has not provided the names of the pharmacists who filled the prescriptions, even though Walmart produced pharmacist names in the MDL. Walmart offered to produce those additional fields but only if the United States withdrew its request for the MDL Data, Ex. E, revealing that its objection to producing the fields is not based on the relevance of the fields or the burden of production.

---

[2] The United States considered requesting data for prescriptions that meet the red-flag specifications. But this option would be significantly more burdensome for Walmart, requiring data experts to write complex code to identify the relevant prescriptions. In the MDL, Walmart argued that responding to a request to produce benzodiazepines and muscle relaxants dispensed within 14 days of an opioid prescription would be "a logistical nightmare, requiring complex algorithms to implement," and that was for one specification alone. Ex. J at 12.

[3] Walmart's claim/violation argument is a legal issue that it can raise at the summary judgment stage as a basis to limit the scope of prescriptions for which Walmart may seek penalties at trial. But Walmart cannot circumscribe its discovery based on this disputed legal argument. Walmart in effect asks the Court to assume, during the discovery phase, that it will prevail on this issue at summary judgment. The Federal Rules provide no basis for such an assumption.

Respectfully submitted,

SHANNON T. HANSON
Acting United States Attorney

BY:    */s/ Elizabeth Vieyra*
       Elizabeth F. Vieyra
       Assistant United States Attorney
       1313 N. Market Street
       P.O. Box 2046
       Wilmington, Delaware 19899-2046
       Telephone: 302-573-6148
       Facsimile: 302-573-6220
       Elizabeth.Vieyra@usdoj.gov

Dated: May 1, 2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-01744-CFC |
| | ) |
| WALMART INC. *et al.*, | ) **CONFIDENTIAL** |
| | ) **FILED UNDER SEAL** |
| Defendants. | ) |
| | ) |
| | ) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2025, true and correct copies of the foregoing document were caused to be served on the following counsel of record via electronic mail:

Robert W. Whetzel
Kelly E. Farnan
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
Email: whetzel@rlf.com
Email: farnan@rlf.com

William G. Laxton, Jr.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Email: wglaxton@jonesday.com

Karen P. Hewitt
Jones Day
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
Email: kphewitt@jonesday.com

Jason S. Varnado
Andrew J. Junker
Jones Day
717 Texas, Suite 3300
Houston, TX 77002-2172
Email: jvarnado@jonesday.com

Email: ajunker@jonesday.com

James W. Carlson
Jones Day
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Email: jamescarlson@jonesday.com

Laura Jane Durfee
Jones Day
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215-2673
Email: ldurfee@jonesday.com

David W. Ogden
Charles C. Speth
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
Email: david.ogden@wilmerhale.com
Email: charles.speth@wilmerhale.com

*/s/ Elizabeth F. Vieyra*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Jury Trial Demanded |
| | ) |
| v. | ) Civil Action No. 1:20-cv-01744-CFC |
| | ) |
| WALMART INC. AND WAL-MART STORES EAST, LP, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## [PROPOSED] ORDER

The Court, having considered the United States' discovery dispute letter brief (the "Motion to Compel"), as well as all submissions related thereto,

IT IS HEREBY ORDERED this _____ day of May, 2025, that:

1.    The Motion to Compel is GRANTED.

2.    Unless otherwise agreed by the parties, Walmart Inc. and Wal-Mart Stores East, LP (collectively, "Walmart") shall produce, within 14 days of the date of this Order, all MDL Data in the manner and form agreed by the parties pursuant to the process set forth below.

   a.    Walmart shall provide to the United States, within 3 days of this Order, a fulsome and comprehensive description of all electronic dispensing data Walmart has produced in *In re National Prescription Opiate Litigation*, Case No. 17-MD-2804 (N.D. Ohio), and related state-court opioid litigation ("the MDL Data").  At a minimum, the description shall state whether the MDL Data currently exists in a single, merged file in Walmart's possession, custody, or control and shall, for

1

each dataset included within the MDL Data, also state the following: (1) the form in which the data is stored; (2) the size of the dataset (including, for example and without limitation, the number of lines of data and the total file size); (3) the temporal and geographic scope of the dataset; (4) all criteria used to generate the dataset (including, for example and without limitation, which controlled and non-controlled substances are included); and (5) the fields included in the dataset.

b. Within 7 days of this Order, the parties shall exchange correspondence and meet-and-confer to develop a mutually agreeable form and manner for Walmart to produce the MDL Data.

3.    Within 7 days of this Order, Walmart shall produce, for all prescriptions identified in the United States' October 25, 2024, Red-Flag Prescriptions Excel file, the 45 transactional dispensing data fields listed in Section I of Walmart's January 31, 2025, letter to the United States.

_____
THE HONORABLE ELEANOR G. TENNYSON
UNITED STATES MAGISTRATE JUDGE

EXHIBIT A

Document Filed
Under Seal

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Case No. 1:20-cv-01744-CFC |
|  | ) | |
| WALMART INC. *et al.*, | ) | **CONFIDENTIAL** |
|  | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |
|  | ) | |
| _____ | ) | |

## PLAINTIFF UNITED STATES' DISCOVERY DISPUTE LETTER

Dear Judge Tennyson,

The United States requests that the Court compel Walmart to comply with the United States' Requests for Production 1 and 2, which seek electronic nationwide dispensing data for controlled substance and certain non-controlled substance prescriptions filled at Walmart pharmacies during the relevant time period.[1]  Ex. 1, at 8-9.  During extensive back and forth on this issue, Walmart has not articulated any burden associated with producing electronic dispensing data.  Rather, Walmart claims that nearly all the requested data is not relevant because it does not relate to specific invalid prescriptions included as examples of Walmart's unlawful conduct in the complaint.  Ex. 2, at 12-15.  Based on that position, Walmart has offered to produce minimal dispensing data and, in fact, has produced none and has been unwilling to even identify the data fields available.  Ex. 3, at 6-7.

Under the lenient standard for relevancy, *see Minerva Surg., Inc. v. Hologic, Inc.*, 2019 WL 5092254, at *3 (D. Del. Oct. 11, 2019), the requested data is relevant for several reasons.  It is relevant to identifying additional prescriptions that Walmart unlawfully filled.  Further, the full universe of data is relevant to determining whether particular prescriptions (including those prescriptions Walmart concedes were alleged in the Complaint) were invalid and whether the filling pharmacist would have known that (for instance, because such red flag fills were extreme statistical outliers compared to the full universe of data).  It is also relevant to determining Walmart's culpability and the public harm, factors in assessing the amount of the civil penalty.  *Advance Pharm., Inc. v. U.S.*, 391 F.3d 377, 399 (2d Cir. 2004) (collecting cases); *Orange Cnty. Coastkeeper v. Bodycote Thermal Proc., Inc.*, 2024 WL 174467, at *1-2 (C.D. Cal. Jan. 12, 2024).

Despite the lack of burden associated with producing the data and its clear relevance, Walmart has refused to comply with its discovery obligations based on its position that the meaning of the term "violation" in the Controlled Substances Act's civil penalties provision, 21 U.S.C. § 842(c)(1), is "coterminous" with the meaning of the term "claim" in Fed. R. Civ. P. 26(b)(1).  Walmart contends that the requested dispensing data is not relevant and discovery may extend only to the prescription fills that Walmart believes are explicitly referenced in the complaint.  Ex. 3, at 2-6.  As the United States explained in meet-and-confer correspondence, the only supporting authority Walmart has offered are decisions providing generic definitions of the term "claim," *none* of which involve the CSA or any other civil penalty statute and *none* of which compare the meaning of "claim" and "violation," let alone equate the terms, as Walmart seeks to do.  Ex. 4, at 2; Ex. 5, at 2-3.

"Claim" in Rule 26(b)(1) simply refers to Rule 8's notice pleading standard that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The United States has alleged two claims under 21 U.S.C. 21 §§ 842(a)(1), 829, and 21 C.F.R. § 1306.04, each alleging that Walmart knowingly filled invalid prescriptions.  D.I. 109 at 194-95.  The United States further alleged that Walmart violated these provisions on multiple occasions, and for each such violation, is liable for a civil penalty.  D.I. 109 at 194-95.  *Cf. U.S. v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1192-93 (E.D. Ky. 2017) (denying motion to dismiss a single CSA claim for recordkeeping violations and determining that the penalty applies "per occurrence" of a violation).

---

[1] The United States is also seeking hard copy prescriptions records but is not moving to compel production of such records now.

The Government's approach here is not unusual. The Government frequently brings civil penalty actions in which it alleges that a defendant violated federal law when it or its employees acted similarly on numerous occasions or engaged in a course of conduct that led to numerous violations, and then provides specific examples of violations. In such cases, courts routinely allow discovery related to violations not specifically referenced in the complaint. For example, in *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012), the Court held that plaintiffs "cannot be expected to plead with particularity each and every false claim nationwide *without the benefit of at least some discovery, as such information rests solely within Defendants' control*," *id.* at 177-78 (emphasis added). As in *CVS*, the complaint in this case includes detailed allegations that Walmart engaged in "generalized practices" that led to violations of the CSA—practices attributable to Walmart's Bentonville, Arkansas-based pharmacy compliance department. *E.g.* D.I. 75, ¶¶ 91-123, 131, 138-44, 538-44; *contra United States v. Ridley's Family Mkts. Inc.*, No. 1:20-cv-173, D.I. 26, ¶ 93 (D. Utah Feb. 26, 2021) (complaint containing a single allegation that "the apparent absence of corporate policies and oversight" at the single location under investigation suggested that invalid fills likely occurred at other *Ridley's* locations). The complaint also alleges that Walmart pharmacists filled thousands of invalid prescriptions with obvious red flags, and that Walmart policies and operations contributed to these invalid fills. *Id.* ¶¶ 476-544. Also, like *CVS*, the complaint includes examples of "specific" violations which span all regions of the country from 2013 to 2018. *Id.* ¶¶ 159-62, 165-68, 207, 219, 223-24, 229-31, 236-445.

*CVS*—and the complaint here—are also consistent with numerous decisions authorizing discovery related to violations not specifically enumerated in a complaint. *See, e.g.*, *Orange Cnty. Coastkeeper* at *1-2; *Corteva Agriscience LLC v. Monsanto Co.*, 2023 WL 6880348, at *1 (D. Del. Oct. 18, 2023); *U.S. ex rel. Bibby v. Wells Fargo Bank*, 165 F. Supp. 3d 1340, 1343, 1355-56 (N.D. Ga. 2015); *In re RFC and ResCap Liquidating Trust Lit.*, 2015 WL 12819152, at *5-6 (D. Minn. Apr. 13, 2015); *U.S. ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 17 (D. Mass. 2008); *U.S. v. Nat'l Dynamics Corp.*, 1981 WL 2070, at *1 (S.D.N.Y. April 30, 1981), *aff'g* 1981 WL 2054, at *2 (S.D.N.Y. Apr. 8, 1981). Courts authorize such discovery because "Rule 26 certainly contemplates" that "additional alleged violations could be unearthed during discovery." *Simpson v. Ocwen Loan Servicing, LLC*, 2020 WL 1465740, at *4 (N.D. W. Va. Mar. 25, 2020).

Walmart's dispensing data include numerous fields of information, such as a customer's name, the prescriber, and the prescription filled date. The United States does not know all of the fields Walmart's pharmacy software system maintains, but is aware that chain pharmacies' systems often include multiple fields that reflect relevant information about customers and its pharmacists' attempts to resolve red flags. Over seven months ago, before issuing its Requests, the United States asked Walmart to provide information about the fields in its system so that the Government could tailor its request for data. Ex. 6. Walmart refused and instead provided a list of the fields Walmart produced in other opioid litigation involving different legal claims. *Id.* The United States is not bound by negotiations in another case. Absent information sufficient to evaluate the relevancy of various fields, the Government seeks all available data fields. In an effort to compromise, however, the Government's Proposed Order sets forth a process for potentially narrowing the scope of data fields Walmart is required to produce.

3

Respectfully submitted,

SHANNON T. HANSON
Acting United States Attorney

BY:    */s/ Elizabeth Vieyra*
        Elizabeth Vieyra
        Assistant United States Attorney
        1313 N. Market Street
        P.O. Box 2046
        Wilmington, Delaware 19899-2046
        Telephone: 302-573-6148
        Facsimile: 302-573-6220
        Elizabeth.Vieyra@usdoj.gov

Dated: February 14, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>WALMART INC. *et al.*,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:20-cv-01744-CFC

**CONFIDENTIAL
FILED UNDER SEAL**

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025 true and correct copies of the foregoing document were caused to be served on the following counsel of record via electronic mail:

Robert W. Whetzel
Kelly E. Farnan
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
Email: whetzel@rlf.com
Email: farnan@rlf.com

Yaakov M. Roth
William G. Laxton, Jr.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Email: yroth@jonesday.com
Email: wglaxton@jonesday.com
Email: jeffreyjohnson@jonesday.com
Email: kalejnieks@jonesday.com

Karen P. Hewitt
Jones Day
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
Email: kphewitt@jonesday.com

Jason S. Varnado
Andrew J. Junker
Jones Day
717 Texas, Suite 3300
Houston, TX 77002-2172
Email: jvarnado@jonesday.com
Email: ajunker@jonesday.com

James W. Carlson
Jones Day
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Email: jamescarlson@jonesday.com

Laura Jane Durfee
Jones Day
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215-2673
Email: ldurfee@jonesday.com

David W. Ogden
Charles C. Speth
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
Email: david.ogden@wilmerhale.com
Email: charles.speth@wilmerhale.com

*/s/ Elizabeth Vieyra*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Jury Trial Demanded |
| | ) |
| v. | ) Civil Action No. 1:20-cv-01744-CFC |
| | ) |
| WALMART INC. AND WAL-MART STORES EAST, LP, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## [PROPOSED] ORDER

The Court, having considered the United States' discovery dispute letter brief (the "Motion to Compel"), as well as all submissions related thereto,

IT IS HEREBY ORDERED this ____ day of March, 2025, that:

1.     The Motion to Compel is GRANTED.  Walmart Inc. and Wal-Mart Stores East, LP (collectively, "Walmart") shall produce all electronic dispensing data for all Controlled Substances dispensed between June 26, 2013, and December 22, 2020.  Walmart is further ordered to produce all electronic dispensing data for all of the non-Controlled Substances listed in the United States' Request for Production 2.

2.     Walmart shall provide to the United States, within 7 days of the date of this Order, a complete list of all fields available in all databases used by Walmart in filling prescriptions during the relevant time frame.

3.     Within 7 days of receiving the list of data fields produced by Walmart pursuant to Paragraph 2 of this Order, the parties shall exchange correspondence and meet-and-confer to

establish a complete universe of data fields for which Walmart will produce dispensing data responsive to Requests for Production Nos. 1 & 2 of the United States' First Set of Requests for Production.

4.      If the parties agree to a complete universe of data fields for which Walmart will produce responsive records, Walmart shall produce, within 45 days of the date of this Order, all dispensing data responsive to Requests for Productions Nos. 1 & 2 of the United States' First Set of Request for Production, complete with all data fields agreed to by the parties.

5.      If the parties cannot agree as to a complete universe of data fields for which Walmart will produce responsive records:

(a) Walmart shall produce, within 30 days of the date of this Order, all dispensing data responsive to Requests for Productions Nos. 1 & 2 of the United States' First Set of Request for Production, complete with all 72 data fields referenced in Parts I and II of Walmart's January 31, 2025, letter to counsel to the United States[1]; and

(b) the United States may request that this Court enter an order compelling Walmart to produce additional data fields for all dispensing data already produced by Walmart pursuant to this Paragraph 5.

 

_____
THE HONORABLE ELEANOR G. TENNYSON
UNITED STATES MAGISTRATE JUDGE

---

[1] Walmart shall produce dispensing data pursuant to Paragraph 5(a) of this Order in a form that that allows for easy and seamless merging of such data with any additional data fields this Court orders Walmart to produce in response to a request by the United States pursuant to Paragraph 5(b) of this Order.

2

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                                     )
UNITED STATES OF AMERICA,                            )
                                                     )
            Plaintiff,                               )
                                                     )
      v.                                             )     Case No. 1:20-cv-01744-CFC
                                                     )
WALMART INC. and                                     )
WAL-MART STORES EAST, LP,                            )
                                                     )
            Defendants.                              )
_____ )

## PLAINTIFF UNITED STATES OF AMERICA'S
## FIRST SET OF REQUESTS FOR PRODUCTION

Plaintiff the United States of America serves this First Set of Requests for Production of

Documents (the "Requests") upon Defendants Walmart Inc. and Wal-Mart Stores East, LP

(collectively "Walmart") pursuant to Federal Rules of Civil Procedure 26 and 34.

## DEFINITIONS

1.     "Action" means the above-captioned lawsuit filed by Plaintiff United States of

America against Defendants Walmart Inc. and Wal-Mart Stores East, LP, in the District of

Delaware.

2.     "Blanket Refusal" means a decision by an individual pharmacist to refuse to fill

all Controlled Substance prescriptions written by a particular Prescriber (that is, to "Blanket

Refuse" to fill all Controlled Substance prescriptions written by a particular Prescriber).

3.     "Boilerplate POM 1311 Response" means the response set forth in the document

Bates numbered WMT_DOJ_000340366, referred to therein as the "pom response."

4.     "Central Block" means a block preventing Your pharmacists from filling

Controlled Substance prescriptions written by certain Prescribers and has the same meaning as "corporate block," "home-office level block," and "prescriber block." "Centrally Blocked Prescriber" means any Prescriber whose Controlled Substance prescriptions were not permitted to be filled at any of Your pharmacies as a result of a Central Block.

5.     "Communication(s)" is defined in the broadest sense permitted by Federal Rules of Civil Procedure 26(b) and 34(a) and means any transmission or exchange of information orally or in writing. This definition includes recorded calls, voice messages, letters, memoranda, notes of meetings and oral conversations, emails, SMS messages, text messages, chats, instant messages, and social media postings.

6.     "Complaint" means the Second Amended Complaint filed in the Action by Plaintiff United States of America against Defendants Walmart Inc. and Wal-Mart Stores East, LP, on February 1, 2024.

7.     "Controlled Substance(s)" has the same meaning given to this term in 21 U.S.C. §§ 802(6), 811(a), 812 and 21 C.F.R. §§ 1308.11-1308.15.

8.     "DEA" means the Drug Enforcement Administration, a component of the Department of Justice, and any representative, employee, executive, official, agent, fiduciary, or Person acting on behalf of the DEA.

9.     "Defendants" refer to Walmart Inc. and Wal-Mart Stores East, LP, as well as any predecessor and successor business entities, parents, subsidiaries, affiliates, segments, departments, branches, units, groups, and divisions, and any director, officer, employee, independent contractor, representative, agent, intermediary, or Person acting on behalf of any of these entities.

10.     "Dispense," "Dispensing," and "Dispensed" have the same meaning given to the

term "dispense" as defined in 21 U.S.C. § 802(10).

11.     "Document(s)" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a) and includes any writing or recording of any nature or description, including any Communication, data from computer programs and applications, handwriting, typewriting, e-mails or any other form of electronic file or transmission, text messages, instant messages (including Skype messages, Microsoft Teams messages, *etc.*), facsimiles, printing, photographs, photostats, tape, wire, video, belt or disc recording, and every other means of recording upon any tangible thing in any form, including drafts, originals and copies of books, calendars, pocket calendars, pocket planners, diaries, correspondence, memoranda, reports, minutes, notes, records, contracts, proposals, tickets, checks, bills, receipts, invoices, telegrams, papers of any character, and copies of Documents that are not identical duplicates of the originals or are maintained in a different documentary form, and materials which have been otherwise photographically or electronically recorded, or any other physical material in the possession, custody or control of Defendants.  Documents also include all writings, recordings, photographs, originals, and duplicates as those terms are used in Rule 1001 of the Federal Rules of Evidence.  A draft or nonidentical copy is a separate Document within the meaning of this term.

12.     "Employee" means any Person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your behalf or who performed any service for You under Your name, whether on a full-time, part-time, piece-work, commission, or other basis, and whether paid or unpaid.

13.     "Person" means any individual, firm, partnership, association, agency,

3

corporation, or other legal, business, or government entity.

14.      "Policy" and "Policies" refer to any Document related to a rationale, method, procedure, or course of action that is used in order to guide Your pharmacy business and practices, business transactions, or compliance with legal requirements.

15.      "POM" means Your Pharmacy Operations Manual.

16.      "Prescriber" means a Person whose name appears on a prescription as the issuer of the prescription.

17.      "Refusal-To-Fill Form" and "RTF Form" mean any form completed by one of Your pharmacists to report a decision to refuse to fill a Controlled Substance prescription, regardless of how the form was submitted (whether by webform, facsimile, in hard copy, *etc.*).

18.      "Regarding" and "related" are to be understood in their broadest sense, and include identifying, evidencing, summarizing, commenting upon, referring to, mentioning, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, pertaining to, summarizing, analyzing, addressing, interpreting, recording, including, supporting, negating, contradicting, manifesting, containing, constituting, concerning, comprising, associated with, or resulting from the subject matter identified.

19.       "You," "Your," and "Yours" refer to Defendants Walmart Inc. and Wal-Mart Stores East, LP, and any director, officer, employee, representative, agent, intermediary, or Person acting on behalf of either Defendant.

## INSTRUCTIONS

1.      Except as otherwise provided in these instructions, these Requests require the production of all Documents responsive to one or more of the Requests set out below that are in the possession, custody, or control of Defendants, regardless of where located.

4

2.      Each responsive Document must be produced in the manner in which it is or has been maintained in the ordinary course of business—*e.g.*, Documents attached to each other must not be separated and any photocopies produced must be bound in the same manner as the originals.

3.      Each production of Documents pursuant to these Requests shall identify with particularity which Documents are responsive to which specific, enumerated Request(s).

4.      If no Documents exist that are responsive to a specific Request, a written statement to that effect shall be provided at the time of production or when Your production is complete.

5.      If any Document otherwise responsive to a Request is not produced because it was lost, destroyed, discarded, or otherwise no longer in the possession, custody, or control of Defendants:

      a.  Identify the Document by type, date, and title;

      b.  Identify the Person who last had custody or control over the Document;

      c.  State the date on which the Document was destroyed or was discovered to have been lost;

      d.  If the Document was destroyed, state why it was destroyed and identify the Person(s) who destroyed it;

      e.  If the Document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the Person(s) who discovered its loss and who last saw or otherwise accounted for it;

      f.  Identify all Persons who have knowledge pertaining to the destruction or loss

of the Document, giving a concise but complete statement of the knowledge

You claim each such Person has;

g.    Identify all Persons who have knowledge of the contents of each lost or

destroyed Document, giving a concise but complete statement of the

knowledge You claim each such Person has; and

h.    Produce all existing indices, lists, or other Documents in Your possession,

custody, or control that reflect the existence of such lost or destroyed

Documents, and/or their transfer or destruction.

6.    To the extent that Documents responsive to these Requests are in the possession,

custody, or control of third parties, these Requests require a written statement to that effect at the

time of production, specifically providing the name, address, telephone number, and principal

contact of the third party, and shall further identify those Documents in the third party's

possession.

7.    To the extent any Document responsive to these Requests was previously produced

to the United States in response to DEA subpoena numbers MW-19-3222366, MW-18-768156,

MW-18-816990, MW-18-817014, or MW-18-817060, in lieu of reproducing the Document, You

may identify the Document by Bates number and state which specific, enumerated Request(s) the

Document is responsive to.

8.    If You object to the production of any Document or any portion thereof because of

the attorney-client privilege, the attorney work product doctrine, or any other privilege, You shall

identify such Documents on a privilege log.  The privilege log shall be produced in accordance with

Section IV of the Order Regarding Discovery of Documents and Electronically Stored Information,

D.I. 132.

9.      When a Document responsive to these Requests contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a Document, You must clearly indicate the portions as to which the privilege is claimed.  Any redaction must be clearly visible on the redacted Document.

10.      If You object to any of the Requests, state in Your response whether Documents are being withheld from inspection and production on the basis of such objection, or whether inspection and production of the responsive Documents will occur notwithstanding such objection.

11.      The terms "all," "any," and "each" encompass "any and all" and shall be construed liberally to achieve the fullest disclosure of information.

12.      Regardless of whether a Request seeks "all" or "any" Documents or "each" Document, Defendants are required to produce all responsive non-privileged Documents in their possession, custody, or control.

13.      The singular form of a noun or pronoun shall be considered to include within its meaning the plural form as well and vice versa.

14.      All present tenses of verbs or verb forms shall be considered to include within their meaning the future and past tenses as well and vice versa.

15.      "And" and "or" shall be construed conjunctively and shall not be interpreted disjunctively to exclude any information otherwise within the scope of the Request.

16.      "Include" and "including" shall be construed as broadly as possible and shall mean "without limitation."

17.      Electronically Stored Information ("ESI") and digitized ("scanned") images shall

7

be produced in accordance with the attached Specifications for Production of ESI and Digitized ("Scanned") Images.

18.     No agreement, understanding, or stipulation by the United States or any of its representatives purporting to modify, limit, or otherwise vary these Requests shall be valid or binding on the United States unless confirmed or acknowledged in writing (or made of record in open court) by a duly authorized representative thereof.

19.     Unless otherwise stated, the timeframe for the Documents requested herein is the Dispensing Violations Period as defined in the Complaint, *see* ¶ 17, that is, June 26, 2013 to present.  You are instructed to produce Documents responsive to the Requests that were created, in effect, exchanged, transmitted, used, or relied upon during the Dispensing Violations Period.

20.     These Requests are continuing in nature as set forth in Fed. R. Civ. P. 26(e).  The Requests therefore require periodic and timely supplementation up to and through the completion of any trial of this Action.

## REQUESTS FOR PRODUCTION

1.     Documents, including electronic and hard copy records, showing all Controlled Substances dispensed by Your pharmacies, including all fields for those fills in Your pharmacy software system(s).

2.     Documents, including electronic and hard copy records, showing any of the following non-Controlled Substances (including all brand name and generic versions, and drugs that include one of the below substances in combination with other substances) dispensed by Your pharmacies, including all fields for those fills in Your pharmacy software system(s):

        a.     Carisoprodol;

        b.     Chlorzoxazone;

        c.      Cyclobenzaprine;

        d.      Doxylamine;

        e.      Gabapentin;

        f.      Hydroxyzine;

        g.      Loperamide;

        h.      Norvir;

        i.      Orphenadrine;

        j.      Ritonavir; and

        k.      Trazodone.

3.     Patient profiles from Your pharmacy software system(s) for all customers for whom You filled Controlled Substance prescriptions, including all fields in the patient profiles.

4.     RTF Forms and summaries of RTF Forms not already produced to the United States in response to DEA subpoenas numbered MW-18-768156, MW-18-816990, MW-18-817014, MW-18-817060, and MW-19-322366.

5.     Documents related to Blanket Refusals, including the forms submitted to report Blanket Refusals (including the comments field).

6.     Documents sufficient to identify Centrally Blocked Prescribers and the dates when the Central Blocks were in effect, which have not already been produced to the United States in response to DEA subpoenas numbered MW-18-768156, MW-18-816990, MW-18-817014, MW-18-817060, and MW-19-322366.

7.     Organization charts as follows:

        a.      Organization charts that reflect the corporate divisions that reported to the Chief Executive Officer, Wal-Mart US and at least two reporting divisions

below the first tier that reported directly to the CEO.  Do not produce

duplicate organization charts.  Instead, produce an organization chart

reflecting the organizational structure in effect at the beginning of the

Dispensing Violations Period and charts that reflect changes to that

structure through the present;

b.      Organization charts for Health & Wellness, Professional Services, Global

Chief Compliance Office, Professional Affairs, Compliance, Health &

Wellness Compliance U.S., Global Ethics and Compliance Systems and

Analytics, and Regulatory Affairs, as well as organization charts specific

to these components, to the extent that the charts responsive to this subpart

are not duplicative of the charts responsive to subpart a.

8.      Documents identifying the structure and personnel of the Compliance Office.

9.      Annual performance evaluations for all Employees who held any of the following

positions at any time during the Dispensing Violations Period:

a.      Senior Vice President and President, Walmart Health & Wellness;

b.      Vice President, Health & Wellness Compliance;

c.      Vice President, Professional Affairs, Health & Wellness Compliance

Officer, Health & Wellness;

d.      Vice President, Global Ethics and Compliance Systems and Analytics;

e.      Senior Director II, Health & Wellness Practice Compliance;

f.      Senior Director I, Health & Wellness Practice Compliance;

g.      Senior Director I, Health & Wellness Compliance;

h.      Senior Director, Regulatory Affairs, Health & Wellness;

i.     Senior Director, Health & Wellness Quality Improvement and Clinical Services;

j.     Senior Director, Quality Improvement and Professional Relations (or Professional Relations and Quality Improvement), Health & Wellness;

k.     Senior Director, U.S. Ethics and Compliance, Health & Wellness Practice Compliance;

l.     Director, Health & Wellness Practice Compliance (excluding any Employees who held the positions of Director, Health & Wellness Practice Compliance (Optical) or Director, Health & Wellness Practice Compliance (Clinical Services));

m.     Director, Health & Wellness Practice Compliance (Controlled Substances);

n.     Director, U.S. Ethics & Compliance, Health & Wellness Practice Compliance;

o.     Head of Regulatory Affairs (regardless of title) who reported to the Vice President of Professional Affairs/Health & Wellness Compliance Officer, Health & Wellness;

p.     Head of Compliance (regardless of title) who reported to the Vice President of Professional Affairs/Health & Wellness Compliance Officer, Health & Wellness;

q.     Director, Pharmacy Regulatory Affairs, Health & Wellness;

r.     Senior Manager II, Health & Wellness Practice Compliance;

11

s.      Senior Manager, Health & Wellness Practice Compliance (excluding any Employees who held the positions of Senior Manager, Health & Wellness Practice Compliance (Optical) or Senior Manager, Health & Wellness Practice Compliance (Health Services));

t.      Senior Manager, Health & Wellness Practice Compliance (Controlled Substances);

u.      Senior Manager, Health & Wellness Practice Compliance, Controlled Substances-Regulatory Affairs;

v.      Senior Manager, Health & Wellness Practice Compliance, Rapid Response;

w.      Senior Manager, Controlled Substances, Regulatory Affairs, Health & Wellness;

x.      Senior Manager, Health & Wellness Compliance-Risk Mitigation;

y.      Senior Analyst, Health & Wellness Practice Compliance;

z.      Analyst, Health & Wellness Practice Compliance;

aa.     Analyst I, Health & Wellness Practice Compliance; and

bb.     Temporary Analyst, Health & Wellness Practice Compliance.

10.     Documents related to the removal of the comments field in the RTF Form, including Documents reflecting the reasons for the removal and Communications with pharmacists about the removal.  *See* WMT_EDTX_00115346.

11.     Documents related to the dashboard report created to "help facilitate the follow up" with pharmacists who submitted RTF Forms and requested to be contacted, *see* WMT_EDTX_00115346, including a screenshot of the dashboard report.

12

12.     Documents related to the assertion that "no blanket refusals are allowed by the Boards of Pharmacy," *see, e.g.,* WMT_DOJ_000340366, including Documents supporting this assertion.

13.     Documents related to the reasons for Your policy prohibiting pharmacists from Blanket Refusing a Prescriber's prescriptions.  *See* WMT_DOJ_000363095.

14.     Communications with pharmacists related to Your policy prohibiting pharmacists from Blanket Refusing a Prescriber's prescriptions.

15.     Documents related to the removal of the following sentence from the March 2011 version of POM 1311: "Blanket refusals of prescriptions are not allowed," which occurred no later than July 2015, *compare* WMT_DOJ_000363095 *with* WMT_DOJ_000547930, including Documents reflecting the reasons for the removal and the date it occurred.

16.     Documents related to the reasons for Your policy to reverse the prohibition against Blanket Refusals and to instead permit pharmacists to Blanket Refuse a Prescriber's prescriptions.

17.     Documents related to the instruction that any pharmacist's decision to Blanket Refuse a Prescriber's prescriptions be communicated only through an oral communication, as reflected in POM 1311.  *See, e.g.*, WMT_DCO_00000061.

18.     Documents related to the addition of a comments field to the Blanket Refusal submission form.  *See* WMT_DOJ_000555742.

19.     Documents related to discontinuing the use of the Boilerplate POM 1311 Response, including Documents reflecting the reasons for the discontinuation.

20.     Documents related to the reasons for implementing the Centrally Blocked Prescriber program.

21.     Document in color that shows the highlighting in the document Bates numbered WMT_EDTX_00236765-66.

22.     With respect to RTF Forms and Communications from Your pharmacists about any individual Prescriber's Controlled Substance prescriptions, including those listed below, Documents related to any subsequent contact with those pharmacists about the information they reported or communicated:

        a.        WMT_EDTX_00048371;

        b.        WMT_EDTX_00246484;

        c.        WMT_EDTX_00047862 at row 3130;

        d.        WMT_EDTX_00062429;

        e.        WMT_EDTX_00058731;

        f.        WMT_EDTX_00065205;

        g.        WMT_EDTX_00137794-95;

        h.        WMT_DOJ_000296686;

        i.        WMT_EDTX_00040701;

        j.        WMT_EDTX_00055249;

        k.        WMT_DOJ_000296454;

        l.        WMT_DOJ_000296584;

        m.        WMT_DOJ_000296648;

        n.        WMT_EDTX_00045716;

        o.        WMT_EDTX_00141724;

        p.        WMT_DOJ_000215420;

        q.        WMT_DOJ_000270823;

r.   WMT_EDTX_00155749;

s.   WMT_EDTX_00155741;

t.   WMT_EDTX_00264294;

u.   WMT_EDTX_00210467;

v.   WMT_EDTX_00135566;

w.   MDL Trial Exh. P-26892_00001;

x.   WMT_DOJ_000258287;

y.   WMT_DOJ_000258309;

z.   WMT_DOJ_000258705;

aa.   WMT_EDTX_00241899;

bb.   WMT_DOJ_000008751;

cc.   WMT_EDTX_00241913;

dd.   WMT_EDTX_00241899;

ee.   WMT_EDTX_00063287;

ff.   WMT_EDTX_00064254;

gg.   WMT_DOJ_000553438-40;

hh.   WMT_EDTX_00070511;

ii.   WMT_EDTX_00044801;

jj.   WMT_EDTX_00138197;

kk.   WMT_EDTX_00045613;

ll.   WMT_EDTX_00046481;

mm.   WMT_DOJ_000214235;

nn.   WMT_EDTX_00247930;

15

oo.    WMT_EDTX_00171617;

pp.    WMT_EDTX_00260794;

qq.    WMT_EDTX_00123434;

rr.    WMT_EDTX_00205526;

ss.    WMT_EDTX _00137354;

tt.    WMT_EDTX_00047861;

uu.    WMT_DOJ_000249255;

vv.    WMT_DOJ_000249254;

ww.    WMT_EDTX_00008498;

xx.    WMT_DOJ_000212509;

yy.    WMT_EDTX_00008498;

zz.    WMT_DOJ_000212509 at row 24;

aaa.    WMT_EDTX_00202845;

bbb.    WMT_EDTX_00139110 at WMT_EDTX_00139175;

ccc.    WMT_EDTX_00202845;

ddd.    SDWVA-CPB-000000152 at row 5;

eee.    WMT_DOJ_000170694;

fff.    WMT_EDTX_00040322 at row 57;

ggg.    WMT_EDTX_00040322 at row 58;

hhh.    WMT_EDTX_00040322 at row 60;

iii.    WMT_DOJ_000206689;

jjj.    WMT_EDTX_00040322 at rows 10-14;

kkk.    WMT_DOJ_000307758;

16

lll.    WMT_EDTX_00242161;

mmm. WMT_EDTX_00064910;

nnn.   WMT_EDTX_00207706 at 66;

ooo.   WMT_EDTX_00220651 at 86;

ppp.   WMT_EDTX_00223775 at 56;

qqq.   WMT_DOJ_000398521 at WMT_DOJ_000398521;

rrr.    WMT_EDTX_00064884 at rows 58, 160, 180, 184, 187, 190, and 192;

sss.    WMT_DOJ_000398521;

ttt.    WMT_DOJ_000227721;

uuu.   WMT_EDTX_00129230 at WMT_EDTX_00129279;

vvv.   WMT_DOJ_000309819;

www. WMT_EDTX_00144482 at WMT_EDTX_00144542–43;

xxx.   WMT_DOJ_000418534;

yyy.   WMT_EDTX_00212342 at WMT_00212413–15;

zzz.   WMT_DOJ_000282735;

aaaa.  WMT_EDTX_00000062;

bbbb.  WMT_DOJ_000545535;

cccc.  WMT_EDTX_00000097;

dddd.  WMT_DOJ_000544073;

eeee.  WMT_DOJ_000213919;

ffff.   WMT_DOJ_000273136;

gggg.  WMT_EDTX_00045728 at WMT_EDTX_00045773;

hhhh.  WMT_DOJ_000270593 at WMT_EDTX_000266519;

17

iiii.　WMT_DOJ_000268668;

jjjj.　WMT_DOJ_000269697;

kkkk.　WMT_DOJ_000270593;

llll.　WMT_ EDTX_00245596;

mmmm.　　WMT_DOJ_000267860;

nnnn.　WMT_DOJ_000213913;

oooo.　WMT_DOJ_000269101;

pppp.　WMT_DOJ_000268287;

qqqq.　WMT_EDTX_00221319 at WMT_EDTX_00221458;

rrrr.　WMT_DOJ_000269703;

ssss.　WMT_EDTX_00264847 at line 632331362;

tttt.　WMT_DOJ_000235584 at WMT_DOJ_000235689;

uuuu.　WMT_EDTX_00057634 at WMT_EDTX_00057653;

vvvv.　WMT_EDTX_00055482 at WMT_EDTX_00055550;

wwww.　　WMT_EDTX_00087738;

xxxx.　WMT_EDTX_00104919;

yyyy.　WMT_EDTX_00061226 at WMT_EDTX_00061274;

zzzz.　WMT_EDTX_00054907 at WMT_EDTX_00054935;

aaaaa.　WMT_EDTX_00264847 at line 2045;

bbbbb.　WMT_DOJ_000268993;

ccccc.　WMT_DOJ_000267230;

ddddd.　WMT_EDTX_00061226;

eeeee.　WMT_DOJ_000310119;

18

fffff.　WMT_DOJ_000310523;

ggggg.　WMT_DOJ_000272006;

hhhhh.　WMT_EDTX_00044293 at WMT_EDTX_00044306;

iiiii.　WMT_DOJ_000307557; and

jjjjj.　WMT_EDTX_00222080 at WMT_EDTX_00222154.

23.　Documents related to any decisions made or actions taken by You that were specific to a Prescriber who was the subject of an RTF Form or other Communication from Your pharmacists about any individual Prescriber's Controlled Substance prescriptions, including the RTF Forms and Communications identified in Request 22 above.

24.　With regard to the email sent to pharmacists who requested to be contacted following submission of an RTF Form, *see, e.g.*, WMT_MDL_001100998, Documents related to the inclusion of the following sentences: "Do not reply to this email with the additional details regarding the Refusal to Fill.  Only phone calls or phone messages are acceptable forms of communication."

25.　Documents related to any request to be contacted by a pharmacist who submitted an RTF Form, including:

a.　Audio recordings of phone messages left by pharmacists;

b.　Audio recordings of phone calls with pharmacists;

c.　Transcripts of audio recordings of phone messages and phone calls;

d.　Notes of phone messages and phone calls;

e.　Logs of phone messages and phone calls; and

f.　Documents related to any follow up actions taken or decisions made that were based on information provided by any pharmacist about a refusal to

19

fill and were specific to an individual Prescriber's Controlled Substance prescriptions.

26.    Communications to and from Your pharmacists related to (i) particular Prescribers' Controlled Substance prescriptions, (ii) exercising corresponding responsibility, *see* 21 C.F.R. § 1306.04, or professional judgment, and (iii) Your Policies related to any of these subject areas, including any hotline Communication and emails to and from the following email addresses:

    a.    ████████████ @wal-mart.com;

    b.    ██████ @walmart.com;

    c.    █████ @wal-mart.com;

    d.    ████ @walmart.com;

    e.    ███ @wal-mart.com;

    f.    ██████████ @wal-mart.com; and

    g.    ███████ @walmart.com.

27.    Documents related to the reasons for creating the Controlled Substances Work Group's Refusal to Fill project.

28.    Documents related to defining the purpose of the Controlled Substances Work Group's Refusal to Fill project as follows: "Establish a process for analysis of refusal to fill data and reporting problematic prescribers or patients internally." *See* WMT_DOJ_000060453.

29.    Documents identifying the members of the RTF Workgroup. *See* WMT_DOJ_000039815.

30.    Communications regarding the Controlled Substances Work Group's Refusal to Fill project.

31.     Documents related to meetings where the Controlled Substances Work Group's Refusal to Fill project was discussed, including meeting minutes and notes of meetings, including meetings of the RTF Work Group.

32.     Documents reflecting proposals, goals, timelines, and progress of the Controlled Substances Work Group's Refusal to Fill project.

33.     Documents reflecting the reasons for the elimination of the Controlled Substances Work Group's Refusal to Fill project as a stand-alone project.

34.     Documents related to the Health & Wellness Compliance Oversight Committee, including:

     a.     minutes of meetings;

     b.     Communications among committee members;

     c.     presentations made during meetings; and

     d.     Documents reflecting committee goals, timelines, and progress.

35.     Documents related to the Controlled Substances Governance team, including:

     a.     Documents reflecting reasons for establishing the team;

     b.     minutes of meetings;

     c.     Communications among team members;

     d.     presentations made during meetings; and

     e.     Documents reflecting team goals, timelines, and progress.

36.     Documents related to the Health & Wellness Compliance Focus Areas Steering Meetings, including:

     a.     monthly PowerPoint summaries;

     b.     minutes of meetings; and

      c.      Communications among meeting attendees.

37.    Documents related to efforts to "[e]nhance RTF reporting, analysis and POS utilization" as part of Your "Accelerated Controlled Substance efforts." *See* WMT_DCO_00001696.

38.    Documents related to adding RTF and Blanket Refusal information to Connexus, including:

      a.      Documents related to the reasons for making RTF and Blanket Refusal information available to pharmacists in Connexus;

      b.      Documents related to the decision to show only the number of RTF and Blanket Refusal submissions in Connexus;

      c.      Documents related to the timing of rolling out this feature to Your pharmacies;

      d.      Documents related to how You informed pharmacists about the availability of RTF and Blanket Refusal information in Connexus;

      e.      Documents related to the decision to not include in POM 1311.2 a section explaining that Connexus contained information about RTF and Blanket Refusal submissions;  and

      f.      Documents related to how You informed pharmacists about the option to launch Archer from Connexus to obtain additional information about a Prescriber or customer and guidance about using this tool.

39.    Documents related to RTF and Blanket Refusal submissions made visible to pharmacists through Archer, including:

    a.       Documents identifying when RTF and Blanket Refusal information was made available to Your Employees, including when this information was made available to different sets of Employees;

    b.       Documents related to how You informed Employees about the availability of the Archer tool to obtain information about RTF and Blanket Refusal submissions; and

    c.       Documents identifying the information visible to pharmacists when searching for Prescriber information in Archer, including a screenshot of the results that would display from searching for RTF and Blanket Refusal submissions related to a Prescriber and a screenshot of the information that would display about any particular RTF or Blanket Refusal submission.  *See* WMT_CN_000008435 at 7.

40.    Documents related to the Controlled Substances Work Group's Controlled Substances Risk Mitigation project, including:

    a.       Documents reflecting reasons for establishing the project;

    b.       Communications regarding the project;

    c.       Documents reflecting the risk mitigation plan, execution of which was defined as the purpose of the project, *see, e.g.,* WMT_DOJ_000041051;

    d.       the Controlled Substances risk assessment, which identified risks that this project was designed to mitigate, *see, e.g.*, WMT_DOJ_000041051 at WMT_DOJ_000041084;

    e.       Documents related to the project's goal of creating a "[p]rocess for analysis of refusal to fill data," *see, e.g.*, WMT_DOJ_000041051 at

WMT_DOJ)000041084, including Documents identifying and defining the process, the timeline, and progress;

    f.    Documents related to the "plan to address prescribers highlighted through RTF data," including the initial proposal developed by in or about October-November 2015, *see* WMT_DOJ_000034984 at 35006, subsequent proposals, and Communications regarding the same;

    g.    Documents reflecting the project's timeline and progress; and

    h.    Documents related to the completion of the project in or about February 2016, *see* WMT_MDL_000077168 at 77187, including project summaries.

41.    Following completion of the Controlled Substances Risk Mitigation project, Documents related to any projects that:

    a.    affected the process by which Your pharmacists reported refusals to fill Controlled Substance prescriptions;

    b.    affected Your use and analysis of information from Your pharmacists about their refusals to fill Controlled Substance prescriptions; and

    c.    affected the information available to Your pharmacists about refusals to fill Controlled Substance prescriptions, whether their own refusals or those by other pharmacists.

42.    Documents related to the Controlled Substances Work Group's Diversion Analytics project, including:

    a.    Documents reflecting reasons for establishing the project;

    b.    Communications regarding the project;

      c.      Documents related to the "Success Measur[e]" of "[i]dentify[ing] chain wide indicators of potential diversion activity," *see. e.g.*, WMT_DOJ_000060843 at 60862, including Documents identifying the chain wide indicators and data and data analyses regarding those indicators;

      d.      Documents related to the "Key Deliverabl[e]" of "[p]roduc[ing] red flag indicators based upon specific criteria based queries," *see* WMT_DOJ_000060843 at 60862, including Documents identifying the red flag indicators and data and data analyses regarding those indicators;

      e.      Documents reflecting the project's timeline and progress; and

      f.      Documents reflecting the reasons for terminating the project, *compare* WMT_MDL_000422145 at slides 5 and 7 *with* WMT_MDL_000088563 at 000088579.

43.      Documents related to the Ethics, Compliance, and Risk Committee, including:

      a.      minutes of meetings;

      b.      Communications among committee members; and

      c.      presentations made during meetings.

44.      Documents related to the Advisory Group established as a result of the Corporate Processes Project of the Controlled Substances Workstream, including meeting minutes and notes of meetings and Communications. *See* WMT_DOJ_000060543 at 000060580.

45.      U.S. Compliance systems portfolio reports and related Correspondence. *See, e.g.,* WMT_MDL_001217727-28.

46.     Documents related to Health & Wellness projects within U.S. Compliance's portfolio, including:

      a.     status updates from U.S. Compliance to Health & Wellness regarding Health & Wellness projects within Compliance's portfolio and related Correspondence;

      b.     executive updates from U.S. Compliance regarding its project portfolio and related Correspondence;

      c.     U.S. Compliance summaries of approved projects;

      d.     "case documents" or any Document related to Health & Wellness projects within U.S. Compliance's portfolio, whether or not the proposal was submitted to U.S. Compliance and whether or not the project became part of U.S. Compliance's portfolio.

47.     Information Systems Division's "Weekly RR Prioritization for Compliance and Business Projects" Excel spreadsheets and the emails distributing them. *See, e.g.*, WMT_DOJ_000145780-81.

48.     Documents related to the Health & Wellness Compliance National Assessment Program, including:

      a.     all reports, including executive summary, progress, ad hoc, and final reports;

      b.     drafts of the reports listed in subpart (a) above; and

      c.     Communications regarding the drafts and reports identified above in subparts (a) and (b).

49.     Mitigation status reports submitted to the Health & Wellness Oversight Committee Meeting.

50.     Documents identifying all Controlled Substances identified as a High Risk Medication in Connexus.

51.     Documents related to identification of highly diverted or abused Controlled Substances, including:

      a.     lists of highly diverted drugs derived from Global Investigation's Hot List and Diversion Hot Lists; and

      b.     Documents related to the selection of Controlled Substances included in any list of highly diverted or abused drugs.

52.     Documents related to Drug Utilization Review (DUR) alerts or edits in Your pharmacy software program (including Connexus) for any Controlled Substance or any drug combination that includes a Controlled Substance, including:

      a.     Documents sufficient to identify DUR alerts and computer program edits;

      b.     Documents related to proposals to implement DUR alerts or edits for any Controlled Substance or any drug combination that includes a Controlled Substance;

      c.     Data related to any DUR alerts or edits, including "trinity" DUR warning data, *see* WMT_DCO_00001696, including Documents containing the data, analyses of the data, and Communications about the data or analyses of the data; and

27

      d.      Data related to a computer program edit for prescriptions for more than twenty tablets per day or for amounts that exceeded certain daily limits, *see* WMT_EDTX_00123434.

53. Controlled Substances training modules for Your pharmacists that were revised or eliminated sometime between February 1, 2013 and January 31, 2014, which resulted in reducing two hours' worth of training, and the Controlled Substances modules that remained in use after these changes. *See* WMT_DOJ_000067779 at 000067794.

54. Diversion training modules that were "expired" sometime between February 1, 2013 and January 31, 2014, and the diversion modules that remained in use after January 31, 2014. *See* WMT_DOJ_000067779 at 000067794.

55. The pain management curriculum that You developed in partnership with the American Pharmacists' Association.

56. Documents related to Your ability to direct, guide, or in any way affect the decisions by Your pharmacists to fill or refuse to fill a prescription.

57. Documents related to calculations and analyses assessing the impact of Your pharmacy customers on Your sales, revenues, profit, or foot traffic through Your retail stores.

58. Documents related to calculations and analyses comparing purchases by pharmacy customers compared to non-pharmacy customers.

59. Documents related to surveys conducted by the Agency for Healthcare Research and Quality, including Community Pharmacy Surveys on Patient Safety Culture, including:

      a.      survey results completed by Your pharmacists;

      b.      compilations, summaries, and analyses of survey results;

      c.      Communications with the Agency for Healthcare Research and Quality

           and its representatives; and

      d.      Documents related to actions taken or considered by You after any

           analysis of survey results.

60.     Documents related to any surveys completed by Your pharmacists related to their

employment, including:

      a.      survey results completed by Your pharmacists;

      b.      compilations, summaries, and analyses of survey results; and

      c.      Documents related to actions taken or considered by You after any

           analysis of survey results.

61.     Documents related to Your participation in efforts by the National Association of

Chain Drug Stores to draft the document entitled "Stakeholder's Challenges and Red Flag

Warning Signs Related to Prescribing and Dispensing Controlled Substances," including

Documents related to Your decision not to be a signatory to that document.

62.     Documents related to pharmacies placed under a Suspicious Order Monitoring

("SOM") Remediation Plan, including:

      a.      Documents identifying all pharmacies placed under an SOM Remediation

           Plan;

      b.      Documents reflecting the process by which You identified each pharmacy

           subject to an SOM Remediation Plan;

      c.      Documents reflecting the requirements of each pharmacy's SOM

           Remediation Plan;

     d.      Documents reflecting the steps taken during execution of the SOM

            Remediation Plan;

     e.      Documents reflecting the training given to Your Employees at each

            pharmacy placed under an SOM Remediation Plan; and

     f.      Documents related to interviews of Employees of pharmacies conducted

            as part of an SOM Remediation Plan.

63.     Documents related to pharmacies identified as "high" and "very high" risk

locations based on SupplyLogix evaluations.

64.     All versions of POM 1311 in effect at any time from January 1, 2009 on,

including all of its related parts (*e.g.*, FAQs, Patient Communication Guidance, Leadership

Message) and all of its sections (*e.g.* POM 1311.1-1311.4).

65.     Documents related to the following addition to POM 1311's list of red flags in or

about February 2017: "Prescriber is under investigation or has been disciplined for inappropriate

prescribing of controlled substances." *See* WMT_DOJ_000553669-71.

Dated:  August 20, 2024

DAVID C. WEISS
United States Attorney for the
District of Delaware

DYLAN STEINBERG
Chief, Civil Division
ELIZABETH F. VIEYRA
Assistant United States Attorney
1313 N. Market Street
Wilmington, DE 19801
Elizabeth.vieyra@usdoj.gov
302-573-6148

AMANDA. N. LISKAMM
Director, Consumer Protection Branch
U.S. Department of Justice, Civil Division

RACHAEL DOUD
Assistant Director

*/s/ Katherine M. Ho*
KATHLEEN G. BRUNSON
KATHERINE M. HO
KIMBERLY R. STEPHENS
Trial Attorneys
P.O. Box 386
Washington, DC 20044
katherine.ho@usdoj.gov
202-353-7835

ROGER B. HANDBERG
United States Attorney for the
Middle District of Florida

CAROLYN B. TAPIE
LINDSAY S. GRIFFIN
Special Attorneys to the Attorney General
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Carolyn.b.tapie@usdoj.gov
813-274-6000

BREON PEACE
United States Attorney for the Eastern
District of New York

ELLIOT M. SCHACHNER
MEGAN FREISMUTH
Special Attorneys to the Attorney General
271 Cadman Plaza East
Brooklyn, NY 11201
Elliot.schachner@usdoj.gov
718-254-7000

MICHAEL F. EASLEY, JR.
United States Attorney for the Eastern
District of North Carolina

C. MICHAEL ANDERSON
ANDREW KASPER
Special Attorneys to the Attorney General
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Michael.anderson7@usdoj.gov
919-856-4619

*Counsel for Plaintiff*
*United States of America*

EXHIBIT 2

CONTAINS WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) |
| WALMART INC. and | ) |
| WAL-MART STORES EAST, LP, | ) |
| Defendants. | ) |

Case No. 1:20-cv-1744-CFC-EGT

## WALMART INC. AND WAL-MART STORES EAST, LP'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendants Walmart Inc. and Wal-Mart Stores East, LP, (collectively, "Walmart") hereby object and respond to Plaintiff's First Set of Requests for Production ("Requests").

## PRELIMINARY STATEMENT

Walmart has been the subject of the government's investigation since at least 2016. In that time, Walmart has produced to Plaintiff over 215,000 documents and over six million lines of dispensing data related to hundreds of different prescribers. Plaintiff also has access to over 500,000 documents that Walmart has produced during more than six years of discovery in *In re National Prescription Opiate Litigation*, Case No. 17-MD-2804 (N.D. Ohio) ("the MDL"). The MDL documents

THESE PAGES CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

include documents from the files of more than 120 custodians, which were produced by Walmart in five MDL bellwether tracks, in other opioid-related litigation filed in 13 state and other federal courts, and in response to investigations by seven state attorneys general. The MDL document productions were shaped by rounds of negotiations with the underlying plaintiffs (or governmental entities). Further, Walmart has already produced to Plaintiff in this case over 50 depositions taken or produced in such opioid-related litigation, including seven corporate representative depositions. Walmart now responds to Plaintiff's requests in light of the immense body of information already accessible to Plaintiff, in accordance with Federal Rule of Procedure 26(b)(1).

Upon receiving these Requests, Walmart has undertaken a reasonable and good faith effort to provide the information sought by Plaintiff's Requests to the extent the requested information is not subject to objection. Walmart notes that discovery is ongoing and additional information may be obtained that may alter these responses. Walmart provides these responses and objections based upon information that has been collected and reviewed to date for this matter and other opioid-related litigation.

Accordingly, all of the following responses are given without prejudice to, and with the express reservation of, Walmart's right to supplement or modify its responses and objections to address additional information, and to rely upon any and

RESTRICTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

all such information and documents at trial or otherwise. Likewise, Walmart shall not be prejudiced if any of its present responses and objections are based on incomplete knowledge or comprehension of the facts, events, or occurrences involved in this matter. Additionally, Walmart provides these responses based on its good faith understanding of each of Plaintiff's Requests. If Plaintiff subsequently asserts interpretations different than those understood by Walmart and upon which Walmart's responses are based, Walmart reserves the right to supplement or amend its responses accordingly.

Walmart notes that its responses to Plaintiff's Requests do not constitute an admission or acknowledgement that documents within the categories Plaintiff requests exist, are within Walmart's possession, custody, and control, or are discoverable. By identifying in its responses to Plaintiff's Requests any documents previously produced to Plaintiff or which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92), Walmart does not admit that such documents are relevant or discoverable in this case.

By responding to these Requests, Walmart does not waive any objections that it may have to the use at any hearings or at trial, or admission into evidence, of these responses, or any documents and things produced in response to these Requests, on any applicable grounds.

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Walmart will produce documents in accordance with the Court's Order Regarding Discovery of Documents and Electronically Stored Information ("ESI Order") (D.I. 132) and Protective Order (D.I. 88), and any such other agreements the parties reach in this case. Additionally, Walmart's counsel is prepared to meet and confer with Plaintiff's counsel concerning disputes about the meaning, scope, and relevance of Plaintiff's Requests, or about Walmart's responses.

## GENERAL OBJECTIONS

1.      These general objections apply to and are incorporated into each of the specific responses to individual requests for production set forth below and have the same force and effect as if they were fully set forth therein, whether or not expressly incorporated by reference in the specific responses. These objections are set forth here to avoid repetition.

2.      Walmart objects to Plaintiff's Requests to the extent they are inconsistent with the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, the ESI Order (D.I. 132) and the Protective Order (D.I. 88).

3.      Walmart objects to Plaintiff's Requests to the extent they call for the production of documents that mention, discuss or refer to information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, the self-investigative or self-critical analysis privilege, the patient safety work product privilege, or any other applicable privilege, immunity, or protection,

RESTRICTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

or to the extent they otherwise call upon Walmart to disclose the mental impressions, conclusions, opinions, or legal theories of Walmart or its attorneys. Nothing contained in these responses, including the identification of previously produced documents, is intended as, or shall in any way be deemed to be, a waiver of such privileges, protections, or immunities, and nothing herein shall put in issue, or constitute the affirmative use of, advice of counsel or of any privileged or protected communications. To the extent that any such protected material is disclosed in response to these Requests, the production of such information shall not constitute waiver of Walmart's rights to assert the applicability of any privilege or immunity, including as provided for Rule 26(b)(5)(B), the ESI Order (D.I. 132), and the Protective Order (D.I. 88). Moreover, any order requiring disclosure in connection with this litigation shall not operate to waive any privilege or protection in any other federal or state proceeding.

4.      Walmart objects to Plaintiff's Requests to the extent they seek disclosure of information protected by any confidentiality obligation owed to a third party. Walmart will not disclose or produce such information absent notice to and, if required, consent of the third party or entry of a court order compelling production.

5.      Walmart objects to Plaintiff's Requests to the extent they seek personal health information ("PHI") protected under the Health Insurance Portability and

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Accountability Act (HIPAA). *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.101 *et seq.*; *see also* Protective Order (D.I. 88).

6.     Walmart objects to Plaintiff's Requests to the extent they seek documents and information through these Requests which were previously produced to Plaintiff or which Plaintiff already has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). To the extent Walmart refers Plaintiff to documents that were previously produced or to which Plaintiff already has access, Walmart does not admit that such documents are relevant or discoverable in this case.

7.     Walmart objects to Plaintiff's definition and characterization of the language set forth in WMT_DOJ_000340366 as the "Boilerplate POM 1311 Response." Walmart refers to the referenced document for a complete and accurate statement of its contents.

8.     Walmart objects to Plaintiff's definition of "Central Block" to the extent Plaintiff states that it has the same meaning as "prescriber block." "Prescriber block" is vague and ambiguous. Walmart will understand "Central Block" or "Corporate Block" to refer to a prohibition by Walmart on filling any controlled-substance prescription written by a single prescriber imposed on all pharmacists who work at a Walmart pharmacy.

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

9. Walmart objects to Plaintiff's definition of "Controlled Substance" to the extent it encompasses any substance not identified as a Schedule II-V substance pursuant to 21 C.F.R. §§ 1308.11-1308.15 at some time between June 26, 2013 and December 22, 2020. Schedule I substances are not relevant to this action because Plaintiff brings no claims against Walmart related to Schedule I substances, nor does it base any allegations in the Complaint on such substances. Further, substances that were not identified as a Schedule II-V substance at any particular point between June 26, 2013 and December 22, 2020 are not relevant to this case as controlled substances. *See infra* ¶ 25.

10. Walmart objects to Plaintiff's definition of "Defendants," "You," "Your" and "Yours," as overly broad, unduly burdensome, and not proportional to the needs of this case because these terms are defined to include persons and entities other than Defendants, many of whom are irrelevant to the claims at issue in this case, such as current and former Walmart employees whose work is unrelated to Walmart's pharmacy business or who work outside of the United States. Walmart further objects to this definition because it renders some of Plaintiff's Requests vague, ambiguous, and unworkable. Walmart will interpret "Defendants," "You" and "Your" to mean (a) Walmart Inc. and (b) its subsidiary Wal-Mart Stores East, LP.

RESTRICTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

11.     Walmart objects to Plaintiff's definition of "Dispense," "Dispensing," and "Dispensed," as having the same meaning as defined in 21 U.S.C. § 802(10), in which the term "dispense" is defined to include "the prescribing of a controlled substance."  Walmart will interpret "Dispense" to mean "to deliver a controlled substance to an ultimate user . . . pursuant to the lawful order of[] a practitioner," consistent with 21 U.S.C. § 802(10), as relevant to the conduct at issue in Plaintiff's claims.

12.     Walmart objects to Plaintiff's definition of "Document" to the extent any of the items identified as documents are outside of the scope of the meaning of the term as used in Rules 26 and 34.  Walmart will interpret "Document" to be synonymous in meaning and equal in scope to the usage of the term in Rules 26 and 24, consistent with the definition within the ESI Order (D.I. 132).

13.     Walmart objects to Plaintiff's definition of "Employee" as overbroad, unduly burdensome, vague, and ambiguous because it is defined to mean "any Person," including those with no relevance to this case, no employment relationship with Walmart, and those without any relationship to Walmart at all.

14.     Walmart objects to Plaintiff's definition of "Policy" and "Policies" as overbroad, unduly burdensome, vague, and ambiguous because it encompasses any document "related"—in its "broadest sense"—to any procedure, method, or course

**PAGES CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

of action used to guide Walmart pharmacy practices, business transactions, or legal requirements.

15.     Walmart objects to Plaintiff's definition of "Prescriber" to the extent it is ambiguous as to whether it refers only to an individual licensed and registered to prescribe prescription medications or to medical offices whose names may be included on a prescription.  Walmart will interpret "Prescriber" to mean any physician, surgeon, nurse practitioner, physician assistant, physiatrist, psychiatrist, dentist, podiatrist, nurse, or other person who is or was licensed and registered to prescribe prescription medications.

16.     Walmart objects to Plaintiff's definition of "Refusal-To-Fill" and "RTF Form" because it is ambiguous as to the term "form."  Walmart further objects to Plaintiff's definition as overly broad to the extent it includes facsimile and hard copy documents.

17.     Walmart objects to Instruction No. 1 because it exceeds the scope of discovery under Rule 26 and the ESI Order (D.I. 132).  Walmart will produce documents as required by the Federal Rules of Civil Procedure and the ESI Order (D.I. 132), including by searching "reasonably accessible sources" Walmart identifies.  (*See* D.I. 132).

18.     Walmart objects to Instruction Nos. 2 through 4 because they exceed the discovery obligations imposed on Walmart by Rule 26, Rule 34, and the ESI

PAGES CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Order (D.I. 132), and because they are unduly burdensome. Walmart will produce documents in the manner required by the Federal Rules of Civil Procedure and the ESI Order (D.I. 132).

19.     Walmart objects to Instruction Nos. 5 and 6 because they exceed the discovery obligations imposed on Walmart by Rule 26, Rule 34, and the ESI Order (D.I. 132), and because they are unduly burdensome. Walmart's responses and productions of documents will be based on those documents within Walmart's possession, custody, and control.

20.     Walmart objects to Instruction No. 7 because it exceeds the discovery obligations imposed on Walmart by Rule 26, Rule 34, and the ESI Order (D.I. 132), and because it is unduly burdensome.

21.     Walmart objects to Instruction No. 9 to the extent it is inconsistent with the Protective Order (D.I. 88) or the ESI Order (D.I. 132). Walmart will redact information from produced documents consistent with the Protective Order (D.I. 88) and the ESI Order (D.I. 132), including by marking redactions so they are easily identified by Plaintiff.

22.     Walmart objects to Instruction No. 10 to the extent it exceeds the discovery obligations imposed on Walmart by Rule 26, Rule 34, and the ESI Order (D.I. 132), and because it is unduly burdensome.

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

23.     Walmart objects to Instruction Nos. 11, 12, 13, 14, 15 and 16 to the extent they render Plaintiff's Requests vague, ambiguous, or incomprehensible. Walmart will interpret Plaintiff's Requests based on its good faith understanding of each of Plaintiff's Requests.

24.     Walmart objects to Instruction No. 17 to the extent the Specifications for Production of ESI and Digitized ("Scanned") Images exceed the discovery obligations imposed on Walmart by Rule 26, Rule 34, and the ESI Order (D.I. 132), and because it is unduly burdensome.  Walmart will produce documents in this case consistent with Rule 26, Rule 34, the Protective Order (D.I. 88), and the ESI Order (D.I. 132).

25.     Walmart objects to Instruction Nos. 19 and 20 to the extent they seek documents from after the filing of Plaintiff's Original Complaint on December 22, 2020.  The Dispensing Violations Period is defined in the Original Complaint as June 26, 2013 to present, Compl. ¶ 17.  (D.I. 1).  Walmart understands "present" to mean the date of the initial pleading in this case on December 22, 2020.  Requiring searches for documents after the filing of this action is overly broad, unduly burdensome, and not proportional to the needs of the case because Plaintiff has not alleged claims against Walmart after that date.  Unless stated otherwise, Walmart's responses are limited to the time period June 26, 2013 to December 22, 2020. Walmart further objects to Instruction No. 19 as overly broad, unduly burdensome,

CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

and not proportional to the needs of this case to the extent it seeks documents "that were created, in effect, exchanged, transmitted, used, or relied upon," from June 26, 2013 to December 22, 2020.

### OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**REQUEST 1:** Documents, including electronic and hard copy records, showing all Controlled Substances dispensed by Your pharmacies, including all fields for those fills in Your pharmacy software system(s).

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 1 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks years of nationwide electronic and hard copy dispensing records, including records unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case. Walmart also objects to Request No. 1 to the extent it is duplicative of the over six million lines of dispensing data Walmart previously produced to Plaintiff related to hundreds of different prescribers, including each of the prescribers in Section II.B.1.c of Plaintiff's Complaint. Walmart further objects to Request No. 1 as ambiguous as to the phrase "all fields for those fills in Your pharmacy software system(s)." Walmart also objects to Request No. 1 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks information in "all fields" regardless of the relevance of the information to the parties' claims and defenses in this case. Walmart also objects to Request No. 1 as

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

vague as to the phrase "pharmacy software system(s)" because it is unclear as to

what systems the phrase refers. Walmart further objects to Request No. 1 because

it seeks PHI protected under HIPAA. *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.101

*et seq.*; *see also* Protective Order (D.I. 88).

Subject to and without waiving its specific and General Objections, Walmart

will not respond further to this Request.

**REQUEST 2:** Documents, including electronic and hard copy records,
showing any of the following non-Controlled Substances (including all brand name
and generic versions, and drugs that include one of the below substances in
combination with other substances) dispensed by Your pharmacies, including all
fields for those fills in Your pharmacy software system(s):

      a.      Carisoprodol;

      b.      Chlorzoxazone;

      c.      Cyclobenzaprine;

      d.      Doxylamine;

      e.      Gabapentin;

      f.      Hydroxyzine;

      g.      Loperamide;

      h.      Norvir;

      i.      Orphenadrine;

      j.      Ritonavir; and

      k.      Trazodone.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 2 on

grounds that it is overly broad, unduly burdensome, and not proportional to the needs

RESTRICTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

of the case because it seeks documents related to "non-Controlled Substances," which are not regulated by the Controlled Substances Act, under which Plaintiff's claims are brought. *See* Compl. ¶ 1. Walmart also objects to Request No. 2 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks years of nationwide electronic and hard copy dispensing records unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case. Walmart further objects to Request No. 2 to the extent it is duplicative of the over six million lines of dispensing data Walmart previously produced to Plaintiff related to hundreds of different prescribers, including each of the prescribers in Section II.B.1.c of Plaintiff's Complaint. Walmart also objects to Request No. 2 as vague and ambiguous as to which medications it seeks, particularly to the extent it seeks "drugs that include one of the below substances in combination with other substances." Walmart further objects to Request No. 2 as vague and ambiguous as to the phrase "non-Controlled Substances" because Plaintiff identifies in Request No. 2 a substance, Carisoprodol, that became a schedule IV controlled substance effective January 11, 2012. Walmart further objects to Request No. 2 as ambiguous as to the phrase "all fields for those fills in Your pharmacy software system(s)." Walmart also objects to Request No. 2 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks information in "all fields" regardless of the relevance of the

REDACTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

information to the parties' claims and defenses in this case.  Walmart also objects to Request No. 2 as vague as to the phrase "pharmacy software system(s)" because it is unclear to what systems the phrase refers.  Walmart further objects to Request No. 2 because it seeks PHI protected under HIPAA.  *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.101 *et seq.*; *see also* Protective Order (D.I. 88).

Subject to and without waiving its specific and General Objections, Walmart will not respond further to this Request.

**REQUEST 3:**  Patient profiles from Your pharmacy software system(s) for all customers for whom You filled Controlled Substance prescriptions, including all fields in the patient profiles.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 3 on grounds that it is vague as to the term "patient profiles" because it is unclear to as to how Plaintiff is using the term.  Walmart also objects to Request No. 3 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents or information related to "non-Controlled Substances," which are not regulated by the Controlled Substances Act, under which Plaintiff's claims are brought.  *See* Compl. ¶ 1.  Walmart also objects to Request No. 3 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks years of documents and information for Walmart patients nationwide, unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case.  Walmart also objects to Request No. 3 as

REDACTED — CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

overly broad, unduly burdensome, and not proportional to the needs of the case because it requests "all fields" in "patient profiles" regardless of the relevance of the information to the parties' claims and defenses in this case. Walmart further objects to Request No. 3 because it is vague as to the "pharmacy software system(s)" because it is unclear to what system(s) the phrase refers. Walmart also objects to Request No. 3 because it seeks PHI protected under HIPAA. *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.101 *et seq*.; *see also* Protective Order (D.I. 88).

Subject to and without waiving its specific and General Objections, Walmart offers to meet and confer with Plaintiff regarding Request No. 3.

**REQUEST 4:** RTF Forms and summaries of RTF Forms not already produced to the United States in response to DEA subpoenas numbered MW-18-768156, MW-18-816990, MW-18-817014, MW-18-817060, and MW-19-322366.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 4 on grounds that it is vague as to the phrase "summaries of RTF Forms." Walmart also objects because Request No. 4 is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks documents unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case. Walmart also objects to Request No. 4 because it seeks PHI protected under HIPAA. *See* 42 U.S.C. § 1320d; 45 C.F.R. § 160.101 *et seq*.; *see also* Protective Order (D.I. 88).

Subject to and without waiving its specific and General Objections, Walmart

REDACTED — CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

agrees to produce documents sufficient to show refusals to fill prescriptions documented through webform or Archer by pharmacists who worked at Walmart pharmacies between June 26, 2013 and December 22, 2020 for controlled-substance prescriptions issued by prescribers referenced by their initials in Section II.B.1.c of Plaintiff's Complaint, less prescribers ███████████████████████████.[1] For the avoidance of doubt, these prescribers are identified in Exhibit A to these Responses. Walmart further agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce documents relating to non-privileged refusals to fill prescriptions documented by pharmacists who worked at Walmart pharmacies between June 26, 2013 and December 22, 2020 for controlled-substance prescriptions issued by prescribers referenced in Section II.B.1.c of Plaintiff's Complaint, less prescribers ████████████████ ██████, to the extent such additional documents are identified. "Walmart's Identified Custodians" refers to members of Walmart's pharmacy compliance team that are reasonably likely to have relevant and unique documents responsive to Plaintiff's Requests identified on Exhibit B to these Responses.

---

[1] Plaintiff is no longer pursuing civil penalties under the Second Claim of the Second Amended Complaint for these three prescribers. *See* June 28, 2024 Plaintiff's Objections and Responses to Walmart's Second Set of Requests for Production.

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 5:**  Documents related to Blanket Refusals, including the forms submitted to report Blanket Refusals (including the comments field).

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 5 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, including because it seeks documents unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case.  Walmart also objects to Request No. 5 as vague as to the phrase "Documents related to Blanket Refusals."  Walmart further objects to Request No. 5 as vague as to the terms "the comments field" because it is unclear to which field the phrase refers.  Walmart also objects to Request No. 5 as vague and ambiguous as to the term "forms," because it is unclear to what the term refers.  Walmart further objects to the extent Request No. 5 is duplicative of Requests Nos. 12 through 18.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to Walmart documents related to blanket refusals to fill which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92), including:  WMT_MA_000008510 and WMT_MDL_001816146.  Walmart also agrees to produce documents sufficient to show blanket refusals to fill documented in Archer through December 22, 2020 for the prescribers referenced by their initials in Section II.B.1.c of Plaintiff's Complaint, less prescribers ███████████████████████.  Walmart

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

further agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce non-privileged documents referring to blanket refusal to fill policies and procedures, to the extent such additional documents are identified.

      **REQUEST 6:** Documents sufficient to identify Centrally Blocked Prescribers and the dates when the Central Blocks were in effect, which have not already been produced to the United States in response to DEA subpoenas numbered MW-18-768156, MW-18-816990, MW-18-817014, MW-18-817060, and MW-19-322366.

      **RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 6 on grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant to Plaintiff's claims or defenses nor proportional to the needs of the case, including, but not limited to, because it seeks documents related to prescribers that have not been identified as the basis for Plaintiff's claims in this case.

      Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to WMT_MDL_001816058, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart will also produce documents sufficient to show the dates when central blocks were in effect for the prescribers referenced by their initials in Section II.B.1.c of Plaintiff's Complaint, less prescribers ████████████████████████

██ .

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 7:** Organization charts as follows:

    a.       Organization charts that reflect the corporate divisions that reported to the Chief Executive Officer, Wal-Mart US and at least two reporting divisions below the first tier that reported directly to the CEO. Do not produce duplicate organization charts. Instead, produce an organization chart reflecting the organizational structure in effect at the beginning of the Dispensing Violations Period and charts that reflect changes to that structure through the present;

    b.       Organization charts for Health & Wellness, Professional Services, Global Chief Compliance Office, Professional Affairs, Compliance, Health & Wellness Compliance U.S., Global Ethics and Compliance Systems and Analytics, and Regulatory Affairs, as well as organization charts specific to these components, to the extent that the charts responsive to this subpart are not duplicative of the charts responsive to subpart a.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 7 on grounds that it is vague and ambiguous as to the phrases "corporate divisions" and "reporting divisions," "first tier," "duplicate" and "duplicative," "changes to that structure," and "charts specific to these components," including because it is unclear whether Plaintiff seeks organization charts reflecting changes in the personnel reflected in the charts or only changes in the organizational structure. Walmart further objects to Request No. 7 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks information that is not relevant to any party's claims or defenses, including, but not limited to, information unrelated to Walmart's pharmacy operations and information unrelated to Walmart's pharmacy compliance team.

RESTRICTED – MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to organizational charts which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique organizational charts.

**REQUEST 8:** Documents identifying the structure and personnel of the Compliance Office.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 8 on grounds that it is vague and ambiguous as to the phrase "Compliance Office." Walmart further objects to Request No. 8 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks information that is not relevant to any party's claims or defenses, including, but not limited to, information unrelated to Walmart's pharmacy operations and information unrelated to Walmart's pharmacy compliance team.

Subject to its specific and General Objections, Walmart refers Plaintiff to its Response to Request No. 7.

**REQUEST 9:** Annual performance evaluations for all Employees who held any of the following positions at any time during the Dispensing Violations Period:

    a.    Senior Vice President and President, Walmart Health & Wellness;

    b.    Vice President, Health & Wellness Compliance;

    c.    Vice President, Professional Affairs, Health & Wellness Compliance Officer, Health & Wellness;

MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

d.      Vice President, Global Ethics and Compliance Systems and Analytics;

e.      Senior Director II, Health & Wellness Practice Compliance;

f.      Senior Director I, Health & Wellness Practice Compliance;

g.      Senior Director I, Health & Wellness Compliance;

h.      Senior Director, Regulatory Affairs, Health & Wellness;

i.      Senior Director, Health & Wellness Quality Improvement and Clinical Services;

j.      Senior Director, Quality Improvement and Professional Relations (or Professional Relations and Quality Improvement), Health & Wellness;

k.      Senior Director, U.S. Ethics and Compliance, Health & Wellness Practice Compliance;

l.      Director, Health & Wellness Practice Compliance (excluding any Employees who held the positions of Director, Health & Wellness Practice Compliance (Optical) or Director, Health & Wellness Practice Compliance (Clinical Services));

m.      Director, Health & Wellness Practice Compliance (Controlled Substances);

n.      Director, U.S. Ethics & Compliance, Health & Wellness Practice Compliance;

o.      Head of Regulatory Affairs (regardless of title) who reported to the Vice President of Professional Affairs/Health & Wellness Compliance Officer, Health & Wellness;

p.      Head of Compliance (regardless of title) who reported to the Vice President of Professional Affairs/Health & Wellness Compliance Officer, Health & Wellness;

q.      Director, Pharmacy Regulatory Affairs, Health & Wellness;

r.      Senior Manager II, Health & Wellness Practice Compliance;

MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

    s.       Senior Manager, Health & Wellness Practice Compliance (excluding any Employees who held the positions of Senior Manager, Health & Wellness Practice Compliance (Optical) or Senior Manager, Health & Wellness Practice Compliance (Health Services));

    t.       Senior Manager, Health & Wellness Practice Compliance (Controlled Substances);

    u.       Senior Manager, Health & Wellness Practice Compliance, Controlled Substances-Regulatory Affairs;

    v.       Senior Manager, Health & Wellness Practice Compliance, Rapid Response;

    w.       Senior Manager, Controlled Substances, Regulatory Affairs, Health & Wellness;

    x.       Senior Manager, Health & Wellness Compliance-Risk Mitigation;

    y.       Senior Analyst, Health & Wellness Practice Compliance;

    z.       Analyst, Health & Wellness Practice Compliance;

    aa.     Analyst I, Health & Wellness Practice Compliance; and

    bb.     Temporary Analyst, Health & Wellness Practice Compliance.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 9 on grounds that it is vague and ambiguous as to the descriptions of roles at Walmart. Walmart further objects to Request No. 9 as overly broad and unduly burdensome because it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case, including, but not limited to, because it

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

seeks highly sensitive and personal information, including information unrelated to the dispensing of controlled substances by Walmart.

Subject to and without waiving its specific and General Objections, Walmart will not respond further to this Request.

**REQUEST 10:** Documents related to the removal of the comments field in the RTF Form, including Documents reflecting the reasons for the removal and Communications with pharmacists about the removal. *See* WMT_EDTX_00115346.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 10 on grounds that it is vague and ambiguous as to the term "removal" and the phrase "Communications with pharmacists about the removal." Walmart also objects to the extent Plaintiff mischaracterizes Walmart's actions or the contents of the document cited in Request No. 10; Walmart refers to the referenced document for a complete and accurate statement of its contents.

Subject to its specific and General Objections, Walmart refers Plaintiff to documents regarding its policies and procedures related to dispensing controlled substances, including refusals to fill, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents relating to the revision of certain fields in refusals to fill in February 2017 and communications with pharmacists about those revisions.

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 11:**  Documents related to the dashboard report created to "help facilitate the follow up" with pharmacists who submitted RTF Forms and requested to be contacted, *see* WMT_EDTX_00115346, including a screenshot of the dashboard report.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 11 on grounds that it is vague and ambiguous as to the term "dashboard report."  Walmart further objects to Request No. 11 as vague and ambiguous because it seeks "a screenshot of the dashboard report," where the report visible may have varied depending on the date and viewer.  Walmart further objects to Request No. 11 as not relevant to Plaintiff's claims because it seeks documents unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case.   Walmart also objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 11; Walmart refers to the referenced document for a complete and accurate statement of its contents.

Subject to its specific and General Objections, Walmart refers Plaintiff to documents relating to refusal to fill policies and procedures which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92).  Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents relating to the use of a dashboard for follow-up with pharmacists who requested to be contacted regarding refusals to fill.

REDACTIONS CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 12:**  Documents related to the assertion that "no blanket refusals are allowed by the Boards of Pharmacy," *see*, *e.g.*, WMT_DOJ_000340366, including Documents supporting this assertion.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 12 on grounds that it is vague as to the phrases "related to the assertion" and "supporting this assertion."  Walmart further objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 12; Walmart refers to the referenced document for a complete and accurate statement of its contents.

Subject to its specific and General Objections, Walmart refers Plaintiff to documents relating to the allowance or disallowance of blanket refusals to fill by Boards of Pharmacy which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92).  Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents relating to the allowance or disallowance of blanket refusals to fill by Boards of Pharmacy, to the extent such additional documents are identified.

**REQUEST 13:**  Documents related to the reasons for Your policy prohibiting pharmacists from Blanket Refusing a Prescriber's prescriptions.  *See* WMT_DOJ_000363095.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 13 on grounds that it is duplicative of Request No. 5.  Walmart further objects to the extent Plaintiff mischaracterizes Walmart policies or the contents of the document cited in

PER D.I. 146 CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Request No. 13; Walmart refers to the referenced document for a complete and accurate statement of its contents.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to blanket refusal to fill policies and procedures which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents relating to the specific reasons for Walmart's blanket refusal to fill policies and procedures, to the extent such additional documents are identified.

**REQUEST 14:** Communications with pharmacists related to Your policy prohibiting pharmacists from Blanket Refusing a Prescriber's prescriptions.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 14 on grounds that it is duplicative of Plaintiff's other Requests for Production, including Request Nos. 5 and 13. Walmart further objects to the extent Plaintiff's Request No. 14 mischaracterizes Walmart's blanket refusal to fill policies and procedures.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents reflecting the Walmart Practice Compliance team's communications with pharmacists who worked at Walmart pharmacies regarding blanket refusal to fill policies and procedures, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I.

PORTIONS CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents reflecting Walmart's pharmacy compliance team's communications with pharmacists who worked at Walmart pharmacies regarding blanket refusal to fill policies and procedures, to the extent such additional documents are identified.

**REQUEST 15:** Documents related to the removal of the following sentence from the March 2011 version of POM 1311: "Blanket refusals of prescriptions are not allowed," which occurred no later than July 2015, *compare* WMT_DOJ_000363095 *with* WMT_DOJ_000547930, including Documents reflecting the reasons for the removal and the date it occurred.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 15 on grounds that it is duplicative of Plaintiff's other Requests for Production, including Request Nos. 5, 13, and 14. Walmart further objects to the extent Plaintiff's Request No. 15 mischaracterizes Walmart policies or the contents of the documents cited in Request No. 15; Walmart refers to the referenced documents for a complete and accurate statement of its contents.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to blanket refusal to fill policies and procedures which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

relevant and unique documents regarding revisions to POM 1311 related to changes to blanket refusal to fill policies and procedures.

**REQUEST 16:** Documents related to the reasons for Your policy to reverse the prohibition against Blanket Refusals and to instead permit pharmacists to Blanket Refuse a Prescriber's prescriptions.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 16 on grounds that it is duplicative of Plaintiff's other Requests for Production, including Request No. 5, 13, 14 and 15. Walmart further objects to the extent Plaintiff's Request No. 16 mischaracterizes Walmart policies regarding blanket refusals to fill.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 13.

**REQUEST 17:** Documents related to the instruction that any pharmacist's decision to Blanket Refuse a Prescriber's prescriptions be communicated only through an oral communication, as reflected in POM 1311. *See*, *e.g.*, WMT_DCO_00000061.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 17 on grounds that Plaintiff mischaracterizes Walmart's policies and procedures or the contents of the document cited in Request No. 17; Walmart refers to the referenced documents for a complete and accurate statement of its contents. Walmart further objects to Plaintiff's Request No. 17 as duplicative of Plaintiff's other Requests for Production, including Request No. 5.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to blanket refusal to fill policies and procedures

THESE DOCUMENTS CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents relating to instructions regarding how pharmacists communicate their blanket refusals to fill to other pharmacists working in their pharmacy, to the extent such additional documents are identified.

**REQUEST 18:** Documents related to the addition of a comments field to the Blanket Refusal submission form. *See* WMT_DOJ_000555742.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 18 on grounds that Plaintiff mischaracterizes the contents of the document cited in Request No. 18; Walmart refers to the referenced documents for a complete and accurate statement of its contents. Walmart further objects to Request No. 18 as vague as to the term "a comments field" because it is unclear to which field the phrase refers. Walmart further objects to Plaintiff's Request No. 18 as duplicative of Plaintiff's other Requests for Production, including Request No. 5.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to blanket refusal to fill policies and procedures which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified

PAGES CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Custodians and produce additional non-privileged documents relating to the decision to revise certain fields for blanket refusal to fill documentation in March 2018 and communications with pharmacists about the revision in March 2018 of certain fields in blanket refusal to fill documentation, to the extent such additional documents are identified.

**REQUEST 19:** Documents related to discontinuing the use of the Boilerplate POM 1311 Response, including Documents reflecting the reasons for the discontinuation.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 19 on grounds that the term "Boilerplate POM 1311 Response" mischaracterizes Walmart's policies and procedures or the language set forth in WMT_DOJ_000340366. Walmart refers to the referenced document for a complete and accurate statement of its contents. Walmart also objects to Request No. 19 as vague and ambiguous at to the terms "discontinuing" and "discontinuation."

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the language set forth in WMT_DOJ_000340366, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents discussing the decision to the use or discontinue the use of the language set forth in

CONTAINS WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

WMT_DOJ_000340366 by Walmart's pharmacy compliance team, to the extent such additional documents are identified.

**REQUEST 20:** Documents related to the reasons for implementing the Centrally Blocked Prescriber program.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 20 on grounds that the term "Centrally Blocked Prescriber program" is vague and ambiguous because it is unclear to what the term "program" refers. Walmart further objects to Request No. 20 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to Walmart corporate block policies and procedures, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents relating to the reasons for Walmart's corporate block policies and procedures.

REDACTED CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 21:**  Document in color that shows the highlighting in the document Bates numbered WMT_EDTX_00236765-66.

**RESPONSE:**  Subject to and without waiving its General Objections, Walmart agrees to produce a color version of WMT_EDTX_00236765, which reflects the highlighting within the document.

**REQUEST 22:**  With respect to RTF Forms and Communications from Your pharmacists about any individual Prescriber's Controlled Substance prescriptions, including those listed below, Documents related to any subsequent contact with those pharmacists about the information they reported or communicated:

a.  WMT_EDTX_00048371;

b.  WMT_EDTX_00246484;

c.  WMT_EDTX_00047862 at row 3130;

d.  WMT_EDTX_00062429;

e.  WMT_EDTX_00058731;

f.  WMT_EDTX_00065205;

g.  WMT_EDTX_00137794-95;

h.  WMT_DOJ_000296686;

i.  WMT_EDTX_00040701;

j.  WMT_EDTX_00055249;

k.  WMT_DOJ_000296454;

l.  WMT_DOJ_000296584;

m.  WMT_DOJ_000296648;

n.  WMT_EDTX_00045716;

o.  WMT_EDTX_00141724;

RESTRICTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

p.        WMT_DOJ_000215420;

q.        WMT_DOJ_000270823;

r.        WMT_EDTX_00155749;

s.        WMT_EDTX_00155741;

t.        WMT_EDTX_00264294;

u.        WMT_EDTX_00210467;

v.        WMT_EDTX_00135566;

w.        MDL Trial Exh. P-26892_00001;

x.        WMT_DOJ_000258287;

y.        WMT_DOJ_000258309;

z.        WMT_DOJ_000258705;

aa.       WMT_EDTX_00241899;

bb.       WMT_DOJ_000008751;

cc.       WMT_EDTX_00241913;

dd.       WMT_EDTX_00241899;

ee.       WMT_EDTX_00063287;

ff.       WMT_EDTX_00064254;

gg.       WMT_DOJ_000553438-40;

hh.       WMT_EDTX_00070511;

ii.       WMT_EDTX_00044801;

jj.       WMT_EDTX_00138197;

kk.       WMT_EDTX_00045613;

ll.       WMT_EDTX_00046481;

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

mm.    WMT_DOJ_000214235;

nn.    WMT_EDTX_00247930;

oo.    WMT_EDTX_00171617;

pp.    WMT_EDTX_00260794;

qq.    WMT_EDTX_00123434;

rr.    WMT_EDTX_00205526;

ss.    WMT_EDTX_00137354;

tt.    WMT_EDTX_00047861;

uu.    WMT_DOJ_000249255;

vv.    WMT_DOJ_000249254;

ww.    WMT_EDTX_00008498;

xx.    WMT_DOJ_000212509;

yy.    WMT_EDTX_00008498;

zz.    WMT_DOJ_000212509 at row 24;

aaa.   WMT_EDTX_00202845;

bbb.   WMT_EDTX_00139110 at WMT_EDTX_00139175;

ccc.   WMT_EDTX_00202845;

ddd.   SDWVA-CPB-000000152 at row 5;

eee.   WMT_DOJ_000170694;

fff.   WMT_EDTX_00040322 at row 57;

ggg.   WMT_EDTX_00040322 at row 58;

hhh.   WMT_EDTX_00040322 at row 60;

iii.   WMT_DOJ_000206689;

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

jjj.     WMT_EDTX_00040322 at rows 10-14;

kkk.     WMT_DOJ_000307758;

lll.     WMT_EDTX_00242161;

mmm.     WMT_EDTX_00064910;

nnn.     WMT_EDTX_00207706 at 66;

ooo.     WMT_EDTX_00220651 at 86;

ppp.     WMT_EDTX_00223775 at 56;

qqq.     WMT_DOJ_000398521 at WMT_DOJ_000398521;

rrr.     WMT_EDTX_00064884 at rows 58, 160, 180, 184, 187, 190, and 192;

sss.     WMT_DOJ_000398521;

ttt.     WMT_DOJ_000227721;

uuu.     WMT_EDTX_00129230 at WMT_EDTX_00129279;

vvv.     WMT_DOJ_000309819;

www.     WMT_EDTX_00144482 at WMT_EDTX_00144542–43;

xxx.     WMT_DOJ_000418534;

yyy.     WMT_EDTX_00212342 at WMT_00212413–15;

zzz.     WMT_DOJ_000282735;

aaaa.     WMT_EDTX_00000062;

bbbb.     WMT_DOJ_000545535;

cccc.     WMT_EDTX_00000097;

dddd.     WMT_DOJ_000544073;

eeee.     WMT_DOJ_000213919;

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

ffff.     WMT_DOJ_000273136;

gggg.     WMT_EDTX_00045728 at WMT_EDTX_00045773;

hhhh.     WMT_DOJ_000270593 at WMT_EDTX_000266519;

iiii.     WMT_DOJ_000268668;

jjjj.     WMT_DOJ_000269697;

kkkk.     WMT_DOJ_000270593;

llll.     WMT_EDTX_00245596;

mmmm.  WMT_DOJ_000267860;

nnnn.     WMT_DOJ_000213913;

oooo.     WMT_DOJ_000269101;

pppp.     WMT_DOJ_000268287;

qqqq.     WMT_EDTX_00221319 at WMT_EDTX_00221458;

rrrr.     WMT_DOJ_000269703;

ssss.     WMT_EDTX_00264847 at line 632331362;

tttt.     WMT_DOJ_000235584 at WMT_DOJ_000235689;

uuuu.     WMT_EDTX_00057634 at WMT_EDTX_00057653;

vvvv.     WMT_EDTX_00055482 at WMT_EDTX_00055550;

wwww.  WMT_EDTX_00087738;

xxxx.     WMT_EDTX_00104919;

yyyy.     WMT_EDTX_00061226 at WMT_EDTX_00061274;

zzzz.     WMT_EDTX_00054907 at WMT_EDTX_00054935;

aaaaa.   WMT_EDTX_00264847 at line 2045;

bbbbb.   WMT_DOJ_000268993;

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

ccccc.    WMT_DOJ_000267230;

ddddd.    WMT_EDTX_00061226;

eeeee.    WMT_DOJ_000310119;

fffff.    WMT_DOJ_000310523;

ggggg.    WMT_DOJ_000272006;

hhhhh.    WMT_EDTX_00044293 at WMT_EDTX_00044306;

iiiii.    WMT_DOJ_000307557; and

jjjjj.    WMT_EDTX_00222080 at WMT_EDTX_00222154.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 22 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks documents unrelated to the prescribers or prescriptions that have been identified as the basis for Plaintiff's claim in this case.  Walmart further objects to Request No. 22 as vague, overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks all communications from tens of thousands of pharmacists who worked at Walmart pharmacies regarding any controlled substance prescription without limitation.  Walmart also objects to Request No. 22 as overly broad, vague, and ambiguous as to the phrase "Communications from Your pharmacists."  Walmart further objects to Request No. 22 as vague, ambiguous, and unduly burdensome related to the use of the phrase "subsequent contact," because it is unclear what communications are "subsequent" and whose contact is referenced.  Walmart also objects to the extent Plaintiff

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

mischaracterizes the contents of the documents cited in Request No. 22; Walmart refers to the referenced documents for a complete and accurate statement of their contents.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to communications between Walmart's pharmacy compliance team and pharmacists who work at a Walmart pharmacy which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents reflecting or discussing communications between Walmart's pharmacy compliance team and pharmacists who work at a Walmart pharmacy or Walmart pharmacy field leadership relating to refusals to fill for or the controlled substance dispensing of prescribers referenced by their initials in Section II.B.1.c of Plaintiff's Complaint, less prescribers ████████████████████████, to the extent such additional documents are identified.

**REQUEST 23:** Documents related to any decisions made or actions taken by You that were specific to a Prescriber who was the subject of an RTF Form or other Communication from Your pharmacists about any individual Prescriber's

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Controlled Substance prescriptions, including the RTF Forms and Communications identified in Request 22 above.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 23 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks documents unrelated to the prescribers or prescriptions that have been identified as the basis for Plaintiff's claims in this case. Walmart further objects to Request No. 23 as overly broad, unduly burdensome, and not proportional to the needs of the case as to the phrase "Communication from Your pharmacists." Walmart also objects to Plaintiff's Request No. 23 as vague and ambiguous as to the phrases "decisions made" and "actions taken." Walmart further objects to Request No. 23 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart further objects to Plaintiff's Request No. 23 as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks information related to Walmart's distribution of controlled substances. Plaintiff's claims based on Walmart's controlled substance distribution have been dismissed from this case with prejudice. (*See* D.I. 117).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to: (1) communications from Walmart notifying DEA of pharmacists' decisions to refuse to fill prescriptions; (2) corporate

MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

block lists, including WMT_MDL_001816058; and (3) Walmart corporate block notices to pharmacists who work at a Walmart pharmacy, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents related to any decisions made or actions taken by Walmart's pharmacy compliance team regarding controlled substance dispensing and relating to the prescribers referenced by their initials in Section II.B.1.c of Plaintiff's Complaint, less prescribers ██████████████████████████████,
to the extent such additional documents are identified.

**REQUEST 24:** With regard to the email sent to pharmacists who requested to be contacted following submission of an RTF Form, *see*, *e.g.*, WMT_MDL_001100998, Documents related to the inclusion of the following sentences: "Do not reply to this email with the additional details regarding the Refusal to Fill. Only phone calls or phone messages are acceptable forms of communication."

**RESPONSE:** In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 24 on grounds that Plaintiff mischaracterizes Walmart's actions and the cited document; Walmart refers to the referenced document for a complete and accurate statement of its contents.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to refusal to fill policies and procedures which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69)

MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents regarding any decision to include or exclude the sentences identified in Plaintiff's Request No. 24 in email correspondence sent by Walmart's pharmacy compliance team to pharmacists who worked at Walmart pharmacies following certain refusals to fill, to the extent such documents are identified.

**REQUEST 25:** Documents related to any request to be contacted by a pharmacist who submitted an RTF Form, including:

a.  Audio recordings of phone messages left by pharmacists;

b.  Audio recordings of phone calls with pharmacists;

c.  Transcripts of audio recordings of phone messages and phone calls;

d.  Notes of phone messages and phone calls;

e.  Logs of phone messages and phone calls; and

f.  Documents related to any follow up actions taken or decisions made that were based on information provided by any pharmacist about a refusal to fill and were specific to an individual Prescriber's Controlled Substance prescriptions.

**RESPONSE:** In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 25 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks documents unrelated to the prescribers or prescriptions that have been identified as the basis for Plaintiff's claims in this case. Walmart further objects to Request No.

PAGES MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

25 as vague and ambiguous as to the phrases "request to be contacted," "notes of phone messages," "logs of phone messages and phone calls," "actions taken," and "decisions made." Walmart also objects to Request No. 25 as duplicative of Request No. 23.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 23. Walmart further refers Plaintiff to documents reflecting or regarding communications between Walmart's pharmacy compliance team and pharmacists who worked at Walmart pharmacies which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents related to any request to be contacted by a pharmacist who submitted a refusal to fill a controlled substance prescription for a prescriber identified by their initials in Section II.B.1.c. of Plaintiff's Complaint, less prescribers ██████████████████████████, to the extent such documents are identified.

**REQUEST 26:** Communications to and from Your pharmacists related to (i) particular Prescribers' Controlled Substance prescriptions, (ii) exercising corresponding responsibility, *see* 21 C.F.R. § 1306.04, or professional judgment, and (iii) Your Policies related to any of these subject areas, including any hotline Communication and emails to and from the following email addresses:

a. ██████████████@wal-mart.com;

REDACTED—CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

    b.      ███████ @walmart.com;

    c.      ██████ @wal-mart.com;

    d.      ████ @walmart.com;

    e.      █████ @wal-mart.com;

    f.      ████████ @wal-mart.com; and

    g.      ███████ @walmart.com.

**RESPONSE:** In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 26 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks years of communications regarding sweeping categories without relating the request to any allegation contained in Plaintiff's Complaint. Walmart further objects to Request No. 26 as vague, overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks communications regarding "professional judgment," that may be unrelated to the dispensing of controlled substances and could be interpreted to include every decision made by any pharmacist that works at a Walmart pharmacy nationwide over nearly a decade. Walmart also objects to Request No. 26 as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks documents unrelated to the prescribers or prescriptions that have been identified as the basis for Plaintiff's claims in this case. Walmart also objects to Request No. 26 as seeking documents from identified email addresses that are likely to have little or no relevance to the party's claims or

PORTIONS CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

defenses in this case, specifically including @Walmart.com,
@walmart.com, @wal-mart.com, @wal-mart.com,
@wal-mart.com, and @walmart.com.

Subject to and without waiving its specific and General Objections, Walmart
will not further respond to this Request.

**REQUEST 27:** Documents related to the reasons for creating the
Controlled Substances Work Group's Refusal to Fill project.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 27 on
grounds that it is vague as to the phrase "Controlled Substances Work Group"
because it is unclear to what group the phrase refers. Walmart also objects to
Request No. 27 on the grounds that it is vague as to the phrase "Refusal-to-fill
project," as it is unclear to what project the phrase refers. Walmart further objects
to Request No. 27 because many responsive documents are likely to be privileged
as attorney-client communications and attorney work product. Walmart will log any
documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart
refers Plaintiff to documents reflecting or regarding Health & Wellness Compliance
Focus Areas Meetings related to refusals to fill, which Plaintiff has access to
pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023
Order (D.I. 92). Walmart does not believe it is reasonable to conduct further
searches in an attempt to identify additional non-privileged relevant and unique

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

documents related to Health & Wellness Compliance Focus Areas Meetings regarding refusals to fill.

**REQUEST 28:**  Documents related to defining the purpose of the Controlled Substances Work Group's Refusal to Fill project as follows:  "Establish a process for analysis of refusal to fill data and reporting problematic prescribers or patients internally." *See* WMT_DOJ_000060453.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 28 on grounds that it is vague as to the phrase "Controlled Substances Work Group" because it is unclear to what group the phrase refers.  Walmart also objects to Request No. 28 on the grounds that it is vague as to the phrase "Refusal-to-fill project," as it is unclear to what project the phrase refers.  Walmart further objects to Request No. 28 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product.  Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).  Walmart further objects to Request No. 28 as duplicative of Request No. 27.  Walmart also objects to Request No. 28 to the extent it appears to quote from a document that does not include the quoted language.

RESTRICTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

**REQUEST 29:** Documents identifying the members of the RTF Workgroup. *See* WMT_DOJ_000039815.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 29 on grounds that it is vague as to the phrase "RTF Workgroup" because it is unclear to what group the phrase refers. Walmart also objects to Request No. 29 to the extent Plaintiff mischaracterizes the language set forth in the cited document, because it is unclear based on the cited document whether an "RTF Workgroup" exists or its membership. Walmart refers to the referenced document for a complete and accurate statement of its contents. Walmart further objects to Request No. 29 as duplicative of Request Nos. 27 and 28.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

**REQUEST 30:** Communications regarding the Controlled Substances Work Group's Refusal to Fill project.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 30 on grounds that it is vague as to the phrase "Controlled Substances Work Group" because it is unclear to what group the phrase refers. Walmart also objects to Request No. 30 as vague as to the phrase "Refusal to Fill project" because it is unclear to what project the phrase refers. Walmart further objects to Request No. 30

RESTRICTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart further objects to Request No. 30 as duplicative, in part, of Request Nos. 27 through 29.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

**REQUEST 31:** Documents related to meetings where the Controlled Substances Work Group's Refusal to Fill project was discussed, including meeting minutes and notes of meetings, including meetings of the RTF Work Group.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 31 on grounds that it is vague as to the phrases "Controlled Substances Work Group" and "RTF Work Group" because it is unclear to what groups the phrases refer. Walmart also objects to Request No. 31 as vague as to the phrase "Refusal to Fill project," because it is unclear to what project the phrase refers. Walmart further objects to Request No. 31 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart further objects to Request No. 31 as duplicative of Request Nos. 27 through 30.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

REDACTED – CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 32:** Documents reflecting proposals, goals, timelines, and progress of the Controlled Substances Work Group's Refusal to Fill project.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 32 on grounds that it is vague as to the phrase "Controlled Substances Work Group" because it is unclear to what group the phrase refers. Walmart also objects to Request No. 32 as vague as to the phrase "Refusal to Fill project," because it is unclear to what project the phrase refers. Walmart further objects to Request No. 32 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart further objects to Request No. 32 as duplicative of Request Nos. 27 through 31.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

**REQUEST 33:** Documents reflecting the reasons for the elimination of the Controlled Substances Work Group's Refusal to Fill project as a stand-alone project.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 33 on grounds that it is vague as to the phrase "Controlled Substances Work Group" because it is unclear to what group the phrase refers. Walmart also objects to Request No. 33 as vague as to the phrase "Refusal to Fill project," because it is unclear to what project the phrase refers. Walmart also objects to Request No. 33 as vague as to the terms "elimination" and "stand alone project," because it is unclear

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

what the terms mean. Walmart also objects to Request No. 33 to the extent it mischaracterizes any project or work at Walmart. Walmart further objects to Request No. 33 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart further objects to Request No. 33 as duplicative of Request Nos. 27 through 32.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

**REQUEST 34:** Documents related to the Health & Wellness Compliance Oversight Committee, including:

   a.      minutes of meetings;

   b.      Communications among committee members;

   c.      presentations made during meetings; and

   d.      Documents reflecting committee goals, timelines, and progress.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 34 on grounds that it is overly broad because the Health & Wellness Compliance Oversight Committee's work included topics other than Walmart's dispensing of controlled substances and the practice of pharmacy. Walmart further objects to Plaintiff's Request No. 34 as overly broad, unduly burdensome, and not proportional to the needs of this case, including because it seeks communications among committee members regardless of topic. Walmart further objects to Request No. 34 because

REDACTED – CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the Health & Wellness Compliance Oversight Committee which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents regarding the Health & Wellness Compliance Oversight Committee meeting minutes and presentations relating to Walmart's dispensing of controlled substance prescriptions.

**REQUEST 35:** Documents related to the Controlled Substances Governance team, including:

a. Documents reflecting reasons for establishing the team;

b. minutes of meetings;

c. Communications among team members;

d. presentations made during meetings; and

e. Documents reflecting team goals, timelines, and progress.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 35 on grounds that it is vague as to the phrase "Controlled Substances Governance team" because it is unclear to what group the phrase refers. Walmart further objects to

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Walmart's Request No. 34 as overly broad, unduly burdensome, and not proportional to the needs of this case, including because it seeks communications among committee members regardless of topic. Walmart further objects to Request No. 35 because responsive documents may be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its response to Request No. 27.

**REQUEST 36:** Documents related to the Health & Wellness Compliance Focus Areas Steering Meetings, including:

    a.        monthly PowerPoint summaries;

    b.        minutes of meetings; and

    c.        Communications among meeting attendees.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 36 on grounds that it is overly broad because the Health and Wellness Compliance Focus Areas Steering Meetings included topics other than Walmart's dispensing of controlled substances and the practice of pharmacy. Walmart further objects to Request No. 36 as overly broad, unduly burdensome, and not proportional to the needs of the case, including to the extent it seeks all communications between attendees of certain meetings, regardless of their relevance. Walmart also objects to Request No. 36 as vague and ambiguous as to the phrase "monthly Power Point

REDACTED - CONTAINS WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

summaries," as it is unclear to what it refers. Walmart further objects to Request No. 36 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the Health and Wellness Compliance Focus Areas Steering Meetings which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents related to the Health and Wellness Compliance Focus Areas Steering meetings relating to Walmart's dispensing of controlled substance prescriptions.

**REQUEST 37:** Documents related to efforts to "[e]nhance RTF reporting, analysis and POS utilization" as part of Your "Accelerated Controlled Substance efforts." *See* WMT_DCO_00001696.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 37 on grounds that it is vague and ambiguous as to the phrase "[e]nhance RTF reporting, analysis and POS utilization," because it is unclear to what the phrase refers. Walmart also objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 37; Walmart refers to the referenced document for a complete and accurate statement of its contents. Walmart further objects to

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Request No. 37 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to refusal to fill policies and procedures, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents referring to refusal to fill policies, procedures, and analyses from May 27, 2020 to December 22, 2020 to the extent such additional documents are identified.

**REQUEST 38:** Documents related to adding RTF and Blanket Refusal information to Connexus, including:

a. Documents related to the reasons for making RTF and Blanket Refusal information available to pharmacists in Connexus;

b. Documents related to the decision to show only the number of RTF and Blanket Refusal submissions in Connexus;

c. Documents related to the timing of rolling out this feature to Your pharmacies;

d. Documents related to how You informed pharmacists about the availability of RTF and Blanket Refusal information in Connexus;

e. Documents related to the decision to not include in POM 1311.2 a section explaining that Connexus contained

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

information about RTF and Blanket Refusal submissions; and

    f.    Documents related to how You informed pharmacists about the option to launch Archer from Connexus to obtain additional information about a Prescriber or customer and guidance about using this tool.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 38 to the extent that it mischaracterizes actions taken by Walmart. Walmart further objects to Request No. 38 as vague and ambiguous as to the phrases "RTF and Blanket Refusal information," "information about RTF and Blanket Refusal submissions," and "additional information about a Prescriber or customer" as it is unclear to what it refers.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to adding information about refusals to fill and blanket refusals to fill to Connexus, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce documents relating to adding information about refusals to fill and blanket refusals to fill to Connexus, to the extent such additional documents are identified.

**REQUEST 39:** Documents related to RTF and Blanket Refusal submissions made visible to pharmacists through Archer, including:

    a.    Documents identifying when RTF and Blanket Refusal information was made available to Your Employees,

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

including when this information was made available to
different sets of Employees;

b.      Documents related to how You informed Employees about
the availability of the Archer tool to obtain information about
RTF and Blanket Refusal submissions; and

c.      Documents identifying the information visible to pharmacists
when searching for Prescriber information in Archer,
including a screenshot of the results that would display from
searching for RTF and Blanket Refusal submissions related
to a Prescriber and a screenshot of the information that would
display about any particular RTF or Blanket Refusal
submission.  *See* WMT_CN_000008435 at 7.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 39 to

the extent that it mischaracterizes actions taken by Walmart.  Walmart further

objects to Request No. 39 as overly broad, unduly burdensome, and not proportional

to the needs of the case to the extent it seeks refusals to fill and blanket refusal

documentation unrelated to any prescriber or prescription that has been identified in

Plaintiff's Complaint as the basis for Plaintiff's claims in this case.  Walmart further

objects to Request No. 39 as vague and ambiguous as to "Employees" and "different

sets of Employees," as it is unclear to which employees or sets of employees it refers.

Walmart further objects to Request No. 39 as vague and ambiguous because it seeks

"information visible to pharmacists," where the information visible to pharmacists

may vary depending on the date and information searched.  Walmart also objects to

the extent Plaintiff mischaracterizes the contents of the documents cited in Request

REDACTED — CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

No. 39; Walmart refers to the referenced documents for a complete and accurate statement of their contents.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the visibility of refusal to fill and blanket refusal to fill documentation to pharmacists working at Walmart pharmacies in Archer, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents relating to the availability of refusal to fill and blanket refusal to fill documentation to pharmacists working at Walmart pharmacies in Archer.

**REQUEST 40:** Documents related to the Controlled Substances Work Group's Controlled Substances Risk Mitigation project, including:

    a.      Documents reflecting reasons for establishing the project;

    b.      Communications regarding the project;

    c.      Documents reflecting the risk mitigation plan, execution of which was defined as the purpose of the project, *see, e.g.*, WMT_DOJ_000041051;

    d.      the Controlled Substances risk assessment, which identified risks that this project was designed to mitigate, *see, e.g.*, WMT_DOJ_000041051 at WMT_DOJ_000041084;

    e.      Documents related to the project's goal of creating a "[p]rocess for analysis of refusal to fill data," *see, e.g.*, WMT_DOJ_000041051 at WMT_DOJ)000041084,

PAGES MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

including Documents identifying and defining the process, the timeline, and progress;

f.  Documents related to the "plan to address prescribers highlighted through RTF data," including the initial proposal developed by in or about October-November 2015, *see* WMT_DOJ_000034984 at 35006, subsequent proposals, and Communications regarding the same;

g.  Documents reflecting the project's timeline and progress; and

h.  Documents related to the completion of the project in or about February 2016, *see* WMT_MDL_000077168 at 77187, including project summaries.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 40 on grounds that it is vague as to the phrase "Controlled Substances Work Group" because it is unclear to what group the phrase refers. Walmart also objects to Request No. 40 as vague as to the phrases "Controlled Substances Risk Mitigation project," and "the project," because it is unclear to what project the phrase refers. Walmart also objects to Request No. 40 as vague as to the terms "risk mitigation plan," "risk assessment," "initial proposal," "subsequent proposals," and "completion," because it is unclear what the terms mean. Walmart further objects to Request No. 40 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents unrelated to Walmart's controlled substance dispensing. Walmart also objects to the extent Plaintiff mischaracterizes the contents of the documents cited in Request No. 40; Walmart refers to the referenced documents for a complete and accurate statement of their contents.

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Walmart also objects to Request No. 40 to the extent it mischaracterizes any project or work at Walmart. Walmart further objects to Request No. 40 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the "Controlled Substances Work Group's Controlled Substances Risk Mitigation project," which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents related to Health & Wellness Compliance Focus Areas Meetings regarding Walmart's dispensing of controlled substance prescriptions.

**REQUEST 41:** Following completion of the Controlled Substances Risk Mitigation project, Documents related to any projects that:

a. affected the process by which Your pharmacists reported refusals to fill Controlled Substance prescriptions;

b. affected Your use and analysis of information from Your pharmacists about their refusals to fill Controlled Substance prescriptions; and

c. affected the information available to Your pharmacists about refusals to fill Controlled Substance prescriptions, whether their own refusals or those by other pharmacists.

REDACTED CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 41 on grounds that it is vague as to the phrase "Controlled Substances Risk Mitigation project" because it is unclear to what project the phrase refers. Walmart further objects to Request No. 41 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents related to "any projects" other than those involving Walmart's pharmacy compliance team. Walmart also objects to Request No. 41 as vague as to the terms "completion," "any projects," "affected the process," "affected Your use and analysis," and "affected the information available," because it is unclear what the terms mean. Walmart also objects to Request No. 41 to the extent it mischaracterizes any project or work at Walmart. Walmart further objects to Request No. 41 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to refusal to fill policies and procedures which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents relating to changes in refusal to

MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

fill policies and procedures, including refusal to fill documentation, analysis, or availability from May 27, 2020 to December 22, 2020, to the extent such documents are identified.

**REQUEST 42:** Documents related to the Controlled Substances Work Group's Diversion Analytics project, including:

a. Documents reflecting reasons for establishing the project;

b. Communications regarding the project;

c. Documents related to the "Success Measur[e]" of "[i]dentify[ing] chain wide indicators of potential diversion activity," *see. e.g.*, WMT_DOJ_000060843 at 60862, including Documents identifying the chain wide indicators and data and data analyses regarding those indicators;

d. Documents related to the "Key Deliverabl[e]" of "[p]roduc[ing] red flag indicators based upon specific criteria based queries," *see* WMT_DOJ_000060843 at 60862, including Documents identifying the red flag indicators and data and data analyses regarding those indicators;

e. Documents reflecting the project's timeline and progress; and

f. Documents reflecting the reasons for terminating the project, *compare* WMT_MDL_000422145 at slides 5 and 7 *with* WMT_MDL_000088563 at 000088579.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 42 on grounds that it is vague as to the phrase "Controlled Substances Work Group" because it is unclear to what group the phrase refers. Walmart also objects to Request No. 42 as vague as to the terms "chain wide indicators," "potential diversion activity," "data analyses," "red flag indicators," and "specific criteria based queries,"

REDACTED-CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

because it is unclear what the terms mean. Walmart further objects to Request No. 42 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case. Walmart also objects to the extent Plaintiff mischaracterizes the contents of the documents cited in Request No. 42; Walmart refers to the referenced documents for a complete and accurate statement of their contents. Walmart also objects to Request No. 42 to the extent it mischaracterizes any project or work at Walmart. Walmart further objects to Request No. 42 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the diversion analytics project, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart agrees to produce documents sufficient to identify diversion analytics project analyses related to prescribers referenced by their initials in Section II.B.1.c of Plaintiff's Complaint, less prescribers ███████████████████████████████████.

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 43:**  Documents related to the Ethics, Compliance, and Risk Committee, including:

      a.        minutes of meetings;

      b.        Communications among committee members; and

      c.        presentations made during meetings.

In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 43 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of  this case because it seeks information not relevant to any party's claims or defenses, including, but not limited to, because it seeks information unrelated to Walmart's pharmacies or to controlled substance dispensing by pharmacists who work at Walmart pharmacies.  Walmart's Ethics, Compliance and Risk Committee, previously known as the Global Compliance and Ethics Committee, oversees Walmart's global compliance and ethics efforts at a management level.  Walmart further objects to Walmart's Request No. 43 as overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information not relevant to any party's claims or defenses and because it seeks communications among committee members regardless of topic.  Walmart further objects to Request No. 43 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product.  Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

PAGES CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Subject to and without waiving its specific and General Objections, Walmart

states that it will not further respond to this Request.

**REQUEST 44:** Documents related to the Advisory Group established as a
result of the Corporate Processes Project of the Controlled Substances
Workstream, including meeting minutes and notes of meetings and
Communications. *See* WMT_DOJ_000060543 at 000060580.

**RESPONSE:** In addition to its General Objections, Walmart specifically

objects to Request No. 44 on the grounds that it is vague as to the phrase "Advisory

Group" because it is unclear to what group the phrase refers. Walmart further

responds that any responsive documents are likely to be privileged as attorney-client

communications and attorney work product because this Request seeks drafts of

documents that were created at the advice and direction of legal counsel. Walmart

will log any documents it withholds as privileged pursuant to the ESI Order (D.I.

132). Walmart also objects to Request No. 44 as vague as to the phrases "Corporate

Processes Project," and "Controlled Substances Workstream," as it is unclear to

what the phrases refer. Walmart also objects to the extent Plaintiff mischaracterizes

the contents of the documents cited in Request No. 44; Walmart refers to the

referenced documents for a complete and accurate statement of their contents.

Walmart further objects to Request No. 44 as overly broad, unduly burdensome, and

not proportional to the needs of this case because it seeks information not relevant

to any party's claims or defenses to the extent it seeks information unrelated to

BEGINS CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Walmart's pharmacies or to controlled substance dispensing by pharmacists who work at Walmart pharmacies.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the Controlled Substance Advisory Panel, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents relating to the Controlled Substance Advisory Panel.

**REQUEST 45:** U.S. Compliance systems portfolio reports and related Correspondence. *See, e.g.,* WMT_MDL_001217727-28.

**RESPONSE:** In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 45 on grounds that it is vague and ambiguous as to the terms and phrases "U.S. Compliance systems" and "portfolio reports." Walmart also objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 45; Walmart refers to the referenced document for a complete and accurate statement of its contents. Walmart also objects to Request No. 45 overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information not relevant to any party's claims or defenses.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents referring to "U.S. Compliance systems portfolio reports" which Plaintiff has access to pursuant to the Court's September 20, 2022

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart states that it will not

further respond to this Request.

**REQUEST 46:** Documents related to Health & Wellness projects within
U.S. Compliance's portfolio, including:

     a.     status updates from U.S. Compliance to Health & Wellness
             regarding Health & Wellness projects within Compliance's
             portfolio and related Correspondence;

     b.     executive updates from U.S. Compliance regarding its
             project portfolio and related Correspondence;

     c.     U.S. Compliance summaries of approved projects;

     d.     "case documents" or any Document related to Health &
             Wellness projects within U.S. Compliance's portfolio,
             whether or not the proposal was submitted to U.S.
             Compliance and whether or not the project became part of
             U.S. Compliance's portfolio.

**RESPONSE:** In addition to its General Objections, Walmart specifically

objects to Plaintiff's Request No. 46 on grounds that it is vague and ambiguous as

to the terms and phrases "U.S. Compliance," "portfolio," "executive updates," and

"case documents." Walmart also objects to Request No. 46 overly broad, unduly

burdensome, and not proportional to the needs of this case because it seeks

information not relevant to any party's claims or defenses.

Subject to and without waiving its specific and General Objections, Walmart

refers Plaintiff to documents referring to "U.S. Compliance" which Plaintiff has

access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January

REDACTED CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

13, 2023 Order (D.I. 92).  Walmart states that it will not further respond to this Request.

**REQUEST 47:**  Information Systems Division's "Weekly RR Prioritization for Compliance and Business Projects" Excel spreadsheets and the emails distributing them.  *See, e.g.*, WMT_DOJ_000145780-81.

**RESPONSE:**  In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 47 on grounds that it is vague and ambiguous as to the phrase "Information Systems Division."  Walmart also objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 47; Walmart refers to the referenced document for a complete and accurate statement of its contents.  Walmart also objects to Request No. 47 overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information not relevant to any party's claims or defenses.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to "Weekly RR Prioritization for Compliance and Business Projects" spreadsheets and emails which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92).  Walmart also agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce additional non-privileged documents relating to "Weekly RR Prioritization for Compliance and

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Business Projects" related to controlled substance dispensing, to the extent such documents are identified.

**REQUEST 48:** Documents related to the Health & Wellness Compliance National Assessment Program, including:

      a.      all reports, including executive summary, progress, ad hoc, and final reports;

      b.      drafts of the reports listed in subpart (a) above; and

      c.      Communications regarding the drafts and reports identified above in subparts (a) and (b).

**RESPONSE:** In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 48 on grounds that it is vague and ambiguous as to the terms and phrases "Compliance National Assessment Program," "drafts," and "reports." Walmart also objects to Request No. 48 overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information not relevant to any party's claims or defenses, including to the extent this Request is related to Walmart stores nationwide. Walmart further responds that any responsive documents are likely to be privileged as attorney-client communications and attorney work product because this Request seeks drafts of documents that were created at the advice and direction of legal counsel. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart further objects to Request No. 48 as not relevant to Plaintiff's claims

CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

because it seeks documents related to stores that have not dispensed any prescriptions that have been identified as the basis for Plaintiff's claims in this case

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to Health & Wellness National Compliance Assessment Program which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Further, counsel for Walmart offers to meet and confer with Plaintiff regarding Request No. 48.

**REQUEST 49:** Mitigation status reports submitted to the Health & Wellness Oversight Committee Meeting.

**RESPONSE:** In addition to its General Objections, Walmart specifically objects to Plaintiff's Request No. 49 on grounds that it is vague and ambiguous as to the terms and phrases "Mitigation status reports." Walmart also objects to Request No. 49 overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information not relevant to any party's claims or defenses. Walmart further responds that any responsive documents are likely to be privileged as attorney-client communications and attorney work product because this Request seeks drafts of documents that were created at the advice and direction of legal counsel. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

THIS MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to its Response to Request No. 34.

**REQUEST 50:** Documents identifying all Controlled Substances identified as a High Risk Medication in Connexus.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 50 on grounds that it is vague as to the term "High Risk Medication in Connexus" because it is unclear to what the term refers. Walmart further objects to Request No. 50 as vague as to the term "identified" because it is unclear whether it refers to identifications made by third parties other than Walmart. Walmart also objects to Request No. 50 overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information not relevant to any party's claims or defenses.

Subject to and without waiving its specific and General Objections, counsel for Walmart offers to meet and confer with Plaintiff regarding Request No. 50.

**REQUEST 51:** Documents related to identification of highly diverted or abused Controlled Substances, including:

a.     lists of highly diverted drugs derived from Global Investigation's Hot List and Diversion Hot Lists; and

b.     Documents related to the selection of Controlled Substances included in any list of highly diverted or abused drugs.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 51 on grounds that it is vague and ambiguous as to the terms "highly diverted or abused," "highly diverted," and "derived from" as it is unclear to what the terms refer.

RESTRICTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Walmart also objects to Request No. 51 as overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information regarding Walmart's Global Investigation's teams' categorization of medications dispensed by Walmart, which is not relevant to the parties' claims and defenses in this case. Walmart also objects to Request No. 51 to the extent it mischaracterizes any project or work at Walmart.

Subject to and without waiving its specific and General Objections, Walmart agrees to conduct a reasonable search of reasonably accessible documents from Walmart's Identified Custodians and produce non-privileged documents regarding Walmart's identification or selection of controlled substances on any list of highly diverted or abused controlled substances, including documents related to Global Investigation's Hot List and Diversion Hot Lists, to the extent such documents are identified.

**REQUEST 52:** Documents related to Drug Utilization Review (DUR) alerts or edits in Your pharmacy software program (including Connexus) for any Controlled Substance or any drug combination that includes a Controlled Substance, including:

> a.      Documents sufficient to identify DUR alerts and computer program edits;
>
> b.      Documents related to proposals to implement DUR alerts or edits for any Controlled Substance or any drug combination that includes a Controlled Substance;
>
> c.      Data related to any DUR alerts or edits, including "trinity" DUR warning data, *see* WMT_DCO_00001696, including

CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Documents containing the data, analyses of the data, and Communications about the data or analyses of the data; and

d.    Data related to a computer program edit for prescriptions for more than twenty tablets per day or for amounts that exceeded certain daily limits, *see* WMT_EDTX_00123434.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 52 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks information unrelated to any party's claims or defenses in this case. Walmart also objects to Request No. 52 as vague and ambiguous regarding the terms "warning data" and "computer program edit for prescriptions for more than twenty tablets per day or for amounts that exceeded certain daily limits," as it is unclear to what the terms refer. Walmart also objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 52; Walmart refers to the referenced document for a complete and accurate statement of its contents. Walmart also objects to Request No. 52 to the extent it seeks documents outside of Walmart's possession, custody, and control, including certain information about Wolters Kluwer DURs or third-party DURs.

Subject to and without waiving its specific and General Objections, counsel for Walmart offers to meet and confer with Plaintiff regarding Request No. 52.

**REQUEST 53:** Controlled Substances training modules for Your pharmacists that were revised or eliminated sometime between February 1, 2013 and January 31, 2014, which resulted in reducing two hours' worth of training, and

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

the Controlled Substances modules that remained in use after these changes. *See*
WMT_DOJ_000067779 at 000067794.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 53 to

the extent Plaintiff mischaracterizes the contents of the document cited in Request

No. 53; Walmart refers to the referenced document for a complete and accurate

statement of its contents. Walmart also objects to Request No. 53 as vague as to the

phrase "Controlled Substances training modules" because it is unclear what

materials are encompassed by the phrase.

Subject to and without waiving its specific and General Objections, Walmart

refers Plaintiff to documents relating to pharmacist training materials relating to the

dispensing of controlled substances by pharmacists who work at a Walmart

pharmacy which Plaintiff has access to pursuant to the Court's September 20, 2022

Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it

is reasonable to conduct further searches in an attempt to identify additional non-

privileged relevant and unique pharmacist training materials relating to dispensing

of controlled substances by pharmacists who work at a Walmart pharmacy.

**REQUEST 54:** Diversion training modules that were "expired" sometime
between February 1, 2013 and January 31, 2014, and the diversion modules that
remained in use after January 31, 2014. *See* WMT_DOJ_000067779 at
000067794.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 54 to

the extent Plaintiff mischaracterizes the contents of the document cited in Request

REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

No. 54; Walmart refers to the referenced document for a complete and accurate statement of its contents. Walmart also objects to Request No. 54 as vague as to the phrase "Diversion training modules" because it is unclear what materials are encompassed by the phrase.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to pharmacist training materials relating to diversion of controlled substances which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique pharmacist training materials relating to diversion of controlled substances.

**REQUEST 55:** The pain management curriculum that You developed in partnership with the American Pharmacists' Association.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 55 on grounds that it is vague and ambiguous as to "pain management curriculum." Walmart further objects to Request No. 55 to the extent the Request mischaracterizes Walmart's participation in the curriculum's development.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents regarding the American Pharmacists Association curriculum, which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92): WMT_MDL_000069882,

EXHIBIT 4 - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

WMT_MDL_000069900,    WMT_MDL_000069928,    WMT_MDL_000069941,

WMT_MDL_000069952, WMT_MDL_000069972.

      **REQUEST 56:**  Documents related to Your ability to direct, guide, or in any way affect the decisions by Your pharmacists to fill or refuse to fill a prescription.

      **RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 56 on grounds that it is vague and ambiguous.  Walmart further objects to Request No. 56 on grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case.  Walmart further objects to Request No. 56 as vague and ambiguous as to the meaning of "guide" and "affect."

      Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to Walmart's policies and procedures relating to dispensing controlled substances, training materials relating to dispensing controlled substances, and communications between Walmart's pharmacy compliance team and pharmacists that work at Walmart pharmacies which Plaintiff also has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92).  Walmart states that it will not further respond to this Request.

MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 57:**  Documents related to calculations and analyses assessing the impact of Your pharmacy customers on Your sales, revenues, profit, or foot traffic through Your retail stores.

**RESPONSE:** Walmart specifically objects  to Plaintiff's Request No. 57 on grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case, including, but not limited to, because it seeks information unrelated to Walmart's dispensing of controlled substances and not relevant to alleged violations of the Controlled Substances Act, under which Plaintiff's claims are brought. Walmart further objects to Request No. 57 as not relevant to Plaintiff's claims because it seeks documents related to stores that have not dispensed any prescriptions that have been identified as the basis for Plaintiff's claims in this case. Walmart further objects to Request No. 57 as vague and ambiguous as to the terms "calculations," "analyses," "impact" and "foot traffic."

Subject to and without waiving its specific and General Objections, Walmart states that it will not further respond to this Request.

**REQUEST 58:**  Documents related to calculations and analyses comparing purchases by pharmacy customers compared to non-pharmacy customers.

**RESPONSE:**  Walmart specifically objects to Plaintiff's Request No. 58 on grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case, including, but not limited to, because it seeks information unrelated to

PAGES CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Walmart's dispensing of controlled substances and not relevant to alleged violations of the Controlled Substances Act, under which Plaintiff's claims are brought. Walmart further objects to Request No. 58 as vague and ambiguous as to the terms "calculations," and "analyses."

Subject to and without waiving its specific and General Objections, Walmart states that it will not further respond to this Request.

**REQUEST 59:** Documents related to surveys conducted by the Agency for Healthcare Research and Quality, including Community Pharmacy Surveys on Patient Safety Culture, including:

    a.        survey results completed by Your pharmacists;

    b.        compilations, summaries, and analyses of survey results;

    c.        Communications with the Agency for Healthcare Research and Quality and its representatives; and

    d.        Documents related to actions taken or considered by You after any analysis of survey results.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 59 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this case, including, but not limited to, because it seeks information unrelated to Walmart's dispensing of controlled substances and not relevant to alleged violations of the Controlled Substances Act, under which Plaintiff's claims are brought. Walmart further objects to Request No. 59 as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks individual survey results because that would involve hundreds of pharmacists who worked at Walmart

MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

pharmacies, most of whom have not dispensed any prescriptions that have been identified as the basis for Plaintiff's claims in this case. Walmart also objects to Request No. 59 as vague, ambiguous, and overly broad regarding the phrases "[c]ommunications with the agency," and "actions taken or considered . . . after any analysis of survey results."

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to surveys conducted by the Agency for Healthcare Research and Quality which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart states that it will not further respond to this Request.

**REQUEST 60:** Documents related to any surveys completed by Your pharmacists related to their employment, including:

a.      survey results completed by Your pharmacists;

b.      compilations, summaries, and analyses of survey results; and

c.      Documents related to actions taken or considered by You after any analysis of survey results.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 60 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this case, including, but not limited to, because it seeks information unrelated to Walmart's dispensing of controlled substances and not relevant to alleged violations of the Controlled Substances Act, under which Plaintiff's claims are brought. Walmart further objects to Request No. 60 as overly broad, unduly burdensome, and

REDACTED - CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

not proportional to the needs of this case because it potentially seeks documents related to thousands of pharmacists who worked at Walmart pharmacies, most of whom have not dispensed any prescriptions that have been identified as the basis for Plaintiff's claims in this case. Walmart also objects to Request No. 60 as vague, ambiguous, and overly broad regarding the phrases "[c]ommunications with the agency," and "actions taken or considered . . . after any analysis of survey results."

Subject to and without waiving its specific and General Objections, Walmart states that it will not further respond to this Request.

**REQUEST 61:** Documents related to Your participation in efforts by the National Association of Chain Drug Stores to draft the document entitled "Stakeholder's Challenges and Red Flag Warning Signs Related to Prescribing and Dispensing Controlled Substances," including Documents related to Your decision not to be a signatory to that document.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 61 to the extent it mischaracterizes Walmart's participation in or relationship to the National Association of Chain Drug Stores document entitled "Stakeholder's Challenges and Red Flag Warning Signs Related to Prescribing and Dispensing Controlled Substances." Walmart also objects to Request No. 61 because many responsive documents are likely to be privileged as attorney-client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132).

DESIGNATED TO CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to the National Association of Chain Drug Stores' creation of a document entitled "Stakeholder's Challenges and Red Flag Warning Signs Related to Prescribing and Dispensing Controlled Substances," which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents relating to the National Association of Chain Drug Stores' creation of a document entitled "Stakeholder's Challenges and Red Flag Warning Signs Related to Prescribing and Dispensing Controlled Substances."

**REQUEST 62:** Documents related to pharmacies placed under a Suspicious Order Monitoring ("SOM") Remediation Plan, including:

    a.    Documents identifying all pharmacies placed under an SOM Remediation Plan;

    b.    Documents reflecting the process by which You identified each pharmacy subject to an SOM Remediation Plan;

    c.    Documents reflecting the requirements of each pharmacy's SOM Remediation Plan;

    d.    Documents reflecting the steps taken during execution of the SOM Remediation Plan;

    e.    Documents reflecting the training given to Your Employees at each pharmacy placed under an SOM Remediation Plan; and

    f.    Documents related to interviews of Employees of pharmacies conducted as part of an SOM Remediation Plan.

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 62 on grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant to any party's claims or defenses nor proportional to the needs of the case, including, but not limited to, because it seeks information related to Walmart's distribution of controlled substances. Plaintiff's claims based on Walmart's controlled substance distribution were dismissed from this case with prejudice. (*See* D.I. 117). Walmart further objects to Request No. 62 as overly broad and unduly burdensome because it seeks all documents related to certain Walmart pharmacies, regardless of the document's relevance to any party's claims or defenses. Walmart also objects to Request No. 62 as vague and ambiguous as to the term "SOM Remediation Plan;" which Walmart interprets it to refer to plans made by Walmart. Walmart further objects to Request No. 62 as vague and ambiguous as to the terms "steps taken during execution," and "training given," as it is unclear to what the terms refer. Walmart further objects to Plaintiff's Request No. 62 as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks information related to Walmart's distribution of controlled substances. Plaintiff's claims based on Walmart's controlled substance distribution have been dismissed from this case with prejudice. (*See* D.I. 117).

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to SOM Remediation Plans which Plaintiff has

PAGES CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92), including in production volumes WMT_DOJ_021 and WMT_DOJ_025. Walmart states that it will not further respond to this Request.

**REQUEST 63:** Documents related to pharmacies identified as "high" and "very high" risk locations based on SupplyLogix evaluations.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 63 on grounds that it is overly broad and unduly burdensome because it seeks information that is not relevant to any party's claims or defenses not proportional to the needs of the case, including, but not limited to, because it seeks information unrelated to any prescriber or prescription that has been identified in Plaintiff's Complaint as the basis for Plaintiff's claims in this case. Walmart further objects to Request No. 63 as overly broad and unduly burdensome because it seeks all documents related to certain Walmart pharmacies, regardless of the document's relevance to any party's claims or defenses. Walmart also objects to Request No. 63 as vague and ambiguous as to the term "SupplyLogix evaluations," because it is unclear to what the term refers.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents referring to "SupplyLogix" which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart states that it will not further respond to this Request.

REDACTED – CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**REQUEST 64:** All versions of POM 1311 in effect at any time from January 1, 2009, on, including all of its related parts (*e.g.*, FAQs, Patient Communication Guidance, Leadership Message) and all of its sections (*e.g.* POM 1311.1-1311.4).

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 64 on grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this case because it seeks documents in effect beginning January 1, 2009, nearly fifteen years before the violations alleged in Plaintiff's Complaint. Walmart also objects to Request No. 64 as vague as to the referenced "related parts" and "sections" because it is unclear to what documents these terms refer.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to the versions of POM 1311 which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart also agrees to conduct a reasonable inquiry into reasonably accessible non-custodial centrally located sources and produce non-privileged, published versions of POM 1311 in effect at any time between June 26, 2013 and December 22, 2020, to the extent such additional documents are identified.

**REQUEST 65:** Documents related to the following addition to POM 1311's list of red flags in or about February 2017: "Prescriber is under investigation or has been disciplined for inappropriate prescribing of controlled substances." *See* WMT_DOJ_000553669-71.

**RESPONSE:** Walmart specifically objects to Plaintiff's Request No. 65 on grounds that responsive documents are highly likely to be privileged as attorney-

THIS PAGE MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

client communications and attorney work product. Walmart will log any documents it withholds as privileged pursuant to the ESI Order (D.I. 132). Walmart also objects to the extent Plaintiff mischaracterizes the contents of the document cited in Request No. 65; Walmart refers to the referenced document for a complete and accurate statement of its contents.

Subject to and without waiving its specific and General Objections, Walmart refers Plaintiff to documents relating to POM 1311 which Plaintiff has access to pursuant to the Court's September 20, 2022 Order (D.I. 69) and January 13, 2023 Order (D.I. 92). Walmart does not believe it is reasonable to conduct further searches in an attempt to identify additional non-privileged relevant and unique documents regarding the addition of the language identified in Request No. 65 to POM 1311.

**REDACTED - CONTAIN WALMART CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

OF COUNSEL:

Yaakov M. Roth
William G. Laxton, Jr.
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939

James W. Carlson
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2172
(412) 391-3939

Karen P. Hewitt
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
(858) 314-1200

Jason S. Varnado
Andrew J. Junker
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002-2172
(832) 239-3939

Laura Jane Durfee
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215-2673
(614) 281-3895

Dated:  October 10, 2024

*/s/ Kelly E. Farnan*
Robert W. Whetzel (#2288)
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
whetzel@rlf.com
farnan@rlf.com

David W. Ogden
Charles C. Speth
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

*Attorneys for Walmart Inc. and
Wal-Mart Stores East, LP*

MAY CONTAIN WALMART CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2024, true and correct copies of the foregoing document were caused to be served on the following counsel of record as indicated:

**BY ELECTRONIC MAIL**
David C. Weiss
United States Attorney
Dylan Steinberg
Elizabeth F. Vieyra
Assistant United States Attorney
U.S. Attorney's Office
Hercules Building
1313 N. Market Street
Wilmington, DE 19801

**BY ELECTRONIC MAIL**
Amanda N. Liskamm
Rachael L. Doud
Joshua Fowkes
Kathleen B. Brunson
Katherine M. Ho
Kimberly R. Stephens
U.S. Department of Justice
Civil Division
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044

**BY ELECTRONIC MAIL**
Lindsay Sax Griffin
Carolyn B. Tapie
USDOJ - Middle District of Florida

400 North Tampa Street, Suite 3200
Tampa, FL 33602

**BY ELECTRONIC MAIL**
Amanda A. Rocque
Jasand P. Mock
USDOJ - District of Colorado
1801 California Street, Suite 1600
Denver, CO 80202

**BY ELECTRONIC MAIL**
C. Michael Anderson
Andrew Kasper
USDOJ - Eastern District of North
Carolina
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601

**BY ELECTRONIC MAIL**
Elliot M. Schachner
Megan Freismuth
USDOJ - Eastern District of New
York
U.S. Attorney's Office
Eastern District of NY
271 Cadman Plaza East
7th Floor
Brooklyn, NY 11201

*/s/ Kelly E. Farnan*
*Attorney for Walmart, Inc. and*
*Wal-Mart Stores East, LP*

- 86 -

CONFIDENTIAL

## Exhibit A



CONFIDENTIAL

### Exhibit B
### Walmart's Identified Custodians

| Custodian | Relevant Role(s)<br>(6/26/2013 – 12/22/2020) | Search Date(s) |
|---|---|---|
| ██████ | Senior Director, Health & Wellness Practice Compliance | 6/26/2013 – 10/2018 |
| | Senior Director II, Health & Wellness Practice Compliance and Ethics | 10/2018 – 8/2019 |
| ██████ | Senior Director, Health & Wellness Professional Relations & Clinical Quality Assurance | 6/26/2013 – 10/2015 |
| | Senior Director, Health & Wellness Quality Assurance & Clinical Services | 10/2015 – 2/2018 |
| | Senior Director, Health & Wellness Professional Relations & Practice Clinical Services | 2/2018 – 10/2018 |
| | Senior Director II, Business Strategy | 10/2018 – 12/22/2020 |
| ██████ | Senior Director, Health & Wellness Practice Compliance | 6/26/2013 – 10/2018 |
| | Senior Director, Specialty Compliance Ethics | 10/2018 – 8/2019 |
| ██████ | Director, Controlled Substances, Health & Wellness Practice Compliance | 5/2014 – 10/2018 |
| | Director, Specialty Compliance Ethics | 10/2018 – 4/2019 |
| ██████ | Senior Director I, Health & Wellness Practice Compliance | 6/26/2013 – 12/22/2020 |
| ██████ | Vice President, Health & Wellness Compliance | 6/26/2013 – 6/2017 |
| ██████ | Senior Director, Health & Wellness Practice Compliance | 6/26/2013 – 10/2018 |
| | Senior Director, Specialty Compliance Ethics | 10/2018 – 8/2019 |
| ██████ | Senior Manager, Controlled Substances Regulatory Affairs | 6/26/2013 – 6/2014 |
| | Director, Corporate Compliance, Health & Wellness Practice Compliance | 6/2014 – 3/2017 |
| ██████ | Senior Manager, Health & Wellness Practice Compliance | 6/26/2013 – 6/2014 |

CONFIDENTIAL

| Custodian | Relevant Role(s) (6/26/2013 – 12/22/2020) | Search Date(s) |
|---|---|---|
| | Director, Operations & Federal Regulatory Affairs, Health & Wellness | 6/2014 – 10/2014 |
| | Director, Health & Wellness Practice Compliance | 11/2014 – 10/2018 |
| | Director, Specialty Compliance Ethics | 10/2018 – 12/2018 |
| | Director, Specialty Compliance Ethics, Health & Wellness | 12/2018 – 12/22/2020 |
| | Senior Manager, Controlled Substance Regulatory Affairs—Health & Wellness | 6/26/2013 – 1/2014 |
| | Senior Manager, Controlled Substance Regulatory Affairs—Health & Wellness | 1/2014 – 6/2014 |
| | Director, Operations and Federal Regulatory Affairs—Health & Wellness | 6/2014 – 10/2014 |
| | Director, Health & Wellness Practice Compliance | 10/2014 – 10/2018 |
| | Director, Specialty Compliance Ethics—Health & Wellness | 10/2018 – 12/22/2020 |

EXHIBIT 3

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, DC 20001.2113

TELEPHONE: +1.202.879.3939 • JONESDAY.COM

Direct Number: +1.202.879.3836
WGLAXTON@JONESDAY.COM

December 13, 2024

BY E-MAIL

Dylan J. Steinberg
Chief, Civil Division
United States Attorney's Office
1313 N. Market Street
Wilmington, DE 19801
Dylan.steinberg@usdoj.gov

Katherine M. Ho
Trial Attorney
U.S. Department of Justice Civil Division,
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
Katherine.ho@usdoj.gov

Re:     *United States v. Walmart Inc., et al.*, No. 1:20-cv-01744-CFC (D. Del.)

Counsel:

I write on behalf of Walmart regarding the government's November 26, 2024 letter responding to Walmart's Objections and Responses to the United States' Requests for Production 1 and 2.

As explained in Walmart's November 12, 2024 letter, the government's Request 1 seeks access to every controlled substance prescription filled at any of Walmart's 5,000 pharmacies over the last decade. Request 2 demands data on millions of further prescriptions for non-controlled substances. Walmart's previous letter detailed the government's failure to justify those over-broad, irrelevant, and disproportionate discovery requests, which together amount to an unprecedented intrusion into the sensitive health information of millions of Americans.

At no point has the government made any attempt to narrow its data requests to have any relation to the prescriptions it alleges were dispensed in violation of the Controlled Substances Act ("CSA"). Instead, the government explicitly confirmed that its requests are focused almost exclusively on data that has nothing to do with those prescriptions when it asked, "whether Walmart is willing to produce any substantial amount of dispensing data *beyond the remaining data for the identified problem prescribers.*" Letter from K. Brunson to W. Laxton at 3 (Nov. 26, 2024). The government then reiterated during the parties' December 4 meet-and-confer that it was seeking Walmart's dispensing data in an attempt to add new claims to this case—both new "problem prescribers" *and* new categories of "red flag" combination prescriptions that are not pled in its Complaint. In other words, the government has repeatedly admitted that the sole purpose of its data requests is to exploit the civil discovery process to conduct a *second* nationwide investigation into Walmart's pharmacy business.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Dylan J. Steinberg
Katherine M. Ho
December 13, 2024
Page 2

Civil discovery cannot be used to cast around for new claims. As numerous courts have long held—and as the plain text of Rule 26(b)(1) instructs—discovery is limited to a plaintiff's well-pleaded claims. *See* Fed. R. Civ. P. 26(b)(1) (limiting discovery to "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case"). The government cannot circumvent this basic principle by artificially expanding its "claims" to encompass unknown and unidentified CSA violations. The government's claims for relief—the only permissible subject of discovery—are those alleged in the Second Amended Complaint. Those CSA claims rest on two legal theories of liability—the pharmacist-knowledge and compliance-team-knowledge theories—but that does not mean the government has alleged every conceivable CSA violation that might fit within those categories. That would be absurd.

Accordingly, Walmart is willing to continue meeting and conferring regarding the dispensing data relevant to the government's claims, as outlined below. Walmart will not, however, produce the protected health information of tens of millions of non-parties simply because the government wishes to pursue a case it has not pled.

## I. Discovery Cannot Be Used to Search for Additional Claims for Relief.

The Federal Rules limit discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). That language restricts discovery to the "actual claims and defenses involved in the action." Adv. Com. Note to Fed. R. Civ. P. 26(b)(1) (2000). Thus, a plaintiff has "no entitlement to discovery to develop new claims … that are not already identified in the pleadings." *Id.*

Numerous courts—including the District of Delaware—have expounded and applied that basic principle for decades. *See, e.g.*, *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 41 (D. Del. 1993) ("While a plaintiff is entitled to a full opportunity to adduce evidence in support of the cognizable claims set out in his complaint, he is not entitled to discovery for the purpose of determining whether or not there may be a factual basis for a claim he has not made.") (quoting *McLaughlin v. Copeland*, 455 F. Supp. 749, 753 (D. Del. 1978), *aff'd*, 595 F.2d 1213 (3d Cir. 1979));[1] *see also, e.g.*, *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 195 (5th Cir. 2009) (discovery must be "targeted to the claims alleged"; it is not "a search for new claims"); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) (courts must not "condone the use of discovery to engage in fishing expeditions," which occurs when a party seeks to "engage in wholesale searches for evidence") (cleaned up); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478

---

[1] The government has argued that *In re ML-Lee Acquisition Fund II, L.P.* is inapposite because it "involved a request for a broad and poorly defined set of documents." D.I. 148 at 3. As explained in Walmart's November 12, 2024 letter, the same is true here. More important, a mountain of federal caselaw confirms that the principle invoked by the District of Delaware is not limited to the specific circumstances of that case.

Dylan J. Steinberg
Katherine M. Ho
December 13, 2024
Page 3

F.3d 413, 425–26 (1st Cir. 2007) (litigants "should not be permitted to conduct fishing expeditions in hopes of discovering claims that they do not know they have") (quoting *McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006)); *Gravelle v. Avis Indus. Corp.*, 2021 WL 4204947, at *2 (7th Cir. Sept. 16, 2021) ("[D]iscovery is not an opportunity to fish for new claims.") (citing *James v. Hyatt Regency Chi.*, 707 F.3d 775, 784 (7th Cir. 2013)); *S. Pointe Wholesale, Inc. v. Vilardi*, 2018 WL 2085275, at *4 (W.D. Ky. Feb. 2, 2018) ("[D]iscovery is not a tool with which to search for new claims, rather it is a tool to develop support for claims already asserted."); *Haigh v. Constr. Indus. & Laborers Joint Pension Tr. for S. Nev., Plan A & Plan B*, 2015 WL 1886666, at *6 (D. Nev. Apr. 24, 2015) (allowing a plaintiff to "fish for evidence to support new claims … not contained in the complaint … would frustrate the fundamental goals of Rule 8 and Rule 26").

Simply put, the sole legitimate "purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists." *Stoner v. Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991). The government has neither disputed that basic principle, nor offered any reason to depart from it in this case.

Indeed, if anything, adherence to this rule is especially important—and equitable—given the government's extensive pre-litigation investigation pursuant to its general regulatory powers over CSA registrants like Walmart. *See, e.g., United States v. Ridley's Fam. Mkts.*, No. 20-cv-173, D.I. 74, slip op. at 13–15 (D. Utah June 27, 2022) (citing pre-litigation investigation in CSA case to justify denial of sweeping discovery requests). Courts have long recognized that a plaintiff's pre-suit access to information informs judicial scrutiny of its pleadings. *See, e.g., Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) (explaining that "the plausibility of claims … should be measured" against facts "readily ascertainable" to plaintiff); *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 258 (2d Cir. 2014) (federal agency's pleading failures were especially apparent because its complaint "followed a three-year investigation" in which the agency enjoyed "ready access to [defendant's] documents and employees"); *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 723 (2d Cir. 2013) ("imprecise pleading is particularly inappropriate" where "plaintiffs necessarily have access, without discovery, to … specific information from which to fashion a suitable complaint"). Using discovery as a fishing expedition to search for new claims is always impermissible, but it is especially improper in this context.

## II. The Government Cannot Expand Discovery by Mischaracterizing the Nature of its Claims for Relief.

So far, the government has not disputed the principle that discovery must be directed to the CSA claims actually alleged in the Second Amended Complaint. Instead, the government has argued that it has effectively alleged an *indefinite* number of CSA claims—specifically, every

JONES DAY

Dylan J. Steinberg
Katherine M. Ho
December 13, 2024
Page 4

hypothetical CSA claim that could fall within one of the *legal theories* of liability expounded in the Second Amended Complaint. On that flawed premise, the government asserts an entitlement to sweeping nationwide discovery untethered to the Second Amended Complaint's allegations concerning specific prescribers, specific patients, and specific prescriptions.

That is wrong. The fact that the Second Amended Complaint articulates two legal theories of CSA liability—the pharmacist-knowledge and compliance-team-knowledge theories—does not mean that the government has actually alleged every conceivable CSA claim that might fit within one of those theories. If a litigant could artificially expand its "claim" to capture any (as-yet-unknown) violations that *resemble* those it actually alleged, nothing would remain of the black-letter rule that discovery is limited to well-pleaded claims. In the government's telling, securing sweeping nationwide discovery is as easy as alleging a *single* claim for relief and articulating in general terms the legal theory that supports it. Apparently, that simple maneuver would suffice to state a categorical "claim" of indefinite scope—and open the door to discovery aimed at populating the asserted category with additional violations.

In addition to gutting the basic rule that discovery is not a fishing expedition, the government's theory rests on a fundamental misunderstanding of a "claim"—the term employed in Rule 26(b)(1). Numerous courts—including the Third Circuit—have long recognized that a "claim" under the Federal Rules is "'the aggregate of operative facts which give rise to a right enforceable in the courts.'" *Cristin v. Brennan*, 281 F.3d 404, 418 (3d Cir. 2002) (quoting *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir. 1943)); *see also, e.g.*, *Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 840 (9th Cir. 2000) (same); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1279 n.15 (7th Cir. 1983) (same); 2 Moore's Federal Practice § 10.03[2][a] (3d ed. 2006) ("The word 'claim' denotes the allegations that give rise to an enforceable right to relief.").

Given that well-established definition, a "claim" is generally inseparable from a *legal violation*—*i.e.*, the defendant's act or omission which, if proved, entitles the plaintiff to a judicial remedy. That linkage explains why courts so often refer to "claim[s] *for relief*." *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added). In previous correspondence, the government has not disputed this doctrinal definition of a claim, but protested that it "does not define [the] 'aggregate of operative facts.'" D.I. 148 at 1. But it does: A claim consists of "the aggregate of operative facts *which give rise to a right enforceable in the courts*." *Cristin*, 281 F.3d at 418 (emphasis added). And an enforceable legal right is informed by the substantive law that defines the alleged violation—here, the CSA and its regulations.

Under those authorities, a CSA "claim" is coterminous with a CSA *violation*. By statute and regulation, CSA liability is a violation-by-violation affair: Each prescription dispensed in violation of 21 C.F.R. § 1306.04(a)—the relevant regulation here—constitutes a separate violation

Dylan J. Steinberg
Katherine M. Ho
December 13, 2024
Page 5

of 21 U.S.C. § 829, and thus an "[u]nlawful act[]" under 21 U.S.C. § 842(a)(1). Each such discrete "unlawful act" entitles the government to a separate civil penalty: "[A]ny person who violates this section shall, *with respect to any such violation*, be subject to a civil penalty of not more than $25,000." 21 U.S.C. § 842(c)(1)(A) (emphasis added). As such, civil penalties for violations of 21 C.F.R. § 1306.04(a) cannot be analogized to damages attributable to a single overarching violation. Instead, they are available only on a violation-by-violation basis. In other words, the "claim for relief" is violation-specific. That means the government can only plead a viable CSA "claim" where it alleges plausible facts showing a CSA violation—*i.e.*, an invalid prescription dispensed with knowledge of its invalidity. The Second Amended Complaint does that for tens of thousands of prescriptions; that defines the scope of this litigation and thus limits the scope of permissible discovery.

If the government instead wishes to treat the two surviving counts in its Second Amended Complaint as discrete, overarching CSA claims encompassing an untold number of violations, it must also agree to seek a maximum of two civil penalties under the CSA. If the government is willing do that, Walmart will promptly resolve this case—but absent that, it is clear that each CSA violation represents a distinct "claim" and therefore only the violations plausibly alleged in the Second Amended Complaint are the proper subject of discovery.

Understanding "claims" to consist of well-pleaded, actionable violations is not new or unusual. For instance, it informs the way courts analyze claim accrual. In general, "a claim accrues when the last act needed to complete the tort [or other legal violation] occurs." *Nguyen v. Pennsylvania*, 906 F.3d 271, 273 (3d Cir. 2018). A statute of limitations "begins to run at the time the claim accrues, and ... time-barred claims cannot be resurrected by being aggregated and labeled continuing violations." *O'Connor v. City of Newark*, 440 F.3d 125, 129 (3d Cir. 2006). Indeed, the government appears to agree, given its decision to limit its alleged CSA violations to those committed within six years of this suit (after accounting for tolling). As that implicitly recognizes, each CSA violation is a discrete "claim" with an identifiable accrual date. And there is no plausible reason to treat discrete CSA violations as separate claims for purposes of the statute of limitations, but parts of a broader single claim for purposes of discovery.

In arguing that the Second Amended Complaint encompasses any CSA violations that resemble those alleged, the government mistakenly conflates a *claim* with a *legal theory* that might support a class of similar claims. It also ignores the "distinction between claims and counts." *Hirst v. Skywest, Inc.*, 2022 WL 3999701, at *6 (N.D. Ill. Aug. 31, 2022). As explained above, "a claim is the aggregate of operative facts which give rise to a right enforceable in the courts." *Id.* (cleaned up). By contrast, a "count is the articulation of a legal theory that may provide support for the plaintiffs' claim." *Id.* And while the government has styled the Second Amended Complaint's counts as "claims for relief" (D.I. 109 at 194–96), that superficial choice does not control the scope

Dylan J. Steinberg
Katherine M. Ho
December 13, 2024
Page 6

of permissible discovery (again, at least unless the government also accepts the remedial consequence of a single civil penalty per count).[2]

Nor does it help to focus exclusively on the compliance-team theory set forth in Count II of the Second Amended Complaint. Under that theory, the government alleges a "claim" only where it plausibly alleges that a Walmart pharmacist filled a prescription written by a physician to whose categorical lawbreaking the "compliance team" was supposedly willfully blind. As the government has explained, Count II "alleges that all prescriptions *written by certain prescribers* and filled by Walmart after a certain date were invalid." D.I. 148 at 1 (emphasis added). Thus, each CSA claim brought under the compliance-team theory is necessarily tethered to a particular prescriber. The fact that the government's legal theory *could* hypothetically apply to other, as-yet unknown prescribers is not a reason to permit a fishing expedition aimed at "[a]dding problem prescribers" to this litigation. Letter from K. Brunson to W. Laxton at 2 (Oct. 30, 20204).

## III.    Proposed Compromise Dispensing Data Productions.

As noted above, Walmart is willing to continue meeting and conferring with the government about producing additional dispensing data that is relevant to the claims the government pled. Specifically, Walmart is willing to produce, to the extent the government does not already have it:

- **Complaint Prescribers:**  For the 18 prescribers identified by name in the Complaint under Counts I and II that the government has not previously withdrawn, Walmart is willing to produce transactional dispensing data showing all prescription fills (regardless of medication type) for those prescribers from June 26, 2013 to December 22, 2020 using the data fields Walmart produced in other opioid-related litigation or the government's investigation (including pharmacist name).

- **Allegedly Invalid Prescriptions:**  For all of the prescriptions identified in the Complaint under Count I as allegedly invalid, Walmart is willing to produce

---

[2] In response, the government has cited two cases, neither of which involved the scope of discovery. First, it relies on an unpublished district court order that contains no relevant legal analysis and provides no basis to depart from the well-established principles set out above. *Palmer v. Ameribanq Mortg. Grp., LLC*, 2009 WL 1249292, at *2 (E.D. Pa. May 5, 2009). Second, it cites footnoted dicta from a Second Circuit decision. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 242 n.11 (2d Cir. 2016). But the observation that a PSLRA plaintiff is not necessarily limited "to the precise set of alleged misstatements identified in their complaint throughout the entire course of litigation" says nothing about a plaintiff's entitlement to *discovery* aimed at identifying new claims. *Id.* After all, a plaintiff can always seek leave to amend the complaint to add claims if new facts happen to emerge in discovery; that is fundamentally different, however, from using discovery to identify such new claims.

Dylan J. Steinberg
Katherine M. Ho
December 13, 2024
Page 7

transactional dispensing data for those prescriptions reflecting the additional data fields utilized by Walmart in other opioid litigations or the government's investigation (including pharmacist name).

- **Relevant Individual Patients:** Walmart will also meet and confer with the government regarding additional dispensing data productions related to any patient receiving a prescription identified by the government as allegedly invalid in its Complaint under Counts I or II and that Walmart or the government also identify as a potential witness in this case.

Combined with the data for approximately 629 prescribers already in the government's possession from its investigation (*see* Letter from W. Laxton to D. Steinberg and K. Ho at 2-3 (Nov. 12, 2024)), Walmart's proposed production would mean the government has in its possession more than six million lines of dispensing data, including all relevant data related to the prescriptions it alleged in its Complaint were invalid.

\*      \*      \*

In short, discovery is not a vehicle for identifying all CSA claims that might satisfy the government's legal theories of liability. The only legitimate purpose of discovery is to establish the factual basis (or lack thereof) for the tens of thousands of CSA claims actually alleged in the Second Amended Complaint. Requests 1 and 2 ignore that basic principle.

Regards,

*/s/ William G. Laxton, Jr.*
William G. Laxton, Jr.

cc:   Kate Gilchrist Brunson, Consumer Protection Branch
      Kelly Farnan, Richards, Layton & Finger, P.A.
      Karen P. Hewitt, Jones Day
      Jason S. Varnado, Jones Day
      James W. Carlson, Jones Day

EXHIBIT 4



# U.S. Department of Justice
Civil Division
Consumer Protection Branch

---

**Mailing Address**
P.O. Box 386
Washington, DC  20044-0386

**Overnight Delivery Address**
450 Fifth Street, NW
Suite 6400
Washington, DC  20001

October 30, 2024

<u>**Via Electronic Mail**</u>
William G. Laxton, Jr.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001
wglaxton@jonesday.com

> **Re:** ***United States of America v. Walmart Inc.,*** **C.A. No. 20-1744-CFC, Walmart's Objections and Responses to Plaintiff's First Set of Requests for Production**

Dear Billy:

The United States writes to raise deficiencies in Walmart's Responses to the United States' First Set of Requests for Production (the "Response").  In the interest of productively using time already scheduled during our upcoming November 1, 2024 meet-and-confer teleconference, this letter addresses only Walmart's Response to Requests 1 and 2.  We will write separately to addresses other deficiencies in the Response.

**REQUEST 1:** Documents, including electronic and hard copy records, showing all Controlled Substances dispensed by Your pharmacies, including all fields for those fills in Your pharmacy software system(s).

**Walmart's Response:** Walmart asserts a series of objections, including that the Request is overly broad, unduly burdensome, and not proportional to the needs of the case and that the Request is duplicative of "the over six million lines of dispensing data" previously produced. Walmart also objects that the phrases "all fields" and "pharmacy software system(s)" are vague or ambiguous. Walmart further objects on the basis of HIPAA.  Walmart concludes that it "will not respond further to this Request."

October 30, 2024
Page 2 of 5

**United States' Response:**

Walmart's blanket refusal to produce dispensing information pursuant to this Request is improper.  Walmart does not dispute that its dispensing data is relevant to this Litigation and does not contend that the data is privileged.  During the investigation, Walmart responded to a DEA administrative subpoena by producing over 6 million lines of dispensing data for prescriptions written by approximately 629 prescribers.  But only about one-third of that data reflects Walmart's dispensing of controlled substances.  The other approximately 4 million lines of dispensing data reflects non-controlled substances that Walmart dispensed.  Walmart operates more than 5,000 pharmacies and dispenses millions of controlled substance prescriptions annually.  In comparison to the scale of its dispensing, the data Walmart has provided to date is not even sufficient as a sampling.  Moreover, partial compliance with an administrative subpoena does not excuse a party from participating in a formal and orderly discovery process in accordance with Rule 26.[1]

Walmart also appears to base its proportionality objection on its erroneous argument that the United States cannot seek statutory penalties for any invalid prescription fills that are not specifically identified in the Complaint.  The United States responded to this argument (Issue 1) in its September 19, 2024 Response to Defendant's Discovery Dispute Letter.  As the government explained, Federal Rule of Civil Procedure 8 does not require the specificity that Walmart seeks.  Additionally, statutory violations are distinct from claims.  Adding problem prescribers and red-flag prescriptions does not add new claims but additional violations to two existing claims.  *See Palmer v. Ameribanq Mortg. Grp., LLC*, No. 05-2023, 2009 WL 1249292, at *1-2 (E.D. Pa. May 5, 2009).  The United States is therefore entitled to obtain through discovery additional dispensing data and to seek statutory penalties for invalid prescription fills identified in the additional dispensing data.

Given that this data is highly relevant to identifying additional violations, the burden of compliance is not undue.  The Request seeks dispensing data that, to the United States' understanding, is largely computerized, centrally maintained, and may be produced in structured files.  The United States offers to meet and confer to discuss ways to minimize the burden of producing noncomputerized, hard-copy records.

Contrary to Walmart's assertion, the terms "pharmacy software system(s)" and "all fields" are specific and their meanings and are known to Walmart based on Walmart's own material and the parties' dialogue in this Litigation.  *See* POM 1005 (describing input of data into "fields"); Connexus Work Flow, Apr. 3, 2013, WMT_MDL_001476735 ("Connexus is Walmart Store's Inc proprietary *pharmacy software system* used throughout the United States and PR." (emphasis added)); Walmart Stores Inc. Health and Wellness Pharmacy Overview, June 2018, WMT_CN_000009466 (again describing Connexus as Walmart's "pharmacy software system" and detailing process for data input into Connexus "fields").  In a June 11, 2024 email, government's counsel explained to Walmart's counsel that "[o]ur understanding is that Connexus has been the only pharmacy software system Walmart has used during the relevant time period."

---

[1] Walmart previously emphasized the distinct nature of discovery under the Federal Rules.  *See* K. Hewitt, Letter, May 13, 2021.

October 30, 2024
Page 3 of 5

*See* Att. A.  In response, Walmart's counsel did not seek clarification on the phrase.  In that same email, when government counsel emailed Walmart's counsel requesting "a list of all Connexus fields," Walmart's counsel expressed no confusion about the meaning of this phrase.  *See id*.

Walmart also objected that the request is not proportional because "it seeks information in 'all fields' regardless of the relevance of the information to the parties' claims and defenses in this case."  The government appreciates this objection and sought to address it before issuing this request.  In June of this year, government counsel asked if Walmart would voluntarily provide a list of all Connexus fields so that the United States could tailor its request for production to only relevant fields.  Walmart refused the government's request and instead suggested that the parties meet and confer regarding data fields after the government issued its request.

Finally, HIPAA cannot be used to shield discovery where, as here, the parties have agreed to an appropriate protective order.  HIPAA authorizes disclosure of personal health information in judicial proceedings through discovery requests when a "qualified protective order" is in place.  45 C.F.R. § 164.512(e)(1)(ii), *see, also e.g., Crawford v. Corizon Health, Inc.*, No. 17-cv-113, 2018 WL 1863022, at *2 (W.D. Pa. Apr. 18, 2018).  The Protective Order entered in this matter constitutes such an order.  D.I. 88 at ¶¶ 26-31.

Walmart must supplement its response and produce documents responsive to this Request.  The United States is available to meet and confer regarding the appropriate scope of data fields and ways to otherwise minimize the burden of this request.

**REQUEST 2:** Documents, including electronic and hard copy records, showing any of the following non-Controlled Substances (including all brand name and generic versions, and drugs that include one of the below substances in combination with other substances) dispensed by Your pharmacies, including all fields for those fills in Your pharmacy software system(s):

      a. Carisoprodol;
      b. Chlorzoxazone;
      c. Cyclobenzaprine;
      d. Doxylamine;
      e. Gabapentin;
      f. Hydroxyzine;
      g. Loperamide;
      h. Norvir;
      i. Orphenadrine;
      j. Ritonavir; and
      k. Trazodone.

**Walmart's Response:** In addition to several objections Walmart also asserts to Request 1, Walmart objects that data related to non-Controlled Substances is not proportional to the needs to the case because non-controlled substances are not regulated by the Controlled Substances Act.  Walmart also objects that the request is vague and ambiguous to the extent it seeks "drugs that include one of the below substances in combination with other substances."  Walmart further objects to the phrase "non-Controlled Substances" as vague and ambiguous because the request

October 30, 2024
Page 4 of 5

identifies Carisoprodol. Walmart responds that it will not produce any information pursuant to the Request.

**United States' Response:**

Walmart's refusal to produce dispensing data pursuant to this Request is improper for the same reasons that its response to Request 1 is improper. The Request seeks relevant information concerning non-controlled substances that may raise a red flag when prescribed in combination with controlled substances and may make it more likely that the controlled substance prescriptions were invalid. These include potentiators, which as explained in the Complaint, and as recognized by Walmart and its pharmacists, increase the euphoric effect brought on by controlled substances, and correspondingly the risk of abuse and overdose. Compl., ¶ 491; *see also* ▮▮▮▮▮▮, Controlled Substance Abuse Awareness and Updates, WMT_EDTX_ 00064582-93. The United States is entitled to discovery as to instances when such prescriptions were filled.

The United States' request for drugs that "include one of the below substances in combination with other substances" is not vague and ambiguous. A combination drug product contains two or more active ingredients combined into a single drug product. *See* 21 C.F.R. § 300.50. The request seeks data for drug products that contain only one active ingredient, as well as drug products that contain one of the substances listed, along with any other active ingredients. If Walmart does not know whether any particular drug fits into the government's request, we are available to meet and confer.

Finally, the inclusion of Carisoprodol in this request was an error that does not impact the meaning of the request and is not a ground for withholding responsive, nonprivileged documents. Dispensing data for Carisoprodol is encompassed within RFP 1.

Walmart must supplement its response and produce documents responsive to this Request.

\* \* \*

We anticipate discussing these issues with Walmart during our upcoming meet-and-confer teleconference. The United States reserves all rights and does not waive its right to supplement its challenges as to Walmart's Response.

Sincerely,

*/s/ Kathleen G. Brunson*
Kathleen G. Brunson
Trial Attorney

October 30, 2024
Page 5 of 5

cc:     Katherine M. Ho, Consumer Protection Branch
          Kimberly Stephens, Consumer Protection Branch
          Dylan Steinberg, U.S. Attorney's Office, District of Delaware
          Elizabeth F. Vieyra, U.S. Attorney's Office, District of Delaware
          Kelly Farnan, Richards, Layton & Finger
          Karen P. Hewitt, Jones Day
          Jason S. Varnado, Jones Day
          James W. Carlson, Jones Day

EXHIBIT 5



**U.S. Department of Justice**
Civil Division
Consumer Protection Branch

| | |
|---|---|
| **Mailing Address** | **Overnight Delivery Address** |
| P.O. Box 386 | 450 Fifth Street, NW |
| Washington, DC 20044-0386 | Suite 6400 |
| | Washington, DC 20001 |

January 16, 2025

**<u>Via Electronic Mail</u>**
William G. Laxton, Jr.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001
wglaxton@jonesday.com

      Re:    *United States v. Walmart Inc. and Wal-Mart Stores East, LP*
               D. Del. Civil Action No. 1:20-cv-01744-CFC

Dear Billy:

      I write in response to your December 11, 2024 letter regarding the United States' answers to Walmart's Interrogatories 1 and 2,[1] and your December 13th letter regarding the United States' RFPs for records of prescriptions dispensed by Walmart and the data fields associated with those records ("dispensing data").

      Walmart is attempting to drastically reduce its exposure in this lawsuit by limiting the United States' ability to seek statutory penalties to those exemplar prescriptions explicitly identified in the Complaint. It is doing so by moving to compel the United States to provide now a final list and description of the prescriptions for which it seeks penalties while refusing to produce nationwide dispensing data from which the United States can identify violative prescriptions. Its attempt hinges on its position that the meaning of the term "violation" in the CSA's civil penalties provision, 21 U.S.C. § 842(c)(1), is "coterminous" with the meaning of the term "claim" in Federal Rule of Civil Procedure 26(b)(1). If that were true, then according to Walmart, the United States cannot pursue penalties for any prescription that was not explicitly

---

[1] Interrogatory 1 asks the United States to identify the prescriptions that serve as the basis of any claim asserted in the case. Interrogatory 2 asks the United States, for each prescription identified in response to Interrogatory 1, to identify the reason(s) the United States contends the prescription violates 21 C.F.R. § 1306.04(a), the methodology used to identify the prescription and reach any conclusions about the prescription, and any analytical programs used to implement the methodologies.

identified in the Complaint.  As explained below, Walmart's position is not supported by the law; the United States' Interrogatory responses are proper; and Walmart's refusal to produce the requested dispensing data is unjustified.  Accordingly, as we agreed during our meet-and-confer call on January 10, 2025, the parties are at an impasse, and these discovery issues are ripe for review by the Court.

**Walmart's Interrogatory 1**:  The Court ordered the United States to produce the lists of invalid fills that it had "provisionally put together."  Sept. 25, 2024 Transcript of Discovery Conference at 20.  The United States complied with the Court's Order by producing the lists of prescriptions that it currently contends serve as the basis for the United States' First and Second Claims.  If the United States determines that Walmart's filling of additional prescriptions violated the CSA or eliminates prescriptions from the lists provided, it will amend and supplement its response to Interrogatory Number 1 in accordance with its obligations under Rule 26(e).

Based on its position that each unlawfully filled prescription is its own claim, Walmart argues that the preliminary list of prescriptions provided by the government is insufficient. Walmart contends that the United States' list of violative prescriptions should be final and cannot be supplemented or modified (except to eliminate prescriptions).  Walmart has also stated that the list the United States already provided "includes many more prescription claims that the government pled in its Complaint," but it did not identify those prescriptions.  Walmart's Dec. 11, 2024 letter, footnote 1.

As an initial matter, Walmart's argument is contrary to the Court's statements at the September 25, 2024 hearing.  The Court stated that the United States would "certainly . . . have the ability to supplement" its provisional list of invalid fills.  Tr. at 16.  The Court ordered the United States to produce the information in 30 days because it was "provisionally put together at this point" but "ask[ed] the parties to be reasonable when it comes to necessary changes that may need to be made."  *Id.* at 20.

Further, Walmart's argument that each individual prescription unlawfully filled constitutes a separate claim is wrong, and it made—and lost—essentially the same argument in its Partial Motion to Dismiss the Amended Complaint.  D.I. 84 at 16-19.  There, Walmart argued that the Government was required to make "prescription-by-prescription allegations," and plead "*each* particular allegedly unlawful act of dispensing."  *Id.* at 16-17.  Walmart accordingly moved the Court to dismiss "any separate claims the Government means to assert" in the paragraphs of the Complaint where the Government alleges that Walmart unlawfully filled thousands of prescriptions with certain red-flag combinations.  *Id.* at 19 (listing paras. 483, 489, 508, 513, and 521-22).  The United States squarely addressed that argument in its motion-to-dismiss brief.  D.I. 93 at 20. The Court did not dismiss any claims or portions of the Complaint based on this argument, and the United States' First Claim and allegations supporting it survived Walmart's Motion.  *See* D.I. 116.  Walmart did not seek reconsideration of or appeal the Court's Order.

Instead, Walmart has repackaged this argument as the basis to contest the sufficiency of the United States' Interrogatory responses. The only authority Walmart has offered in support of its proposition that each violation is its own claim are decisions providing generic definitions of the term "claim," *none* of which involve the CSA or any other civil penalty statute and *none* of which compare the meaning of "claim" and "violation," let alone equate the terms, as Walmart seeks to do. *See Cristin v. Brennan*, 281 F.3d 404, 418 (Antiterrorism and Effective Death Penalty Act); *Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 840 (9th Cir. 2000) (employment discrimination); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1266 (7th Cir. 1983) (Fourth and Fourteenth Amendment challenges to municipal strip search policy); *Hirst v. Skywest, Inc.*, No. 15 C 02036, 2022 WL 3999701, at (N.D. Ill. Aug. 31, 2022) (Fair Labor Standards Act). That is notable because standard definitions of the two terms in legal dictionaries are not "coterminous," *compare, e.g.*, "Claim," Black's Law Dictionary (8th ed. 2004) ("The aggregate of operative facts giving rise to a right enforceable by a court."), *with* "Violation," Black's Law Dictionary ("An infraction or breach of the law; a transgression."), and because courts have recognized that the term "violation" gives rise to "per occurrence" penalties. *See United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1192-93 (E.D. Ky. 2017) (citing *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 399-400 (2d Cir. 2004)).

Walmart's argument that the United States must provide, prior to obtaining meaningful discovery from Walmart, a final list of each violative prescription fill also conflicts with numerous decisions authorizing the Government and private litigants to obtain discovery regarding regulatory or other violations not expressly enumerated in a complaint, particularly when, as here, the additional violations fall within the scope of an alleged course of unlawful conduct. *E.g.*, *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177-78 (E.D. Pa. 2012) ("Plaintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery. . . ."); *In re RFC and ResCap Liquidating Trust Lit.*, No. 13-cv-3451, 2015 WL 12819152, at *5-6 (D. Minn. April 13, 2015); *United States ex rel. Hudalla v. Walsh Const. Co.*, 834 F. Supp. 2d 816, 823 (N.D. Ill. 2011); ECF No. 78, *Hudalla*, No. 05 C 5930 (N.D. Ill. Nov. 23, 2010) (compelling defendant in civil penalties action to produce records related to potentially violative projects not specifically enumerated in Complaint). And Walmart's position conflicts with numerous decisions allowing the Government and private litigants to establish regulatory violations giving rise to civil penalties through extrapolation, which necessarily entail that the Government not specifically identify each violation giving rise to each civil penalty. *E.g. Grant on behalf of United States v. Zorn*, 107 F.4th 782, 794 (8th Cir. 2024); *United States v. Rite Aid Corp.*, No. 2:12-cv-01699, 2020 WL 3970201, at *10 (E.D. Cal. July 14, 2020); *U.S. ex rel. Loughren v. UnumProvident*, 604 F. Supp. 2d 259, 261 (D. Mass. 2009).

Walmart's request for a complete and final list of violative prescriptions at this early stage is particularly unjustified given that Walmart has not yet produced the requested nationwide dispensing data or even a list of the associated data fields maintained in its pharmacy dispensing system. Absent that data and the fields, it is impossible for the United States to identify all prescriptions that Walmart pharmacists knowingly filled within the descriptions in Section II.B.2.b.ii of the Complaint and for which the United States will seek civil penalties. To

restrict this case to the limited set of dispensing data the United States obtained from Walmart during its pre-filing investigation through administrative subpoenas—which Walmart's unsupported "claim" versus "violation" argument implicitly seeks to do—would improperly reward Walmart for not complying with the United States' administrative subpoenas and establish an incentive for other investigative targets to do the same.

**Walmart's Interrogatory 2**:  The United States' response to Interrogatory 2 was not part of the earlier discovery dispute brought to the Court.  Interrogatory 2 asks the United States to identify (a) the reason(s) it contends the prescriptions violated 21 C.F.R. § 1306.04(a), (b) the methodology or methodologies used to identify the prescription and any conclusions about the prescription, and (c) any electronic scripts, codes, or analytical programs used to implement the methodologies.  The United States objected that the Interrogatory was premature and seeks information that will be developed in discovery and addressed by experts later in litigation and should be deferred.  *United States ex rel. Long v. Janssen Biotech, Inc.*, 2023 WL 3794179, at *4 (D. Mass. June 1, 2023) (holding that interrogatories asking the relator to state the basis upon which each claim was false was premature contention interrogatory because discovery was ongoing); *see also, e.g. Novanta Corp. v. Iradion Laser, Inc.*, 2016 WL 4987110, at *7 (D.Del. Sept. 16, 2016) ("courts tend to deny contention interrogatories filed before substantial discovery has taken place, [and instead] grant them if discovery almost is complete" (quoting *Amgen Inc. v. Sandoz Inc.* No. 14-cv-04741, 2016 WL 1039029, at *3 (N.D. Cal. Mar 15, 2016)).

Notwithstanding that objection, the United States provided preliminary data specifications used to identify the prescriptions listed in its October 25, 2024 Response to Walmart (e.g., three or more different immediate-release narcotic painkillers filled either at the same time or with at least 8 days' overlapping supplies is a data specification of the alleged category of "dangerous combinations of opioids"). The United States further explained that these data specifications are not final and reserved its right to supplement, clarify, revise or correct them.

Walmart's argument that the United States' response is deficient is again based on its unsupported position that each violation is its own claim that should have been identified in the Complaint, and thus, Walmart is entitled now to the information requested.  But each violation is not its own claim, and as the United States explained at the September 25, 2025 hearing, it has retained a different set of experts for purposes of litigation and is working with those experts to identify the specific list of violative fills for which the United States will pursue penalties at trial. To the extent necessary and appropriate, the United States will amend and supplement its response to Interrogatory 2.

Walmart's request in Interrogatory 2 is even more unjustified given Walmart's failure to produce the requested dispensing data and a list of the associated data fields.  Absent this information, it is impossible for the United States to identify all facts supporting the invalidity of the prescriptions, even for the prescriptions the United States has already identified.  For example, and without limitation, the United States may decline to seek penalties for prescription

fills for high dosages of opioids where there is some indication from the data fields (such as a diagnosis code or pharmacist notes) that the customer had a cancer diagnosis that may have theoretically warranted a stronger opioid dose. The absence of any such indication would be a fact supporting the invalidity of the prescription, but the United States presently cannot determine what information Walmart possesses about the validity of the prescriptions it has dispensed.

With respect to Walmart's concern that it does not know what combinations of red-flag prescription fills the United States will be seeking penalties for, the United States represents that it will not seek penalties under its First Claim for red-flag prescription fills that do not fall within the categories alleged in Section II.B.2.b.ii of the Complaint.

**United States' request for dispensing data**: Based on Walmart's December 13, 2024 letter, it is clear that Walmart's primary basis for refusing to produce a significant amount of dispensing data is its misguided position that each violation is a claim. The United States has maintained throughout the meet-and-confer process that it is willing to discuss ways to further tailor its dispensing data request. But Walmart's very narrow offer expressed in its December 13, 2024 letter is unacceptable, and the United States intends to seek relief from the Court.

Sincerely,

*/s/ Kathleen G. Brunson*
Kathleen G. Brunson
Trial Attorney

cc:   James W. Carlson, Jones Day
      Kelly Farnan, Richards, Layton & Finger
      Karen P. Hewitt, Jones Day
      Katherine M. Ho, Consumer Protection Branch
      Andrew J. Junker, Jones Day
      Dylan Steinberg, U.S. Attorney's Office, District of Delaware
      Kimberly R. Stephens, Consumer Protection Branch
      Jason S. Varnado, Jones Day
      Elizabeth F. Vieyra, U.S. Attorney's Office, District of Delaware

EXHIBIT 6

| From: | Laxton, Jr., William G. |
|---|---|
| To: | Brunson, Kathleen G; Steinberg, Dylan (USADE); Ho, Katherine; Stephens, Kimberly R.; Vieyra, Elizabeth (USADE) |
| Cc: | Farnan, Kelly E.; Carlson, James W.; Durfee, Laura Jane; Gottbrecht, Geoffrey N. |
| Subject: | [EXTERNAL] FW: Walmart - dispensing data request |
| Date: | Monday, July 1, 2024 10:50:16 AM |
| Attachments: | 2020.01.27 SM Cohen Discovery Ruling Regarding Pharmacy Data Production [Dkt. 3106].pdf |

Kate –

See below for my response from the 21st.

Best,

Billy

William G. Laxton, Jr.

Partner

**JONES DAY® - One Firm Worldwide℠**

51 Louisiana Ave., N.W.

Washington, D.C. 20001-2113

Office 202-879-3836

Cell 919-357-2094

wglaxton@jonesday.com

**From:** Laxton, Jr., William G.
**Sent:** Friday, June 21, 2024 11:52 AM
**To:** Brunson, Kathleen G ; Carlson, James W. ; Durfee, Laura Jane
**Cc:** Gottbrecht, Geoffrey N. ; Farnan, Kelly E. ; Steinberg, Dylan (USADE) ; Ho, Katherine ; Stephens, Kimberly R. ; Vieyra, Elizabeth (USADE)
**Subject:** RE: Walmart - dispensing data request

Kate –

Responding to your request for a list of "all Connexus fields for prescriptions dispensed and fields for the patient profiles" is actually not at all a straightforward exercise. Exhibit A in the attached Order from the MDL shows the data fields that the pharmacies were ordered to produce in that matter. This list was the result of extensive negotiations between the parties with the oversight of the MDL Special Master. Once the government serves its "request for production seeking additional dispensing data," Walmart will evaluate the specific request and the parties can meet and confer over data fields as necessary.

Regards,

Billy

William G. Laxton, Jr.

Partner

**JONES DAY® - One Firm Worldwide℠**

51 Louisiana Ave., N.W.

Washington, D.C. 20001-2113

Office 202-879-3836

Cell 919-357-2094

wglaxton@jonesday.com

**From:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>
**Sent:** Tuesday, June 11, 2024 11:25 AM
**To:** Laxton, Jr., William G. <wglaxton@JonesDay.com>; Lejnieks, Kristen A. <kalejnieks@jonesday.com>
**Cc:** Gottbrecht, Geoffrey N. <ggottbrecht@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>; Ho, Katherine <Katherine.Ho@usdoj.gov>;

Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Vieyra, Elizabeth (USADE)
<Elizabeth.Vieyra@usdoj.gov>

**Subject:** Walmart - dispensing data request

Billy and Kristen,

We are planning to issue a request for production seeking additional dispensing data. To minimize the burdens on your client associated with producing irrelevant data, would Walmart be willing to provide us with a list of all Connexus fields for prescriptions dispensed and fields for the patient profiles so we can appropriately tailor our requests? We would like the fields from June 26, 2013 – present. Our understanding is that Connexus has been the only pharmacy software system Walmart has used during the relevant time period, but if there were others, we'd like this information from those systems as well.

If you'd like, we can set up a call to discuss further.

Thank you,

Kate

Kate Gilchrist Brunson

Trial Attorney

Consumer Protection Branch

U.S. Department of Justice

450 5th St. NW, Washington, DC 20001

Office: (202) 305-0489

Cell: (202) 532-5391

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

EXHIBIT C

13:12:40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           ) C.A. No. 20-1744(CFC)(EGT)
v.                         )
                           )
WALMART, INC., et al.,     )
                           )
            Defendants.    )


                    Friday, March 7, 2025
                    1:00 p.m.
                    Motion Hearing


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE ELEANOR G. TENNYSON
         United States District Court Magistrate Judge



APPEARANCES:


            UNITED STATES ATTORNEY'S OFFICE
            BY:  ELIZABETH VIEYRA, ESQ.

            -and-

            DEPARTMENT OF JUSTICE
            BY:  ANDREW KASPER, ESQ.
            BY:  KATHLEEN G. BRUNSON, ESQ.

            -and-

            DEPARTMENT OF JUSTICE
            CONSUMER PROTECTION BRANCH
            BY:  NOAH KATZEN, ESQ.

                    Counsel for the Plaintiff

```
1          APPEARANCES CONTINUED:

2

3                  RICHARDS, LAYTON & FINGER, PA
                   BY:  KELLY E. FARNAN, ESQ.
4
                   -and-
5
                   JONES DAY
6                  BY:  JASON S. VARNADO, ESQ.
                   BY:  WILLIAM G. LAXTON, JR., ESQ.
7                  BY:  JAMES W. CARLSON, ESQ.
                   BY:  ANDREW J. JUNKER, ESQ.
8                  BY:  WILLIAM K. LEATHERS, III, ESQ.

9
                          Counsel for the Defendants
10

11

12          _ _ _ _ _ _ _ _ _ _ _ _ _ _

13
```

12:59:45 14

12:59:45 15          THE COURT:  Good afternoon, everyone.  Please be

12:59:48 16  seated.  Let's start with some introductions.  Does the

12:59:55 17  government want to introduce first?

12:59:57 18          MS. VIEYRA:  Good afternoon, Your Honor.

13:00:00 19  Elizabeth Vieyra on behalf of the government.  I am joined

13:00:01 20  by Andrew Kasper who will be speaking on the government's

13:00:03 21  motion as well as issues one and two opposing Walmart's

13:00:09 22  motion.  And Kathleen Brunson will be addressing the third

13:00:11 23  issue.

13:00:12 24          THE COURT:  Thank you.

13:00:13 25          Ms. Farnan.

13:00:14  1                    MS. FARNAN:  Good afternoon, Your Honor.  Kelly

13:00:17  2      Farnan from Richards, Layton & Finger on behalf of Walmart.

13:00:21  3      I'm joined today by my co-counsel from Jones Dave, Jason

13:00:24  4      Varnado, Billy Laxton, James Carlson, Andrew Junker, William

13:00:30  5      Leathers, and we also have from the Walmart in the back,

13:00:33  6      Isaac Workman and Julia Sear.  And Mr. Varnado is going to

13:00:36  7      handle the first two issues in our motion and I'll be

13:00:38  8      handling the third issue.

13:00:40  9                    THE COURT:  Great.  Good afternoon to you all of

13:00:42 10      you as well.

13:00:42 11                    We're here today for a number of discovery

13:00:45 12      discount -- I'm sorry.

13:00:47 13                    MR. KATZEN:  Noah Katzen from the Consumer

13:00:49 14      Protection Branch.  I'll be representing the nonparty

13:00:50 15      agencies.

13:00:50 16                    THE COURT:  Thank you.

13:00:51 17                    We're here today on a number of discovery

13:00:53 18      dispute motions filed by the government and two by Walmart.

13:00:59 19      Unless there is a strong objection, I think I would like to

13:01:01 20      start with the government's discovery two motion first.

13:01:06 21      Okay.

13:01:07 22                    MR. KASPER:  Good afternoon, Your Honor.  My

13:01:14 23      name is Andrew Kasper.  A single red thread runs through the

13:01:18 24      United States' motion to compel Walmart to produce

13:01:22 25      nationwide dispensing data as well as Walmart's request that

13:01:25  1    this Court bar the government from supplementing its

13:01:27  2    interrogatory responses.

13:01:29  3            Walmart is seeking to leverage the discovery

13:01:32  4    process to effectively strike allegations of the United

13:01:33  5    States' complaint and thereby significantly reduce its

13:01:36  6    prospective liability for repeatedly violating the

13:01:40  7    Controlled Substances Act.  This Court should reject that.

13:01:43  8            The United States ask the Court to compel

13:01:45  9    Walmart to fully comply with its first and second RPDs.

13:01:49 10    These two RPDs request nationwide electronic dispensing

13:01:53 11    data -- again, I want to be clear, it's only electronic

13:01:56 12    dispensing data that's subject to this motion -- and related

13:01:58 13    fields maintained in Walmart's dispensing data systems for

13:02:01 14    controlled substance and a limited number of noncontrolled

13:02:04 15    substance prescriptions filled at Walmart pharmacies.

13:02:07 16            Over the --

13:02:08 17            THE COURT:  So let me ask, do you really mean

13:02:10 18    all controlled substances dispensed for the last decade at

13:02:14 19    every single Walmart store?

13:02:16 20            MR. KASPER:  So our request seeks all controlled

13:02:19 21    substances.  Most of those controlled substances directly

13:02:23 22    relate to the allegations in the complaint.  We recognize

13:02:25 23    that there may be a few certain steroids that do not.

13:02:30 24            Walmart has to date never articulated any burden

13:02:34 25    associated with producing some of these other controlled

13:02:38  1    substances that aren't served within the scope of the

13:02:40  2    opioids and other controlled substances in the complaint.

13:02:43  3    And how we understand their dispensing data systems to work.

13:02:47  4    They haven't actual sort of signified the controlled

13:02:51  5    substance and this is not -- it's possible that it's

13:02:53  6    actually easier to produce all controlled substances rather

13:02:57  7    than some subset.  We are certainly open if they want to

13:03:01  8    have a discussion about limiting the universe to sort of

13:03:04  9    controlled substances that are specific to the allegations

13:03:06 10    in the complaint.  We welcome them to do that.

13:03:09 11              THE COURT:  Did you have any discussions about

13:03:10 12    narrowing your request during the meet-and-confer process?

13:03:15 13    I'll ask them about burden, I'm asking you, your request is

13:03:18 14    very broad, it seems like it's not relevant to get every

13:03:21 15    single controlled substance.

13:03:22 16              MR. KASPER:  So up to this point we have really

13:03:25 17    been stuck at the starting point.  Walmart has basically

13:03:30 18    taken the position that any prescription that is not in its

13:03:33 19    perspective specifically enumerated in the complaint is not

13:03:36 20    relevant.  And that's where it sort of hung its hat to date

13:03:41 21    throughout the process.

13:03:41 22              We have at a number of different junctures

13:03:44 23    offered to limit the universe of field for which we're

13:03:47 24    seeking information as well as talk about other ways to

13:03:51 25    tailor our request, but that's really not where Walmart has

13:03:54  1    been in the negotiations.  They have focused consistently

13:03:58  2    throughout the process on this claim versus violation issue

13:04:01  3    that they raise in their briefing and that's sort of been a

13:04:05  4    starting and stopping point for them.

13:04:07  5             THE COURT:  Can you give me an example of how

13:04:09  6    you would narrow your request to be a little bit more

13:04:12  7    reasonable?

13:04:12  8             MR. KASPER:  Our request in terms of all

13:04:15  9    controlled substances?

13:04:16 10             THE COURT:  Because it's not true that

13:04:18 11    dispensing a controlled substance is a violation of the

13:04:21 12    Controlled Substances Act.

13:04:22 13             MR. KASPER:  That is certainly true, Your Honor.

13:04:25 14    And we do recognize that there are, as I said, a small

13:04:28 15    universe of controlled substances that are not sort of

13:04:32 16    related to the allegations in our complaint.  However, many,

13:04:36 17    perhaps most are, you know, opioids or similar drugs that

13:04:42 18    are specifically sort of among the drugs that are described

13:04:45 19    in the complaint.  As I said, we are certainly open to

13:04:48 20    narrowing that to sort of the common -- our complaint talks

13:04:51 21    about combinations of opioids together and cocktails of

13:04:57 22    opioids and non-opioids, some of which are controlled

13:05:01 23    substances, as being problematic.  And we are certainly

13:05:03 24    willing to sort of narrow the universe of prescriptions that

13:05:07 25    we're seeking to those categories, but again, there has been

13:05:11 1   no articulation by Walmart that it's actually harder to

13:05:15 2   produce that sort of narrower -- or that larger universe

13:05:19 3   than the narrower one.  And certainly if they had raised

13:05:22 4   that issue at any point in the process, which they haven't,

13:05:25 5   we would have been open to discussing it.

13:05:28 6            THE COURT:  Just so I'm clear, is it your

13:05:30 7   position that if there is a single controlled substance sale

13:05:34 8   of like thirty OxyContin or somebody that is relevant and

13:05:41 9   should be produced to you?

13:05:42 10           MR. KASPER:  Yes, we would agree that that is

13:05:44 11  relevant.  And I can explain --

13:05:47 12           THE COURT:  Yeah, you're going to have to help

13:05:49 13  me understand why because I don't think that that would

13:05:52 14  reasonably relate to a potential violation.

13:05:55 15           MR. KASPER:  So I would say not only do we think

13:05:58 16  that's relevant, actually Walmart has articulated that it

13:06:02 17  believes that that's relevant.  It is requested data from

13:06:06 18  four different state prescription monitoring programs which

13:06:09 19  are programs that collect controlled substance dispensing

13:06:14 20  data for various compliance and other reasons.  And with

13:06:17 21  respect to Delaware in particular, and I have the

13:06:19 22  correspondence, we did not have access to this when we filed

13:06:22 23  our briefing.  It came to us after that point.  We requested

13:06:26 24  it.  They declined to produce it.  And we went to the AG's

13:06:31 25  office and obtained the correspondence.

13:06:34  1    But in those -- the AG's requested that Walmart

13:06:38  2  explain to them why they needed this broad universe of PDMP

13:06:43  3  data and their request -- let me specifically highlight one

13:06:46  4  of them.  Their request to the State of Delaware sought all

13:06:54  5  DI identified PDMP data regardless of pharmacy from 2013

13:07:01  6  through 2024 that was filled in Delaware.  And the rationale

13:07:08  7  that Walmart provided to the state AG's office as to the

13:07:11  8  relevance of that data was that it's relevant to the

13:07:14  9  standard of care.  And that's precisely our position as

13:07:18 10  well, which is that one of the things that we are saying is

13:07:22 11  that the universe of prescriptions that are being filled

13:07:25 12  that we believe are invalid, they are outside the scope of

13:07:28 13  the legitimate medical practice.  And the Walmart data as to

13:07:33 14  sort of the full universe of fills speaks -- will speak to

13:07:37 15  what is the universe of legitimate medical practice and also

13:07:40 16  whether there there are statistical outliers.  If these --

13:07:45 17  for example, one of our categories is high dosages of

13:07:50 18  opioids, above 800.  And we specified that in our data

13:07:55 19  specifications to date.  And if those are occurring

13:07:58 20  infrequently relative to the full universe of Walmart's

13:08:02 21  filling, it's indicative that their pharmacists knew this

13:08:06 22  was an outlier.

13:08:07 23    THE COURT:  Sure.  I mean, I guess if you had

13:08:09 24  asked for all high fills, I might think about it a little

13:08:13 25  bit differently.  Certainly that falls within your "Red

13:08:17  1    Flag" that you identify in the complaint.  I'm not taking a

13:08:20  2    position as to whether it has to be limited to the

13:08:22  3    complaint, but it at least is more tethered to the issues in

13:08:26  4    this case that give rise to violations.  I'm just curious

13:08:30  5    why in the meet-and-confer process offers like that weren't

13:08:34  6    made, how about we start with all the "Red Flag"

13:08:37  7    descriptions.

13:08:38  8         MR. KASPER:  Let me step back why this is

13:08:39  9    relevant and why we would need the ones that are sort of

13:08:42 10    lower.  So they're lower than the 800 MME, for example.  And

13:08:46 11    the reason is is say that in the sort of -- if you have a

13:08:51 12    normal curve of prescribing patterns for opioids, the

13:08:55 13    typical sort of dosage is 60 or 40 MME per day and that

13:09:01 14    these 800 MME prescriptions occurred extremely infrequently,

13:09:06 15    or infrequently, and that's what -- if you're the Walmart

13:09:10 16    pharmacist at a particular store and this data would provide

13:09:14 17    this information what the Walmart pharmacist was seeing, you

13:09:17 18    are constantly seeing these 80 and 60 and 40 MME per day

13:09:21 19    prescriptions and they are filling those and then suddenly

13:09:24 20    one comes in that's 800 MME which is orders of magnitude

13:09:28 21    higher than what you're typically seeing.  Well, that would

13:09:31 22    be a "Red Flag" to you that this is outside the scope of

13:09:34 23    legitimate medical practice.

13:09:36 24         And we have an obligation to prove that the

13:09:38 25    pharmacist, or Walmart more generally, that was filling the

13:09:41 1    prescription would have known that this was an invalid

13:09:44 2    prescription.  And that sort of comparison to what their

13:09:47 3    typically seeing versus what this particular prescription is

13:09:51 4    is relevant to establishing that knowledge.

13:09:54 5           THE COURT:  It just doesn't seem like you need

13:09:57 6    the regular fills to establish that that was so outside the

13:10:02 7    norm.  I'll ask Walmart the same question, but I'm not sure

13:10:05 8    that they would disagree that filling 800 MME is potentially

13:10:10 9    a "Red Flag".

13:10:11 10          MR. KASPER:  It seems like as I said that they

13:10:13 11   do agree because they asked the states to provide precisely

13:10:16 12   that broader universe of data as well because they think

13:10:19 13   it's relevant to the standard of care.  And that's what

13:10:23 14   we're saying as well.  I think both sides -- again, I can

13:10:26 15   provide you with the correspondence if you would like to

13:10:28 16   review it right now.  Both sides are in agreement that

13:10:31 17   comparing the particularly -- the biological prescriptions

13:10:35 18   that we are seeking penalties for versus what is sort of

13:10:38 19   typically coming across the pharmacists' desk on a

13:10:41 20   day-to-day basis is a relevant point to determine whether

13:10:45 21   they had the knowledge required to be in violation of the

13:10:48 22   CSA.

13:10:48 23          THE COURT:  So if you were to get what you're

13:10:51 24   requesting, what is the government going to do with that in

13:10:55 25   terms of processing that incredible amount of data?

13:10:59  1          MR. KASPER:  So we are going to -- I mean, I

13:11:02  2   think Your Honor has requested and seen the spreadsheet that

13:11:06  3   we provided to Walmart in response to the Court's previous

13:11:12  4   order to produce the sort of examples of violative fills.

13:11:16  5   And you can see on that spreadsheet that there are various

13:11:19  6   columns which is the data fields that we obtained from the

13:11:22  7   system as well as there are tabs, and those tabs are data

13:11:25  8   specifications that fall under the sort of categories

13:11:29  9   described in the complaint.  So there is Trinity, Trinities

13:11:33 10   of various types and various tabs at the bottom.  We will do

13:11:36 11   that same sort of aggregate analysis of, you know --

13:11:40 12          THE COURT:  I guess my question was more sort of

13:11:43 13   logistically, how is that going to work?  That is a huge

13:11:46 14   amount of data.  How are you going to process it?  How long

13:11:49 15   is that going to take you?  Are you going to go to trial in

13:11:52 16   2032?  I'm trying to understand what this means for the

13:11:55 17   case.

13:11:55 18          MR. KASPER:  Yes, so I think that data, it's

13:11:57 19   obviously, you know, whatever number of millions of lines of

13:12:00 20   data seems like a very large number, but there are, you know

13:12:07 21   -- there have been many cases that I worked on in the

13:12:11 22   antitrust context and other sort of contexts where you have

13:12:14 23   even larger data fields.  If you look at some of the

13:12:18 24   mortgage-backed securities litigation, you would have tens

13:12:22 25   of millions, hundreds of million of potential data fields,

13:12:22  1    and so we have retained experts to process that data in a

13:12:26  2    timely fashion on an aggregate level to get the results we

13:12:27  3    need.

13:12:27  4            The size of the data from what I understand from

13:12:30  5    talking to our experts, that's not going to be an obstacle.

13:12:33  6    Now, how we receive it from Walmart could take -- you know,

13:12:37  7    it increases the amount of time it takes for us to actually

13:12:40  8    process and analyze it, but we're happy to have our expert

13:12:43  9    data people work with Walmart to produce it in a fashion

13:12:47 10    that allows us to review it in as efficient way as possible.

13:12:53 11            THE COURT:  I guess I also need to understand

13:12:55 12    why you are asking for some eleven noncontrolled substances.

13:13:00 13            MR. KASPER:  So the noncontrolled substances

13:13:03 14    are --

13:13:03 15            THE COURT:  And that's again nationally for the

13:13:05 16    past ten years at every single Walmart store ever.

13:13:08 17            MR. KASPER:  Yes.  And so, Your Honor, you may

13:13:10 18    recall in the complaint that there are trinity prescriptions

13:13:14 19    that are at issue.  So these are prescriptions that involve

13:13:17 20    an opioid, perhaps another controlled substance and then

13:13:21 21    some noncontrolled substances as well.  And these -- and the

13:13:24 22    patients take these noncontrolled substances as a way to

13:13:29 23    enhance the high.  They're called potentiators.  They're

13:13:33 24    also classic well recognized in the case law and by experts

13:13:37 25    signs of abuse.  And so we need the noncontrolled substances

13:13:41  1    that are sort of potentiators.

13:13:44  2            THE COURT:  I'm sorry, do you actually reference

13:13:47  3    potentiators in the complaint?

13:13:49  4            MR. KASPER:  We do.  So we reference, you know,

13:13:52  5    a trinity would be an opioid, a benzodiazapine.  And one of

13:13:57  6    the more common trinity combinations involves carisoprodol,

13:14:03  7    which is a muscle relaxant.

13:14:04  8            THE COURT:  I'm thinking more like the hydroxy

13:14:07  9    or the imodium generic equivalent.  Is that in your

13:14:11 10    complaint as well?  I certainly see the trinity cocktails

13:14:15 11    that you're talking about, but not the ones that are with

13:14:18 12    these other noncontrolled substances that seem to be in a

13:14:21 13    different bucket.

13:14:21 14            MR. KASPER:  So these are the ones that we have

13:14:24 15    asked for, the ones we have discussed with our experts as

13:14:27 16    ones that are seen in the marketplace as indicative of

13:14:31 17    abuse.  And since we have advised by experts in the field

13:14:33 18    that these are indicative of abuse, that's where we got that

13:14:38 19    list.

13:14:38 20            THE COURT:  It came after the filing of the

13:14:40 21    complaint?

13:14:40 22            MR. KASPER:  We certainly -- I have been

13:14:42 23    involved since the filing of the complaint.  I think that

13:14:44 24    these sort of combinations have been recognized for a number

13:14:47 25    of years.  You know, again, we're certainly welcome -- there

13:14:51  1    is a couple in there that reference antiretroviral drugs

13:14:56  2    that have been used as abuse.  I think we're willing to talk

13:14:59  3    and to negotiate over which ones are necessary and if it is

13:15:04  4    much more burdensome to produce additional ones to sort of

13:15:08  5    narrow it to specific ones.  But again, we've been at the

13:15:11  6    starting point.  They have been unwilling to produce

13:15:13  7    anything beyond--

13:15:13  8              THE COURT:  I'm just trying to figure out how

13:15:16  9    much of a surprise was this request for noncontrolled

13:15:20 10    substances if it came through your discussion with experts

13:15:22 11    after you initiated the case.  They may, and I would hear

13:15:25 12    from them, be like where is this coming from.

13:15:28 13              MR. KASPER:  So I think -- I think a fair

13:15:30 14    reading of our complaint is that we did say that there are

13:15:33 15    combinations of cocktails of controlled substances and

13:15:36 16    noncontrolled substances --

13:15:37 17              THE COURT:  Sure, I got that.  I view these

13:15:39 18    differently, that's what I'm saying.  And maybe I'm wrong.

13:15:42 19              MR. KASPER:  And I should also say we have in

13:15:44 20    the course of trying to get some movement from Walmart on

13:15:48 21    this issue, we have offered to only seek noncontrolled

13:15:53 22    substances that were filled within sixty days of controlled

13:15:56 23    substances to sort of highlight that we are really seeking

13:15:59 24    that these are being used as cocktails, not just every

13:16:02 25    instance.  And that's in our correspondence, not just every

13:16:06  1    instance when a controlled substance and not a controlled

13:16:10  2    substance is filled.

13:16:11  3              THE COURT:  Okay.  Anything else you want to add

13:16:13  4    before I hear from Walmart?

13:16:14  5              MR. KASPER:  Is it just with respect to our

13:16:18  6    motion to compel?

13:16:19  7              THE COURT:  Yeah.  I think I would like to go

13:16:21  8    Plaintiff's motion, and then Defendant's motion.  But I'll

13:16:24  9    hear everything on Plaintiff's motion, turn to that and then

13:16:27 10    come back to you for the last part.

13:16:28 11              MR. KASPER:  I do want to say this is in our

13:16:31 12    briefing, so I will not sort of belabor this point, but with

13:16:34 13    respect to that sort of claim versus violation issues they

13:16:37 14    have raised, we really believe that this sort of wealth of

13:16:40 15    authority supports the government's position on this.  We

13:16:44 16    have highlighted a number of different contexts, different

13:16:46 17    civil penalty statutes where courts have not limited

13:16:49 18    discovery to specifically enumerated claims, specifically

13:16:53 19    enumerated violations in the complaint, but everything that

13:16:57 20    falls within the scope of the alleged conduct.

13:16:58 21              THE COURT:  And I hear you, and I read your

13:17:00 22    papers and I read those cases.  There just seems to be a

13:17:05 23    middle ground that nobody is talking about.  One side wants

13:17:09 24    you to be absolutely bound to the complaint, the facts that

13:17:14 25    are reasonably findable in the complaint and you guys want

13:17:17  1    everything that has been filled for the last ten years.  So

13:17:22  2    I hear -- I know that that dispute is underlying a lot of

13:17:25  3    this.  I'm not sure that it's a dispute that I have to

13:17:29  4    formally rule on, but it seems like there is some other

13:17:33  5    middle ground.

13:17:33  6              MR. KASPER:  We understand that and we are

13:17:35  7    willing to work, it's just been the process so far has not

13:17:39  8    progressed and we would appreciate some sort of judicial

13:17:43  9    pushing forward in the process because we are sort of stuck

13:17:45 10    on that issue which has led to this problem.

13:17:47 11              THE COURT:  All right.  Thank you.

13:17:48 12              MR. KASPER:  Thank you, Your Honor.

13:17:58 13              MR. VARNADO:  Judge, I have some slides I may

13:18:04 14    refer to at some point.  Do you mind if I hand them up?

13:18:06 15              THE COURT:  Sure.

13:18:27 16              MR. VARNADO:  Good afternoon, Your Honor.  Jason

13:18:30 17    Varnado on behalf of Walmart.  Thank you for your time this

13:18:32 18    afternoon.

13:18:32 19              Just to answer a couple of questions that you

13:18:34 20    posed to Mr. Kasper, the Court is exactly right that they

13:18:39 21    are seeking 400 million prescriptions from Walmart.  That

13:18:44 22    would be 300 million controlled substance prescriptions.

13:18:48 23    That is a colossal number of prescriptions.  We already have

13:18:52 24    a case that's ongoing where the government has alleged

13:18:55 25    80,000 violations of the Controlled Substances Act, so that

13:18:59 1    would be a 5,000 times increase in this case if that request

13:19:02 2    were to be granted.  And the government already cannot meet

13:19:05 3    its discovery obligations with respect to the case as it

13:19:08 4    currently stands right before the Court right now.

13:19:10 5            It's important to note a couple of other things.

13:19:13 6    Walmart produced 6 million prescriptions during the course

13:19:18 7    of a four-year investigation preceding the filing of this

13:19:21 8    complaint.  Those prescriptions related to 629 doctors that

13:19:25 9    were specifically picked by the government.  And they

13:19:28 10   involve fields that the parties negotiated through the

13:19:31 11   course of the government's administrative subpoenas.  So the

13:19:35 12   idea that kind of comes through the government's letter of

13:19:38 13   Walmart has been recalcitrant or something, it's really

13:19:41 14   counterfactual.

13:19:42 15           To answer your question on the noncontrolled

13:19:45 16   substances, that appears nowhere in the complaint and did

13:19:47 17   come out of complete left field for us.  That alone would be

13:19:51 18   a hundred million prescriptions out of the total 400

13:19:54 19   million.  And so they really haven't pled that.  There is no

13:19:57 20   reason that should be part of this at all.

13:19:59 21           So just to stay with the theme of what the

13:20:04 22   government is asking for here and how it would impact the

13:20:08 23   case, we're trying to get this case moving.  And we provided

13:20:13 24   in our response Exhibit A, which I'm -- I'm hoping to have a

13:20:18 25   chance to go through when we argue our motion which lays out

13:20:21  1    what this complaint is really about and how the government

13:20:23  2    has already made very fulsome allegations here.

13:20:26  3              But in terms of their specific motion to compel,

13:20:28  4    I do want to just note a couple of things.  The government

13:20:31  5    has never come off the all prescriptions.  There has not

13:20:35  6    been an offer to negotiate different controlled substances.

13:20:37  7    We've repeatedly pointed out there is lots of controlled

13:20:40  8    substances like epilepsy medication or testosterone and lots

13:20:45  9    of others.  It's not just a minor amount of controlled

13:20:49 10    substances that are nonopioids, many, many controlled

13:20:52 11    substances are nonopioids.  And they have refused.  And they

13:20:55 12    have refused to narrow that request and the same with fields

13:20:58 13    --

13:20:58 14              THE COURT:  Let me ask you, they will narrow it

13:21:00 15    if I order them to do so.  But do you agree that there is

13:21:03 16    probably some middle ground?  It doesn't have to be right in

13:21:06 17    the middle between your two positions, but there is

13:21:09 18    something less than all, more than just in the complaint

13:21:13 19    that probably should be produced.

13:21:16 20              MR. VARNADO:  Judge, I think our position is

13:21:17 21    that what they've pled in the complaint, which again, it's

13:21:21 22    unclear to us how they could possibly try this case as pled

13:21:25 23    with 80,000 violations alleged, that they should be bound by

13:21:30 24    that complaint.  They spent four years investigating

13:21:33 25    Walmart.  They had 6 million prescriptions --

13:21:36  1          THE COURT:  Okay.  So say that I agree with

13:21:38  2  that, I'm not saying that I am going to agree with that, but

13:21:41  3  say I do, they pled in the complaint that a "Red Flag" per

13:21:46  4  Walmart is unusually high starting doses or unusually high

13:21:51  5  fills.  So what if they ask you to produce all controlled

13:21:57  6  substance fills for 800 pills for a thirty-day supply, why

13:22:03  7  isn't that something that they can ask?

13:22:06  8          MR. VARNADO:  Well, I think they're the ones who

13:22:08  9  said what they believe these high levels are and what red

13:22:12 10  flags are.  To be clear, red flags are not synonymous with

13:22:16 11  controlled substance violations --

13:22:18 12          THE COURT:  I understand.  I'm just going based

13:22:19 13  on what I understand the red flags for controlled substances

13:22:22 14  to be in this case.

13:22:23 15          MR. VARNADO:  That's certainly one of them.

13:22:25 16  It's their criteria that they have laid out.  We disagree

13:22:29 17  with a lot of that criteria.  And they suggested at the last

13:22:32 18  hearing that some of these prescriptions are *per se*

13:22:35 19  violative if they reach a certain amount or if there is a

13:22:38 20  certain quantity or if there is a certain combination.  We

13:22:41 21  would disagree with that.  We think what they have put in

13:22:43 22  the complaint where they have alleged particular prescribers

13:22:46 23  and where they put in certain "Red Flag" instances --

13:22:47 24          THE COURT:  You think it should be limited only

13:22:50 25  to the prescribers identified?

13:22:52  1          MR. VARNADO:  Not just the prescribers

13:22:53  2   identified.  They did also -- it might be helpful, Judge, if

13:22:57  3   I could walk through Exhibit A --

13:22:59  4          THE COURT:  I just want you to answer my

13:23:01  5   question which I don't think you have yet.  That is if they

13:23:03  6   came back with a tailoring of their request to say all

13:23:06  7   right, I'm going to limit it specifically to red flags that

13:23:09  8   I believe are fairly disclosed in our pleading, give me all

13:23:15  9   controlled substances where a thousand pills were filled for

13:23:22 10   oxycodone.

13:23:22 11          MR. VARNADO:  That would be something we would

13:23:24 12   definitely consider.

13:23:25 13          THE COURT:  You're not saying no right now.

13:23:27 14          MR. VARNADO:  I'm not saying no to that.  We

13:23:29 15   would still argue at summary judgment if they didn't put

13:23:32 16   that as part of their complaint, if it's not in there, this

13:23:35 17   is a discovery hearing.

13:23:36 18          THE COURT:  That's fine.  Just help me

13:23:38 19   understand why it's not in their complaint if one of their

13:23:42 20   red flags in the complaint is unusually high starting doses

13:23:45 21   or unusually high therapeutic amounts.

13:23:48 22          MR. VARNADO:  Because they use specific examples

13:23:50 23   and then they have these catchall paragraphs that we think

13:23:53 24   are insufficient and don't adequately plead an actual claim.

13:23:57 25   And so they should be bound by what's put in the complaint.

13:24:00  1            THE COURT:  So then what is the purpose of

13:24:03  2   discovery in a case like this?  What are they allowed to ask

13:24:07  3   for?

13:24:08  4            MR. VARNADO:  They are certainly allowed and we

13:24:10  5   have offered to provide them with fulsome discovery in

13:24:13  6   additional fields and information related to the

13:24:15  7   prescriptions that they have put at issue in this complaint

13:24:17  8   so they can further build their case.  They want fields like

13:24:21  9   pharmacist identity, other fields and we have offered to

13:24:24 10   produce them a very large amount of subset of field that's

13:24:28 11   in our Exhibit CC.  I can walk you through that at some

13:24:31 12   point, Judge, as well.  But they refused and said we want

13:24:35 13   all fields.  Give us the list of all fields, sort of all of

13:24:39 14   everything for them in terms of the number of prescriptions

13:24:42 15   and the fields.  So there are prescriptions that are before

13:24:44 16   the Court right now, they are at issue, we have acknowledged

13:24:48 17   they have made what we think is an vastly overreach of the

13:24:51 18   case and we don't think they can possibly try it in the time

13:24:54 19   allotted just practically speaking given that they have to

13:24:57 20   prove each prescription is invalid and that it was knowingly

13:25:00 21   filled by a pharmacist.

13:25:01 22            But we have said and we have told them numerous

13:25:04 23   times we're more than willing to provide discovery on the

13:25:08 24   prescriptions that are in the complaint and we can talk

13:25:10 25   about additional fields if they would like, their request

13:25:13  1    for all fields is impractical as I think you can see from

13:25:17  2    our declaration of how burdensome that would be, but that is

13:25:21  3    what we think the discovery in this case should be about.

13:25:23  4          THE COURT:  Last question and I'll let you say

13:25:25  5    what you wanted to say originally.  And this might come up

13:25:29  6    more in the context of the first two issues in your motion,

13:25:32  7    but is it Walmart's position that there is no way they could

13:25:38  8    find a new "Red Flag" and add it to this case?

13:25:42  9          MR. VARNADO:  I think our position is that they

13:25:45 10    have -- what they can't do, Judge, is they have pronounced

13:25:50 11    their red flags that are in the complaint, I will agree with

13:25:53 12    that.  They're very broad categories.

13:25:55 13          THE COURT:  I thought they came from a Walmart

13:25:58 14    pharmacy operating manual.  Am I wrong about that?

13:26:00 15          MR. VARNADO:  I think they are red flags that

13:26:03 16    are acknowledged in the industry.

13:26:04 17          THE COURT:  I want to make sure I didn't say

13:26:06 18    something wrong because you seem to be pushing back against

13:26:09 19    that.

13:26:09 20          MR. VARNADO:  No.  I mean, I would say that the

13:26:10 21    red flags sort of combinations hide in the meaning, that's

13:26:14 22    not defined, early, that's not defined, that's sort of the

13:26:17 23    problem here is we're trying to get specifics parameters in

13:26:21 24    this case so we know which prescriptions we're defending so

13:26:24 25    we can take fact discovery relating to those prescriptions.

13:26:27  1   That's a big part of why we're here in front of you today at

13:26:31  2   least on our motion.

13:26:32  3         They spent four years investigating this case.

13:26:34  4   They determined what red flags -- and just to back up,

13:26:38  5   again, they had 629 doctors data and they put about twenty

13:26:42  6   at issue in the case.  They had 6,000 lines of prescription

13:26:45  7   data and they have identified about 80,000 violations which

13:26:48  8   is a colossal CSA case, never heard of numbers that large,

13:26:53  9   frankly, but --

13:26:54 10         THE COURT:  You put 6,000 before the larger

13:26:57 11   number.  What was that 6,000?

13:26:59 12         MR. VARNADO:  6 million.  If I said thousand,

13:27:01 13   sorry.  6 million prescriptions that they had and --

13:27:05 14         THE COURT:  Makes more sense.

13:27:06 15         MR. VARNADO:  They have now put 80,000 at issue.

13:27:08 16   So it's not for lack of data.  They don't need more data.

13:27:12 17   Really this is where the *Ridley's* case is on point.  Maybe

13:27:16 18   we can just pull up that particular slide.  We might just

13:27:21 19   reference some of these from time to time.  This is on slide

13:27:24 20   6.  But this case is very, very similar to *Ridley's*, where

13:27:28 21   that's a case involving about 180 violations of that the

13:27:33 22   government alleged.  And then they had one of these catchall

13:27:37 23   paragraphs that said and *Ridley's* did a whole bunch of other

13:27:41 24   stuff that we'll tell you about later.  They made a motion

13:27:44 25   for discovery and this what is judge said.  When the United

13:27:48  1   States files a lawsuit based on a pre-litigation

13:27:50  2   investigation, they can use civil discovery to seek

13:27:53  3   information relevant to the claims, but it cannot, however,

13:27:56  4   engage in a fishing expedition by using civil discovery as a

13:27:59  5   mechanism to search for all of the regulatory violations the

13:28:00  6   defendant may have committed for the entirety of the

13:28:02  7   limitations period preceding the filing of the complaint in

13:28:06  8   this action.

13:28:06  9           And this is what they're trying to do, alleging

13:28:09 10   a pattern or practice, well, that doesn't untether discovery

13:28:12 11   from its rule-based moorings which is what is actually in

13:28:15 12   the complaint.  So I mean that is our position.  We think

13:28:17 13   this court -- I mean this case is directly on point.  It's

13:28:20 14   literally the only CSA case that has addressed this issue

13:28:24 15   and we think this Court should follow the *Ridley's* court.

13:28:27 16           THE COURT:  Do you know if in *Ridley's* because

13:28:30 17   the issue was filled over 120 pills, I think that was the

13:28:34 18   specific issue, did the government go back and try to change

13:28:37 19   its request and succeed or did that kill the issue?

13:28:40 20           MR. VARNADO:  That killed the issue.  I think

13:28:42 21   that case will go to trial this fall.  But that killed the

13:28:44 22   issue because the CSA has not been used in this way.

13:28:48 23           And I did want to mention, I don't know if you

13:28:52 24   had any questions on *Ridley's*, but we think that is

13:28:54 25   instructive in terms of what the Court should do here with

13:28:59  1    respect to these very overbroad and incredibly broad

13:29:03  2    document requests.

13:29:03  3            I did want to mention briefly just because

13:29:06  4    Mr. Kasper touched on it, the PDMP data request we made if

13:29:11  5    the Court would like to hear a little bit more about that.

13:29:14  6            THE COURT:  Sure.

13:29:14  7            MR. VARNADO:  It's one thing for the government

13:29:16  8    to be seeking information from Walmart to try to add claims,

13:29:19  9    and Mr. Kasper said, gave some address and it's in their

13:29:23 10    letter a little bit about outliers, that they want to

13:29:26 11    identify outliers.  They purely want this additional

13:29:29 12    dispensing data to add claims.  They have said that to us

13:29:33 13    repeatedly.  We want to find new doctors for the compliance

13:29:37 14    theory.  And we want to find new "Red Flag" prescriptions so

13:29:40 15    we can try to add those to the pharmacists' knowledge

13:29:43 16    theory.  So this is not about finding outliers.

13:29:46 17            I did want to mention our requests to try to get

13:29:50 18    PDMP data is an important one and it's because the

13:29:53 19    government has said here is these bright line criteria of

13:29:57 20    red flags that you would never fill and we had some examples

13:30:00 21    of that at the last hearing and I just wanted to show a

13:30:03 22    couple of those really briefly if I could where the

13:30:06 23    government was taking the position that as we talked about,

13:30:09 24    "Red Flag" prescriptions.  If we could go to slide 3.  I'm

13:30:20 25    sorry.  Sorry.

13:30:30 1          And so you asked them about these "Red Flag"

13:30:33 2  prescriptions and said that they're invalid based on the

13:30:37 3  combination.  "So for example" -- this is what Ms. Ho

13:30:40 4  said -- "two immediate-release opioid prescriptions on their

13:30:46 5  face could not be a legitimate medical purpose under any set

13:30:49 6  of circumstances."

13:30:50 7          That was the position they were articulated in

13:30:52 8  the last hearing.  You had asked a follow-up question and

13:30:54 9  Ms. Ho reiterated, no, this would be a situation with two

13:30:59 10  immediate-release opioids for more than six months to a

13:31:02 11  patient, he cannot imagine a legitimate medical purpose for

13:31:02 12  that.

13:31:03 13          There was another statement.  Ms. Brunson said,

13:31:06 14  "based on the particular combination of drugs, the dosage,

13:31:09 15  or other characteristics, that prescription would simply not

13:31:13 16  have a legitimate medical purpose and it really doesn't

13:31:17 17  matter who the prescriber is.  There is no medical reason

13:31:19 18  why a patient would need that particular combination of

13:31:22 19  drugs."

13:31:22 20          And then you followed up and said, "so a

13:31:25 21  facially suspect combination of drugs or you're prescribing

13:31:29 22  a thousand pills of something, just things that are wholly

13:31:31 23  unreasonable without regard to who prescribed it; correct?"

13:31:36 24          And she said, "Yes, that's right."

13:31:37 25          That ties into the PDMP because the government

13:31:40 1    is really just making this up as they go along.  They're

13:31:43 2    saying these are *per se* violations, no one ever fills these

13:31:47 3    prescriptions.  We're getting PDMP data.  We already got it

13:31:50 4    from Pennsylvania.  We're getting it from Delaware.  And it

13:31:53 5    shows that federal pharmacies fill these prescriptions

13:31:57 6    regularly.  It shows that federal doctors write these

13:32:00 7    prescriptions.  And it shows that other pharmacies

13:32:03 8    throughout the industry are filling these prescriptions.  So

13:32:05 9    that's relevant for us to show that the government is

13:32:08 10   misleading on the standard of care.  So we're not getting

13:32:10 11   that data to add violations, we're getting it to undermine

13:32:14 12   the government's claims here.

13:32:15 13          And this notion that we need 400 million

13:32:18 14   prescriptions to show outliers, the PDMP data alone is going

13:32:22 15   to show that these prescriptions are not outliers and that

13:32:25 16   they're filled routinely by facilities including federal

13:32:30 17   pharmacies and written by federal doctors.  I did want to

13:32:33 18   mention that real briefly, Judge.

13:32:35 19          I did want to speak to a couple of other things

13:32:37 20   on the claims first violation issue if you would like to

13:32:40 21   hear about that.

13:32:42 22          THE COURT:  Actually, I'll ask the government

13:32:44 23   this on rebuttal.  I don't think I need to decide that issue

13:32:48 24   to rule on this discovery dispute.  I just want to clarify

13:32:52 25   that.

13:32:53 1          MR. VARNADO:  Okay.  I understand the Court's

13:32:56 2    position.  I think what I would -- would be helpful at least

13:32:59 3    from our perspective in terms of looking at -- we already

13:33:03 4    looked at the *Ridley's* case.  I think the government points

13:33:06 5    to the *Appalachian Health* case, this is slide 7.  And there

13:33:10 6    is a couple of things about this that I think -- this is

13:33:13 7    their case that they cite.  And first is that they have a

13:33:17 8    list of prescriptions.  This is what almost all of these CSA

13:33:22 9    complaints and indictments they say here is the

13:33:24 10   prescriptions at issue, this is how you violated the law.

13:33:27 11         And it's important to remember, although this is

13:33:29 12   a civil case like ours, the regulation that's at issue is

13:33:32 13   the same regulation that you send doctors and pharmacists to

13:33:37 14   prison for.  I mean, these are serious matters.  So what the

13:33:39 15   government typically does is very carefully lay out what the

13:33:43 16   violations are because the doctor in this instance or the

13:33:46 17   pharmacy in this instance could go to jail for these

13:33:49 18   violations.  It's literally the same statute.  The burden of

13:33:53 19   proof is just beyond a reasonable doubt instead of

13:33:55 20   preponderance.

13:33:56 21         The government did not do that here, but to show

13:33:59 22   in *Appalachian* what happened, in that case, the defendant

13:34:02 23   was saying well, you only charge one cause of action

13:34:05 24   basically.  You had one count.  And so -- actually they had

13:34:12 25   two counts and they said we only need to pay two civil

13:34:15  1  penalties for a maximum amount that would be much less than

13:34:18  2  the 180 times maximum the government was seeking.  So the

13:34:21  3  government very quickly said no, no, no, we understand these

13:34:24  4  civil penalties if they're going to be evaluated on a per

13:34:28  5  count basis, we'll assert 180 claims or counts.  So this

13:34:32  6  idea that there is some difference -- they cite this for the

13:34:34  7  proposition that there is a difference between violations

13:34:37  8  and claims and counts, I mean, it's all just semantics.  The

13:34:41  9  bottom line is a claim is an aggregate set of operative

13:34:46 10  facts that give rise to getting relief from a court.

13:34:49 11          Every prescription in this case, all 80,000 of

13:34:52 12  them are claims.  And that's just clear Third Circuit law

13:34:56 13  from the case that we quoted.  They take exception that it's

13:34:59 14  a habeas case, but if you read the part we were quoting, it

13:35:04 15  is just black letter law on what Rule 8 says.

13:35:07 16          And so in terms of them being limited, we think

13:35:10 17  that the law, in addition to *Ridley's*, and the government --

13:35:15 18  further than that, the government cannot point to any

13:35:18 19  authority under the CSA for what they're looking for.  The

13:35:22 20  *Ridley's* case shut them down and this *Appalachian* case

13:35:26 21  doesn't help them.

13:35:27 22          So then they turn to False Claims Act cases and

13:35:29 23  they say this is all very ordinary.  This is just a normal

13:35:32 24  thing that happens in civil penalty cases.  The CSA is no

13:35:39 25  ordinary statute.  This is not some run-of-the-mill civil

13:35:45  1    penalty statute.  The CSA is a criminal statute with some

13:35:49  2    civil penalties that are bolted on.  As I said, it is the

13:35:52  3    same regulation that is used to prosecute doctors and

13:35:55  4    pharmacists.  Pull up slide 1.  And that's meaningful here,

13:36:00  5    because here is the regulation itself.  For a prescription

13:36:02  6    to be effective it's got to be issued for a legitimate

13:36:06  7    medical purpose, so it's got to be for a valid purpose.  And

13:36:09  8    if a -- someone -- so if the person knowingly fills a

13:36:13  9    prescription that's not issued in the ordinary course of

13:36:15 10    practice, that's basically an illegitimate or illegal

13:36:19 11    prescription, that person as well as the person issuing it,

13:36:23 12    so the pharmacist as well as the doctor can be subject to

13:36:26 13    the penalties provided by the violations of the provisions

13:36:29 14    of law relating to controlled substances.

13:36:30 15            So this really takes this out of the realm of

13:36:34 16    False Claims Act cases which we can distinguish in many,

13:36:38 17    many other ways.  But as a foundational point, the fact that

13:36:42 18    you can go to prison for these same violations is the very

13:36:45 19    reason, and you have an element of intent of knowingly is

13:36:48 20    why an individual assessment is required for each

13:36:51 21    prescription.  Every prescription has an individual doctor,

13:36:54 22    individual patient, an individual pharmacist and they have

13:36:57 23    to prove each prescription was invalid and that the

13:37:00 24    pharmacist knew it was invalid and filled it anyway.  And

13:37:04 25    that is a high bar for them.  We actually don't think they

13:37:07  1    can prove that.  And they have instead tried to allege this

13:37:10  2    pattern or practice that said all these prescriptions are

13:37:13  3    invalid in a sweeping way and now they're attempting to get

13:37:17  4    discovery commensurate with that.

13:37:19  5           That shouldn't happen here because this is not a

13:37:21  6    negligence standard recordkeeping case or a False Claims Act

13:37:27  7    case which has a very different fact pattern like a

13:37:30  8    centralized operation with the same, you know, false billing

13:37:34  9    going over and over.  This is individualized specific

13:37:38 10    activity that has to be looked at on that basis.  And we

13:37:42 11    think that really takes this matter completely away from the

13:37:45 12    False Claims Act scenario and these other cases that they

13:37:49 13    cite.

13:37:49 14           And just want to mention a couple of other

13:37:52 15    things just while we're talking about their motion and --

13:37:57 16    getting additional discovery on claims well pled.  They

13:38:00 17    point to Rule 8 and say all that's required is a short and

13:38:04 18    plain statement.  They filed a 200-page complaint with

13:38:07 19    almost 800 paragraphs that was written for a

13:38:10 20    sensationalistic press release.  And they also cite the *BSD*

13:38:16 21    *Crown* case for that same proposition, we just have to give a

13:38:19 22    short statement.  But what they omit is that the government

13:38:22 23    must -- or that a claim must provide the defendant with a

13:38:26 24    fair notice of what a plaintiff's claim is and the grounds

13:38:29 25    on which it rest.  And we're going to get to our motion in a

13:38:33 1    minute, but they're not doing that.

13:38:35 2              And opening up this case, which is already

13:38:37 3    dragging on, we're halfway through fact discovery and we

13:38:42 4    have basically gotten virtually nothing out of the

13:38:45 5    government and we'll talk about that probably at a

13:38:46 6    subsequent hearing if not today, it is -- the government has

13:38:51 7    pled its case.  This is not an FCA case, this is a

13:38:55 8    Controlled Substances Act case that has a very different

13:38:57 9    functioning statute.  And we think you should deny their

13:39:00 10   motion to compel and we should have more fulsome discovery

13:39:03 11   on the prescriptions that are already at issue in this case

13:39:06 12   and that will be plenty for Judge Connolly to try to try in

13:39:10 13   2027.

13:39:11 14             THE COURT:  Thank you.  Before you sit down, can

13:39:13 15   you just say how burdensome it would be for you to produce

13:39:18 16   these 400 some million prescriptions.

13:39:20 17             MR. VARNADO:  Yes, Judge, I'll point you to

13:39:26 18   Exhibit DD of our motion.  I can hand you up a copy of that

13:39:31 19   if it's easier, Your Honor.

13:39:33 20             THE COURT:  Sure.

13:39:46 21             MR. VARNADO:  So when the government filed its

13:39:51 22   papers and suggested Walmart had never said anything about

13:39:55 23   burden, that was surprising to say the least.  And I'm

13:40:03 24   actually going to hand up, I'll start with CC.  Sorry about

13:40:06 25   that.

13:40:31 1          So to kind of get to your question of burden

13:40:35 2   which goes to some of the discussions that you had with

13:40:37 3   Mr. Kasper, if we could start, Judge, with Exhibit CC to our

13:40:42 4   pleadings.  There is a few things that are worth pointing

13:40:45 5   out in this letter.  And it's got a big PowerPoint attached

13:40:48 6   to it, but I'm really -- it's got a deposition and a

13:40:52 7   PowerPoint, but I'm just going to focus on the first couple

13:40:55 8   of pages of the letter.

13:40:56 9          This is a letter we sent on January 31st which

13:40:59 10  is well in advance of the briefing you got on February 14th

13:41:02 11  which said that Walmart had never articulated any burden

13:41:06 12  associated with collecting the data that the government was

13:41:09 13  asking for.  And this letter primarily talks about the

13:41:12 14  transactional data fields where they keep saying all fields,

13:41:16 15  give us everything.

13:41:17 16         And I wanted to just share with the Court

13:41:19 17  because you had asked about narrowing of the fields, what

13:41:22 18  we've already offered that's been summarily objected.  And

13:41:26 19  the first one is number 1 there on page 1 talks about the

13:41:29 20  transactional dispensing data.  And so we're saying with

13:41:32 21  respect to all prescriptions that are at issue in this case,

13:41:36 22  Walmart is willing to provide all of these additional

13:41:38 23  fields.  And this goes 1 through 45.  And these are fields

13:41:42 24  that have been produced in other opioid litigation, in a

13:41:46 25  place where we can gather that information and it's an

13:41:51  1    enormous amount of information.  The government has also

13:41:55  2    expressed interest in pharmacist notes.

13:41:57  3              Look, as an initial matter we don't necessarily

13:42:00  4    agree that they're relevant because they have disclaimed

13:42:03  5    any -- it doesn't matter who the patient is, in some

13:42:06  6    instances with red flags it doesn't matter who the doctor

13:42:10  7    is, but we said producing these notes that begins on the

13:42:13  8    bottom of page 2 over to page 3 is extraordinarily

13:42:18  9    burdensome because they're found in multiple locations, they

13:42:21 10    include electronic databases and on hard copies and it's a

13:42:26 11    separate patient-based query for each prescription at issue.

13:42:30 12    Tens of millions of patients would mean millions upon

13:42:33 13    millions of searches.  But we still said look, if we can

13:42:37 14    align and reach some amount of reasonable number of

13:42:41 15    prescriptions where patient notes would be required, we have

13:42:44 16    offered in pages 2 and 3, twenty-seven categories of

13:42:47 17    information that would constitute patient notes.

13:42:50 18              THE COURT:  So are you going to provide this

13:42:52 19    data for the list that they gave you that we'll get to for

13:43:01 20    your motion?

13:43:01 21              MR. VARNADO:  That they gave us, I'm sorry?

13:43:01 22              THE COURT:  That we'll get to for your motion,

13:43:03 23    the list of prescriptions.

13:43:04 24              MR. VARNADO:  We would provide the transactional

13:43:07 25    dispensing data.

13:43:08  1              THE COURT:  Do you provide --

13:43:10  2              MR. VARNADO:  I'm sorry, let me back up.  So

13:43:15  3    they gave us data that I think the Court requested on

13:43:18  4    Wednesday and you got three excels.  Let me just pause for a

13:43:21  5    minute.

13:43:22  6              THE COURT:  I don't want to make you talk about

13:43:23  7    something that you're later going to talk about.  I was just

13:43:27  8    asking if there was some amount of data that you would give

13:43:30  9    for a known set of prescriptions for this point.

13:43:32 10              MR. VARNADO:  I will answer that shortly because

13:43:34 11    we will come back to it because there is some major problems

13:43:37 12    with the spreadsheets relating to red flags which is wildly

13:43:41 13    overbroad and includes tons and tons of prescriptions not in

13:43:45 14    complaint.  So I think my best answer would be, we will

13:43:47 15    definitely give them transactional dispensing data that are

13:43:49 16    set forth here for all 80,000 prescriptions that are pled in

13:43:53 17    complaint.  The pharmacist notes is a totally different

13:43:56 18    story.  It's enormously complicated and burdensome.  We've

13:44:00 19    only had to do it in other litigation for much, much smaller

13:44:03 20    subsets and it still took a tremendous amount of time.

13:44:08 21              And I'm just raising this now because the

13:44:10 22    government suggest that there was no burden to this.  This

13:44:11 23    is enormously burdensome as I'm sure the Court is aware,

13:44:16 24    5,000 pharmacies scattered across the country, data for ten

13:44:19 25    years.  But we have tried to reach some accommodation here.

13:44:23  1    And we talked about again on page 3 of the letter and really

13:44:27  2    4 some additional data fields that we would be willing to

13:44:30  3    discuss with them.  We've always been shut down with no, we

13:44:34  4    want a list of all fields, that's all we'll take and nothing

13:44:38  5    less.  And so we even attached, which is why the particular

13:44:40  6    document that I handed you is so large, a deposition which

13:44:44  7    included a PowerPoint which walked them through look, this

13:44:47  8    is what's available and this is like what the pharmacist is

13:44:51  9    seeing and what the process is.  And frankly we have just

13:44:55 10    gotten no engagement whatsoever from them on this.  So they

13:44:59 11    were aware that it was enormously burdensome and we were

13:45:03 12    surprised to see the representation otherwise.

13:45:05 13            And to talk about the actual burden beyond what

13:45:09 14    the Exhibit CC says, if you look at Exhibit DD, which I

13:45:12 15    handed up just before then which is the declaration of David

13:45:17 16    Cherryhomes, it spells out very clearly that, you know,

13:45:21 17    there are 5,200 Walmart pharmacies.  There are one or more

13:45:24 18    unique rows of dispensing data for each prescription.  A

13:45:29 19    single Walmart pharmacy would generate data for more than

13:45:34 20    1,600 fills per week on average, that's number five.

13:45:38 21    Paragraph 6, again, Mr. Cherryhomes is understanding that

13:45:41 22    the government wants that enormous amount of data from June

13:45:45 23    of 2013 through December of 2020.  That would involve

13:45:50 24    looking at over 3 billion prescriptions over 160 million

13:45:55 25    distinct records.  And then if you get it down to the

13:45:58  1    controlled substances, it's about 300 million controlled

13:46:01  2    substance prescriptions involving 40 million patients and

13:46:05  3    100 million prescriptions.  So it's a colossal amount of

13:46:09  4    data.

13:46:10  5          Mr. Cherryhomes explains that there is a complex

13:46:13  6    set of data inquiries that pull information from hundreds of

13:46:16  7    data tables across Walmart which again we've explained to

13:46:20  8    the government.

13:46:21  9          Another thing to note is that for each drug, it

13:46:25 10    has an NDC code, a National Drug Code, and so every

13:46:29 11    manufacturer has different codes.  And so there were eight

13:46:34 12    controlled substance medications in the MDL and that

13:46:38 13    involved 25,000 NDCs.  This is not push a button, spit out

13:46:44 14    all the information, this is an enormously complex endeavor.

13:46:48 15    Mr. Cherryhomes estimates it would take six to nine months

13:46:52 16    even just to produce the transactional data and that is if

13:46:55 17    we could do it at this volume and scale.  We have never done

13:46:59 18    anything near that for the patient information -- I'm sorry,

13:47:03 19    the pharmacist notes.  So I think, again, the Court could

13:47:07 20    take a look at the rest of the declaration, but this is just

13:47:11 21    an enormously burdensome process and we explained that to

13:47:15 22    the government and we supported that with the motion as

13:47:17 23    well, which is further reason that their request is grossly

13:47:20 24    disproportional under Rule 26 for what they're seeking.

13:47:25 25          They have a case, they pled it after a four-year

13:47:28  1    investigation, we should be taking discovery on that

13:47:29  2    information and getting ready for trial instead of starting

13:47:33  3    over, essentially erasing the complaint and starting over

13:47:37  4    with new categories of red flags, 400 million additional

13:47:41  5    prescriptions in a way that's going to be completely

13:47:44  6    counterproductive to what Walmart wants which is getting

13:47:48  7    this case to trial so we can vindicate ourselves.

13:47:51  8                THE COURT:  Thank you.

13:47:52  9                Mr. Kasper, so I guess first I would like to

13:47:59 10    hear the government's position on *Ridley's*, other than it's

13:48:04 11    a District of Utah case, it's not binding on me, how do I

13:48:07 12    just cast that aside?

13:48:09 13                MR. KASPER:  So I would say a couple of things.

13:48:11 14    One is to just again, the government disagrees with the

13:48:14 15    resolution of *Ridley's.*  This is inconsistent with the

13:48:17 16    approach courts have taken in other litigation.  We have

13:48:21 17    cited a number of examples of a number of statutes that

13:48:24 18    provide civil penalties.  Other sort of fraud-based cases

13:48:27 19    that are not statutory but still involve intent crimes that

13:48:30 20    have individualized proof potentially where courts have

13:48:33 21    authorized discovery with respect to violations not

13:48:37 22    specifically enumerated in the complaint.  So that's the

13:48:39 23    starting point.

13:48:40 24                Second of all, just as a sort of even if you

13:48:43 25    were to agree with the *Ridley's* court reasoning, which

13:48:46  1    again, we don't agree with that reasoning, if even if you

13:48:49  2    were to agree with it, this case is different.  And that's

13:48:52  3    because what the *Ridley's* court was really focused on was

13:48:55  4    that the complaint spoke essentially about two patients at

13:48:58  5    one pharmacy location.  All of the examples where those two

13:49:03  6    patients, that specific universe of prescriptions, and there

13:49:08  7    was one allegation in the complaint of a pattern of practice

13:49:11  8    and the government was trying to expand it beyond those

13:49:14  9    particular things when all of the allegations related to

13:49:17 10    those two particular patients.  That is not the complaint at

13:49:21 11    issue in this case.  I think any fair reading of the

13:49:24 12    200-page complaint is that we have allegations related to at

13:49:27 13    least fifteen different states that span the entire country

13:49:30 14    in terms of geographic regions.  We have many different

13:49:34 15    specific examples.

13:49:35 16            They have conceded that we have specifically in

13:49:38 17    whatever sort of way they use specific alleged at least

13:49:41 18    80,000 individual violations in that complaint.  That's the

13:49:45 19    order of magnitude different than what was happening in

13:49:49 20    *Ridley's*, and it is geographically much more dispersed.  We

13:49:53 21    have allegations regarding both corporate practice and

13:49:56 22    localized practice and it's a fundamentally different

13:49:59 23    complaint and that's why nationwide discovery is supported

13:50:03 24    in that context.  I think that's an important point of

13:50:06 25    distinction.

13:50:06 1          THE COURT:  Okay.

13:50:07 2          MR. KASPER:  Second of all, I would like to go

13:50:10 3  through on the sort of burden issue.  And I think

13:50:14 4  Mr. Varnado's presentation was actually hopefully

13:50:19 5  informative to the Court which is Walmart's position has

13:50:22 6  been consistently throughout this discovery process since we

13:50:27 7  served our discovery, even before that, that they are not

13:50:30 8  going to produce any documents, including expense and data,

13:50:33 9  but also other sort of custodial records related to any

13:50:38 10  violation that is not specifically enumerated in the

13:50:41 11  complaint.  And that has been the line that they have taken

13:50:44 12  and they are reinforcing that position today.  They have

13:50:47 13  made that sort of a starting point.

13:50:50 14          So they had never, as I said, articulated any

13:50:53 15  burden until that January 31st letter associated with

13:50:57 16  producing this.  And that was because up until that point,

13:51:01 17  they said in a November 12th meet-and-confer letter that any

13:51:05 18  discussion of fields would be premature until there was a

13:51:09 19  resolution of this claim versus violation issue.  And when

13:51:12 20  we said in early January we think the parties are at an

13:51:15 21  impasse, we are ready to move forward with having this issue

13:51:19 22  addressed by the Court because we can't get any farther

13:51:22 23  forward if we don't have a resolution of this claim versus

13:51:26 24  violation issue.  Only then did they produce that

13:51:26 25  declaration to us about potential burden.  The United States

13:51:29  1    --

13:51:30  2                THE COURT:  The problem and the reason why I

13:51:32  3    said this to Mr. Varnado is I don't necessarily view that as

13:51:37  4    something I have to decide because the dispute I have in

13:51:41  5    front of me from the government's motion is whether they

13:51:43  6    have to produce all controlled substances nationally for

13:51:47  7    seven to ten years, whatever it is.  It's not -- like that

13:51:51  8    is the dispute in front of me.  It's a very binary thing.

13:51:55  9    It's not we get something in between because we're not bound

13:51:59 10    to the complaint.  That's the problem I have.  I'm deciding

13:52:03 11    what's in front of me.

13:52:04 12                MR. KASPER:  Well, the problem, Your Honor, is

13:52:07 13    we are not able to negotiate with them because of that

13:52:10 14    position on the claim versus violation issue.  We couldn't

13:52:14 15    -- we don't know enough about what is actually burdensome to

13:52:17 16    them and what is not burdensome to them, what their data

13:52:20 17    systems actually look to to actually propose any sort of

13:52:26 18    tailored approach because they have stopped in the

13:52:27 19    meet-and-confer process as we will not produce anything

13:52:30 20    beyond what we view as these 80 some thousand specifically

13:52:36 21    enumerated claims.

13:52:37 22                THE COURT:  But when Mr. Varnado was standing up

13:52:38 23    there and I asked him, he said he would entertain something

13:52:41 24    in between.

13:52:42 25                MR. KASPER:  They have never to my understanding

13:52:44  1    ever entertained producing anything beyond what is

13:52:48  2    specifically -- and that's why we are here today.

13:52:50  3                THE COURT:  Okay.  I apologize that I am going

13:52:53  4    to do this to you, but I'm going to ask him a question and

13:52:56  5    let you come back and keep talking because I'm concerned

13:52:59  6    that if I resolve this dispute in a certain way, it's going

13:53:03  7    to do absolutely nothing.

13:53:05  8                Okay.  So Mr. Varnado, if I agree with Walmart

13:53:11  9    that they do not get everything that they've asked for as

13:53:15 10    it's in front of me right now, what happens next?  They're

13:53:21 11    going to go back and they're going to refine their request

13:53:24 12    and try to come up with something less than, and you're

13:53:27 13    going to say no, claims are violations and you're stuck with

13:53:32 14    the complaint?

13:53:33 15                MR. VARNADO:  Well, I think a couple of things,

13:53:35 16    Judge.  They may try to go to Judge Connolly to get a

13:53:38 17    different ruling.

13:53:39 18                THE COURT:  Fair enough.

13:53:41 19                MR. VARNADO:  I don't know what they're going to

13:53:42 20    do, but I think we would -- that would be -- that would

13:53:48 21    probably be a hill we would die on if you came out the other

13:53:52 22    way, we would say we have to stick with our position because

13:53:56 23    we think this is an untriable case already.  They have a

13:54:00 24    four-year investigation, they pled their claims.  To be

13:54:02 25    clear, they've never offered some other compromise.

13:54:06  1          THE COURT:  No, I understand that.

13:54:07  2          MR. VARNADO:  But to your point, I don't know

13:54:09  3    that that's going to resolve the issue.  Now, they have

13:54:11  4    given us a spreadsheet that we'll talk about, the "Red Flag"

13:54:15  5    spreadsheet, and perhaps that -- it's still far overly broad

13:54:20  6    and way beyond the complaint, it has 64,000 prescriptions

13:54:24  7    when the complaint alleges about 500 -- actually the

13:54:28  8    complaint alleges about 6,000 "Red Flag" prescriptions, so

13:54:33  9    it's got far more than is pled in the complaint.  That might

13:54:37 10    be a starting point to talk about, that may be something

13:54:40 11    that as you directed them after the last hearing to prepare

13:54:43 12    a list, and we have massive problems with that list that we

13:54:47 13    want to talk about on our motion, so I won't jump the gun on

13:54:51 14    that, but perhaps that may be a starting point.

13:54:53 15          THE COURT:  I want to make sure if I agreed with

13:54:55 16    you, you're not going to then refuse to engage with them if

13:54:59 17    they try to come back with something less than what I

13:55:01 18    rejected.

13:55:02 19          MR. VARNADO:  Well, we'll certainly talk with

13:55:05 20    them, Judge.

13:55:05 21          THE COURT:  I understand that some of it may be

13:55:07 22    colored by what I say in response to your motion, I got

13:55:10 23    that.  I just wanted to make sure that you weren't saying if

13:55:13 24    we win, that's it, we're not engaging.

13:55:16 25          MR. VARNADO:  Again, we are, of course, willing

13:55:19 1    to engage and have said repeatedly on the prescriptions that

13:55:23 2    are part of the complaint, they have said we need more

13:55:25 3    information, we need to know who the pharmacist is, we want

13:55:28 4    all this additional data to prove our case, we'll give them

13:55:32 5    that discovery, that's fair game and we told them that we

13:55:36 6    will give them that additional discovery.  So we're not

13:55:38 7    rolling up the tent and saying you get nothing.  We're

13:55:43 8    saying let's make this case about what's been pled in the

13:55:46 9    complaint.  Let's have discovery on that so that Walmart is

13:55:46 10   on notice of how it needs to defend itself, what

13:55:48 11   prescriptions are at issue, what patients are at issue, what

13:55:51 12   doctors are at issue.  And we cannot have this ever

13:55:55 13   expanding size of this case which is already logistically in

13:55:59 14   your view, and they have the burden, it's an untriable case

13:56:02 15   from their perspective to meet their burden, but this is a

13:56:05 16   discovery hearing and we will definitely give them fulsome

13:56:08 17   discovery on the prescriptions that are in the complaint.

13:56:11 18           THE COURT:  Okay.  Thank you.  Again, I

13:56:15 19   apologize, Mr. Kasper, I just want to make sure I understood

13:56:19 20   whatever I did, what was going to happen next.

13:56:21 21           MR. KASPER:  So I just want to be clear.  What I

13:56:23 22   understood Mr. Varnado's answer to be is no, they will not

13:56:26 23   provide any prescription data for prescriptions that they do

13:56:31 24   not believe are alleged in the complaint.

13:56:32 25           THE COURT:  I think that's mostly what he's

13:56:36 1    saying, but with an openness depending on where I come out

13:56:41 2    with the next issue, with Walmart's motion.

13:56:46 3             MR. KASPER:  So I want to step back a little bit

13:56:49 4    on that, which is the data we use to generate that list of

13:56:54 5    prescriptions that we produced in response to your order

13:56:59 6    from the fall was from the 600-and-something prescriber

13:57:04 7    dataset that Walmart produced to the government in the

13:57:07 8    course of its pre-filing investigation.  That was far

13:57:11 9    smaller than what the government had requested and Walmart

13:57:15 10   refused to produce all the data the United States requested

13:57:19 11   at that point in time.  Because we, in looking at that data

13:57:23 12   and other material we obtained in our investigation, had a

13:57:27 13   factual basis to believe that this conduct extended to a

13:57:31 14   nationwide basis to support the allegations in the

13:57:34 15   complaint, we moved forward with filing our complaint based

13:57:39 16   upon the evidence in our possession rather than moving to

13:57:42 17   compel full compliance with our administrative subpoena.  If

13:57:47 18   this Court were to limit this case to only the sort of

13:57:51 19   prescriptions we can identify using the data that Walmart

13:57:55 20   provided to us in response to our administrative subpoena,

13:57:59 21   it essentially would be rewarding targets of investigations

13:58:02 22   for not complying with investigative subpoenas.  And we

13:58:08 23   don't think that's sort of a proper approach.

13:58:10 24            We found a factual basis with the materials we

13:58:13 25   had to support our complaint and then we elected to moved

13:58:17  1    forward in discovery.  And in discovery we wanted to obtain

13:58:19  2    the additional data we did not get in the investigative

13:58:24  3    phase to flesh out all of the violations that fall within

13:58:28  4    the scope of the four "Red Flag" categories that are alleged

13:58:31  5    in the complaint.

13:58:32  6             As you mentioned, Your Honor, those categories

13:58:34  7    are well-established both in Walmart's own internal

13:58:38  8    documents and in the medical literature and in case law.

13:58:42  9    This is not some unknown universe, which also speaks to

13:58:46 10    whether Walmart has fair notice of what it needs to defend

13:58:49 11    in this case.  Those allegations should not be a surprise to

13:58:53 12    it.  It knows the nature of these red flags.  To the extent

13:58:56 13    there was uncertainty, that list we provided along with

13:58:59 14    those data specifications which gives further meat to how

13:59:04 15    those categories will be operationalized when we analyze the

13:59:07 16    data provide Walmart with more than a necessary opportunity

13:59:10 17    to defend itself in this case.

13:59:12 18             I also want to emphasize Walmart has taken a lot

13:59:16 19    of time to say that this case is not going to be

13:59:21 20    administrable or triable because it believes from what I can

13:59:24 21    understand that from each individual prescription at issue,

13:59:27 22    the government's obligation is to sort of put forth

13:59:30 23    testimony from a prescriber and a patient and a pharmacist

13:59:34 24    that showed that this was an invalid prescription and that

13:59:37 25    the pharmacist knew it was invalid.

13:59:39  1                 If Walmart wants to defend the case that way,

13:59:43  2      that is certainly its right, but the United States as has

13:59:46  3      happened in many cases that involve large numbers of

13:59:49  4      violations has the ability to prove its case using aggregate

13:59:53  5      data.  We have to sort of elicit evidence that would allow a

13:59:57  6      jury to find by a preponderance of the evidence that more

14:00:00  7      likely than not each violation we allege did in fact occur.

14:00:05  8      We can do that through statistical and empirical evidence.

14:00:09  9      There is a decision by Judge Easterbrook in the Seventh

14:00:13 10      Circuit that did not make it into our brief, but I think

14:00:16 11      it's really apropos to what they're talking about here.

14:00:17 12      It's called United States v. Roy, the citation is 517 F.3d

14:00:23 13      414.  And what's going on in that case, it's an appeal of a

14:00:27 14      civil trial and there were findings of civil penalties for

14:00:33 15      1,800 violations.  And one of the arguments that, and the --

14:00:39 16      it was a bench trial, the judge issues an opinion, finds a

14:00:42 17      violation.  And one of the arguments that the defendant made

14:00:45 18      on the appeal was well, the judge's opinion only

14:00:49 19      specifically analyzed a subset of the violations, not all

14:00:53 20      1,814 on an individual basis.  And what Judge Easterbrook

14:00:59 21      said in the opinion is that sort of request by the defendant

14:01:02 22      is a formula for paralysis if you can prove the violations

14:01:07 23      through statistical evidence.  That's what the government

14:01:10 24      will do here.  We may provide exemplary violations to the

14:01:14 25      factfinder, but we can also use statistical evidence and

14:01:18  1    expert evidence to show --

14:01:18  2              THE COURT:  Sure, that's true at trial, but I

14:01:20  3    think this is sort of weighing into what I decided before

14:01:23  4    which is you have to provide during fact discovery every

14:01:28  5    prescription that you contend is a violation and you have to

14:01:31  6    provide it in fact discovery.

14:01:32  7              MR. KASPER:  Yes.  And we are prepared.  We

14:01:34  8    haven't gotten to that issue yet.  But what we also said is

14:01:37  9    we can't provide that comprehensive list until we actually

14:01:41 10    have the data necessary to identify all those things.  So

14:01:43 11    any prejudice to Walmart associated with us not giving it to

14:01:49 12    them earlier is associated with their refusal to provide

14:01:52 13    this evidence.

14:01:53 14              And as Mr. Varnado has indicated, they are not

14:01:55 15    prepared to step beyond that claim versus violation

14:01:59 16    position.  And that -- until that is resolved, you know, we

14:02:02 17    can't move forward with this discovery process we feel like.

14:02:05 18              THE COURT:  Thank you.  So I think it makes

14:02:09 19    sense to move on to the first two issues in Defendants'

14:02:13 20    motion.  I guess you filed two motions, the list of

14:02:21 21    prescriptions.

14:02:22 22              MR. VARNADO:  Your Honor, do you mind if I did

14:02:24 23    respond to Mr. Kasper?

14:02:26 24              THE COURT:  I'm going to give him the last word.

14:02:29 25              MR. VARNADO:  If you don't mind.

14:02:30   1          THE COURT:  Keep it to like a minute or less.

14:02:32   2          MR. VARNADO:  On the administrative subpoena

14:02:35   3     issue, the government is acting as if Walmart did nothing.

14:02:38   4     We produced 6 million lines of prescriptions for 629 doctors

14:02:42   5     specifically identified by the government.  None of these

14:02:45   6     present lawyers were part of any of that process, but that

14:02:49   7     was a negotiated process that Walmart completed in good

14:02:52   8     faith without a doubt.

14:02:52   9          In terms of many cases with large numbers of

14:02:56  10     violations that are proved statistically, never under the

14:02:59  11     CSA, never once.  And that's because it's a very different

14:03:03  12     statute with criminal penalties with the exact same

14:03:06  13     regulation and people go to jail over that.  Judge

14:03:09  14     Easterbrook's case was a False Claims Act case and is

14:03:13  15     immediately distinguishable.

14:03:15  16          Lastly, in terms of looking for a compromise,

14:03:17  17     the government did produce that excel spreadsheet that says

14:03:21  18     red flags.  We think that's far beyond what was in the

14:03:24  19     complaint.  We would certainly be willing to look at that as

14:03:28  20     a starting point for negotiating potential additional

14:03:32  21     discovery in this case.  We think it's unnecessary and it

14:03:35  22     will be very difficult for the government again to prove its

14:03:38  23     case, but that's at least just so you hear it from us, a

14:03:42  24     starting place.  We think some narrowing would be necessary,

14:03:47  25     but that would at least based on the list they provided

14:03:49  1    today be somewhere we can start, but not beyond that.

14:03:52  2            THE COURT:  Okay.  Mr. Kasper, do you want to

14:03:54  3    respond?

14:03:54  4            MR. KASPER:  Just two quick points, Your Honor.

14:03:57  5    One, the 6 million lines of data they produced, 4 million of

14:04:00  6    those lines were for non-controlled substances, only two

14:04:03  7    million for controlled substances.  By comparison the data

14:04:05  8    they have requested from the State of Delaware alone, just

14:04:08  9    one of the fifty states is over 20 million lines of

14:04:11 10    prescribing data, filling data, which means --

14:04:14 11            THE COURT:  Does that mean 20 million

14:04:16 12    prescriptions?

14:04:18 13            MR. KASPER:  21 million prescriptions, yes.

14:04:20 14    They're requesting three times more prescriptions, and --

14:04:24 15    sorry, ten times more controlled substances prescriptions

14:04:27 16    than they produced to the United States in the pre-filing

14:04:30 17    investigation just in the State of Delaware alone.

14:04:33 18            The second point I would say about the False

14:04:36 19    Claims Act distinction versus the CSA, one, the False Claims

14:04:41 20    Act is a fraud statute which actually has heightened

14:04:44 21    pleading standards.  It also has a knowing intent

14:04:48 22    requirement.  Second of all, the statute where courts have

14:04:48 23    authorized discovery when you don't have a violation

14:04:52 24    initially alleged in the complaint like the Clean Water Act

14:04:54 25    and the Clean Air Act where those statutes have criminal

14:04:57  1    penalties as well.  Thank you.

14:05:11  2              MR. VARNADO:  Thank you, Your Honor.

14:05:12  3              With respect to our motions, our first two

14:05:15  4    issues, the first item we requested in our docket entry 178

14:05:22  5    is that the United States comply with the Court's order to

14:05:26  6    identify in fact discovery prescriptions that the United

14:05:30  7    States alleges are invalid as requested by interrogatory

14:05:34  8    number 1.

14:05:35  9              Judge, we have been trying to identify the

14:05:39 10    scripts that are at issue in this case since discovery

14:05:42 11    opened.

14:05:44 12              THE COURT:  So I guess maybe it would be better

14:05:46 13    if you would start with, what is wrong with the October 25th

14:05:50 14    "Red Flag" excel spreadsheet?

14:05:52 15              MR. VARNADO:  That particular spreadsheet,

14:05:54 16    several things are wrong with it.  First, it goes far beyond

14:05:57 17    the complaint.

14:05:58 18              THE COURT:  Okay.  So you think that it should

14:06:00 19    be fewer prescriptions listed?

14:06:02 20              MR. VARNADO:  We do.

14:06:03 21              THE COURT:  Okay.

14:06:03 22              MR. VARNADO:  It also actually doesn't include

14:06:06 23    some of the prescriptions that are in the complaint.

14:06:08 24              THE COURT:  Maybe they dropped them.  I will ask

14:06:10 25    them, but maybe they dropped them.

14:06:12  1          MR. VARNADO:  And more fundamentally when we

14:06:15  2    received that list, what we were told is this is very

14:06:18  3    preliminary, this is provisional, it could change, we'll be

14:06:22  4    getting new experts, there might be new criteria that we

14:06:25  5    have later and we'll tell you about it in expert discovery.

14:06:27  6          THE COURT:  I share the concern about expert

14:06:29  7    discovery.  What concerns me about your position is you want

14:06:34  8    this to be final immutable at this moment.

14:06:38  9          MR. VARNADO:  We understand as the Court ruled

14:06:40 10    that there could be some supplementation, that there could

14:06:44 11    be some minor modification, some modifications, and this is

14:06:49 12    what you said in the last hearing, "I expect the parties to

14:06:52 13    be reasonable."

14:06:52 14          Giving us a list that says we change wholesale

14:06:56 15    and we're not going to tell you what it finally is until

14:06:59 16    expert discovery is not reasonable.  It's just not.  And

14:07:03 17    that is literally the position they've taken.  They said

14:07:06 18    that list was not ready for Prime Time.  And said that

14:07:10 19    actually they had not read the hearing transcript from

14:07:13 20    September 25th when they gave it to us.  And we think we

14:07:18 21    need some finality and we need it during fact discovery so

14:07:22 22    that we can take discovery into those particular

14:07:24 23    prescriptions.  And fundamentally that's what's wrong with

14:07:28 24    that list --

14:07:29 25          THE COURT:  How do you make it final enough that

14:07:32  1    you are assured, but not final enough that they can't change

14:07:37  2    it?

14:07:38  3              MR. VARNADO:  They have indicated that they can

14:07:40  4    change the criteria, they could change the categories of red

14:07:44  5    flags.  And we have nine months left in fact discovery and

14:07:48  6    they have been at this for eight years.  They should not

14:07:51  7    need more time to figure out what they think is a violation.

14:07:54  8    And they certainly shouldn't need Walmart data to establish

14:07:59  9    "Red Flag" criteria.  They should have that criteria.  And

14:08:03 10    so, again, it puts us in a position where they continue to

14:08:06 11    say, contrary to your order, we don't owe you anything until

14:08:11 12    expert discovery.  We just think that's entirely incorrect.

14:08:15 13              I would like to if I could show an example of

14:08:19 14    Exhibit E to our pleading.  Judge, this is the interrogatory

14:08:49 15    response we got on November 21st of last year.  And I'll

14:08:53 16    direct the Court's attention to page 4.

14:09:07 17              So we may pull that up on the screen just so

14:09:11 18    it's easier for you, Judge.  On page 4, this is where

14:09:14 19    they're answering interrogatory number 2.  And they say --

14:09:21 20    let me give you clean copies so my notes aren't on here.

14:09:26 21              And if you recall, the complaint has four

14:09:30 22    categories of red flags.  That's what they start with.  So

14:09:33 23    what they've told us now is on interrogatory 2, subject

14:09:39 24    without waiving its objections, list below the categories

14:09:42 25    that were applied to derive the list of prescriptions

14:09:45 1    identified in the October 25th, 2024 response.  And so there

14:09:49 2    are some things that may be familiar.  Fills for Schedule II

14:09:53 3    drugs eight days before the prior prescription expired.

14:09:57 4         And I'll just remind you, Judge, on this "Red

14:10:00 5    Flag" discussion like we showed a couple of slides before,

14:10:04 6    these were supposed to be prescriptions that would shock the

14:10:07 7    conscious, no one would ever fill these types of

14:10:10 8    prescriptions.  And of course there are lots of reasons

14:10:12 9    somebody might fill a prescription earlier if they are

14:10:15 10   moving or if they are traveling.  The list goes on.  There

14:10:21 11   are a colossal number of different categories, so from four

14:10:27 12   we have gone to now there are starting at the top, mind

14:10:30 13   numbing number of different trinity combinations.  I'll

14:10:34 14   focus on number 8 which is prescriptions for methadone and

14:10:38 15   oxycodone 30 mg filled wither at the same time or with at

14:10:42 16   least eight days' overlapping supply.

14:10:45 17        These aren't insane prescriptions, these are

14:10:47 18   things that people get prescribed from time to time,

14:10:50 19   especially back at the time frame of this case where the

14:10:53 20   standard of care was very different than it is now.

14:10:56 21        Just to go to 14 on the next page, you get to a

14:11:00 22   lot more trinities that they're listing here.  And again,

14:11:04 23   like for us to try to track all these different categories,

14:11:08 24   and the specific limitations and eight days overlapping and

14:11:13 25   30-day supply.  And they end with patients receiving 800 MME

14:11:17  1    which even the government acknowledges that that happens, it

14:11:20  2    could be a cancer patient, Hospice patient, it could be

14:11:24  3    somebody who is opioid tolerant because they have been on

14:11:28  4    the medication for a long time.

14:11:30  5         So just the idea that these red flags are *per se*

14:11:33  6    violations of the CSA is completely wrong.  But most

14:11:37  7    importantly, this is what they said.  "The United States

14:11:39  8    reiterates that the lists are preliminary and that the

14:11:42  9    government reserves the right to supplement, clarify,

14:11:44 10    revise, or correct the lists according to the Federal Rules

14:11:48 11    of Civil Procedure and according to the timeline for expert

14:11:50 12    discovery in the Court's Scheduling Order."

14:11:53 13         And that's not what you ordered them to do.

14:11:55 14         THE COURT:  No, I'll talk to them about the

14:11:57 15    expert piece of it.  If that is their position, I will

14:12:00 16    gently correct them that that is the wrong position to have.

14:12:04 17         But what I'm struggling to understand is first

14:12:08 18    of all, you said four red flags in the complaint.  It's my

14:12:11 19    understanding that all of those that you put up on the

14:12:13 20    screen are fairly disclosed in some way in the Second

14:12:18 21    Amended Complaint.

14:12:18 22         MR. VARNADO:  There are four broad categories of

14:12:21 23    red flags.

14:12:22 24         THE COURT:  You were short-handing, when you

14:12:24 25    said four you were short-handing the list of twenty-one in

14:12:28  1      these four buckets?

14:12:28  2              MR. VARNADO:  No.  The complaint has four

14:12:29  3      buckets and they have made these, sliced it in a various

14:12:33  4      number of ways to get to twenty-one, but there is only four.

14:12:37  5      When you look through the complaint it has opioid --

14:12:39  6              THE COURT:  Cocktails.

14:12:40  7              MR. VARNADO:  -- cocktails, and early, they have

14:12:43  8      added this criteria --

14:12:46  9              THE COURT:  I want to make sure -- is it your

14:12:48 10      position that those twenty-one shouldn't be in the case

14:12:50 11      because they weren't in the complaint?

14:12:52 12              MR. VARNADO:  No, I think they fall within that,

14:12:55 13      it's just that they're not when they stood up here on

14:13:00 14      September 25th and said these "Red Flag" prescriptions are

14:13:03 15      ones that no one would ever fill, no doctor would ever write

14:13:07 16      those, you could look through those categories and plenty of

14:13:10 17      them do get written.  And they said these categories may

14:13:14 18      change at some point.  We're halfway through fact discovery

14:13:18 19      and we have been working on this case for eight years.  We

14:13:21 20      need a set of criteria that we can move forward with and

14:13:24 21      really it should be what's in the complaint, that's the easy

14:13:28 22      answer, instead of going back to the drawing board and say

14:13:31 23      they can wait until expert discovery to tell us what the

14:13:34 24      case is about.

14:13:34 25              THE COURT:  What if it's the twenty-one red

14:13:36  1    flags -- I looked at the spreadsheet because I was curious

14:13:40  2    what everyone was fighting about, and it's organized by tabs

14:13:44  3    per the "Red Flag".  I didn't have a huge problem with the

14:13:48  4    spreadsheet.  I thought it was a decent effort at complying

14:13:52  5    with my order.  I take your point that you don't want them

14:13:55  6    to be adding new wholesale types of red flags, but I'm not

14:14:00  7    sure what the problem with this is.

14:14:01  8              MR. VARNADO:  I think the main problem from our

14:14:01  9    perspective is that it's overinclusive and includes

14:14:04 10    prescriptions that are not specifically pled in the

14:14:05 11    complaint.

14:14:05 12              THE COURT:  Okay.

14:14:05 13              MR. VARANDO:  That being said, I don't disagree

14:14:07 14    with you that it could fall in one of those four larger

14:14:11 15    categories, and the main issue is that this statement that

14:14:15 16    it could continually change, why should we start taking

14:14:19 17    discovery on those prescriptions and those doctors if

14:14:21 18    they're going to modify it wholesale?  They have indicated

14:14:24 19    we got new experts, this may change significantly, so that's

14:14:28 20    our main concern is we want to hem them down so we can start

14:14:33 21    discovery on this.

14:14:34 22              I'll go back to your earlier question of what we

14:14:38 23    would be willing to produce.  That would be a starting

14:14:40 24    point.  That's at least a list.  If we go from there inward

14:14:44 25    on discovery and start finding a way to litigate this case,

14:14:47  1    that's at least a starting place that perhaps the Court

14:14:51  2    could land on where we could move forward instead of at this

14:14:55  3    impasse that we're at right now.

14:14:56  4            THE COURT:  Is it your position that there is no

14:14:58  5    way for them to add a prescription that they say is a

14:15:03  6    violation without amending their complaint?

14:15:06  7            MR. VARNADO:  No, I think they could.  Maybe --

14:15:09  8    they've already got these doctors at issue in the compliance

14:15:13  9    theory, compliance knowledge theory, it's now down to

14:15:17 10    eighteen doctors, they could find additional violations for

14:15:20 11    them if they figured out they wrote more prescriptions and

14:15:23 12    the date range that they're alleging, I think absolutely

14:15:27 13    they could do that.

14:15:27 14            THE COURT:  What if they found through discovery

14:15:30 15    that you thought was appropriate that there was a particular

14:15:34 16    Walmart store that was filling a lot more violative

14:15:38 17    prescriptions than others, and then they said we want all

14:15:43 18    controlled substance fills for that store, what about that?

14:15:46 19            MR. VARNADO:  I think that would be a discussion

14:15:48 20    we would have to have with them as to whether they could get

14:15:51 21    discovery into that.  I mean, my thought process would be

14:15:54 22    that they've had an amazing -- a very large amount of

14:15:58 23    information already, but it's something we would talk to

14:16:01 24    them about.

14:16:02 25            THE COURT:  Okay.  So you don't think that they

14:16:04 1    should be allowed to add new types of red flags, but if they

14:16:08 2    find prescriptions that they aren't otherwise aware of or

14:16:13 3    weren't at the time they filed the complaint that fit within

14:16:16 4    those red flags, they could add them?

14:16:19 5            MR. VARNADO:  I think they can take discovery on

14:16:20 6    them and I think we would still argue at summary judgment

14:16:23 7    that they should not be part of the case.

14:16:26 8            THE COURT:  But you would not oppose discovery

14:16:28 9    on them?

14:16:28 10           MR. VARNADO:  I think we would find a way to

14:16:30 11   reach some sort of compromise on those types of

14:16:33 12   prescriptions.  But again, not going -- our position is we

14:16:37 13   should not be going beyond what's in the complaint.  And now

14:16:40 14   what they've given us is this list which you have

14:16:44 15   identified, you have seen, it's got 64,000 prescriptions,

14:16:48 16   it's a tremendously large amount of additional

14:16:51 17   prescriptions.  If we're going from there inward, we'll find

14:16:56 18   a way to produce discovery and work with them.

14:16:58 19           THE COURT:  They may not be that opposed to it

14:17:02 20   as long as there is a safety valve for oh, look, we found a

14:17:06 21   bunch of violations in this category you already knew about

14:17:09 22   but you didn't know about before we filed the complaint.  I

14:17:13 23   think that they feel as though they should be able to add

14:17:16 24   that type of information because of this list.

14:17:18 25           MR. VARNADO:  And I think under your ruling if

14:17:20  1    they get discovery on it, they can attempt to add it and we

14:17:25  2    can attempt to say they can't add it.

14:17:27  3              THE COURT:  So I would be inviting more

14:17:29  4    discovery disputes?

14:17:29  5              MR. VARNADO:  I think that would be at a summary

14:17:32  6    judgment stage.  Obviously if the Court orders it, we're

14:17:35  7    going to produce the information, but we will be taking the

14:17:38  8    position because of the way this case was pled and because

14:17:42  9    it's under the CSA and all the reasons I have mentioned

14:17:44 10    before, we should be capped at where we are.  But they have

14:17:47 11    given us this list and if that's at least a starting place

14:17:50 12    to compromise to work inward, if the Court wants to pursue

14:17:57 13    that, we would be amenable to that.

14:17:57 14              THE COURT:  For the "Red Flag" categories, there

14:18:00 15    is at least in the briefing a fight about exception.  Is

14:18:02 16    that still -- what I'm trying to figure out is are you aware

14:18:05 17    of exceptions that you want to be part of the case, are

14:18:08 18    they, do you want them to tell you what they are?

14:18:11 19              MR. VARNADO:  Yes.  This goes -- I think this

14:18:14 20    goes back to some of what we were looking at before on the

14:18:17 21    slide deck where the government had said these are these *per

14:18:25 22    se* violations.  If you look -- we can go slide 14.  This is

14:18:32 23    just the last example.  There is no medical reason why a

14:18:35 24    patient would need a particular combination of drugs.  And

14:18:38 25    that's what they said in the hearing.  They described the

14:18:41  1    red flags.  They can say what they want now in their

14:18:45  2    briefing, but that's what they said at the hearing.

14:18:48  3              And then by -- after the hearing, if we go to

14:18:51  4    slide 16, we started having discussions with the government

14:18:54  5    and they're saying well, look, there may be some indication

14:18:58  6    that a customer had a cancer diagnosis that may have

14:19:03  7    theoretically warranted a stronger dose.  Well, if these are

14:19:06  8    not *per se* violations and their position has changed and

14:19:09  9    there could be facts or circumstances related to the

14:19:12 10    patient, related to the doctor, they need to let us know

14:19:15 11    what those exceptions are according to them so we can take

14:19:19 12    discovery on them because they avoided having to look in

14:19:22 13    their files for the doctors that wrote the "Red Flag"

14:19:26 14    scripts, because they said it didn't matter, it didn't

14:19:29 15    matter who wrote them, these are *per se* violations.  They

14:19:33 16    achieved that ruling.  And it seems that they're changing

14:19:35 17    now because they're not saying *per se*, and they're saying we

14:19:37 18    may learn additional information about the prescriber and

14:19:41 19    the patient, and if that matters, then these aren't *per se*

14:19:44 20    and we need to know what the exceptions are so we can pursue

14:19:44 21    those in questioning the agent and talking to patients, they

14:19:48 22    type of information we want to elicit in our defense.

14:19:50 23              THE COURT:  Okay.

14:19:57 24              MR. VARNADO:  So I think that is the main

14:20:00 25    concept with our first request related to interrogatory

14:20:05 1    number 1.

14:20:06 2            And really I guess number 2 is that if they're

14:20:09 3    not saying it's *per se* invalid, if that has changed and that

14:20:13 4    -- there is -- we need to know what the exceptions are so we

14:20:16 5    can take discovery into that right now and not wait until

14:20:19 6    expert discovery because that seems like what their plan is

14:20:23 7    for the entire case.

14:20:25 8            THE COURT:  So is your issue for interrogatory

14:20:28 9    number 2 just that if there are exceptions they are aware

14:20:31 10   of, they need to tell you now?  Because I feel like the "Red

14:20:37 11   Flag" categories at the bottom of the spreadsheets provide

14:20:41 12   the basis for invalidity for the prescriptions they

14:20:43 13   identified.  I'm just trying to figure out what more you're

14:20:46 14   asking for for interrogatory number 2.

14:20:49 15           MR. VARNADO:  If their position is those are not

14:20:52 16   *per se* violations, then we need to know what makes them not

14:20:55 17   *per se* violations because that's what they said in the case,

14:20:58 18   that's what they said in the hearing the last time, these

14:21:00 19   are prescriptions you would never fill, no doctor would ever

14:21:03 20   write.  And so that's what we want to know, what are the

14:21:06 21   exceptions that would make it okay in the government's mind

14:21:08 22   for these types of prescriptions to be prescribed.

14:21:10 23           THE COURT:  And if there are exceptions, doesn't

14:21:13 24   that open you up to having to provide pharmacist notes?

14:21:17 25   Like is the pharmacist aware that the patient was a cancer

14:21:20   1    patient?

14:21:20   2            MR. VARNADO:  I want to stress this really

14:21:22   3    quickly on interrogatory number 2 because we're talking

14:21:26   4    about invalidity here, and whether -- what the pharmacist's

14:21:30   5    notes say doesn't make an invalid prescription valid, just

14:21:35   6    like what the pharmacist writes down wouldn't make a valid

14:21:39   7    prescription invalid.

14:21:40   8            The inquiry is at the front end when the patient

14:21:43   9    goes into the doctor, gets the prescription, is that

14:21:45  10    prescription valid or not.  And what the pharmacist may

14:21:49  11    write about it later, that may go to their knowledge, that's

14:21:52  12    the second component.  What we are discussing here is the

14:21:55  13    fact that there is no, we don't believe, any set criteria of

14:22:00  14    *per se* invalidity and the government has said that before,

14:22:04  15    and now they seem to be changing.

14:22:06  16            And one of the reasons we're pursuing this -- if

14:22:08  17    we could just show slide 9.  So I do want to make sure the

14:22:14  18    Court is aware of this, and we put this in our briefing,

14:22:17  19    this is important to remember.  And this is the last time

14:22:21  20    the DEA has made a formal official statement on the

14:22:25  21    dispensing of controlled substances in the Federal Register,

14:22:28  22    what they say is, "[O]ne cannot provide an exhaustive and

14:22:32  23    foolproof list of 'dos and don'ts' when it comes to

14:22:34  24    prescribing controlled substances.  [T]he courts have

14:22:36  25    recognized that there are no definitive criteria laying out

14:22:40  1    precisely what is legally permissible, as each patient's

14:22:44  2    medical situation is unique and must be evaluated based on

14:22:47  3    the entirety of the circumstances."

14:22:49  4            I know that's dated from 2006.  If we can go to

14:22:52  5    the next slide.  Just a handful of years ago, the DEA sent a

14:22:57  6    letter to the National Associations of Chain Drug Stores,

14:22:57  7    and this was concerning trinity prescriptions where the

14:22:59  8    government in a criminal case said you would never write a

14:23:02  9    trinity, those are *per se* invalid.  And the person who wrote

14:23:05 10    this letter is a guy named Tom Prevoznik who is now the head

14:23:11 11    of the DEA Diversion Control Division, and he said,

14:23:13 12    "Although the DEA is the agency responsible for

14:23:15 13    administering the CSA, the DEA does not act as the federal

14:23:16 14    equivalent of a state medical board."  "The DEA lacks the

14:23:20 15    authority to issue guidelines that constitute advice

14:23:23 16    relating to the general practice of medicine."  Federal law

14:23:26 17    and DEA regulations do not impose a specific quantitative

14:23:28 18    minimum or maximum limit on the amount of medication that

14:23:31 19    may be prescribed on a single prescription, or the duration

14:23:35 20    of treatment intended with the prescribed controlled

14:23:35 21    substance."

14:23:36 22            So we -- this is why we're pinning them down, we

14:23:39 23    know this, and so we're saying, alright, you say these red

14:23:43 24    flags are *per se* invalid, explain to us why they gave us the

14:23:46 25    list of twenty-one factors, and then we hear from

14:23:49  1    Ms. Brunson, well, there may be certain cases where those

14:23:53  2    prescriptions are okay and we want to know the circumstances

14:23:56  3    when they're okay.  And that's what we're pressing for in

14:23:59  4    interrogatory number 2.  And we need it during fact

14:24:02  5    discovery.

14:24:02  6            THE COURT:  Okay.  Just so I'm clear on this

14:24:05  7    dispute, if I say that I think this spreadsheet is largely

14:24:12  8    in compliance with what I ordered before and it needs to be

14:24:16  9    close to what you intend to produce or to prove at trial

14:24:19 10    because each prescription is its own violation, but there is

14:24:24 11    some safety valve for them to add and removal, they have to

14:24:28 12    tell you close in time to when they do that, are you okay

14:24:32 13    with that?

14:24:33 14            MR. VARNADO:  Meaning add or remove additional

14:24:35 15    prescriptions?

14:24:35 16            THE COURT:  Violations.

14:24:36 17            MR. VARNADO:  Based on the information that's in

14:24:38 18    that spreadsheet?

14:24:38 19            THE COURT:  Yes.  Or they find a new

14:24:41 20    prescription that falls within a "Red Flag" that they have

14:24:44 21    identified that you agree has already been identified.

14:24:47 22            MR. VARNADO:  I think we would be fine producing

14:24:50 23    discovery on it.  I'm not going to represent to the Court

14:24:53 24    that we're not going to challenge it at some point, yes.

14:24:58 25            THE COURT:  All right.  Who is handling this for

14:24:59  1    the government?  Mr. Kasper?  So I guess speak to that point

14:25:04  2    first, because as I just said to Mr. Varnado, I didn't

14:25:08  3    really have a problem with this spreadsheet, but it does

14:25:12  4    give me pause if you think that this spreadsheet is largely

14:25:15  5    meaningless and you can do whatever you want.

14:25:17  6               MR. KASPER:  So we don't think the spreadsheet

14:25:19  7    is meaningless, Your Honor.  We are committed to -- if we

14:25:23  8    receive the data that we require from Walmart and this Court

14:25:26  9    authorizes us to get that data to providing a list during

14:25:31 10    fact discovery to them and we'll do it as soon as possible

14:25:35 11    after they produce that information.  I would say --

14:25:38 12               THE COURT:  Just assume that I don't order them

14:25:40 13    to produce the information that you have requested, then

14:25:44 14    what?

14:25:44 15               MR. KASPER:  So if we can't -- if the Court is

14:25:47 16    going to agree with their position that the claim versus

14:25:50 17    violation --

14:25:51 18               THE COURT:  That's not what I said.  The dispute

14:25:53 19    in front of me is whether they have to produce all

14:25:56 20    controlled substance fills for the past seven to ten years,

14:26:00 21    I don't remember what it is, for every Walmart nationally,

14:26:03 22    that's the dispute in front of me.  There were no

14:26:05 23    discussions about compromises, so what I am deciding is yes,

14:26:10 24    they have to do that, or no, they don't have to do that.

14:26:12 25               So if I say no, they don't have to do that, what

14:26:15  1    are you telling me is going to change about this?

14:26:18  2              MR. KASPER:  So I think Your Honor could rule

14:26:20  3    without definitively saying the claim versus violation,

14:26:23  4    resolving that particular issue, you could say that the

14:26:27  5    United States is entitled to more -- well, you could say

14:26:30  6    that the United States is entitled to more discovery than

14:26:33  7    just the particular prescriptions alleged, that they believe

14:26:36  8    are alleged in the complaint.  And I think that that would

14:26:40  9    meaningfully affect our meet-and-confer and negotiation

14:26:44 10    process because until that is resolved, they have not

14:26:48 11    progressed forward on that issue.

14:26:50 12              THE COURT:  Well, I think I'm hesitant to do

14:26:54 13    that because I don't have that particular dispute in front

14:26:57 14    of me.  I have the dispute which you raised which -- I know

14:27:00 15    we're supposed to be talking about Defendants' issue at this

14:27:03 16    point, but you brought this up.  You asked for everything,

14:27:06 17    there was no discussion about compromises, so I don't really

14:27:10 18    have occasion to rule on that.  I think my question to both

14:27:13 19    sides suggest that I think there is some middle ground, but

14:27:17 20    I don't have that specific dispute in front of me to be able

14:27:20 21    to give you formal guidance on it.

14:27:23 22              MR. KASPER:  I think these two, the two issues

14:27:25 23    are interrelated.

14:27:27 24              THE COURT:  This one for sure I think I can be

14:27:29 25    closer to giving you more formal guidance on it.  But in

14:27:33  1    terms of the first dispute, I'm not going to say you can ask

14:27:36  2    for X, Y and Z, because you didn't.

14:27:39  3              MR. KASPER:  So if the United States were able

14:27:41  4    to obtain discovery beyond the prescriptions that Walmart

14:27:48  5    believes are alleged in the complaint, and through that data

14:27:53  6    using the, you know, data specifications like those we have

14:27:57  7    disclosed to Walmart, we identify additional violations, we

14:28:01  8    would provide those to them.  And we think that is -- they

14:28:06  9    have their notice of what we are looking at in the sense of

14:28:09 10    we have the four categories described in our complaint and

14:28:12 11    as Your Honor has highlighted, you know, what those

14:28:15 12    specifications are we provided to them are consistent with

14:28:18 13    these sort of categories described in the complaint, they're

14:28:21 14    just operationalizing those categories.

14:28:23 15              THE COURT:  How different -- if you got some

14:28:27 16    middle ground set of discovery from them, how different do

14:28:30 17    you expect this in close to final form to look?

14:28:34 18              MR. KASPER:  I think in form it would look --

14:28:37 19              THE COURT:  Not in form, in terms of volume.

14:28:39 20              MR. KASPER:  Well, you know, we can't really

14:28:41 21    know, right, because all we have now is data for 689

14:28:45 22    prescribers.

14:28:46 23              THE COURT:  See, that's what's concerning me is

14:28:49 24    that this case, you think you can expand it so far in scope

14:28:54 25    beyond how you laid it out in the complaint, so it concerns

14:28:58  1   me that you can't answer that question.  I understand that

14:29:00  2   you can't, but you can't answer that question because it

14:29:03  3   could be an order of magnitude different than what I'm

14:29:05  4   looking at.

14:29:06  5          MR. KASPER:  But it's going to be the same, you

14:29:09  6   know -- it's just going to be more prescriptions, but it's

14:29:12  7   going to be the same -- you know, same type of this is a

14:29:19  8   benzodiazapine, this is an opioid, this a muscle relaxant,

14:29:23  9   they have had overlapping supply for eight days, it's going

14:29:26 10   to be those, it's just going to be more prescriptions like

14:29:29 11   that.

14:29:30 12          THE COURT:  Why didn't you have a RFP that was

14:29:34 13   directed to that?  Again, I'm asking you about the first

14:29:38 14   issue, and I apologize about that, but you raised it.

14:29:41 15          MR. KASPER:  There is a couple of reasons that

14:29:43 16   we would want data beyond just -- we could ask and I think

14:29:47 17   we would be open to asking for them to do this, for just

14:29:52 18   this sort of we give them a "Red Flag" specification, let

14:29:55 19   them run it through their system and let them produce that,

14:30:00 20   all the prescriptions that fall within that.

14:30:01 21          THE COURT:  That seems to be discovery guided by

14:30:03 22   the pleadings.

14:30:04 23          MR. KASPER:  Well, but remember, so relevance is

14:30:07 24   not just -- it's relevant to proving our case, not just the

14:30:12 25   sort of exact violation, right, in the sense that so -- so

14:30:18  1    as I said earlier, there is the universe of this particular

14:30:24  2    prescription is meaningfully different than the

14:30:28  3    run-of-the-mill prescription that a particular pharmacy or

14:30:31  4    pharmacist was seeing, and that speaks to their knowledge.

14:30:33  5    And that sort of comparison point is relevant to our case to

14:30:37  6    proving that they would have known because they rarely, if

14:30:40  7    ever, saw a thousand mil MME prescriptions, but yet they did

14:30:46  8    hear and nonetheless fill this prescription.

14:30:48  9            Second of all, if we want to do sampling to sort

14:30:51 10    of focus and do more intensive analysis of particular

14:30:57 11    prescriptions to sort of present a sample to the factfinder,

14:31:00 12    we would need the full universe so our statistician can pull

14:31:05 13    a representative sample from that full universe.

14:31:08 14            THE COURT:  But couldn't you have asked Walmart

14:31:11 15    to produce the sampling?

14:31:14 16            MR. KASPER:  You could, but I mean, in many

14:31:16 17    cases, it's done this way.  This is not -- it's not -- it's

14:31:23 18    still relevant to generate for us to request that data.

14:31:28 19            THE COURT:  I guess where I come out in terms of

14:31:32 20    what I'm thinking, I'm not sure that you should be bound to

14:31:36 21    every single prescription that can be identified in the

14:31:39 22    complaint.  I think that there is a purpose for discovery

14:31:42 23    and you should be allowed to get some discovery.  But that

14:31:46 24    being said, I don't think you should get discovery as broad

14:31:49 25    as you're seeking.  I think that it needs to have some

14:31:53  1    grounding in the complaint and it may be that CSA cases,

14:31:57  2    there is some sort of artificial tighter standard.

14:32:01  3            So I think that your list should have a safety

14:32:04  4    valve for additional violations to be added because you

14:32:07  5    should be allowed to find additional violations that relate

14:32:11  6    to what you put in the complaint.  I don't see why you

14:32:15  7    should be allowed to ask for everything.  So I'm trying to

14:32:19  8    understand how much what you have produced by way of the

14:32:24  9    spreadsheet is going to change in light of what I just said.

14:32:28 10            MR. KASPER:  So I think it will look -- what we

14:32:31 11    would ultimately have as our list would look extremely

14:32:35 12    similar to this, it would just be more lines because we

14:32:38 13    would identify more within these specifications.

14:32:41 14            THE COURT:  If it's like a thousand more lines,

14:32:43 15    okay, that doesn't bother me as much.  It probably doesn't

14:32:47 16    bother Walmart as much.  But if it's a hundred thousand more

14:32:50 17    lines, that is effectively doubling the scope of the case.

14:32:53 18            MR. KASPER:  Well, so we would say that was --

14:32:56 19    it's already in the case based upon the allegations in the

14:32:59 20    complaint.

14:32:59 21            THE COURT:  But they have to do discovery on it.

14:33:01 22            MR. KASPER:  So how we view this is what they

14:33:03 23    are trying to materially narrow the case from what was

14:33:07 24    actually alleged in the complaint by restricting it to what

14:33:09 25    they see -- this is really -- they're trying to leverage

14:33:14  1    discovery to sort of limit their liability.

14:33:17  2            THE COURT:  I think both sides are on opposite

14:33:20  3    ends of the spectrum in terms of is discovery matching the

14:33:25  4    pleading issue.  I think that that's clear.  I think that

14:33:27  5    I'm somewhere in the middle.  I'm just trying to figure out

14:33:31  6    how to resolve the dispute in front of me when nobody -- it

14:33:36  7    seems like you're not able to tell me how close this is to

14:33:39  8    final because you say it depends on what discovery you get,

14:33:42  9    but you didn't ask for any discovery other than that.

14:33:47  10           MR. KASPER:  I think it's hard for us to tell

14:33:48  11   you what's close because we don't know what their data looks

14:33:52  12   like beyond what we have in the 689 -- I can tell you in the

14:33:56  13   689 people, approximately seven percent of the prescriptions

14:33:59  14   it appears from the data sort of hit on these "Red Flag"

14:34:03  15   categories that we specified in the operationalized

14:34:06  16   specifications in the spreadsheet.

14:34:08  17           The other thing I want to add about what could

14:34:10  18   happen to change this list is that we've only gotten a

14:34:15  19   limited universe of fields at this point in time and there

14:34:18  20   are some additional fields like one of the fields that we

14:34:20  21   know does exist in their nexus system that we have not

14:34:25  22   received is a checkbox of whether the pharmacist resolved

14:34:29  23   whether there was a "Red Flag" or not.  We also know that

14:34:34  24   there are fields related --

14:34:35  25           THE COURT:  Did they say they were not going to

14:34:39  1    give you whether the "Red Flag" was resolved?

14:34:41  2            MR. KASPER:  I don't know the answer to that.

14:34:44  3    I'm sorry, Your Honor, I don't know to answer to that.  I

14:34:46  4    apologize.

14:34:47  5            THE COURT:  Did you ask?  I'm just wondering, is

14:34:50  6    this part of this dispute or is that just something you are

14:34:55  7    telling me.

14:34:56  8            MS. BRUNSON:  We had asked for it.

14:34:57  9            MR. KASPER:  What we asked for just to clear,

14:34:58 10    Your Honor, we asked for a list of fields and we asked in

14:35:02 11    June of last year so we could tailor our requests to the

14:35:05 12    ones that we need.  We have asked many different times over

14:35:08 13    a multi-month period and they never provided any type of

14:35:12 14    list until January 31st after this issue had already reached

14:35:16 15    an impasse.  We know that field exist because it's in sort

14:35:21 16    of spreadsheet documents, or in description documents we

14:35:25 17    have obtained, but we have not actually gotten able to make

14:35:29 18    a list of fields we want.  We haven't gotten a list of

14:35:33 19    what's actually possibly not there.

14:35:35 20            THE COURT:  Would you at least agree not to add

14:35:38 21    new red flags, new "Red Flag" categories?

14:35:43 22            MR. KASPER:  We're not adding new "Red Flag"

14:35:46 23    categories beyond the sort of four that are described in the

14:35:49 24    complaint.

14:35:50 25            THE COURT:  And the twenty-one tabs or whatever

14:35:52 1    in the --

14:35:53 2              MR. KASPER:  So the only thing I would say about

14:35:55 3    that is, again, we might not -- so there is a difference

14:35:59 4    between being a "Red Flag" and even a "Red Flag" that we

14:36:03 5    think was an improper fill that we're actually going to try

14:36:07 6    to prove to a factfinder as warranting a civil penalty.  And

14:36:11 7    so it could very well be that we elect to, within the scope

14:36:15 8    of those twenty-one type, the data specifications to sort of

14:36:22 9    curve out if the pharmacist would have had a reason to

14:36:25 10   believe that this patient had cancer, maybe even if we think

14:36:28 11   it still might have been an invalid prescription, we're not

14:36:33 12   going to ask the jury to make a finding on that because we

14:36:36 13   would rather focus on -- focus on the ones where we're

14:36:40 14   saying to the jury we think there is a preponderance of the

14:36:42 15   evidence that supports that.

14:36:43 16             THE COURT:  Okay.  It sounds like you're largely

14:36:47 17   close to -- I won't hold you to this, you're largely close

14:36:53 18   to them in terms of identifying "Red Flag" categories,

14:36:56 19   subject to exceptions.  The reason I'm asking you is because

14:37:00 20   Mr. Varnado expressed concern that this is effectively

14:37:03 21   meaningless because you could do whatever you want.

14:37:06 22             MR. KASPER:  I don't think this is meaningless.

14:37:08 23   I think this is consistent with what we are -- that

14:37:11 24   twenty-one -- I mean, obviously we're going to have to --

14:37:17 25   now that we received whatever the final dataset we are

14:37:20  1    authorized to receive is, we're going to run that dataset

14:37:26  2    through these sort of specifications, but those sort of how

14:37:30  3    we specified that, you know eight days overlapping supply,

14:37:34  4    we believe those are the categories, the specifications.

14:37:37  5            THE COURT:  And I'm not saying that I agree with

14:37:40  6    this, but if this -- if you are -- if you do not get any

14:37:46  7    discovery from Walmart, I'm not saying that that's the right

14:37:49  8    answer, but if you did nothing, is this close to final

14:37:53  9    subject to revision as you described so far?

14:37:55 10            MR. KASPER:  I think we would need to -- I mean,

14:37:59 11    so we have retained as we've said separate experts for the

14:38:04 12    litigation from the pre-investigation phase.  That

14:38:08 13    particular document was from the investigation phase.  So we

14:38:12 14    would want them to sort of rerun this to make sure that all

14:38:16 15    the code is appropriate and everything else, but sort of how

14:38:20 16    we're operationalizing those categories would be consistent,

14:38:24 17    yes.

14:38:24 18            THE COURT:  So it's close to final subject to

14:38:26 19    whatever discovery you're authorized to get?

14:38:29 20            MR. KASPER:  So if I were Walmart and I was sort

14:38:31 21    of defending this case and I had access to all my data, I

14:38:36 22    believe that relying on those four high-level categories and

14:38:40 23    then those operational specifications would provide me

14:38:43 24    notice of what it is I need to defend, if that makes sense.

14:38:48 25            THE COURT:  It does.  I was just asking how this

14:38:50  1    particular list that I ordered you to produce would change

14:38:53  2    and it sounds like it's going to change only insofar as

14:38:57  3    discovery let's you change it.

14:38:59  4              MR. KASPER:  Yes.

14:39:00  5              THE COURT:  All right.  In terms of the

14:39:01  6    exceptions, are there certain exceptions to red flags that

14:39:04  7    the government knows for sure about at this point?

14:39:09  8              MR. KASPER:  So I don't think we would

14:39:11  9    characterize these as exceptions to red flags.  But I think

14:39:22 10    what Walmart is getting at is are there additional factors.

14:39:25 11    This is -- as the DEA material speaks to that they cited,

14:39:28 12    there are a multiplicity of circumstances that they are on

14:39:32 13    the validity of the prescription and also the pharmacist's

14:39:34 14    knowledge of the validity of the prescription.  There are

14:39:36 15    additional things that may be reflected in data fields that

14:39:39 16    Walmart has that we have not yet obtained like information

14:39:43 17    regarding the particular diagnosis of the patient, or like

14:39:49 18    whether the pharmacist actually denoted that they resolved a

14:39:54 19    potential "Red Flag" that would bear on our list, we think

14:39:59 20    that's just part of the universe of facts and that we would

14:40:02 21    consider those things in setting up the code to run those

14:40:06 22    categories through it, if that makes sense.

14:40:08 23              THE COURT:  It does.  So can you identify what

14:40:14 24    you just said to me in narrative form in response to

14:40:18 25    interrogatory number 2.

14:40:19  1                MR. KASPER:  I think --

14:40:21  2                THE COURT:  Because it sounds like you have some

14:40:24  3     universe of exceptions -- I made air quotes.  You have some

14:40:27  4     universe of exceptions that you think could apply, but you

14:40:31  5     don't know if they apply on a prescription-by-prescription

14:40:34  6     basis because that is in the possession of Walmart.

14:40:39  7                MR. KASPER:   I think we would need sort of a

14:40:41  8     fairly comprehensive list of just the fields available in

14:40:47  9     Walmart's system so that we could look at that list and say

14:40:50 10     which are the ones that would be relevant to our actual

14:40:55 11     final specifications and then advise them, you know, there

14:41:00 12     is -- so a data field that would speak to the diagnosis, so

14:41:06 13     it could be that the prescribers, what practice they worked

14:41:09 14     for, what their specialty is, if there is a data field that

14:41:13 15     could speak to some other issues, we could tell them, but we

14:41:18 16     would need that sort of to know the universe of data field

14:41:21 17     that we might want to sort of consider that with.

14:41:24 18                THE COURT:  But it seems like that set might

14:41:28 19     come after you saying what you think exceptions would be.

14:41:32 20     Like it sounds like just for a simplified example is someone

14:41:37 21     gets prescribed 300 OxyContin, they are terminally ill with

14:41:45 22     throat cancer, you're saying that's a high dose, high

14:41:48 23     starting dose, a lot of pills, but it's not going to be an

14:41:52 24     invalid prescription because there is an exception to this

14:41:57 25     "Red Flag".

14:41:58  1          MR. KASPER:  Well, I would say first of all,

14:42:01  2   getting a thousand MME prescription is a "Red Flag"

14:42:04  3   regardless of what condition the patient has.  That being

14:42:09  4   said, a pharmacist in that circumstance might, or a

14:42:15  5   prescriber might determine, and Mr. Varnado testified to

14:42:21  6   whether these are typical --

14:42:24  7          THE COURT:  I don't think he testified.

14:42:25  8          MR. KASPER:  I'm not an expert on this, so I am

14:42:28  9   not going to make a representation as to whether these are

14:42:31 10   typically, I think the ones we have provided from what I

14:42:35 11   have been advised are not typical, but that's a situation

14:42:37 12   where it could be envisioned that this is a legitimate

14:42:41 13   prescription, so we might exclude that from what we're

14:42:45 14   seeking penalties for.  It doesn't mean it's not a "Red

14:42:49 15   Flag", because there are red flags that can be resolved, but

14:42:52 16   it may mean we would not seek penalties for because we would

14:42:56 17   rather focus our case and our evidence on the ones that we

14:42:59 18   think are the strongest.

14:43:01 19          THE COURT:  Why can't you say that in response

14:43:03 20   to interrogatory number 2, why can't you describe what you

14:43:06 21   have just described to me today?

14:43:08 22          MR. KASPER:  I think we can describe some of the

14:43:11 23   things we did today.  We might keep adding additional things

14:43:15 24   if we learn more of the field they have because part --

14:43:18 25          THE COURT:  They're not going to say we're not

14:43:20  1    going to give you these fields until you give me a reason to

14:43:24  2    give you the fields, that's what I'm trying to avoid by

14:43:28  3    getting you to disclose in interrogatory number 2 reasons to

14:43:32  4    give you fields that you think would have the information to

14:43:34  5    prove or disprove the exception.

14:43:37  6                MR. KASPER:  I guess it's a chicken or egg

14:43:41  7    problem.

14:43:41  8                THE COURT:  I understand it is.

14:43:42  9                MR. KASPER:  And we feel like, you know, we

14:43:44 10    would like to be able to present to our expert the different

14:43:47 11    fields that are available so the expert can say to us, these

14:43:51 12    are the kind of things that we do think would potentially

14:43:54 13    matter in our opinion and these are the kind of things that

14:43:57 14    don't matter in our opinion.

14:43:59 15                THE COURT:  That you have to disclose in fact

14:44:00 16    discovery.  Like, they have to be able to take discovery

14:44:03 17    into it.

14:44:04 18                MR. KASPER:  And we are prepared to do that,

14:44:06 19    again, if we can get a sort of list of the fields.  We're

14:44:09 20    not asking for actually production of the fields, we're just

14:44:12 21    asking for a list of the fields so that we can sort of

14:44:14 22    present those to our experts so they can weigh in on it.

14:44:17 23                THE COURT:  It sounds like you have descriptions

14:44:19 24    of exceptions that you could put in an interrogatory

14:44:22 25    response that would help them understand what you are

14:44:25  1    saying.

14:44:26  2              MR. KASPER:  I think there are some things that

14:44:28  3    we would consider on that, but we don't have all of them and

14:44:31  4    we also don't know if those things could actually be

14:44:34  5    considered in a data analysis because we have not seen what

14:44:36  6    the data looks like.

14:44:38  7              THE COURT:  Is it fair to say that a terminally

14:44:41  8    ill cancer patient may be an exception to one or more of

14:44:45  9    your red flags?

14:44:46 10              MR. KASPER:  I think it's fair to say a

14:44:48 11    terminally ill cancer patient, we would not seek a civil

14:44:53 12    penalty, if we could establish that in the data that exist.

14:44:56 13              THE COURT:  Okay.  It seems like that is

14:44:58 14    something you could put in response to interrogatory number

14:45:00 15    2.

14:45:01 16              MR. KASPER:  We could certainly provide that

14:45:02 17    information.

14:45:03 18              THE COURT:  Yeah, I think you should think about

14:45:05 19    the exceptions that you're aware of right now in fact

14:45:08 20    discovery that would affect your decision whether or not to

14:45:13 21    pursue it as a violation as you just described to me over

14:45:17 22    the past five to seven minutes, I think that is information

14:45:20 23    that they should get now so that they can explore it and

14:45:23 24    then you can have the fight about whether they're giving you

14:45:27 25    data fields that cover that information so you can flesh it

14:45:30  1   out, but I don't see any reason why you can't give that to

14:45:33  2   them right now.

14:45:34  3              MR. KASPER:  So we are prepared to provide that

14:45:37  4   information.  I will say that particular interrogatory ask

14:45:40  5   for the basis for finding that the particular prescription

14:45:42  6   was invalid, not the basis for not including it, right.

14:45:45  7              THE COURT:  I think they would say invalidity or

14:45:48  8   lack thereof.  I mean, I guess they could serve another

14:45:53  9   interrogatory asking for exceptions, but I don't understand

14:45:57 10   why it's not fairly responsive to the interrogatory.  They

14:46:00 11   just want to know what is the basis for invalidity and if

14:46:06 12   there is something that calls into question the invalidity,

14:46:09 13   say it.

14:46:10 14              MR. KASPER:  Yes, I think we can provide a more

14:46:12 15   fulsome response on that, but as I said, I do think if we

14:46:16 16   got additional information about what data they have in

14:46:18 17   their system, it would help us do that.

14:46:21 18              THE COURT:  Okay.  Thank you.

14:46:22 19              MR. KASPER:  The other point I really do want to

14:46:26 20   sort of just say, and this goes back to the first issue as

14:46:28 21   well, is Walmart is talking a lot about needing to do this

14:46:33 22   investigation in fact discovery.  Even if this Court were to

14:46:38 23   hold that only the sort of claims violations, however word

14:46:44 24   you want to use, that are explicitly enumerated in the

14:46:50 25   complaint are at issue, Walmart has still conceded that's

14:46:54  1    over 80,000 claims, violations, whatever word you want to

14:46:57  2    use.  There is 150 hours of deposition time.  The notion

14:47:02  3    that we would be sort of going prescriber, patient,

14:47:06  4    pharmacist, you know, depositions for each of those 80,000

14:47:11  5    prescriptions, we have to sort of introduce that evidence at

14:47:15  6    trial, I don't think that's what the civil rules contemplate

14:47:18  7    we have to do at trial.  I do want to emphasis that point.

14:47:23  8              THE COURT:  Can I ask, what actual discovery has

14:47:25  9    happened so far?

14:47:26 10              MR. KASPER:  It's a great point and I have some

14:47:29 11    summary statistics.  So the United States has made ten

14:47:38 12    productions to date.  It's well in excess of a hundred

14:47:44 13    thousand documents, more than 1.4 million pages.  It's also

14:47:49 14    agreed to search for records from at least 130 custodians,

14:47:53 15    many of whom, I think most of whom are with the DEA.

14:47:59 16    Walmart has made six productions.  I think there is only two

14:48:05 17    of those are in response to the United States' RPDs.  They

14:48:09 18    have produced I think a little bit less than 40,000 pages of

14:48:14 19    documents in those productions, most of which were just

14:48:18 20    interrogatories -- discovery responses they provided in the

14:48:21 21    multi-district litigation.  In addition to that, Walmart did

14:48:25 22    produce several hundred thousand documents in response to

14:48:28 23    the pre-filing investigative demands.

14:48:32 24              But that's the current state of discovery, so

14:48:35 25    the United States has produced about 1.4 million pages and

14:48:40  1    Walmart is in that sort of 40,000 page range.

14:48:44  2                THE COURT:  Okay.

14:48:49  3                MR. KASPER:  One other thing, in terms of -- I

14:48:52  4    did mention, we are prepared -- we're searching for records

14:48:56  5    from 130 custodians.  They have agreed to produce records

14:49:01  6    from ten custodians.

14:49:03  7                THE COURT:  Okay.

14:49:09  8                MR. VARNADO:  Thank you, Judge.  I want to start

14:49:11  9    with just a couple of things, especially this concept of red

14:49:15 10    flags.  And I want to be very, very clear, just because

14:49:19 11    something is a "Red Flag", it does not violate the

14:49:24 12    Controlled Substances Act.  I don't know if you can pull up

14:49:25 13    the slide from the *Ridley's* decision on the motion to compel

14:49:29 14    order.  Can you pull up from our slide deck from the

14:49:37 15    district court.  We're talking about these red flags as if

14:49:42 16    it's a "Red Flag", it's a violation of the CSA.

14:49:44 17                THE COURT:  I wasn't assuming that it was.

14:49:48 18                MR. VARNADO:  Again, the government has a

14:49:50 19    tendency and others to devolve into this.  But this is from

14:49:56 20    the judge, Judge Stewart in the District of Utah who is the

14:50:02 21    *Ridley's* judge who is denying the summary judgment motion

14:50:04 22    who is articulating there is red flags here, you should find

14:50:08 23    for us.  What Judge Stewart said, "Indeed, whether a "Red

14:50:12 24    Flag" is present depends on a pharmacist's professional

14:50:14 25    judgment and specific circumstances of the prescription,

14:50:17  1    including a holistic review of the prescription, patient,

14:50:19  2    and situation."  That is what the government is stuck with,

14:50:24  3    they have elected to bring the case they brought.

14:50:27  4              Counsel represented or mentioned that there is

14:50:30  5    150 hours of deposition time for non-parties.  That applies

14:50:34  6    to them, too, and they have the burden of proof.  They are

14:50:36  7    the ones who should be very concerned about how they're

14:50:39  8    going to prove their case.

14:50:40  9              THE COURT:  Have any depositions been noticed?

14:50:43 10              MR. VARNADO:  None yet, Judge.  And I guess I

14:50:45 11    want to hit these in a couple of orders, in the correct

14:50:48 12    order.  I'll go back to your last question about document

14:50:51 13    productions.  So the government, the representation was a

14:50:56 14    hundred thousand documents.  To be very clear, all they have

14:51:00 15    produced so far is the files that were gathered in

14:51:03 16    connection with the prosecution of just six of the -- six

14:51:07 17    out of nine that were prosecuted who were the compliance

14:51:11 18    knowledge prescribers.  There is like these eighteen doctors

14:51:15 19    that they say as of a certain date never wrote another valid

14:51:20 20    prescription.  It's a crazy theory that a doctor would never

14:51:23 21    write a valid prescription after a date, it's never

14:51:28 22    articulated anywhere else, it's a novel theory that's never

14:51:29 23    been brought, but that should be material that was just in

14:51:32 24    their hands at the time that they charged this case.  And

14:51:34 25    all we've got eeked out of them is six of those nine doctors

14:51:38  1    and that should be the most low hanging fruit.

14:51:41  2           They have done -- we have been tussling with

14:51:43  3    them for months and months over custodians.  They have not

14:51:47  4    run a single search term across the cuss custodian data.

14:51:50  5    They have produced zero custodian data.  We previewed this

14:51:56  6    in one of our letters.  I suspect we'll be back in front of

14:52:00  7    you next month because none of this is happening.  The

14:52:03  8    government is not working this case.  What they want is what

14:52:05  9    counsel just said, give me a spreadsheet of prescriptions

14:52:08 10    and we'll call an expert and tell you they're invalid and

14:52:11 11    we've met our burden.  And that is not the way this case is

14:52:14 12    going to be tried.  I think they desperately wish that's all

14:52:18 13    they had to do, that the practice of medicine was just a

14:52:20 14    machine that was processing fraudulent bills like a False

14:52:23 15    Claims Act case.  This is a specific statute that looks at a

14:52:25 16    specific inquiry into the doctor, the patient, and the

14:52:28 17    pharmacist, and they have to meet that burden.  And to cite

14:52:31 18    the restrictions on discovery, that's to their own peril.

14:52:35 19           You asked them about that list and I really do

14:52:37 20    want to come back to that excel spreadsheet because perhaps

14:52:40 21    that is where we could land as a way to begin the process --

14:52:45 22           THE COURT:  I think it will be.

14:52:46 23           MR. VARNADO:  -- of putting some boundaries on

14:52:48 24    this case.

14:52:48 25           You asked counsel well, if I gave you everything

14:52:51  1    you want, how many prescriptions would it be.  He said seven

14:52:55  2    percent is what the hit rate was according to them for the

14:53:00  3    629 doctors.  Well, doing that math, that would put 28

14:53:04  4    million more prescriptions at issue if you gave them what

14:53:07  5    they're asking for.  That can't be the way this case

14:53:10  6    proceeds.  They want this unbounded case where they can just

14:53:13  7    call an expert who looks at a spreadsheet, not any medical

14:53:16  8    records, not talking to a pharmacist, not talking to a

14:53:19  9    patient, and are going to claim that they met their burden.

14:53:23 10         And the fact that Walmart is trying to limit its

14:53:26 11    liability on an 80,000 count CSA case is sort of a

14:53:33 12    phenomenal statement.  Anyway, they have the burden in this

14:53:35 13    case.

14:53:36 14         I think in terms of identifying exceptions, you

14:53:39 15    asked them well, if it's a terminal cancer patient, and I

14:53:44 16    think counsel said, well, we would not seek civil penalties

14:53:47 17    for that.  Well, you couldn't seek civil penalties for that

14:53:52 18    because it wouldn't be an invalid prescription.  It's a

14:53:54 19    valid prescription so there is no CSA violation.  So that

14:53:58 20    sort of exchange proves why this is an individualized

14:53:58 21    inquiry and you can't just apply some mathematical formula

14:54:04 22    and declare victory as the government because you haven't

14:54:07 23    proven anything.

14:54:08 24         THE COURT:  I know Mr. Kasper said he would give

14:54:11 25    you some narrative and his point was well, you have to give

14:54:15  1    us some data.  I do think that there is some merit to that

14:54:19  2    that if there are fields that you have that they don't have

14:54:23  3    that they don't know about that is responsive to an

14:54:27  4    exception, why not?

14:54:28  5           MR. VARNADO:  We gave them a list of seventy

14:54:31  6    something fields and invited them to talk to us about it,

14:54:34  7    and they said we want all the fields, no further discussion.

14:54:37  8    We actually encouraged them not to bring the fields issue as

14:54:40  9    part of this dispute because we said this isn't ripe, we

14:54:43 10    haven't sat down and had an conversation.  They wanted to do

14:54:46 11    it anyway, that's fine.  But I walked you through the letter

14:54:48 12    where we have identified the forty-five fields that are

14:54:48 13    transactional data that has been used in all of the opioid

14:54:52 14    litigation, and there is no reason why that shouldn't

14:54:54 15    satisfy what the government is looking for and we have said

14:54:57 16    for the prescriptions that are in the complaint and that we

14:55:00 17    would say and the excel spreadsheet as overexpansive as it

14:55:04 18    is, we will provide that transactional data.  And so that's

14:55:08 19    one way we could go about this.

14:55:10 20           And I wasn't criticizing counsel at all, but the

14:55:14 21    not seeking a civil penalty, that means they couldn't seek

14:55:18 22    it because there was no violation.  If a terminally ill

14:55:23 23    cancer patient gets a 1,000 MME prescription, that's not a

14:55:28 24    CSA violation.  The prescription was never invalid in the

14:55:30 25    first place.  So it just illustrates two things, one a "Red

14:55:34  1    Flag" does not equal a violation of the Controlled

14:55:38  2    Substances Act period, over and out, and that's been said by

14:55:40  3    the DEA and by district courts and it's an individualized

14:55:44  4    assessment.  That exchange just illustrates, you got to know

14:55:47  5    the individual facts and circumstances surrounding these

14:55:50  6    prescriptions.

14:55:51  7         And why the government elected to charge this

14:55:54  8    case in the way it did and put the volume of prescriptions

14:55:57  9    and doctors at issue, that will be a problem of their own

14:56:01  10   creation that we'll deal with at trial.

14:56:03  11        THE COURT:  Is there another way that I'm not

14:56:06  12   appreciating that they could have done it, like a bellwether

14:56:10  13   case?  You make it seem like this was a choice that they

14:56:13  14   made and they could have done it differently.  I'm just not

14:56:15  15   understanding what I'm missing.

14:56:17  16        MR. VARNADO:  They could do it the way they did

14:56:18  17   it in the *Ridley's* case and identify 160 prescriptions that

14:56:23  18   they think were violations and try and go get the maximum

14:56:26  19   penalties for each of those prescriptions which would still

14:56:28  20   be a big number.  I mean, they could check a finite amount

14:56:31  21   of prescriptions which is what happens in every Controlled

14:56:34  22   Substances Act case against a pharmacy or a doctor before

14:56:37  23   the one that was charged here.

14:56:42  24        THE COURT:  I think that's it for that motion.

14:56:44  25   The only thing left is the non-agency motion, is that right?

14:56:49  1                    MS. FARNAN:  Yes, Your Honor.  Do you want us to

14:56:51  2      start with that?

14:56:51  3                    THE COURT:  Yes, please.

14:56:56  4                    MS. FARNAN:  Good afternoon, Your Honor.

14:56:59  5                    On this motion we were obviously before Your

14:57:03  6      Honor on a similar issue back in September.  This time we're

14:57:06  7      asking the Court to make the six federal agencies a part of

14:57:10  8      the definition of you or your in Walmart's document

14:57:13  9      requests.  We have been pursuing this discovery since May,

14:57:16 10      discovery that everyone believes is relevant.  And we have

14:57:19 11      gotten nothing but roadblock after roadblock from the

14:57:24 12      government.

14:57:24 13                    There is two reasons why they should become part

14:57:27 14      of the you/your definition at this time.  First, the

14:57:29 15      agencies have not cooperated in the most basic way in

14:57:32 16      response --

14:57:32 17                    THE COURT:  Are the *Touhy* objections dead at

14:57:34 18      this point are they still alive for one agency?

14:57:38 19                    MS. FARNAN:  They're alive for DoD.

14:57:40 20                    But I think that background is important, the

14:57:43 21      way the government stonewalled and the position they took.

14:57:45 22      The way they presented this to Your Honor is we met and

14:57:48 23      conferred, they heard us out and now they have changed their

14:57:51 24      mind.  That is not what happened at all.  They were

14:57:55 25      steadfast in their position until the day before we filed

14:57:57  1    our letter with the Court.  And the way in which they

14:58:00  2    handled that, I think they've lost their opportunity to

14:58:03  3    proceed under Rule 45.  They need to be part of the you/your

14:58:08  4    definition.

14:58:08  5              The second reason since we were here in

14:58:11  6    September we learned additional information.  At least two

14:58:14  7    of these agencies were involved in the investigation.  And

14:58:16  8    the way the government is parsing the word "investigation"

14:58:18  9    is a new litigation inspired position.

14:58:20 10              So that's obviously our primary relief, but if

14:58:24 11    Your Honor disagrees, we'll get into it at the end, if Your

14:58:28 12    Honor still believes that Rule 45 is applicable, we think

14:58:30 13    all the *Touhy* objections should fall away, and as well as

14:58:35 14    many of them have waived any objections to the subpoena.

14:58:37 15              THE COURT:  Can I ask just because you raised

14:58:40 16    it.  Why did they drop their *Touhy* objections?  I'll ask

14:58:44 17    Mr. Kasper that as well.  Do you have an answer to that?

14:58:47 18              MS. FARNAN:  Probably because they have

14:58:49 19    absolutely no merit.  The regulations say that you cannot

14:58:52 20    invoke *Touhy* when the United States is a party to the case.

14:58:55 21              THE COURT:  So they didn't say they're dropping

14:58:58 22    these objections because of the law, they just did it?

14:59:01 23              MS. FARNAN:  No, they did not.  We got on that

14:59:03 24    call the day before our letter was filed, and they acted

14:59:06 25    like it was supposed to be good news.  Hey, guys, we have

14:59:09  1    been screwing around with you for three months, we're going

14:59:12  2    to drop these objections, you should happy.  We said to them

14:59:15  3    great, are you actually prepared to talk about the documents

14:59:18  4    we asked for, they said no.  They weren't prepared to talk

14:59:21  5    about it.  They weren't prepared to actually engage on the

14:59:23  6    documents we asked.

14:59:24  7            From our perspective, I'm sure they will tell

14:59:27  8    you something different.  Their letter says it was a result

14:59:30  9    of a meet-and-confer.  I want to go through and lay out for

14:59:33 10    you, Your Honor, the way the meet-and-confer happened,

14:59:35 11    because there was never a point in time when they acted like

14:59:39 12    we were taking a reasonable position.  In fact, they blamed

14:59:41 13    you us.  Walmart, all you need to do is the provide the

14:59:45 14    statement that the FBI has asked for, provide the FBI their

14:59:48 15    statement of relevance and then we will talk to you.  It was

14:59:50 16    nothing other than a meritless position and that's wasted

14:59:53 17    several months of this case.

14:59:55 18            I want to go through exactly what happened.

14:59:57 19    Obviously the government objected to this.  And we came to

14:59:59 20    Your Honor back in September and we got CDC and FDA are now

15:00:03 21    part of the you/your definition.  That's been helpful.

15:00:08 22    Those agencies still aren't moving as quickly as they

15:00:11 23    should, but the other agencies are going to need the same

15:00:14 24    result in order to do anything.

15:00:16 25            So we served those subpoenas -- I want to show

15:00:19  1    slide 17, because when they told Your Honor that they

15:00:22  2    shouldn't be part of you/your, this is what they said.

15:00:28  3    "They still have the Rule 45 process to get documents from

15:00:31  4    those agencies and that the scope of discovery is still

15:00:34  5    governed by Rule 26."

15:00:36  6              So we left that hearing thinking okay, the Judge

15:00:41  7    didn't give us everything we asked for, but we'll serve

15:00:44  8    these Rule 45 subpoenas and we'll be off to the races.  We

15:00:48  9    serve those subpoenas in October, that's about four months

15:00:51 10    ago.  In November we started getting responses to our

15:00:54 11    subpoenas.  To a T, every single agency sent a several page

15:00:59 12    letter invoking *Touhy* and then putting some broad

15:01:03 13    boilerplate objections to their requests.  Other than the

15:01:07 14    VA, nobody engaged with any of the requests specifically.

15:01:09 15    They threw up the *Touhy* objections.  We responded in late

15:01:14 16    November, and I guess I'll just note because I will come

15:01:16 17    back to this, three of them were untimely.  The FBI and the

15:01:21 18    VA missed the deadline.  The FBI by a couple of days.  The

15:01:26 19    VA by a couple of weeks.  The Department of Defense missed

15:01:30 20    it by a month.  We had to reach out to the government and

15:01:32 21    say hey, do you know anyone we could contact because you're

15:01:35 22    not responding to our subpoena.

15:01:35 23              THE COURT:  You didn't hear from them until

15:01:37 24    December.

15:01:38 25              MS. FARNAN:  Exactly.  They didn't reach out,

15:01:40  1    they didn't say anything.  I think HHS and DOD's conduct is

15:01:44  2    particularly egregious, these subpoenas, these discovery

15:01:48  3    requests should not have been a surprise to these agencies

15:01:51  4    because they have been involved in the investigation.

15:01:53  5              So then in late November we provided each of

15:01:55  6    them with letters.  We provided the case law.  We provided

15:01:57  7    the language of the regulations which says *Touhy* does not

15:02:01  8    apply when the United States is a party to the litigation.

15:02:03  9    We provided case law that said the same thing.  And, of

15:02:08 10    course, you know, the lawyers for the government had already

15:02:10 11    told Your Honor that this is going to be Rule 45 and

15:02:14 12    Rule 26.

15:02:14 13              So the original objections came from lawyers

15:02:17 14    within the agencies.  In early December we get an outreach

15:02:20 15    from a lawyer at the federal program branch of the DOJ

15:02:25 16    telling us she is going to be representing the agencies and

15:02:28 17    ask for a meet-and-confer.  We get on the meet-and-confer,

15:02:31 18    and again, there was no compromise, it was you need to

15:02:34 19    follow *Touhy*, you didn't follow *Touhy* and until you follow

15:02:39 20    *Touhy*, we don't have anything to talk about.  We said can

15:02:41 21    you give us that position in writing?  Because we want to

15:02:43 22    see, do you have a case, have you read the regulations, have

15:02:46 23    you read the cases that we cited, this seems like a very

15:02:49 24    difficult position for you all.

15:02:51 25              And so what she told us at that time, which was

15:02:53  1    early December, was that she could get us a response on

15:02:58  2    January 6th.  And part of the reason she needed until

15:03:00  3    January 6th was so that other people above her could review

15:03:04  4    it and approve it.  This was going to be a considered

15:03:08  5    position of the government that we were going to receive on

15:03:10  6    January 6th.

15:03:11  7            THE COURT:  Was it going to be a *Touhy* decision,

15:03:13  8    was the intent of taking that long?

15:03:15  9            MS. FARNAN:  No, they were going to respond to

15:03:18 10    our position that *Touhy* didn't apply.

15:03:19 11            THE COURT:  So there was no instance that you

15:03:21 12    responded to their *Touhy* objection with whatever they wanted

15:03:24 13    under *Touhy*?

15:03:25 14            MS. FARNAN:  We have never engaged in *Touhy*

15:03:27 15    because we don't think that was a process that we should be

15:03:30 16    engaging with.  So we did get their January 6th letter and

15:03:34 17    it's up here on slide 18.  But here is what they told us,

15:03:38 18    because we asked for cases.  They told us our position was

15:03:41 19    untenable.  They said, "I trust this explanation finally

15:03:41 20    resolves this issue, which has hindered Walmart's provision

15:03:50 21    of information the Respondent Agencies require to continue

15:03:51 22    processing the subpoenas.  Accordingly, we request that

15:03:54 23    Walmart comply with applicable *Touhy* regulations the

15:03:59 24    Respondent Agencies identified in their initial subpoena

15:04:00 25    responses."

15:04:01  1          This was supposed to be a considered position by

15:04:04  2  the government.  We received it on January 6th and there was

15:04:06  3  absolutely no movement.  They are blaming Walmart and they

15:04:10  4  are calling our position untenable.

15:04:12  5          At that point we knew we were at an impasse and

15:04:15  6  we said we wanted to come to the Court.  January 15th, the

15:04:19  7  woman from the Federal Programs Branch reached out to us and

15:04:21  8  said we want to have another meet-and-confer.  We would like

15:04:22  9  to include a member of the trial team on that

15:04:24 10  meet-and-confer.  And we thought at that point maybe they

15:04:27 11  were changing their position because how could a member of

15:04:29 12  the trial team that stood up and told Your Honor that we

15:04:31 13  would be able to use Rule 45 continue to allow this *Touhy*

15:04:35 14  objection to remain.

15:04:35 15          So we had that meet-and-confer on January 21st.

15:04:38 16  But the government was immovable in their position.  And

15:04:42 17  they kept invoking at that point Your Honor's decision

15:04:45 18  saying well, the Judge said the agencies are non-parties,

15:04:48 19  which is not what you said, you said they are not part of

15:04:51 20  the definition of you/your, but it doesn't matter because

15:04:54 21  the regulations saying when the United States is a party,

15:04:58 22  these regulations don't apply.  They were invoking Your

15:05:01 23  Honor's order.  And candidly, we think didn't have a good

15:05:04 24  position.

15:05:05 25          So we raised the dispute with the Court and the

15:05:07  1    day before the letter was due, that's when we have the

15:05:10  2    meet-and-confer.  So now the lawyer from Federal Program

15:05:13  3    Branch has left the scene and new lawyers from the Consumer

15:05:19  4    Protection Branch, and the Consumer Protection Branch is the

15:05:22  5    part of the DOJ that we deal with on every meet-and-confer,

15:05:26  6    so they are the branch that seems to be pushing this case

15:05:30  7    forward.  They have other lawyers from within the Consumer

15:05:33  8    Protection Branch that now take over.

15:05:35  9           But as I mentioned before, so obviously they

15:05:37 10    wanted us to not raise this issue with the Court, but we

15:05:40 11    said to them okay, well, are you ready to talk about giving

15:05:44 12    us documents?  Because if you want to talk to us today about

15:05:46 13    what documents you're going to produce, well, that is

15:05:49 14    probably a different situation.  They were not.

15:05:51 15           And so then when they filed their response, they

15:05:57 16    told the Court in their letter that they would serve updated

15:06:00 17    objections.  And they did, at 3 o'clock yesterday.  So at

15:06:04 18    3 o'clock yesterday three of the agencies, CMS, IHS and HHS,

15:06:10 19    served additional objections, thirty to forty pages worth,

15:06:14 20    not a single agency has agreed to produce a single document.

15:06:18 21           Their objections are thirty to forty pages and

15:06:22 22    the best that any of their responses is is we'll

15:06:26 23    meet-and-confer with Walmart.  We don't have any idea based

15:06:28 24    on these new objections from yesterday what documents they

15:06:31 25    might actually be willing to produce, and nor have they

15:06:35  1    committed to produce a single document, nor do we have a

15:06:38  2    single document.  But importantly, the VA, the FBI, and the

15:06:43  3    Department of Defense did not serve updated objections.

15:06:46  4            So we still don't even know, other than the

15:06:50  5    several-page letter telling us that *Touhy* applies, what

15:06:53  6    these allegations want to do in response to these subpoenas.

15:06:56  7            THE COURT:  So you don't have objections from

15:07:00  8    the VA, the FBI and the DOJ?

15:07:03  9            MS. FARNAN:  To be fair to the VA, their initial

15:07:03 10    responses were more fulsome than everybody else's, but they

15:07:03 11    effectively said these are some other cases of good

15:07:09 12    litigation, you can have that, have a nice day, otherwise,

15:07:12 13    follow *Touhy*.  So I would say they are the only ones that

15:07:16 14    engaged in any level with the actual document requests

15:07:20 15    initially, but they have not served undated objections.

15:07:24 16            THE COURT:  So everybody except for the DoD at

15:07:27 17    this point agrees with you that they should be proceeding

15:07:31 18    under Rule 45?

15:07:32 19            MS. FARNAN:  Correct.

15:07:33 20            THE COURT:  Okay.  Do you have any indication of

15:07:37 21    whether more is coming from CMS, IHS, and HHS given that you

15:07:44 22    got updated objections yesterday, but do you have a

15:07:47 23    meet-and-confer planned later on?  Is there -- all the

15:07:51 24    letters that I saw discussed willingness to continue working

15:07:56 25    with Walmart, that's why I'm asking.

15:07:58   1                    MS. FARNAN:  I find it a little ironic that they

15:08:01   2      expressed willingness to continue working with Walmart

15:08:03   3      because they have never worked with Walmart.  So when we had

15:08:06   4      that call with them on February 13th, the day before we

15:08:09   5      filed our letter, we said come back to us, tell us do you

15:08:12   6      want to produce the documents, do you want to engage.

15:08:15   7      Waiting for the day before today's hearing to even give us

15:08:18   8      updated objections, we invited them because I understand the

15:08:22   9      Court really doesn't want to hear disputes that it doesn't

15:08:24  10      have to, so if they really wanted to engage, like why didn't

15:08:28  11      we hear from them last week?  Why are the objections we got

15:08:32  12      yesterday forty pages of we'll meet-and-confer with you?

15:08:35  13                    I mean, again, HHS served forty pages of

15:08:38  14      objections yesterday.  They were involved in the

15:08:41  15      investigation.  To act like all we'll tell you is we'll

15:08:45  16      meet-and-confer with you I think is really unfair.  This is

15:08:47  17      one of the worst runarounds I've really seen.  And I think

15:08:52  18      at this point given that these subpoenas were served in

15:08:54  19      October, we are four months down the road, they have done

15:08:57  20      nothing except object and block us, that it's time that they

15:09:01  21      be part of the you/your definition.

15:09:04  22                    I mean, these are agencies of the United States

15:09:07  23      of America, everybody agrees they have relevant documents,

15:09:10  24      and they need to engage with us.  And I just candidly don't

15:09:14  25      believe that they're going to engage unless they're told to

15:09:17  1    be part of the Rule 34 request.

15:09:20  2            THE COURT:  So let me ask, if I agree with you

15:09:22  3    that *Touhy* does not apply, and I don't agree that I'm going

15:09:29  4    to make them a party today, any of the agencies, there is

15:09:32  5    nothing else I can do because I don't have a motion to

15:09:35  6    compel in front of me and I don't have a motion to quash in

15:09:38  7    front of me.

15:09:40  8            MS. FARNAN:  Well, you do have -- I think our

15:09:43  9    motion is in a sense a motion to compel.  We did put in our

15:09:48 10    proposed order some timelines.

15:09:49 11            THE COURT:  You didn't ask me to deem their

15:09:51 12    objections waived, you didn't ask me to order them to comply

15:09:54 13    with the subpoena.

15:09:56 14            MS. FARNAN:  Our proposed order actually asked

15:09:59 15    you to find that they're part of party discovery.  I will

15:10:03 16    get to -- I do think that I would ask Your Honor to keep an

15:10:07 17    open mind as to HHS and DoD because I think they're in a

15:10:15 18    very different situation, but we did ask that they be part

15:10:18 19    of you/your, that they provide supplement discovery

15:10:21 20    responses within seven days, provide discovery custodian

15:10:24 21    search terms within fourteen days, and to begin rolling

15:10:27 22    production of documents within thirty days.  I think if Your

15:10:31 23    Honor thinks they are still under Rule 45, you can issue

15:10:33 24    those same timelines for them.

15:10:33 25            THE COURT:  I think I need a motion to compel or

15:10:35  1    a motion to quash within the bounds of Rule 45, though.  I

15:10:39  2    don't think I can just do it.

15:10:41  3                MS. FARNAN:  Well, actually I do think you can.

15:10:44  4    We do have a motion in front of you about these subpoenas,

15:10:47  5    about their objections, and I think to reward them with

15:10:52  6    coming to us the day before our letter is due and then

15:10:55  7    coming to us yesterday the day before the hearing and for

15:10:57  8    you to tell them, well, Walmart didn't have the right motion

15:11:00  9    in front of me so there is nothing I can do for Walmart, I

15:11:03  10   guess at least I think they need to hear that they need to

15:11:09  11   participate in some kind of certain timeline and if we're

15:11:13  12   not going to get relief on this, we need the opportunity to

15:11:16  13   come back to you on a fairly expedited basis.

15:11:20  14                To let these agencies screw around for four

15:11:23  15   months and just continue to do so, because they changed the

15:11:25  16   landscape.  We wouldn't have a motion to compel if they

15:11:29  17   weren't constantly changing the landscape.  They're the ones

15:11:30  18   --

15:11:30  19                THE COURT:  You raised *Touhy* objections and you

15:11:33  20   weren't sure what to do, I understand that was a wrench that

15:11:35  21   was thrown in this mix, I get that, I'm just concerned about

15:11:37  22   the boundaries of what I do if I don't agree they should be

15:11:41  23   made parties today.

15:11:42  24                MS. FARNAN:  This is a discovery issue.  Your

15:11:44  25   Honor has a lot of discretion.  And I think that you

15:11:46  1    certainly can order them to engage.  I mean, they are here

15:11:49  2    today, they're represented, and I just don't think there

15:11:52  3    would be any issue with putting them on some timeline in

15:11:55  4    terms of how they need to deal with these subpoenas if Your

15:11:58  5    Honor is going to deal with them under Rule 45.

15:12:01  6            But I do think, we do have -- and I'll get to

15:12:04  7    the waiver point, but I do think you can find that their

15:12:07  8    objections were waived which would move this process along a

15:12:09  9    lot.  And I do think that they have been waived for several

15:12:12 10    reasons.

15:12:12 11            Before I get to that, though, I want to get to

15:12:15 12    the point about the DoD and the HHS because when Your Honor

15:12:19 13    made your ruling in September, you relied on cases presented

15:12:24 14    to you by the government that said only those agencies who

15:12:29 15    contributed to the investigation should be part of the

15:12:31 16    Rule 34 request.  But as now we can see given what the

15:12:36 17    government's position has been since then, the government

15:12:38 18    was taking those cases very far.  They were reading in a

15:12:43 19    requirement that the involvement with the investigation be

15:12:46 20    substantial.  The cases they cited and provided to Your

15:12:49 21    Honor do not require that.  The *UBS* case requires only that

15:12:55 22    it be a joint effort.  But I think no matter how you define

15:12:59 23    it, whether you buy into their substantial or whether you

15:13:02 24    require a joint effort, these agencies meet the definition.

15:13:05 25            But I think even more surprising is that when

15:13:07  1    the government came to Walmart and to you to say that only

15:13:12  2    DEA and certain components of DOJ should be part of the

15:13:17  3    you/your definition, it was based on the interpretation of

15:13:20  4    the word "investigation" that's just not credible.

15:13:23  5            The government engaged in a wide range

15:13:26  6    investigation of Walmart.  Opioid filling -- filling of

15:13:31  7    opioid prescriptions and many agencies, including we now

15:13:33  8    know HHS and DoD were involved in that investigation.  And

15:13:36  9    what the government is saying is well, that's right, they

15:13:41 10    were involved, but we were looking at False Claims Act

15:13:44 11    claims and we were looking at CSA claims and because we only

15:13:48 12    brought the CSA claims, it was now two investigations.  That

15:13:51 13    is not how the investigation worked.  That's not how the

15:13:55 14    investigation was presented to Walmart.  Walmart understood

15:13:58 15    at the time that it was under investigation for potential

15:14:02 16    CSA violations and FDA violations.

15:14:05 17            THE COURT:  This is all the same.

15:14:08 18            MS. FARNAN:  Exactly, it's all about filling

15:14:10 19    opioid prescriptions and then obviously for the FDA the

15:14:15 20    payment of those.  But the fact that the government decided

15:14:18 21    only to put CSA allegations in the complaint does not change

15:14:21 22    what happened in the investigation.  And the only way we

15:14:22 23    learned about this is because to Walmart, it understood what

15:14:26 24    it was being investigated for, it knew who attended the

15:14:29 25    meetings that Walmart attended during the investigation, but

15:14:31  1     it doesn't necessarily know every person that's working

15:14:34  2     behind the scenes on the investigation.

15:14:36  3            But we learned in discovery because we asked, we

15:14:38  4     knew that the government has been out talking to current and

15:14:41  5     former Walmart pharmacists, so we asked please tell us who

15:14:45  6     you spoke to, when you spoke to them, and how long.  So we

15:14:49  7     served interrogatory 4, that was Exhibit B to our letter.

15:14:52  8     And it asked for the government to identify conversations of

15:14:58  9     any current or former Walmart employee, "regarding this

15:15:02 10     litigation or the civil or criminal investigation preceding

15:15:05 11     this litigation."

15:15:07 12            In response we got in Exhibit A, this is where

15:15:10 13     we learned about the involvement of HHS and DoD.  I think

15:15:15 14     it's important to walk through a couple of these and just to

15:15:19 15     highlight what's been going on here.

15:15:22 16            We have slide 19, number 17.  So these are all

15:15:28 17     interviews of former Walmart pharmacists that were conducted

15:15:33 18     by the government.  Now, they would agree that these are

15:15:37 19     within this investigation.  So the first one, Nancy Beck,

15:15:42 20     you have Sonja Chuprinko from HHS.  Importantly who else is

15:15:47 21     there?  The first listed person that is there is

15:15:50 22     Investigator Amanda Graf from the Consumer Protection Branch

15:15:54 23     of the DoD.  As far as we understand it, she is the lead

15:15:59 24     investigator in this case.  She has verified the

15:16:02 25     interrogatory responses, so obviously playing a substantial

15:16:05  1    role in this case.  And we're going to see Ms. Chuprinko's

15:16:08  2    name again, but the notion that she's sitting there next to

15:16:09  3    the lead investigator on this case and it's got nothing to

15:16:12  4    do with this case really makes no sense.

15:16:13  5           And again, I think, too, the fact that she's

15:16:21  6    from HHS is important given the way that HHS has treated

15:16:25  7    Walmart's discovery requests and the Rule 45 subpoena.

15:16:28  8           Item 41 there is Isela Chavez, so we put in bold

15:16:36  9    Special Agent Heather Hand, Defense Criminal Investigative

15:16:40 10    Service.  That's part of the Department of Defense.  But

15:16:43 11    again, who else is in attendance there?  If you go down

15:16:46 12    about six lines, Assistance United States Attorney Amanda

15:16:50 13    Rocque and Assistant United States Attorney Jasand Mock.

15:16:54 14    They were both counsel of record in this case until October.

15:16:57 15    The motion that these agencies, HHS and DoD, were somehow

15:17:05 16    walled off from this case really makes no sense.

15:17:08 17           You also have a Senior Civil Investigator Kevin

15:17:12 18    Codol.  He's from the Middle District of Florida.  They also

15:17:15 19    have had attornies, they're counsel of record in this case.

15:17:19 20           You have Diversion Investigator Nick Romero from

15:17:23 21    the DEA, obviously even according to the government's

15:17:26 22    admission the lead investigative agency in this case.

15:17:29 23           If we go to the next slide.  I want to go back

15:17:31 24    because I want to point out, too, because this will be

15:17:34 25    important later, Nancy Beck was interviewed in August of

15:17:37 1    2021 after this case had been filed, so the case has been

15:17:40 2    pending at that time for eight months and HHS is

15:17:43 3    interviewing former Walmart pharmacists.

15:17:46 4          We go to the next slide.  Michael Choate was

15:17:50 5    interviewed twice.  He was interviewed once before the

15:17:52 6    complaint was filed in 2019 and again in 2022 while this

15:17:57 7    case was pending.  Special Agent Jason Bell from HHS, again,

15:18:02 8    not engaging in discovery, but sitting next to the DEA

15:18:05 9    interviewing former Walmart pharmacists while this case is

15:18:08 10   ongoing.

15:18:09 11         Number 126 there is an interview of Bruce

15:18:12 12   Kowiatek in February of 2020.  Again, somebody from DoD

15:18:18 13   interviewing a former Walmart pharmacist sitting next to

15:18:21 14   someone from the Middle District of Florida, again, counsel

15:18:24 15   of record in this case.

15:18:25 16         If we go to the next slide.  James Marcilla.

15:18:31 17   Again, we have Special Agent Mitch Tharp from the DoD.  We

15:18:35 18   have two people from the DEA there.  We have Special Counsel

15:18:40 19   Natalie Waites from DOJ Civil Fraud.  Civil Fraud

15:18:44 20   participated in many of the meetings with Walmart

15:18:48 21   pre-filing, again, very involved in the investigation that

15:18:51 22   led to this case, involving a DoD investigator in an

15:18:55 23   interview.

15:18:56 24         The final two are February 2020 interviews,

15:18:59 25   David Shoup and Matthew Weathers.  Again, we have a DoD

15:19:03  1    investigator sitting next to someone from the Middle

15:19:08  2    District of Florida, again, counsel of record in this case.

15:19:11  3            In addition to -- if I could grab something from

15:19:14  4    the table, Your Honor.

15:19:20  5            In addition to the supplemental discovery

15:19:23  6    responses we got yesterday, we got another letter -- if I

15:19:27  7    could put this up to the screen -- identifying some more

15:19:33  8    interviews.  We have another one that took place, Joseph

15:19:38  9    Fraund in May of 2021.  And I mentioned this before, Sonja

15:19:44  10   Chuprinko from HHS again interviewing former Walmart

15:19:48  11   pharmacists while this case is ongoing.  And she appears

15:19:52  12   again in three more interviews, all after this case was

15:19:59  13   filed, interviewing former Walmart pharmacists.

15:20:02  14           Now to be fair what the government says in this

15:20:04  15   letter is they went and asked, I think it's Civil Fraud and

15:20:07  16   they didn't know about these until Civil Fraud told them

15:20:12  17   after Walmart told them to ask Civil Fraud, so they say they

15:20:16  18   didn't have knowledge of this, but again, the point is these

15:20:18  19   agencies are involved in the investigation.

15:20:20  20           And I think I could also -- I could pass up to

15:20:26  21   Your Honor, although I don't think the government could ever

15:20:28  22   really deny it, this investigation, again, Walmart was aware

15:20:32  23   of what it was, and they entered into several tolling

15:20:35  24   agreements with the government while the investigation was

15:20:37  25   going to toll the statute of limitations until the case was

15:20:41  1   finally brought.  The fifth tolling agreement, the first

15:20:46  2   whereas clause says, "Whereas the United States has informed

15:20:50  3   Walmart that it is investigating Walmart's conduct related

15:20:53  4   to the dispensing and distribution of controlled substances

15:20:57  5   and prescription drugs, which the United States contends may

15:21:00  6   give rise to civil liability under the Controlled Substances

15:21:04  7   Act and/or the False Claims Act."  That's the investigation.

15:21:08  8        The government contends at this point in time to

15:21:12  9   parse the investigation into two investigations, a CSA

15:21:16 10   investigation and a False Claims Act investigation, is just

15:21:19 11   revisionist history.  And given the extent to which HHS and

15:21:25 12   the Department of Defense were involved in that

15:21:27 13   investigation, they should certainly be part of party

15:21:31 14   discovery.

15:21:31 15        And in hindsight, because this is not

15:21:34 16   information we had, again, Walmart understood what was going

15:21:38 17   on in this investigation but what it didn't know is

15:21:41 18   everybody was involved in it.

15:21:43 19        THE COURT:  When did you find out that HHS was

15:21:46 20   attending these interviews?

15:21:48 21        MS. FARNAN:  When we got these discovery

15:21:50 22   responses, I believe this fall, December.

15:21:55 23        THE COURT:  After the --

15:21:57 24        MS. FARNAN:  It was after.

15:21:58 25        THE COURT:  -- the ruling from me.

15:22:00  1          MS. FARNAN:  Yes, we didn't know any of this.

15:22:02  2  Obviously we would have brought this to Your Honor's

15:22:05  3  attention.  We made the point in September at the hearing

15:22:08  4  that HHS was involved in investigating the doctors that are

15:22:13  5  alleged of the invalid prescriptions, so it's really -- I

15:22:16  6  guess in hindsight it's not really a surprise that HHS was

15:22:19  7  involved in the investigation of Walmart, but we didn't know

15:22:22  8  it at that time.  We didn't know it until we got these

15:22:26  9  December interrogatory responses.

15:22:28 10          And we have repeatedly asked the government to

15:22:28 11  reconsider their position on this, running with this

15:22:33 12  bifurcated FDA/CSA investigative line which I think doesn't

15:22:39 13  hold water.

15:22:40 14          I think in hindsight, I want to address what

15:22:42 15  happened at the last hearing because I'm sure the government

15:22:45 16  is going to bring it up.  We can bring up slide 22.

15:22:49 17          In hindsight it seems like the government was

15:22:51 18  walking a really fine line.  So Your Honor asked, you know,

15:22:54 19  candidly in the September hearing, this really didn't

15:22:57 20  register, it certainly didn't register with me, so my fault,

15:23:01 21  but you asked them, what agencies were conducting the

15:23:04 22  investigation that gave rise to the complaint here.  First

15:23:07 23  of all, they would say the complaint, the CSA complaint so

15:23:11 24  they don't need to talk to you about False Claims Act.  So

15:23:15 25  they said, "the DEA was the primary investigative agency

15:23:19  1    that was conducting the investigation that led to this CSA

15:23:22  2    complaint.  As Mr. Varnado recognized, the investigation of

15:23:27  3    Walmart related to its pharmacies has been a long-running

15:23:27  4    investigation that's had a lot of different components to

15:23:30  5    it, and much earlier in the investigation, there was also a

15:23:33  6    False Claims Act component."  So that's what they're trying

15:23:35  7    to throw away, the False Claims Act part of it.  I don't

15:23:39  8    really know how they can square that.

15:23:41  9           First of all, the sixth superseding tolling

15:23:45 10    agreement, which I believe is the last one, mentioned the

15:23:48 11    CSA and the FDA.  And now they're telling us that interviews

15:23:54 12    of Walmart pharmacists that happened in 2021 and 2022 are

15:23:59 13    really related to the FDA, but that's really not much

15:24:02 14    earlier at all.

15:24:03 15           But Your Honor followed up and said, "Are there

15:24:05 16    other agencies that whom the DEA was telling to go out and

15:24:10 17    do investigation on its behalf in this case?"

15:24:13 18           And then, "I'm not aware of any that have done

15:24:17 19    any significant involvement."

15:24:18 20           Again, I think they would say it wasn't this

15:24:20 21    case, it was the FDA.  I think this was a litigation

15:24:24 22    inspired position that's designed for these agencies to

15:24:29 23    avoid discovery.  I don't think there is any question at

15:24:31 24    this point that these agencies are not interested in

15:24:33 25    participating in discovery.  And so we think all six

agencies should be part of the you/your definition, but certainly given what we've learned since the last hearing, HHS and DoD should be part of that.

That's what I have on the you/your issue.  I will address the Rule 45 issue to the extent Your Honor is inclined to still let these agencies take the benefit of Rule 45.  First of all, the DoD is still advocating a *Touhy* objection and we don't think that has any merit.  We recognize that the DoD *Touhy* regulations are worded slightly differently than the other regulations, they do not have the specific language that says it doesn't apply when the United States is a party to a litigation.  Of course, interestingly it says the government can go to DoD and get anything they need if they are a party in litigation, but of course the government's adversary doesn't have the same clear language.

But the courts have interpreted this, we cited to Your Honor, the *U.S. v. Boeing* case and the *Allison v. FBI* case, both of which address DoD *Touhy* regulations and says in the context of civil discovery those don't apply. So the only cases that have been cited to Your Honor that the DoD *Touhy* regulations are at issue have found they don't apply in civil litigations.  The government hasn't given you -- they have given you other cases that are in the criminal context where the issue was is it a constitutional violation to invoke *Touhy*.  They have given you other

15:26:06  1    agencies, but the only cases before Your Honor involving DoD

15:26:09  2    the courts have said *Touhy* doesn't apply.  So we think the

15:26:14  3    DOD's *Touhy* objections need to fall aside.

15:26:17  4            And then there is the waiver issue.  So the FBI,

15:26:22  5    the VA, and the DoD did not timely respond to the subpoenas,

15:26:27  6    and they don't have any reason.  And we don't disagree, the

15:26:32  7    government put in some cases in their letter that say, you

15:26:35  8    know, tardiness can be excused, but it's only excused in

15:26:40  9    unusual circumstances or upon a showing of good cause.  And

15:26:42 10    there is a case in this district with Judge Fallon, *In re:*

15:26:48 11    *Sevier*, that says the same thing, there has been no

15:26:50 12    explanation of the good cause, of any unusual circumstances.

15:26:54 13    I don't know if they didn't pay attention to the deadline,

15:26:56 14    we really don't know.  They haven't given us any reason.

15:27:00 15    And they haven't presented Your Honor, and that's exactly

15:27:00 16    what Judge Fallon said in *In re: Sevier*, you have not given

15:27:03 17    me any exceptional circumstance, any good cause, so you

15:27:06 18    didn't timely serve objections, your objections are waived.

15:27:09 19    So we think as to DoD, VA, and FBI, those objections are

15:27:14 20    waived on a timeliness grounds.

15:27:16 21            As to the other agencies who did serve

15:27:18 22    objections and who have served, so the issue we raised with

15:27:22 23    those, and they served updated objections yesterday, but the

15:27:26 24    issue with those is that the objections they timely served

15:27:28 25    were merely boilerplate objections.  They didn't engage with

15:27:32  1    any of the requests.  And, you know, they really didn't give

15:27:36  2    us anything other than effectively, when you look at it, I

15:27:41  3    think you can tell a law student, hey, these are all the

15:27:44  4    kinds of objections you can make in response to a subpoena,

15:27:47  5    that's effectively what we got.

15:27:48  6            And I think the cases that we cited show that

15:27:50  7    Your Honor can overrule them.  In particular there is *Ceuric

15:27:55  8    v. Tier One*, which says particularly when you're just

15:27:56  9    talking about general objections, so when you just say this

15:27:59 10    is a burden, this is not relevant, Your Honor could overrule

15:28:02 11    those objections and then they didn't engage with a specific

15:28:05 12    request.

15:28:05 13            So we think that, again, obviously we think that

15:28:08 14    given what's transpired both in terms of the way the

15:28:11 15    agencies have treated this process as well as the

15:28:14 16    involvement of certain agencies that they should be brought

15:28:17 17    within the you/your definition.  So if they are still under

15:28:22 18    Rule 45, we think for various reasons they have all waived

15:28:25 19    their objections and should be ordered to respond to the

15:28:28 20    subpoenas.

15:28:29 21            THE COURT:  Mr. Kasper, is the government going

15:28:34 22    to present a dispute to this term?

15:28:34 23            MR. KATZEN:  So the government is going to

15:28:36 24    address the United States allegations, I think their primary

15:28:41 25    request is to the definition of you/your.

15:28:46 1                    THE COURT:  Sure.  Fine.

15:28:53 2                    MS. BRUNSON:  Good afternoon.  Kate Brunson.

15:28:57 3                    With respect to the DoD and the HHS, I can gave

15:29:01 4      a little bit more context for you.  Our position remains

15:29:05 5      that those agencies did not contribute significantly to --

15:29:08 6                    THE COURT:  I'm a little bit uneasy about the

15:29:13 7      HHS information that Ms. Farnan just showed me.  I mean, if

15:29:17 8      that person is verifying interrogatory responses here and

15:29:20 9      they were sitting at interviews that have the same set of

15:29:23 10     facts giving rise to two different causes of action, that

15:29:27 11     seems a little different.

15:29:28 12                   MS. BRUNSON:  The individual who verified

15:29:31 13     interrogatory responses is Amanda Graf.  She is a civil

15:29:34 14     investigator with the Consumer Protection Branch working on

15:29:38 15     our matter.  She is not with HHS.

15:29:40 16                   THE COURT:  What was being referenced when that

15:29:42 17     was said?

15:29:43 18                   MS. BRUNSON:  I'm sorry, what was that?

15:29:44 19                   THE COURT:  What was the reference when that was

15:29:47 20     being said earlier?

15:29:48 21                   MS. BRUNSON:  Ms. Farnan was referencing that

15:29:51 22     there was an interview where Ms. Graf attended the interview

15:29:55 23     along with someone from -- I think that one was with someone

15:29:59 24     from HHS.

15:30:00 25                   THE COURT:  Okay.

15:30:01  1          MS. BRUNSON:  So to break it down a little bit,

15:30:05  2   we have -- Walmart issued an interrogatory asking for the

15:30:09  3   list of individuals that we attempted to contact or

15:30:12  4   interview along with information about who attended these

15:30:16  5   interviews for the ones that took place.  So that list

15:30:20  6   included many names on it.  There were about sixty-five,

15:30:24  7   sixty-six interviews that took place.  Of those, there were

15:30:28  8   I think it was -- let's see, it was like six where HHS or

15:30:38  9   DoD folks were involved.  For HHS in the list for

15:30:44 10   interrogatories there were three interviews.

15:30:47 11          Would you all mind if we put back up the list

15:30:50 12   of -- I believe it was slides 20, or 19, 20, 21.  Was this

15:30:57 13   the first page?

15:30:59 14          Okay.  So if you don't mind going for a second,

15:31:04 15   I would like to address HHS first.  There are two interviews

15:31:09 16   of Michael Choate.  We actually told Walmart earlier, those

15:31:13 17   were interviews that were conducted in the course of a

15:31:16 18   criminal investigation of a doctor down in Nashville.  And

15:31:19 19   we learned that in the course of that criminal investigation

15:31:23 20   of a doctor that they interviewed a former Walmart

15:31:26 21   pharmacist.  So their prosecution team provided us with

15:31:30 22   copies of those interview reports.  So these were actually

15:31:35 23   not interviews that related to the False Claims Act

15:31:39 24   investigation of Walmart, those HHS agents were there

15:31:42 25   investigating a doctor.  And this Michael Choate was a

15:31:48  1    former pharmacist who had I think filled some of these

15:31:51  2    doctor's prescriptions.

15:31:53  3          So I don't think these interviews necessarily

15:31:57  4    are responsive to the interrogatory, but we were trying to

15:32:01  5    be inclusive and provide the list of all the interviews that

15:32:04  6    we had.  And so because we had these interview reports, we

15:32:08  7    included them on our list.  But these are not interviews

15:32:11  8    that took place in the course of the False Claims Act

15:32:14  9    investigation of Walmart.

15:32:15 10          THE COURT:  Were there interviews that took

15:32:17 11    place in the False Claims investigation of Walmart that also

15:32:20 12    had applicability to the Controlled Substances Act case in

15:32:23 13    front of me where HHS did attend those interviews?

15:32:28 14          MS. BRUNSON:  So there are four interviews that

15:32:31 15    HHS attended that we disclosed to Walmart that relate to the

15:32:36 16    False Claims Act investigation.  One of those, this is the

15:32:40 17    interview of Nancy Beck, which I think might be on the next

15:32:44 18    page.  That one was also attended by Amanda Graf who was the

15:32:49 19    investigator for Consumer Protection.  That interview took

15:32:53 20    place in August of 2021.

15:32:55 21          Just to go back to the timeline.  So we filed

15:33:01 22    our complaint in December of 2020.  There were not False

15:33:08 23    Claims Act allegations involved, however, the False Claims

15:33:11 24    Act investigation of Walmart continued until the United

15:33:14 25    States declined to intervene in April of 2024.  So at that

15:33:18  1    point, there had been -- we're not denying that there was

15:33:23  2    coordination between the CSA and False Claims Act

15:33:27  3    investigation, Walmart knew that.  They signed the tolling

15:33:31  4    agreement.  There was representation present at both.

15:33:34  5            At the time we filed the complaint, there became

15:33:37  6    a separation between the two investigations such that, for

15:33:40  7    example, we were not involved in negotiations surrounding

15:33:45  8    the CID that was issued in the False Claims Act

15:33:49  9    investigation after our complaint had been filed.  However,

15:33:53 10    we did talk to the Fraud Section lawyers and said if you all

15:33:58 11    reach out to somebody and are doing an interview, please let

15:34:03 12    us know, we'll do the same thing and we can have somebody

15:34:06 13    from the other side attend.  That happened once for HHS,

15:34:10 14    which is this interview of Nancy Beck.  HHS attended three

15:34:14 15    other interviews all after the complaint that we were not

15:34:17 16    aware of.  We don't have those records.  Walmart asked us

15:34:22 17    when we disclosed this list, they said were there other

15:34:27 18    interviews that the Fraud Section conducted in the course of

15:34:30 19    a False Claims Act investigation, and we said we provided

15:34:33 20    you everything we are aware of.  We will go back and look

15:34:36 21    and see if there is anything else.  And then the Fraud

15:34:40 22    Section provided us with a list of three additional

15:34:42 23    interviews, plus one attempted contact.

15:34:45 24            So in summary, for HHS there was one interview

15:34:48 25    where there were representatives from both our team and the

15:34:56  1   Fraud Section.  And then there were three interviews that

15:34:58  2   took place after we filed the complaint once there was a

15:35:02  3   separation that we did not know about until we were informed

15:35:07  4   trying to answer Walmart's questions.

15:35:10  5           The False Claims Act investigation, it was

15:35:12  6   really a DOJ led investigation.  HHS attended these four

15:35:17  7   interviews.  But I think even with respect to the False

15:35:21  8   Claims Act investigation that -- I wouldn't characterize

15:35:23  9   that as a significant contribution.  They attended

15:35:26 10   interviews which is common that government interviews will

15:35:30 11   have agents or investigators there to write the memorandum,

15:35:35 12   but these are not instances where they were affirmatively

15:35:39 13   moving forward with the investigation.  So that's HHS.

15:35:42 14           DoD attended five interviews.  Those were

15:35:48 15   disclosed to Walmart earlier in our interrogatory response.

15:35:52 16   Two of those were of the relaters in the False Claims Act

15:35:56 17   investigation, Chavez and Marcilla.  Those interviews were

15:36:01 18   attended by a lot of people which is common with relaters

15:36:06 19   interviews including the people from the Attorney General's

15:36:10 20   office and individuals were there because as common in False

15:36:13 21   Claims Act investigations, there were tri-care claims

15:36:15 22   involved so they attended those interviews.

15:36:17 23           And then there were also three interviews, these

15:36:20 24   are the ones attended by Kevin and Heather.  Kevin was

15:36:24 25   working on our CSA investigation and Heather was working on

15:36:27  1    the False Claims Act.

15:36:28  2            And so our view is that this is a very discrete

15:36:35  3    limited set of interviews that took place.  It does not

15:36:38  4    change the fact that these agencies did not significantly

15:36:42  5    contribute to our investigation in this matter.  And we

15:36:44  6    don't think that this warrants them being considered

15:36:48  7    parties.

15:36:48  8            I would also point out that their subpoenas to

15:36:54  9    the government, the first request relates to investigations

15:36:59 10    of Walmart, but the rest of the requests, there are many of

15:37:03 11    them for HHS.  We have got fifteen requests and the rest of

15:37:08 12    them have nothing to do with the False Claims Act

15:37:10 13    investigation.  It's sort of incidental.  They presumably

15:37:14 14    are subpoenas that they would be issuing regardless of

15:37:17 15    whether there happened to be a False Claims Act

15:37:20 16    investigation or not.  So we think that this hook of having

15:37:22 17    a couple of -- a handful of interviews for each of these

15:37:26 18    agencies respectively should not bring them back into party

15:37:30 19    discovery.

15:37:31 20            THE COURT:  Okay.

15:37:34 21            MS. BRUNSON:  Unless Your Honor has any other

15:37:36 22    questions.

15:37:36 23            THE COURT:  No.  I'll hear from Mr. Katzen.

15:37:46 24            Mr. Katzen, just to confirm before you tell me

15:37:49 25    what you would like me to hear, the only agency still

15:37:53  1    maintaining a *Touhy* objection is DoD, correct?

15:37:56  2                 MR. KATZEN:  Correct.

15:37:56  3                 THE COURT:  If I find that the objections are

15:37:59  4    not waived based on timeliness, is that *Touhy* objection

15:38:03  5    going to be dropped?

15:38:04  6                 MR. KATZEN:  Yes.  So during our

15:38:07  7    meet-and-confer, that is the deal we offered Walmart, we

15:38:10  8    would be willing --

15:38:11  9                 THE COURT:  Understood.  I'm just saying if I do

15:38:13 10    that, will the *Touhy* objection --

15:38:15 11                 MR. KATZEN:  If you find that the objections are

15:38:17 12    not waived?

15:38:17 13                 THE COURT:  Yes.

15:38:18 14                 MR. KATZEN:  If you find that the objections are

15:38:20 15    not waived, I think we would be willing to drop the *Touhy*

15:38:25 16    objection.

15:38:25 17                 THE COURT:  I'm just trying to understand if

15:38:27 18    that's what I find, do I have to say words about *Touhy* in my

15:38:30 19    ruling, so that's what I was asking.

15:38:31 20                 MR. KATZEN:  On the assumption we're proceeding

15:38:34 21    under Rule 45, there are three issues.  There is the *Touhy*

15:38:37 22    issue for the DoD.  There is the issue whether DoD, FBI and

15:38:42 23    the VA waived their objections by tardiness.  And there is

15:38:45 24    the question whether the HHS agencies, HHS, IHS and CMS,

15:38:51 25    waived their objections to the boilerplate, that they were

15:38:57  1    too boilerplate.  I will take those actually in reverse

15:39:01  2    order.

15:39:02  3              As they pointed out, the three HHS agencies have

15:39:06  4    submitted supplemental objections.  I understand they have

15:39:09  5    other problems with those objections, but I do hear them

15:39:12  6    today say that those objections are still boilerplate, so I

15:39:15  7    think the thing to do now would be to proceed to

15:39:19  8    meet-and-confer on those objections.  They did argue that

15:39:22  9    the objections when served timely were boilerplate, but the

15:39:31 10    *AMMEX* case we cite from the District of New Jersey says as

15:39:35 11    long as the boilerplate is cured in advance of the hearing

15:39:38 12    or even at the hearing, then lateness -- then the

15:39:41 13    boilerplate won't result in a waiver.

15:39:45 14              Turning to the other three agencies, DoD, FBI,

15:39:51 15    and the VA, it's true that waiver -- or tardiness doesn't

15:39:59 16    result in waiver unless in unusual circumstances.  And those

15:40:03 17    unusual circumstances can include when the agency acts in

15:40:09 18    good faith, the requests are overbroad on their face, and

15:40:14 19    there has been contact between the subpoenaed parties and

15:40:19 20    the party issuing the subpoena, and all three of those are

15:40:23 21    met here.

15:40:24 22              Just to emphasize the overbreadth of the

15:40:27 23    subpoenas on their face, take, for instance, the FBI

15:40:31 24    subpoena, the second request to the FBI subpoena, it request

15:40:41 25    any document that's within the possession of the FBI that

15:40:46 1    mentioned an identified prescriber regardless of whether it

15:40:49 2    relates to the subject matter of the litigation.  So if the

15:40:54 3    FBI is investigating an identified prescriber for something

15:40:58 4    totally unrelated to this litigation, Walmart's position is

15:41:01 5    because the FBI was two days late in submitting its

15:41:05 6    response, that FBI must produce any document in its

15:41:09 7    possession about that investigation regardless of any law

15:41:11 8    enforcement provision, regardless of how sensitive the

15:41:14 9    document is, that should not result in waiver in this case.

15:41:18 10          On the *Touhy* issue, as they acknowledge, the

15:41:20 11   Department of Defense's regulations do not contain language

15:41:24 12   saying that they do not apply when the United States is a

15:41:27 13   party.  Their argument has been that there is something

15:41:30 14   inherent in the nature of *Touhy* regulations that they cannot

15:41:34 15   apply when the government in any form is a party, and we

15:41:39 16   think the *Redland* case from the Third Circuit makes clear

15:41:43 17   that's not the case.

15:41:43 18          THE COURT:  I don't think it makes it clear.  I

15:41:45 19   mean, it's sort of an unclear statement in a footnote.  I

15:41:49 20   think there is a real question as to whether *Touhy* can be

15:41:52 21   raised when the United States brings the case in its own

15:41:56 22   name.

15:41:56 23          MR. KATZEN:  That was a case where the United

15:42:00 24   States was a party, the government agency was a party --

15:42:03 25          THE COURT:  I'm just saying where it's cited for

15:42:06  1    the proposition, it doesn't say whoever put it in their

15:42:10  2    letter says, it's not that clear.

15:42:12  3              MR. KATZEN:  Fair enough.  The other cases cited

15:42:15  4    in that same paragraph --

15:42:18  5              THE COURT:  It would be odd that there would be

15:42:24  6    a rule for all other agencies except for DoD, right?

15:42:29  7    Actually, let my ask you.  Why did the five of six agencies

15:42:32  8    drop their *Touhy* objections?

15:42:34  9              MR. KATZEN:  Sure.  So as they pointed out,

15:42:38 10    those five agencies have regulations that contain language

15:42:41 11    that say they don't apply when the United States is a party.

15:42:45 12              THE COURT:  Okay.

15:42:45 13              MR. KATZEN:  Those agencies were initially

15:42:48 14    thinking about the regulation in light of this Court's

15:42:51 15    ruling back in September.  One way to understand that

15:42:54 16    ruling, we think, is that for purposes of this case, we're

15:42:57 17    thinking of the United States as certain agencies from whom

15:43:02 18    party discovery is appropriate.  If you take that

15:43:04 19    understanding and apply it in the context of those agency's

15:43:08 20    *Touhy* regulations, it makes sense when the agencies thought

15:43:12 21    that the *Touhy* regulations might apply here.  We don't feel

15:43:16 22    like we need to take a definitive position on that.  We're

15:43:19 23    not raising that issue at this point.  We're willing to drop

15:43:22 24    that issue and not make that contingent on anything on

15:43:26 25    precedent.  I was surprise to hear them cite our dropping

15:43:29  1    this objection as evidence of the United States is a party,

15:43:29  2    usually when a party withdraws its objection, it's evidence

15:43:33  3    of trying to move things forward and get along and that's

15:43:36  4    the case here.

15:43:37  5           THE COURT:  So my point was -- and thank you for

15:43:39  6    that clarification.  It's helpful.  My point was it is odd

15:43:43  7    that the other agencies cannot assert *Touhy* in a case where

15:43:48  8    the United States is a party, but the DoD can.  That's an

15:43:53  9    outlier.

15:43:54 10           MR. KATZEN:  The Federal Housekeeping Statute

15:43:56 11    gives it to each agency to decide on what its procedures are

15:44:00 12    going to be when it receives a request for documents in the

15:44:03 13    form of a subpoena.  Some agencies have chosen to exclude,

15:44:07 14    to have their regulations not apply when the United States

15:44:12 15    is a party, and others haven't made that choice.  And I

15:44:16 16    think that's just a product under the Federal Housekeeping

15:44:25 17    Statute that each agency decides that.  I do want to address

15:44:27 18    the two cases that they pointed to, *Alexander* and the *Boeing*

15:44:31 19    case.  The *Boeing* case I believe was a False Claims Act in

15:44:34 20    which the Department of Defense was effectively the party

15:44:37 21    agency, so it's little bit different than here where we're

15:44:40 22    proceeding here under the assumption that DoD is not a party

15:44:44 23    agency in the case.

15:44:45 24           In A*lexander*, there is some broad language that

15:44:50 25    they cite about a prior version of DOD's regulations that do

15:44:56 1   suggests that it doesn't apply when the United States is a

15:44:59 2   party.  If you look at footnote 3, the court recognizes that

15:45:02 3   *Touhy* regulations in certain contexts can apply when the

15:45:06 4   United States is a party.  And they cite the DOD's

15:45:12 5   regulations at the time as an example of that.  The

15:45:14 6   difference that the court said is that in the DOD's

15:45:18 7   regulations, there was a policy against, a general policy

15:45:21 8   against disclosure.  Under the DOD's current regulations,

15:45:25 9   and I think this is 32 CFR 97.4, it expressly states that

15:45:36 10  DOD's policy is in favor of applying the regulation in a way

15:45:41 11  that favors disclosure.  It says the DoD generally should

15:45:44 12  make official information reasonably available for use in

15:45:48 13  federal, state, and foreign courts, and other adjudicative

15:45:53 14  bodies if the information is not classified, privileged, or

15:45:56 15  otherwise protected from public disclosure.

15:45:58 16          Just to reiterate the bottom line, if the Court

15:46:01 17  rules that we have not waived objection, we would be willing

15:46:04 18  to withdraw the *Touhy* objection and proceed.

15:46:06 19          THE COURT:  Okay.  Thank you.

15:46:07 20          So if that happens and you all have to move

15:46:12 21  forward under Rule 45, because I'm not going to find at this

15:46:16 22  point that you should be a party for failure to engage in

15:46:19 23  the process, I need you to give me an assurance that the

15:46:23 24  agencies are going to meaningful engage and do so with

15:46:27 25  dispatch.  Can you help me out with that?

15:46:29  1          MR. KATZEN:  Yeah, I can give you assurances

15:46:31  2   that the agency will meet-and-confer.  I can't give you a

15:46:34  3   firm deadline without talking to my clients about like in

15:46:37  4   terms of deadlines or any other additional supplemental

15:46:41  5   objections or responses from DoD, FBI and the DEA, but I

15:46:46  6   take Your Honor's admonishment very seriously and we'll work

15:46:51  7   with dispatch to respond to the subpoenas.

15:46:53  8          THE COURT:  And it will be something more than

15:46:55  9   just go pound sand.

15:46:57 10          MR. KATZEN:  It will be something more than just

15:46:59 11   go pound sand.

15:47:00 12          THE COURT:  Okay.

15:47:01 13          MR. KATZEN:  Thank you.

15:47:02 14          THE COURT:  Thank you.

15:47:08 15          MS. FARNAN:  Just briefly, Your Honor, with

15:47:11 16   respect to HHS and DoD, I mean, the facts just keep coming

15:47:19 17   out.  We keep hearing a different story than we were told in

15:47:23 18   September.  I just heard Ms. Brunson today acknowledge that

15:47:26 19   they, meaning DEA, were getting information from HHS.  They

15:47:31 20   were participating in joint interviews.  And I hope I didn't

15:47:35 21   misspeak, I was trying to point out that the person who

15:47:39 22   verified interrogatories was sitting with HHS.

15:47:43 23          THE COURT:  I probably just --

15:47:45 24          MS. FARNAN:  The point being to act like there

15:47:47 25   is this segregation where no information is shared is really

15:47:50  1    not a credible assertion.  But Ms. Brunson acknowledged

15:47:54  2    there was coordination in the CSA and FDA investigations.

15:47:59  3    And it sounds like it was as Walmart saw it which is as one

15:48:03  4    investigation until the time that this case was filed and

15:48:06  5    then they sent the FDA folks maybe off to the side, but

15:48:09  6    still are sharing information, getting information together.

15:48:12  7    There was no separation.

15:48:14  8              And I think importantly, the other thing that

15:48:17  9    was brought up, well, it wasn't significant.  But that's not

15:48:22 10    a requirement.  So when they brought these cases to Your

15:48:25 11    Honor in September, one of them was United States v. UBS

15:48:29 12    Securities, and there are places where the case will say,

15:48:32 13    you know, was the involvement significant or not.  But they

15:48:37 14    cite, when they brought this to Your Honor back in

15:48:40 15    September, they cited this case at Star 4 to Star 6, and at

15:48:44 16    Star 6, 2020 Westlaw 7062789, it says for purposes of party

15:48:50 17    discovery, the United States includes agencies that engage

15:48:53 18    in joint investigations.  However, the definition of the

15:48:56 19    United States also includes agencies that inform the

15:48:59 20    policies, rules, and regulations that the executive branch

15:49:04 21    set.

15:49:04 22              When you have agencies sitting together

15:49:06 23    interviewing former Walmart pharmacists and Ms. Brunson

15:49:10 24    acknowledges it was coordination, I don't know how that's

15:49:13 25    not part of a joint investigation.

15:49:15  1          And the notion that there were two

15:49:17  2   investigations is something that sounds like it was created

15:49:21  3   for this litigation to avoid discovery.  And so given -- and

15:49:25  4   again, this is the limited information we have.  So HHS and

15:49:30  5   DoD people are sitting there side-by-side with DoD, side by

15:49:36  6   side with lawyers in this case, investigating former Walmart

15:49:40  7   pharmacists, the notion that information wasn't shared and

15:49:42  8   that this wasn't one investigation doesn't make any sense.

15:49:45  9   And so obviously they should be part of party discovery.

15:49:47 10          I want to address the FBI overbreadth.  If we

15:49:53 11   could just pull up the FBI subpoena.  It's two requests.  We

15:49:58 12   have one request about documents relating to this litigation

15:50:02 13   or any investigation of Walmart.  And the second one is all

15:50:06 14   documents relating to any identified prescriber, including

15:50:10 15   but not limited to, and then it has sort of three

15:50:15 16   categories.

15:50:15 17          I guess their concern is documents related to

15:50:17 18   prosecutions of any identified prescribers.  We knew and we

15:50:20 19   said at the last hearing that the FBI was involved in

15:50:24 20   investigating the prescribers who are at issue in this case

15:50:28 21   on who are charged with a crime.  That is obviously what we

15:50:32 22   are getting at.

15:50:32 23          The government hasn't even said if there was

15:50:35 24   another prosecution of an identified prescriber for

15:50:38 25   something other than filling or writing invalid opioid

15:50:43  1    prescriptions.  It is very easy for the FBI to respond to

15:50:46  2    this and say you know what, we'll produce all the documents

15:50:49  3    about our opioid prosecution, but if we prosecuted somebody

15:50:53  4    for, you know, mail fraud or something else, we are not

15:50:57  5    going to give you that.

15:50:58  6           I mean, to call this so obviously overbroad as

15:51:02  7    to somehow absolve the FBI of their failure to participate I

15:51:08  8    think again is just not credible.

15:51:10  9           So I think, Your Honor, I didn't really hear

15:51:13 10    anything on the waiver point, particularly as to DoD.  I

15:51:18 11    mean, they just waited a month and sent us a *Touhy* letter.

15:51:23 12    You know, these agencies just haven't participated.  They

15:51:26 13    need to participate.  So we think obviously all of them

15:51:30 14    should be part of the you/your definition, but certainly at

15:51:34 15    a minimum HHS and DoD and the other agencies should deem

15:51:38 16    their objections waived and should be ordered to produce

15:51:41 17    documents.

15:51:42 18           THE COURT:  Thank you.  Okay.  So what I would

15:51:44 19    like to do is take like a twenty-minute break, go back and

15:51:47 20    think about some of the things that you all presented today

15:51:50 21    and hopefully be able to come back and give you a ruling on

15:51:53 22    all of the disputes.  So let's break and come back at 4:15.

15:52:01 23           COURT CLERK:  All rise.

15:52:02 24           (A brief recess was taken.)

16:22:48 25           COURT CLERK:  All rise.

16:22:50  1          THE COURT:  Thank you.  Everyone, please be

16:22:51  2   seated.  I am going to be able to give you a ruling on all

16:22:54  3   the discovery issues currently pending.

16:22:57  4          So as to Plaintiff's request for all

16:23:02  5   prescription data, it's a shorthand, DI 180, I am going to

16:23:07  6   deny the government's motion to compel the requested

16:23:11  7   nationwide dispensing data for all controlled substances and

16:23:14  8   certain non-controlled substances.  The requested

16:23:17  9   information spans nearly ten years and 5,000 stores,

16:23:21 10   resulting in something like 400 million prescriptions.

16:23:21 11   Guided by the factors in Rule 26, I don't think that the

16:23:24 12   requested information bears sufficient relevance to the

16:23:27 13   claims alleged in the case.  The government alleges here

16:23:29 14   that Walmart knowingly filled certain controlled substance

16:23:34 15   prescriptions that had indicators of invalidity.  But this

16:23:37 16   discovery request seeks every single controlled substance

16:23:41 17   prescription fill at all Walmarts across the country for

16:23:45 18   nearly a decade, as well as every single fill for eleven

16:23:49 19   non-controlled substances - the request is untethered from

16:23:51 20   the Controlled Substances Act violations pled in this case.

16:23:54 21   Just like the government's request for all controlled

16:23:56 22   substance fills for 120 pills or more in the *Ridley's Family*

16:24:01 23   *Markets* case, the government's request here seems to be a

16:24:03 24   fishing expedition.

16:24:04 25          And because the requested information would

16:24:06 1    encompass hundreds of millions of prescriptions, I also find

16:24:09 2    that the discovery sought is not proportional to the needs

16:24:13 3    of the case and complying with such a request would be

16:24:16 4    unduly burdensome for Walmart.

16:24:19 5              Turning next to Defendants' first motion at D.I.

16:24:21 6    178, I'm going to deny Defendants' motion as to the

16:24:24 7    government's list of prescriptions.  That's interrogatory

16:24:26 8    number 1.  I previously ordered the government to provide

16:24:32 9    the requested information for any prescription that they

16:24:35 10   intend to use as a basis for a violation in this case.  It

16:24:38 11   appears that the government has done that.  I have reviewed

16:24:41 12   the excel spreadsheet that contains the list of

16:24:42 13   prescriptions.  And it appears they have complied with my

16:24:43 14   order.  I did not order the government to produce a final

16:24:46 15   list of prescriptions that they cannot change.  And I am not

16:24:49 16   going to do that today either.  Today, the government said

16:24:52 17   that it did not anticipate adding new "Red Flag" categories

16:24:56 18   and that it considered this list the universe subject to

16:24:58 19   adding additional violations that may become known through

16:25:01 20   discovery.  So I do view this list as sufficient at this

16:25:04 21   point and I think even counsel for Walmart said that this

16:25:07 22   can be a starting point.  If prescriptions are added or

16:25:10 23   removed from this universe of prescriptions, the government

16:25:13 24   must make those changes clear via supplementation under Rule

16:25:17 25   26.

16:25:17  1          Turning to the next part of that motion, D.I.

16:25:20  2     178, as to interrogatory number 2, I am going to partially

16:25:24  3     grant Defendants' request.  I think with the "Red Flag"

16:25:27  4     category tabs at the bottom of the spreadsheet in question,

16:25:30  5     the government did identify the bases for invalidity for all

16:25:33  6     the prescriptions in that list.  But I am going to order the

16:25:36  7     government to respond to interrogatory number 2 and provide

16:25:39  8     a narrative of "Red Flag" exceptions that it is aware of

16:25:43  9     that would provide a basis for an otherwise invalid

16:25:46 10     prescription not constituting a violation that they would

16:25:50 11     pursue at trial.  I think the government essentially agreed

16:25:52 12     to provide that information today anyway.  And I think

16:25:56 13     Walmart needs to know this information so that the parties

16:25:59 14     can start to really start the discovery process for each

16:26:02 15     prescription that the government intends to use as a basis

16:26:04 16     for a violation of the Controlled Substances Act.  And this

16:26:10 17     all needs to happen now in fact discovery.

16:26:12 18          That being said, as discovery continues, the

16:26:14 19     government may supplement this response.  But that

16:26:18 20     supplementation must happen in fact discovery as well.

16:26:20 21          Turning now to Defendants' request as it relates

16:26:23 22     to the non-party agencies at D.I. 179.

16:26:27 23          Walmart's motion is essentially asking me to

16:26:30 24     reconsider my prior ruling where I said only certain

16:26:34 25     agencies may be considered the "United States" as a party in

16:26:37  1    this case.  I haven't been provided with any sufficient

16:26:40  2    reason to change that decision today.

16:26:42  3             Although a close call, I don't think the fact

16:26:44  4    that certain HHS and DoD employees attending some pre-suit

16:26:49  5    interviews focused on False Claims Act violations warrants

16:26:53  6    treating those agencies as parties in this CSA case.  But I

16:26:59  7    heard a lot of information that was new today that is mildly

16:27:04  8    troubling, but ultimately I haven't been convinced at this

16:27:08  9    point that HHS was involved enough that they should be

16:27:11 10    considered a party.

16:27:11 11             As to Walmart's request that I deem the

16:27:15 12    non-party agency objections waived and order them to respond

16:27:18 13    as if a party, I am not going to do that, either.  As to the

16:27:21 14    timeliness of the objections, this issue is raised only with

16:27:24 15    respect to DoD, VA and FBI.  I'm not going to find these

16:27:30 16    objections waived as untimely.  These agencies all responded

16:27:32 17    at least by letter by early December - when the subpoenas

16:27:36 18    were served at the end of October.  And I think unusual

16:27:36 19    circumstances exist here because the agencies were

16:27:39 20    attempting to discern whether *Touhy* was something to assert

16:27:42 21    in response to the subpoenas.  Moreover, that the agencies

16:27:45 22    are not parties means that they get more leniency in

16:27:48 23    situations like this.  And it sounds like the agencies are

16:27:51 24    going to continue working with Walmart to respond more

16:27:54 25    fulsomely to the various subpoenas, so I'm not going to

16:27:58  1    order their objections waived based on untimeliness.

16:28:00  2                As to the purportedly boilerplate nature of the

16:28:03  3    objections, or at least the objections that were originally

16:28:06  4    served, I don't think the objections from HHS, IHS and CMS

16:28:10  5    were necessarily boilerplate.  For example, HHS's objection

16:28:14  6    on vagueness, ambiguity and burden goes on to explain that

16:28:17  7    there is no time period constraining the request.  Or CMS

16:28:22  8    objected that the subpoena sought confidential information

16:28:23  9    of individual Medicare beneficiaries that are protected from

16:28:27 10    disclosure by federal law - and then cited the relevant law.

16:28:31 11                And even if I did find the objections to be

16:28:33 12    boilerplate, I'm not convinced that the proper remedy would

16:28:37 13    be waiver.  Walmart would challenge the sufficiency of those

16:28:40 14    objections and attempt to get more specific ones from the

16:28:43 15    agencies.  In any event, it sounds like the agencies updated

16:28:46 16    their objections and those objections may no longer be

16:28:49 17    boilerplate.  So I'm not going to find that any objections

16:28:53 18    be considered waived based on boilerplate.

16:28:54 19                And because DoD agreed today to withdraw its

16:28:57 20    *Touhy* objection if I found that its substantive objections

16:29:01 21    were not waived, I'm not reaching the issue of whether *Touhy*

16:29:04 22    may be raised in this case.

16:29:06 23                So discovery will proceed with the non-party

16:29:11 24    agencies pursuant to Rule 45.

16:29:13 25                And finally, I want to reiterate what I said to

16:29:16  1    Mr. Katzen.  The agencies need to work with Walmart to

16:29:20  2    respond to these subpoenas and do so with dispatch.  And the

16:29:23  3    responses need to be meaningful.  I was assured of that on

16:29:26  4    the record today.

16:29:27  5            So I have ruled on all the disputes in front of

16:29:30  6    me.  The transcript is going to serve as my ruling.  Is

16:29:33  7    there anything else that we need to discuss today?  From the

16:29:36  8    government.

16:29:37  9            MR. KASPER:  No, Your Honor.

16:29:38 10            THE COURT:  Okay.

16:29:38 11            MR. VARNADO:  Sorry, Your Honor.  Very briefly

16:29:42 12    on Document 178, Item 2 on interrogatory 2, you had ordered

16:29:47 13    the government to provide the list of exceptions.

16:29:49 14            THE COURT:  That they're aware of or that they

16:29:51 15    think exist.

16:29:52 16            MR. VARNADO:  The other part of our request

16:29:53 17    there is if those twenty-one categories, if there are none

16:29:58 18    that are *per se*, maybe they can say this on the record.

16:30:00 19    That was our request is if these are not *per se*, tell us

16:30:05 20    now.  If there are any that are *per se* in their mind

16:30:08 21    violations of the CSA, that's what we would ask that you

16:30:11 22    order them to do as well.

16:30:12 23            THE COURT:  Can that be part of your response?

16:30:15 24    I'm not looking to have further argument.

16:30:18 25            MR. KASPER:  Your Honor, I don't think we're

16:30:20  1    prepared to make a decision on that right now.

16:30:26  2              MR. VARNADO:  I guess that was part of our

16:30:29  3    motion and request here was to get to the bottom of that

16:30:32  4    issue.  If none of them are *per se*, they should be able to

16:30:37  5    say that.  If some of them are, we would like to know that.

16:30:40  6    So maybe give them seven days to make that determination and

16:30:43  7    let us know which is which.

16:30:46  8              THE COURT:  Is that fairly part of your

16:30:48  9    discovery motion?

16:30:49 10              MR. VARNADO:  It is.  It's Walmart's request in

16:30:52 11    interrogatory number 2 that for each prescription United

16:30:55 12    States alleges invalid, the United States identify the basis

16:30:58 13    for that allegation, including whether certain categories of

16:31:02 14    prescriptions are *per se* invalid.

16:31:04 15              THE COURT:  Okay.  So if there is no exception,

16:31:07 16    then is it *per se* invalidity?

16:31:11 17              MR. VARNADO:  I think that's their theory.

16:31:12 18              MR. KASPER:  Your Honor, I don't know what the

16:31:14 19    term -- what they mean by *per se* invalidity, that's why I'm

16:31:18 20    not certain we can commit to that at this point in time.

16:31:21 21              THE COURT:  Okay.  So then what I am going to

16:31:23 22    order is that you provide the narrative response for the

16:31:26 23    exceptions.  If there is something that you can divine in

16:31:30 24    terms of *per se* invalidity or not, then add that, but it

16:31:34 25    sounds like you all should meet-and-confer after he provides

16:31:38   1    an initial response.

16:31:39   2              MR. VARNADO:  Just to be clear for the record,

16:31:40   3    what I was referring to are the statements that were made at

16:31:43   4    the last hearing that there are these type of prescriptions

16:31:46   5    that no prescriber would ever write or no pharmacist would

16:31:50   6    ever fill, they're a violation of the CSA.  They've walked

16:31:55   7    back from that position in subsequent communications and

16:31:55   8    that's something that we just definitively need to know what

16:31:58   9    their position is on each of those twenty-one categories.

16:32:00  10              THE COURT:  Do you have an interrogatory that

16:32:03  11    asks me whether a *per se* "Red Flag" category exists?

16:32:09  12              MR. VARNADO:  I don't know that we have

16:32:10  13    propounded it that way.  We can consider that.  I think it's

16:32:13  14    fairly part of interrogatory 2, but we'll see what they come

16:32:17  15    back with.  So I'm told by counsel, it's our new

16:32:27  16    interrogatories numbers 8, 9 and 10, and they said that they

16:32:31  17    will not answer it because it's premature.  We cannot wait

16:32:35  18    around for expert discovery for them to make a determination

16:32:38  19    which should be a fairly easy one because I think they know

16:32:41  20    the answer.  None of these are *per se* violations and to

16:32:44  21    suggest otherwise in the last hearing, I think it's not in

16:32:49  22    step with what the DEA says about these situations and what

16:32:52  23    the law says.

16:32:53  24              THE COURT:  Okay.  So I guess I look forward to

16:32:56  25    that forthcoming discovery dispute.  So in answer to your

16:32:59 1    request right now, I will tell the government, if there are

16:33:03 2    exceptions that exist to disclose them in the narrative

16:33:06 3    response in interrogatory number 2.  If there is an

16:33:09 4    exception that does not apply to one of your "Red Flag"

16:33:12 5    categories, why don't you include that in your response as

16:33:15 6    well.  I'm not really sure that you guys have talked about

16:33:18 7    this *per se* invalidity thing enough for me to make a

16:33:22 8    meaningful decision on it.

16:33:23 9           MR. VARNADO:  We appreciate that ruling.  Thank

16:33:25 10   you, Judge.

16:33:25 11          THE COURT:  Anything else?

16:33:27 12          MS. FARNAN:  Your Honor, I need to be the bearer

16:33:29 13   of bad news.  We do have some other discovery disputes

16:33:33 14   coming.  We sent the government a draft motion for

16:33:37 15   conference yesterday.  We have agreed on potential dates of

16:33:40 16   April 7th, 8th, the afternoon of 9th.  I'm not wanting you

16:33:45 17   to do anything today.  We're waiting to hear back from them.

16:33:48 18   I didn't want you to get it on Monday -- we may have filed

16:33:51 19   it today if we had worked it out between us.  I didn't want

16:33:54 20   you to get it on Monday and say they were in front of me

16:33:58 21   Friday afternoon, why didn't they say anything.

16:34:00 22          THE COURT:  I appreciate you telling me that.  I

16:34:02 23   guess now is a good time for me to say that there will start

16:34:06 24   to be consequences for proliferative discovery disputes.  I

16:34:11 25   think all hearings will be in person at this point.  I will

16:34:14  1    think about -- I would assume that everybody is meeting and

16:34:18  2    conferring, but I will see about whether I want to make some

16:34:21  3    in person meet-and-confer requirements.  I'm not saying

16:34:24  4    you're doing anything wrong.

16:34:26  5         MS. FARNAN:  We have had a cooperative

16:34:28  6    meet-and-confer, almost every week we do it by video.  I do

16:34:33  7    understand Your Honor's concern.  We have tried to be, and I

16:34:34  8    think the government would agree, we have been working hard

16:34:36  9    on that together, but we obviously cannot resolve all our

16:34:40 10    disputes.  I just want Your Honor to be aware of that.

16:34:42 11         THE COURT:  I appreciate that.  I mean, I don't

16:34:45 12    really appreciate that.  I appreciate the heads up.  Can you

16:34:48 13    give my an idea of how many we're talking about?

16:34:51 14         MS. FARNAN:  I believe they're enumerated as

16:34:53 15    five separate ones.  It's lot of about custodians and search

16:34:57 16    terms.  Some of it pertains to CDC and FDA.  Some of it

16:35:02 17    pertains to the government.  Mr. Carlson may have a better

16:35:07 18    sense on that one just because I'm not remembering it off

16:35:11 19    the top of my head.

16:35:11 20         MR. CARLSON:  It is custodian search terms DEA,

16:35:14 21    DoD, DOJ, CDC.

16:35:18 22         THE COURT:  Go ahead.

16:35:21 23         MS. BRUNSON:  Your Honor, I want to give you a

16:35:23 24    heads up that with respect to the in person, the DOJ is

16:35:27 25    subject to pretty restrictive travel restrictions right now.

16:35:30  1    We were able to have three of us here today because this

16:35:33  2    travel was booked before those restrictions were in place,

16:35:36  3    so we're having to consider whether we would potentially

16:35:39  4    move to have this be telephonic.  I appreciate you

16:35:45  5    mentioning it in person, so we'll talk to our supervisors

16:35:47  6    about that.

16:35:47  7          THE COURT:  I think you need to say the Judge

16:35:49  8    said that we're not going to be allowed to do this

16:35:51  9    telephonically and have that be the starting premises.

16:35:54 10          MS. BRUNSON:  I appreciate that.  Thank you.

16:35:57 11          THE COURT:  Anything else?

16:35:58 12          Thank you all and have a nice weekend.

         13          (Court adjourned at 4:35 p.m.)

         14

         15          I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.

         16

         17                              /s/ Dale C. Hawkins
                                     Official Court Reporter
         18                            U.S. District Court

         19

         20

         21

         22

         23

         24

         25

**'**

**'dos** [1] - 63:23

**/**

**/s** [1] - 139:17

**1**

**1** [7] - 30:4, 33:19, 33:23, 51:8, 62:1, 130:8
**1,000** [1] - 87:23
**1,600** [1] - 36:20
**1,800** [1] - 47:15
**1,814** [1] - 47:20
**1.4** [2] - 82:13, 82:25
**10** [1] - 136:16
**100** [1] - 37:3
**120** [2] - 24:17, 129:22
**126** [1] - 105:11
**12th** [1] - 40:17
**130** [2] - 82:14, 83:5
**13th** [1] - 98:4
**14** [2] - 54:21, 60:22
**14th** [1] - 33:10
**150** [2] - 82:2, 84:5
**15th** [1] - 95:6
**16** [1] - 61:4
**160** [2] - 36:24, 88:17
**17** [2] - 92:1, 103:16
**178** [4] - 51:4, 130:6, 131:2, 134:12
**179** [1] - 131:22
**18** [1] - 94:17
**180** [4] - 23:21, 29:2, 29:5, 129:5
**19** [2] - 103:16, 114:12
**1:00** [1] - 1:9

**2**

**2** [20] - 34:8, 34:16, 53:19, 53:23, 62:2, 62:9, 62:14, 63:3, 65:4, 76:25, 78:20, 79:3, 80:15, 131:2, 131:7, 134:12, 135:11, 136:14, 137:3
**20** [4] - 50:9, 50:11, 114:12
**20-1744(CFC)(EGT** [1] - 1:4
**200-page** [2] - 31:18, 39:12
**2006** [1] - 64:4
**2013** [2] - 8:5, 36:23
**2019** [1] - 105:6

**2020** [5] - 36:23, 105:12, 105:24, 115:22, 126:16
**2021** [4] - 105:1, 106:9, 109:12, 115:20
**2022** [2] - 105:6, 109:12
**2024** [3] - 8:6, 54:1, 115:25
**2025** [1] - 1:8
**2027** [1] - 32:13
**2032** [1] - 11:16
**21** [2] - 50:13, 114:12
**21st** [2] - 53:15, 95:15
**22** [1] - 108:16
**25,000** [1] - 37:13
**25th** [4] - 51:13, 52:20, 54:1, 56:14
**26** [5] - 37:24, 92:5, 93:12, 129:11, 130:25
**28** [1] - 86:3

**3**

**3** [8] - 25:24, 34:8, 34:16, 36:1, 36:24, 96:17, 96:18, 124:2
**30** [1] - 54:15
**30-day** [1] - 54:25
**300** [3] - 16:22, 37:1, 77:21
**31st** [3] - 33:9, 40:15, 73:14
**32** [1] - 124:9
**34** [2] - 99:1, 101:16

**4**

**4** [6] - 36:2, 50:5, 53:16, 53:18, 103:7, 126:15
**40** [3] - 9:13, 9:18, 37:2
**40,000** [2] - 82:18, 83:1
**400** [6] - 16:21, 17:18, 27:13, 32:16, 38:4, 129:10
**41** [1] - 104:8
**414** [1] - 47:13
**45** [18] - 33:23, 90:3, 90:12, 92:3, 92:8, 93:11, 95:13, 97:18, 99:23, 100:1, 101:5, 104:7, 110:5, 110:7, 112:18, 119:21, 124:21, 133:24
**4:15** [1] - 128:22

**4:35** [1] - 139:13

**5**

**5,000** [3] - 17:1, 35:24, 129:9
**5,200** [1] - 36:17
**500** [1] - 43:7
**517** [1] - 47:12

**6**

**6** [10] - 17:6, 18:25, 23:12, 23:13, 23:20, 36:21, 49:4, 50:5, 126:15, 126:16
**6,000** [4] - 23:6, 23:10, 23:11, 43:8
**60** [2] - 9:13, 9:18
**600-and-something** [1] - 45:6
**629** [4] - 17:8, 23:5, 49:4, 86:3
**64,000** [2] - 43:6, 59:15
**689** [3] - 68:21, 72:12, 72:13
**6th** [5] - 94:2, 94:3, 94:6, 94:16, 95:2

**7**

**7** [2] - 1:8, 28:5
**7062789** [1] - 126:16
**7th** [1] - 137:16

**8**

**8** [4] - 29:15, 31:17, 54:14, 136:16
**80** [2] - 9:18, 41:20
**80,000** [10] - 16:25, 18:23, 23:7, 23:15, 29:11, 35:16, 39:18, 82:1, 82:4, 86:11
**800** [8] - 8:18, 9:10, 9:14, 9:20, 10:8, 19:6, 31:19, 54:25
**844** [1] - 1:11
**8th** [1] - 137:16

**9**

**9** [2] - 63:17, 136:16
**97.4** [1] - 124:9
**9th** [1] - 137:16

**A**

**ability** [1] - 47:4

**able** [13] - 41:13, 59:23, 67:20, 68:3, 72:7, 73:17, 79:10, 79:16, 95:13, 128:21, 129:2, 135:4, 139:1
**absolutely** [5] - 15:24, 42:7, 58:12, 90:19, 95:3
**absolve** [1] - 128:7
**abuse** [4] - 12:25, 13:17, 13:18, 14:2
**access** [2] - 7:22, 75:21
**accommodation** [1] - 35:25
**according** [5] - 55:10, 55:11, 61:11, 86:2, 104:21
**accordingly** [1] - 94:22
**accurate** [1] - 139:15
**achieved** [1] - 61:16
**acknowledge** [2] - 121:10, 125:18
**acknowledged** [3] - 21:16, 22:16, 126:1
**acknowledges** [2] - 55:1, 126:24
**Act** [44] - 4:7, 6:12, 16:25, 29:22, 30:16, 31:6, 31:12, 32:8, 49:14, 50:19, 50:20, 50:24, 50:25, 83:12, 85:15, 88:2, 88:22, 102:10, 107:7, 107:10, 108:24, 109:6, 109:7, 114:23, 115:8, 115:12, 115:16, 115:23, 115:24, 116:2, 116:8, 116:19, 117:5, 117:8, 117:16, 117:21, 118:1, 118:12, 118:15, 123:19, 129:20, 131:16, 132:5
**act** [3] - 64:13, 98:15, 125:24
**acted** [2] - 90:24, 91:11
**acting** [1] - 49:3
**action** [3] - 24:8, 28:23, 113:10
**activity** [1] - 31:10
**acts** [1] - 120:17
**actual** [6] - 5:4, 20:24, 36:13, 77:10, 82:8, 97:14

**add** [17] - 15:3, 22:8, 25:8, 25:12, 25:15, 27:11, 58:5, 59:1, 59:4, 59:23, 60:1, 60:2, 65:11, 65:14, 72:17, 73:20, 135:24
**added** [3] - 56:8, 71:4, 130:22
**adding** [5] - 57:6, 73:22, 78:23, 130:17, 130:19
**addition** [4] - 29:17, 82:21, 106:3, 106:5
**additional** [29] - 14:4, 21:6, 21:25, 25:11, 31:16, 33:22, 36:2, 38:4, 44:4, 44:6, 46:2, 49:20, 58:10, 59:16, 61:18, 65:14, 68:7, 71:4, 71:5, 72:20, 76:10, 76:15, 78:23, 81:16, 90:6, 96:19, 116:22, 125:4, 130:19
**address** [8] - 25:9, 108:14, 110:5, 110:18, 112:24, 114:15, 123:17, 127:10
**addressed** [2] - 24:14, 40:22
**addressing** [1] - 2:22
**adequately** [1] - 20:24
**adjourned** [1] - 139:13
**adjudicative** [1] - 124:13
**administering** [1] - 64:13
**administrable** [1] - 46:20
**administrative** [4] - 17:11, 45:17, 45:20, 49:2
**admission** [1] - 104:22
**admonishment** [1] - 125:6
**advance** [2] - 33:10, 120:11
**adversary** [1] - 110:15
**advice** [1] - 64:15
**advise** [1] - 77:11
**advised** [2] - 13:17, 78:11
**advocating** [1] - 110:7
**affect** [2] - 67:9, 80:20
**affirmatively** [1] - 117:12
**afternoon** [11] - 2:15, 2:18, 3:1, 3:9, 3:22,

16:16, 16:18, 89:4, 113:2, 137:16, 137:21

**AG's** [3] - 7:24, 8:1, 8:7

**Agencies** [2] - 94:21, 94:24

**agencies** [61] - 3:15, 89:7, 89:15, 90:7, 91:22, 91:23, 92:4, 93:3, 93:14, 93:16, 95:18, 96:18, 98:22, 99:4, 100:14, 101:14, 101:24, 102:7, 104:15, 106:19, 108:21, 109:16, 109:22, 109:24, 110:1, 110:6, 111:1, 111:21, 112:15, 112:16, 113:5, 118:4, 118:18, 119:24, 120:3, 120:14, 122:6, 122:7, 122:10, 122:13, 122:17, 122:20, 123:7, 123:13, 124:24, 126:17, 126:19, 126:22, 128:12, 128:15, 131:22, 131:25, 132:6, 132:16, 132:19, 132:21, 132:23, 133:15, 133:24, 134:1

**agency** [16] - 64:12, 88:25, 89:18, 92:11, 96:20, 104:22, 108:25, 118:25, 120:17, 121:24, 123:11, 123:17, 123:21, 123:23, 125:2, 132:12

**agency's** [1] - 122:19

**Agent** [3] - 104:9, 105:7, 105:17

**agent** [1] - 61:21

**agents** [2] - 114:24, 117:11

**aggregate** [4] - 11:11, 12:2, 29:9, 47:4

**ago** [2] - 64:5, 92:10

**agree** [20] - 7:10, 10:11, 18:15, 19:1, 19:2, 22:11, 34:4, 38:25, 39:1, 39:2, 42:8, 65:21, 66:16, 73:20, 75:5, 99:2, 99:3, 100:22,

103:18, 138:8

**agreed** [7] - 43:15, 82:14, 83:5, 96:20, 131:11, 133:19, 137:15

**agreement** [4] - 10:16, 107:1, 109:10, 116:4

**agreements** [1] - 106:24

**agrees** [2] - 97:17, 98:23

**ahead** [1] - 138:22

**air** [1] - 77:3

**Air** [1] - 50:25

**al** [1] - 1:6

**Alexander** [2] - 123:18, 123:24

**align** [1] - 34:14

**alive** [2] - 89:18, 89:19

**allegation** [2] - 39:7, 135:13

**allegations** [15] - 4:4, 4:22, 5:9, 6:16, 18:2, 39:9, 39:12, 39:21, 45:14, 46:11, 71:19, 97:6, 102:21, 112:24, 115:23

**allege** [2] - 31:1, 47:7

**alleged** [15] - 15:20, 16:24, 18:23, 19:22, 23:22, 39:17, 44:24, 46:4, 50:24, 67:7, 67:8, 68:5, 71:24, 108:5, 129:13

**alleges** [5] - 43:7, 43:8, 51:7, 129:13, 135:12

**alleging** [2] - 24:9, 58:12

**Allison** [1] - 110:17

**allotted** [1] - 21:19

**allow** [2] - 47:5, 95:13

**allowed** [7] - 21:2, 21:4, 59:1, 70:23, 71:5, 71:7, 139:8

**allows** [1] - 12:10

**almost** [3] - 28:8, 31:19, 138:6

**alone** [4] - 17:17, 27:14, 50:8, 50:17

**alright** [1] - 64:23

**Amanda** [4] - 103:22, 104:12, 113:13, 115:18

**amazing** [1] - 58:22

**ambiguity** [1] - 133:6

**amenable** [1] - 60:13

**Amended** [1] - 55:21

**amending** [1] - 58:6

**America** [1] - 98:23

**AMERICA** [1] - 1:3

**AMMEX** [1] - 120:10

**amount** [17] - 10:25, 11:14, 12:7, 18:9, 19:19, 21:10, 29:1, 34:1, 34:14, 35:8, 35:20, 36:22, 37:3, 58:22, 59:16, 64:18, 88:20

**amounts** [1] - 20:21

**analysis** [3] - 11:11, 70:10, 80:5

**analyze** [2] - 12:8, 46:15

**analyzed** [1] - 47:19

**Andrew** [3] - 2:20, 3:4, 3:23

**ANDREW** [1] - 1:20, 2:7

**answer** [17] - 16:19, 17:15, 20:4, 35:10, 35:14, 44:22, 56:22, 69:1, 69:2, 73:2, 73:3, 75:8, 90:17, 117:4, 136:17, 136:20, 136:25

**answering** [1] - 53:19

**anticipate** [1] - 126:1

**antiretroviral** [1] - 14:1

**antitrust** [1] - 11:22

**anyway** [4] - 30:24, 86:12, 87:11, 131:12

**apologize** [4] - 42:3, 44:19, 69:14, 73:4

**Appalachian** [3] - 28:5, 28:22, 29:20

**appeal** [2] - 47:13, 47:18

**APPEARANCES** [2] - 1:16, 2:1

**applicability** [1] - 115:12

**applicable** [2] - 90:12, 94:23

**applied** [1] - 53:25

**applies** [2] - 84:5, 97:5

**apply** [20] - 77:4, 77:5, 86:21, 93:8, 94:10, 95:22, 99:3, 110:11, 110:19, 110:22, 111:2, 121:12, 121:15, 122:11, 122:19, 122:21, 123:14, 124:1, 124:3, 137:4

**applying** [1] - 124:10

**appreciate** [8] - 16:8, 137:9, 137:22, 138:11, 138:12,

139:4, 139:10

**appreciating** [1] - 88:12

**approach** [3] - 38:16, 41:18, 45:23

**appropriate** [2] - 58:15, 75:15, 122:18

**approve** [1] - 94:4

**April** [2] - 115:25, 137:16

**apropos** [1] - 47:11

**argue** [4] - 17:25, 20:15, 59:6, 120:8

**argument** [2] - 121:13, 134:24

**arguments** [2] - 47:15, 47:17

**articulated** [6] - 4:24, 7:16, 26:7, 33:11, 40:14, 84:22

**articulating** [1] - 83:22

**articulation** [1] - 7:1

**artificial** [1] - 71:2

**aside** [2] - 38:12, 111:3

**assert** [3] - 29:5, 123:7, 132:20

**assertion** [1] - 126:1

**assessment** [2] - 30:20, 88:4

**Assistance** [1] - 104:12

**Assistant** [1] - 104:13

**associated** [5] - 4:25, 33:12, 40:15, 48:11, 48:12

**Associations** [1] - 64:6

**assume** [2] - 66:12, 138:1

**assuming** [1] - 83:17

**assumption** [2] - 119:20, 123:22

**assurance** [1] - 124:23

**assurances** [1] - 125:1

**assured** [2] - 53:1, 134:3

**attached** [2] - 33:5, 36:5

**attempt** [3] - 60:1, 60:2, 133:14

**attempted** [2] - 114:3, 116:23

**attempting** [2] - 31:3, 132:20

**attend** [2] - 115:13, 116:13

**attendance** [1] -

104:11

**attended** [13] - 102:24, 102:25, 113:22, 114:4, 115:15, 115:18, 116:14, 117:6, 117:9, 117:14, 117:18, 117:22, 117:24

**attending** [1] - 107:20, 132:4

**attention** [3] - 53:16, 108:3, 111:13

**Attorney** [3] - 104:12, 104:13, 117:19

**ATTORNEYS'** [1] - 1:17

**attornies** [1] - 104:19

**August** [2] - 104:25, 115:20

**authority** [3] - 15:15, 29:19, 64:15

**authorized** [4] - 38:21, 50:23, 75:1, 75:19

**authorizes** [1] - 66:9

**available** [4] - 36:8, 77:8, 79:11, 124:12

**average** [1] - 36:20

**avoid** [3] - 79:2, 109:23, 127:3

**avoided** [1] - 61:12

**aware** [15] - 35:23, 36:11, 59:2, 60:16, 62:9, 62:25, 63:18, 80:19, 106:22, 109:18, 116:16, 116:20, 131:8, 134:14, 138:10

**B**

**backed** [1] - 11:24

**background** [1] - 89:20

**bad** [1] - 137:13

**bar** [2] - 4:1, 30:25

**based** [19] - 19:12, 24:1, 24:11, 26:2, 26:14, 34:11, 38:18, 45:15, 49:25, 64:2, 65:17, 71:19, 96:23, 102:3, 119:4, 133:1, 133:18

**bases** [1] - 131:5

**basic** [1] - 89:15

**basis** [17] - 10:20, 29:5, 31:10, 45:13, 45:14, 45:24, 47:20, 62:12, 77:6, 81:5, 81:6, 81:11, 100:13, 130:10, 131:9,

131:15, 135:12
**bear** [1] - 76:19
**bearer** [1] - 137:12
**bears** [1] - 129:12
**became** [1] - 116:5
**Beck** [4] - 103:19, 104:25, 115:17, 116:14
**become** [2] - 89:13, 130:19
**BEFORE** [1] - 1:13
**begin** [2] - 85:21, 99:21
**begins** [1] - 34:7
**behalf** [4] - 2:19, 3:2, 16:17, 109:17
**behind** [1] - 103:2
**belabor** [1] - 15:12
**believes** [5] - 7:17, 46:20, 68:5, 89:10, 90:12
**Bell** [1] - 105:7
**bellwether** [1] - 88:12
**below** [1] - 53:24
**bench** [1] - 47:16
**beneficiaries** [1] - 133:9
**benefit** [1] - 110:6
**benzodiazapine** [2] - 13:5, 69:8
**best** [2] - 35:14, 96:22
**better** [2] - 51:12, 138:17
**between** [9] - 18:17, 29:7, 41:9, 41:24, 74:4, 116:2, 116:6, 120:19, 137:19
**beyond** [17] - 14:7, 28:19, 36:13, 39:8, 41:20, 42:1, 43:6, 48:15, 49:18, 50:1, 51:16, 59:13, 68:4, 68:25, 69:16, 72:12, 73:23
**bifurcated** [1] - 108:12
**big** [3] - 23:1, 33:5, 88:20
**billing** [1] - 36:8
**billion** [1] - 36:24
**bills** [1] - 85:14
**Billy** [1] - 3:4
**binary** [1] - 41:8
**binding** [5] - 38:11
**biological** [1] - 10:17
**bit** [10] - 6:6, 8:25, 25:5, 25:10, 45:3, 82:18, 113:4, 113:6, 114:1, 123:17
**black** [1] - 29:15
**blamed** [1] - 91:12

**blaming** [1] - 95:3
**block** [1] - 98:20
**board** [2] - 56:22, 64:14
**bodies** [1] - 124:14
**Boeing** [3] - 110:17, 123:18, 123:19
**boilerplate** [13] - 92:13, 111:25, 119:25, 120:1, 120:6, 120:9, 120:11, 120:13, 133:2, 133:5, 133:12, 133:17, 133:18
**bold** [1] - 104:8
**bolted** [1] - 30:2
**booked** [1] - 139:2
**bother** [2] - 71:15, 71:16
**bottom** [7] - 11:10, 29:9, 34:8, 62:11, 124:16, 131:4, 135:3
**bound** [5] - 15:24, 18:23, 20:25, 41:9, 70:20
**boundaries** [2] - 85:23, 100:22
**bounds** [1] - 100:1
**BRANCH** [1] - 1:23
**Branch** [8] - 3:14, 95:7, 96:3, 96:4, 96:8, 103:22, 113:14
**branch** [3] - 93:15, 96:6, 126:20
**break** [3] - 114:1, 128:19, 128:22
**brief** [2] - 47:10, 128:24
**briefing** [7] - 6:3, 7:23, 15:12, 33:10, 60:15, 61:2, 63:18
**briefly** [5] - 25:3, 25:22, 27:18, 125:15, 134:11
**bright** [1] - 25:19
**bring** [5] - 84:3, 87:8, 108:16, 118:18
**brings** [1] - 121:21
**broad** [9] - 5:14, 8:2, 22:12, 25:1, 43:5, 55:22, 70:24, 92:12, 123:24
**broader** [1] - 10:12
**brought** [10] - 67:16, 84:3, 84:23, 102:12, 107:1, 108:2, 112:16, 126:9, 126:10, 126:14
**Bruce** [1] - 105:11

**Brunson** [7] - 2:22, 26:13, 65:1, 113:2, 125:18, 126:1, 126:23
**BRUNSON** [11] - 1:21, 73:8, 113:2, 113:12, 113:18, 113:21, 114:1, 115:14, 118:21, 138:23, 139:10
**BSD** [1] - 31:20
**bucket** [1] - 13:13
**buckets** [2] - 56:1, 56:3
**build** [1] - 21:8
**bunch** [2] - 23:23, 59:21
**burden** [20] - 4:24, 5:13, 28:18, 32:23, 33:1, 33:11, 35:22, 36:13, 40:3, 40:15, 40:25, 44:14, 44:15, 84:6, 85:11, 85:17, 86:9, 86:12, 112:10, 133:6
**burdensome** [11] - 14:4, 22:2, 32:15, 34:9, 35:18, 35:23, 36:11, 37:21, 41:15, 41:16, 130:4
**button** [1] - 37:13
**buy** [1] - 101:23
**BY** [10] - 1:18, 1:20, 1:21, 1:24, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8

**C**

**C.A** [1] - 1:4
**cancer** [9] - 55:2, 61:6, 62:25, 74:10, 77:22, 80:8, 80:11, 86:15, 87:23
**candidly** [3] - 95:23, 98:24, 108:19
**cannot** [12] - 17:2, 24:3, 26:11, 29:18, 44:12, 63:22, 90:19, 121:14, 123:7, 130:15, 136:17, 138:9
**capped** [1] - 60:10
**care** [5] - 8:9, 10:13, 27:10, 54:20, 117:21
**carefully** [1] - 28:15
**carisoprodol** [1] - 13:6
**CARLSON** [2] - 2:7, 138:20
**Carlson** [2] - 3:4,

138:17
**case** [158] - 9:4, 11:17, 12:24, 14:11, 16:24, 17:1, 17:3, 17:23, 18:22, 19:14, 21:2, 21:8, 21:18, 22:3, 22:8, 22:24, 23:3, 23:6, 23:8, 23:17, 23:20, 23:21, 24:13, 24:14, 24:21, 28:4, 28:5, 28:7, 28:12, 28:22, 29:11, 29:13, 29:14, 29:20, 31:6, 31:7, 31:21, 32:2, 32:7, 32:8, 32:11, 33:21, 37:25, 38:7, 38:11, 39:2, 39:11, 42:23, 44:4, 44:8, 44:13, 44:14, 45:18, 46:8, 46:11, 46:17, 46:19, 47:1, 47:4, 47:13, 49:14, 49:21, 49:23, 51:10, 54:19, 56:10, 56:19, 56:24, 57:25, 59:7, 60:8, 60:17, 62:7, 62:17, 64:8, 68:24, 69:24, 70:5, 71:17, 71:19, 71:23, 75:21, 78:17, 84:3, 84:8, 84:24, 85:8, 85:11, 85:15, 85:24, 86:5, 86:6, 86:11, 86:13, 88:8, 88:13, 88:17, 88:22, 90:20, 91:17, 93:6, 93:9, 93:22, 96:6, 101:21, 103:24, 104:1, 104:3, 104:4, 104:14, 104:16, 104:19, 104:22, 105:1, 105:7, 105:9, 105:15, 105:22, 106:2, 106:11, 106:12, 106:25, 109:17, 109:21, 110:17, 110:18, 111:10, 115:12, 120:10, 121:9, 121:16, 121:17, 121:21, 121:23, 122:16, 123:4, 123:7, 123:19, 123:23, 126:4, 126:12, 126:15, 127:6, 127:20, 129:13, 129:20, 129:23, 130:3, 130:10, 132:1, 132:6, 133:22
**cases** [26] - 11:21, 15:22, 29:22, 29:24,

30:16, 31:12, 38:18, 47:3, 49:9, 65:1, 70:17, 71:1, 93:23, 94:18, 97:11, 101:13, 101:18, 101:20, 110:20, 110:23, 111:1, 111:7, 112:6, 122:3, 123:18, 126:10
**cast** [1] - 38:12
**catchall** [2] - 20:23, 23:22
**categories** [37] - 6:25, 8:17, 11:8, 22:12, 34:16, 38:4, 46:4, 46:6, 46:15, 53:4, 53:22, 53:24, 54:11, 54:23, 55:22, 56:16, 56:17, 57:15, 60:14, 62:11, 68:10, 68:13, 68:14, 72:15, 73:21, 73:23, 74:18, 75:4, 75:16, 75:22, 76:22, 127:16, 130:17, 134:17, 135:13, 136:9, 137:5
**category** [3] - 59:21, 131:4, 136:11
**causes** [1] - 113:10
**CC** [4] - 21:11, 32:24, 33:3, 36:14
**CDC** [3] - 91:20, 138:16, 138:21
**centralized** [1] - 31:8
**certain** [20] - 4:23, 19:19, 19:20, 19:23, 42:6, 65:1, 76:6, 84:19, 100:11, 102:2, 112:16, 122:17, 124:3, 129:8, 129:14, 131:24, 132:4, 135:13, 135:20
**certainly** [21] - 5:7, 6:13, 6:19, 6:23, 7:3, 8:25, 13:10, 13:22, 13:25, 19:15, 21:4, 43:19, 47:2, 49:19, 53:8, 80:16, 101:1, 107:13, 108:20, 110:2, 128:14
**certify** [1] - 139:15
**Ceuric** [1] - 112:7
**CFR** [1] - 124:9
**Chain** [1] - 64:6
**challenge** [2] - 65:24, 133:13
**chance** [1] - 17:25
**change** [19] - 24:18, 52:3, 52:14, 53:1,

53:4, 56:18, 57:16, 57:19, 67:1, 71:9, 72:18, 76:1, 76:2, 76:3, 102:21, 118:4, 130:15, 132:2
**changed** [4] - 61:8, 62:3, 89:23, 100:15
**changes** [1] - 130:24
**changing** [4] - 61:16, 63:15, 95:11, 100:17
**characteristics** [1] - 26:15
**characterize** [2] - 76:9, 117:8
**charge** [2] - 28:23, 88:7
**charged** [3] - 84:24, 88:23, 127:21
**Chavez** [2] - 104:8, 117:17
**check** [1] - 88:20
**checkbox** [1] - 72:22
**Cherryhomes** [3] - 36:16, 36:21, 37:5
**cherryhomes** [1] - 37:15
**chicken** [1] - 79:6
**Choate** [3] - 105:4, 114:16, 114:25
**choice** [2] - 88:13, 123:15
**chosen** [1] - 123:13
**Chuprinko** [2] - 103:20, 106:10
**Chuprinko's** [1] - 104:1
**CID** [1] - 116:8
**Circuit** [3] - 29:12, 47:10, 121:16
**circumstance** [2] - 78:4, 111:17
**circumstances** [12] - 26:6, 61:9, 64:3, 65:2, 76:12, 83:25, 88:5, 111:9, 111:12, 120:16, 120:17, 132:19
**citation** [1] - 47:12
**cite** [10] - 28:7, 29:6, 31:13, 31:20, 85:17, 120:10, 122:25, 123:25, 124:4, 126:14
**cited** [11] - 38:17, 76:11, 93:23, 101:20, 110:16, 110:20, 112:6, 121:25, 122:3, 126:15, 133:10
**Civil** [7] - 55:11,

104:17, 105:19, 106:15, 106:16, 106:17
**civil** [23] - 15:17, 24:2, 24:4, 28:12, 28:25, 29:4, 29:24, 29:25, 30:2, 38:18, 47:14, 74:6, 80:11, 82:6, 86:16, 86:17, 87:21, 103:10, 107:6, 110:19, 110:22, 113:13
**claim** [13] - 6:2, 15:13, 20:24, 29:9, 31:23, 31:24, 40:19, 40:23, 41:14, 48:15, 66:16, 67:3, 86:9
**Claims** [32] - 29:22, 30:16, 31:6, 31:12, 49:14, 50:19, 85:15, 102:10, 107:7, 107:10, 108:24, 109:6, 109:7, 114:23, 115:8, 115:11, 115:16, 115:23, 116:2, 116:8, 116:19, 117:5, 117:8, 117:16, 117:21, 118:1, 118:12, 118:15, 123:19, 132:5
**claims** [20] - 15:18, 24:3, 25:8, 25:12, 27:12, 27:20, 29:5, 29:8, 29:12, 31:16, 41:21, 42:13, 42:24, 81:23, 82:1, 102:11, 102:12, 117:21, 129:13
**clarification** [1] - 123:6
**clarify** [2] - 27:24, 55:9
**classic** [1] - 12:24
**classified** [1] - 124:14
**clause** [1] - 107:2
**clean** [1] - 53:20
**Clean** [2] - 50:24, 50:25
**clear** [17] - 4:11, 7:6, 19:10, 29:12, 42:25, 44:21, 65:6, 72:4, 73:9, 83:10, 84:14, 110:15, 121:16, 121:18, 122:2, 130:24, 136:2
**clearly** [1] - 36:16
**CLERK** [2] - 128:23, 128:25
**clients** [1] - 125:3

**close** [10] - 65:9, 65:12, 68:17, 72:7, 72:11, 74:17, 75:8, 75:18, 132:3
**closer** [1] - 67:25
**CMS** [5] - 96:18, 97:21, 119:24, 133:4, 133:7
**co** [1] - 3:3
**co-counsel** [1] - 3:3
**cocktails** [6] - 6:21, 13:10, 14:15, 14:24, 56:6, 56:7
**code** [3] - 37:10, 75:15, 76:21
**Code** [1] - 37:10
**codes** [1] - 37:11
**Codol** [1] - 43:22
**collect** [1] - 7:19
**collecting** [1] - 33:12
**colored** [1] - 43:22
**colossal** [4] - 16:23, 23:8, 37:3, 54:11
**columns** [1] - 11:6
**combination** [6] - 19:20, 26:3, 26:14, 26:18, 26:21, 60:24
**combinations** [6] - 6:21, 13:6, 13:24, 14:15, 22:21, 54:13
**coming** [7] - 10:19, 14:12, 97:21, 100:6, 100:7, 125:16, 137:14
**commensurate** [1] - 31:4
**commit** [1] - 135:20
**committed** [3] - 24:6, 66:7, 97:1
**common** [5] - 6:20, 13:6, 117:10, 117:18, 117:20
**communications** [1] - 136:7
**comparing** [1] - 10:17
**comparison** [3] - 10:2, 50:7, 70:5
**compel** [12] - 3:24, 4:8, 15:6, 18:3, 32:10, 45:17, 83:13, 99:6, 99:9, 99:25, 100:16, 129:6
**Complaint** [1] - 55:21
**complaint** [102] - 4:5, 4:22, 5:2, 5:10, 5:19, 6:16, 6:19, 6:20, 9:1, 9:3, 11:9, 12:18, 13:3, 13:10, 13:21, 13:23, 14:14, 15:19, 15:24, 15:25, 17:8,

17:16, 18:1, 18:18, 18:21, 18:24, 19:3, 19:22, 20:16, 20:19, 20:20, 20:25, 21:7, 21:24, 22:11, 24:7, 24:12, 31:18, 35:14, 35:17, 38:3, 38:22, 39:4, 39:7, 39:10, 39:12, 39:18, 39:23, 40:11, 41:10, 42:14, 43:6, 43:7, 43:8, 43:9, 44:2, 44:9, 44:17, 44:24, 45:15, 45:25, 46:5, 49:19, 50:24, 51:17, 51:23, 53:21, 55:18, 56:2, 56:5, 56:11, 56:21, 57:11, 58:6, 59:3, 59:13, 59:22, 67:8, 68:5, 68:10, 68:13, 68:25, 70:22, 71:1, 71:6, 71:20, 71:24, 73:24, 81:25, 87:16, 102:21, 105:6, 108:22, 108:23, 109:2, 115:22, 116:5, 116:9, 116:15, 117:2
**complaints** [1] - 28:9
**complete** [1] - 17:17
**completed** [1] - 49:7
**completely** [3] - 31:11, 38:5, 55:6
**complex** [2] - 37:5, 37:14
**compliance** [7] - 7:20, 25:13, 45:17, 58:8, 58:9, 65:8, 84:17
**complicated** [1] - 35:18
**complied** [1] - 130:13
**comply** [4] - 4:9, 51:5, 94:23, 99:12
**complying** [3] - 45:22, 57:4, 130:3
**component** [2] - 63:12, 109:6
**components** [2] - 102:2, 109:4
**comprehensive** [2] - 48:9, 77:8
**compromise** [5] - 42:25, 49:16, 59:11, 60:12, 93:18
**compromises** [2] - 66:23, 67:17
**conceded** [2] - 39:16, 81:25
**concept** [2] - 61:25, 83:9

**concern** [5] - 52:6, 57:20, 74:20, 127:17, 138:7
**concerned** [3] - 42:5, 84:7, 100:21
**concerning** [2] - 64:7, 68:23
**concerns** [2] - 52:7, 68:25
**condition** [1] - 78:3
**conduct** [4] - 15:20, 45:13, 93:1, 107:3
**conducted** [3] - 103:17, 114:17, 116:18
**conducting** [2] - 108:21, 109:1
**confer** [24] - 5:12, 9:5, 40:17, 41:19, 67:9, 91:9, 91:10, 93:17, 95:8, 95:10, 95:15, 96:2, 96:5, 96:23, 97:23, 98:12, 98:16, 119:7, 120:8, 125:2, 135:25, 138:3, 138:6
**conference** [1] - 137:15
**conferred** [1] - 89:23
**conferring** [1] - 138:2
**confidential** [1] - 133:8
**confirm** [1] - 118:24
**connection** [1] - 84:16
**Connolly** [2] - 32:12, 42:16
**conscious** [1] - 54:7
**consequences** [1] - 137:24
**consider** [6] - 20:12, 76:21, 77:17, 80:3, 136:13, 139:3
**considered** [8] - 80:5, 94:4, 95:1, 118:6, 130:18, 131:25, 132:10, 133:18
**consistent** [3] - 68:12, 74:23, 75:16
**consistently** [2] - 6:1, 40:6
**constantly** [2] - 9:18, 100:17
**constitute** [2] - 34:17, 64:15
**constituting** [1] - 131:10
**constitutional** [1] - 110:24
**constraining** [1] - 133:7
**Consumer** [7] - 3:13,

96:3, 96:4, 96:7, 103:22, 113:14, 115:19
**CONSUMER** [1] - 1:23
**contact** [4] - 92:21, 114:3, 116:23, 120:19
**contain** [2] - 121:11, 122:10
**contains** [1] - 130:12
**contemplate** [1] - 82:6
**contend** [1] - 48:5
**contends** [2] - 107:5, 107:8
**context** [7] - 11:22, 22:6, 39:24, 110:19, 110:24, 113:4, 122:19
**contexts** [3] - 11:22, 15:16, 124:3
**contingent** [1] - 122:24
**continually** [1] - 57:16
**continue** [7] - 53:10, 94:21, 95:13, 97:24, 98:2, 100:15, 132:24
**continued** [1] - 115:24
**CONTINUED** [1] - 2:1
**continues** [1] - 131:18
**contrary** [1] - 53:11
**contribute** [2] - 113:5, 118:5
**contributed** [1] - 101:15
**contribution** [1] - 117:9
**Control** [1] - 64:11
**Controlled** [11] - 4:7, 6:12, 16:25, 32:8, 83:12, 88:1, 88:21, 107:6, 115:12, 129:20, 131:16
**controlled** [50] - 4:14, 4:18, 4:20, 4:21, 4:25, 5:2, 5:4, 5:6, 5:9, 5:15, 6:9, 6:11, 6:15, 6:22, 7:7, 7:19, 12:20, 14:15, 14:22, 15:1, 16:22, 18:6, 18:7, 18:9, 18:10, 19:5, 19:11, 19:13, 20:9, 30:14, 37:1, 37:12, 41:6, 50:6, 50:7, 50:15, 58:18, 63:21, 63:24, 64:20, 66:20, 107:4, 129:7, 129:8, 129:14, 129:16, 129:19, 129:21
**conversation** [1] -

87:10
**conversations** [1] - 103:8
**convinced** [2] - 132:8, 133:12
**cooperated** [1] - 89:15
**cooperative** [1] - 138:5
**coordination** [3] - 116:2, 126:2, 126:24
**copies** [3] - 34:10, 53:20, 114:22
**copy** [1] - 32:18
**corporate** [1] - 39:21
**correct** [7] - 26:23, 55:10, 55:16, 84:11, 97:19, 119:1, 119:2
**correspondence** [4] - 7:22, 7:25, 10:15, 14:25
**counsel** [12] - 3:3, 84:4, 85:9, 85:25, 86:16, 87:20, 104:14, 104:19, 105:14, 106:2, 130:21, 136:15
**Counsel** [3] - 1:25, 2:9, 105:18
**count** [3] - 28:24, 29:5, 86:11
**counterfactual** [1] - 17:14
**counterproductive** [1] - 38:6
**country** [3] - 35:24, 39:13, 129:17
**counts** [3] - 28:25, 29:5, 29:8
**couple** [19] - 14:1, 16:19, 17:5, 18:4, 25:22, 27:19, 28:6, 31:14, 33:7, 38:13, 42:15, 54:5, 69:15, 83:9, 84:11, 92:18, 92:19, 103:14, 118:17
**course** [14] - 14:20, 17:6, 17:11, 30:9, 43:25, 45:8, 54:8, 93:10, 110:12, 110:14, 114:17, 114:19, 115:8, 116:18
**COURT** [197] - 1:1, 2:15, 2:24, 3:9, 3:16, 4:17, 5:11, 6:5, 6:10, 7:6, 7:12, 8:23, 10:5, 10:23, 11:12, 12:11, 12:15, 13:2, 13:8, 13:20, 14:8, 14:17,

15:3, 15:7, 15:21, 16:11, 16:15, 18:14, 19:1, 19:12, 19:24, 20:4, 20:13, 20:18, 21:1, 22:4, 22:13, 22:17, 23:10, 23:14, 24:16, 25:6, 27:22, 32:14, 32:20, 34:18, 34:22, 35:1, 35:6, 38:8, 40:1, 41:2, 41:22, 42:3, 42:18, 43:1, 43:15, 43:21, 44:18, 44:25, 48:2, 48:18, 48:24, 49:1, 50:2, 50:11, 51:12, 51:18, 51:21, 51:24, 52:6, 52:25, 55:14, 55:24, 56:6, 56:9, 56:25, 57:12, 58:4, 58:14, 58:25, 59:8, 59:19, 60:3, 60:14, 61:23, 62:8, 62:23, 65:6, 65:16, 65:19, 65:25, 66:12, 66:18, 67:12, 67:24, 68:15, 68:19, 68:23, 69:12, 69:21, 70:14, 70:19, 71:14, 71:21, 72:2, 72:25, 73:5, 73:20, 73:25, 74:16, 75:5, 75:18, 75:25, 76:5, 76:23, 77:2, 77:18, 78:7, 78:19, 78:25, 79:8, 79:15, 79:23, 80:7, 80:13, 80:18, 81:7, 81:18, 82:8, 83:2, 83:7, 83:17, 84:9, 85:22, 86:24, 88:11, 88:24, 89:3, 89:17, 90:15, 90:21, 92:23, 94:7, 94:11, 97:7, 97:16, 97:20, 99:2, 99:11, 99:25, 100:19, 102:17, 107:19, 107:23, 107:25, 112:21, 113:1, 113:6, 113:16, 113:19, 113:25, 115:10, 118:20, 118:23, 119:3, 119:9, 119:13, 119:17, 121:18, 121:25, 122:5, 122:12, 123:5, 124:19, 125:8, 125:12, 125:14, 125:23, 128:18, 128:23, 128:25, 129:1, 134:10, 134:14, 134:23, 135:8,

135:15, 135:21, 136:10, 136:24, 137:11, 137:22, 138:11, 138:22, 139:7, 139:11
**court** [8] - 24:13, 24:15, 29:10, 38:25, 39:3, 83:15, 124:2, 124:6
**Court** [37] - 1:13, 4:1, 4:7, 4:8, 16:20, 17:4, 21:16, 24:15, 24:25, 25:5, 33:16, 35:3, 35:23, 37:19, 40:5, 40:22, 45:18, 52:9, 58:1, 60:6, 60:12, 63:18, 65:23, 66:8, 66:15, 81:22, 89:7, 90:1, 95:6, 95:25, 96:10, 96:16, 98:9, 124:16, 139:13, 139:17, 139:18
**Court's** [6] - 11:3, 28:1, 51:5, 53:16, 55:12, 122:14
**courts** [9] - 15:17, 38:16, 38:20, 50:22, 63:24, 88:3, 110:16, 111:2, 124:13
**cover** [1] - 80:25
**crazy** [1] - 84:20
**created** [1] - 127:2
**creation** [1] - 88:10
**credible** [3] - 102:4, 126:1, 128:8
**crime** [1] - 127:21
**crimes** [1] - 38:19
**Criminal** [1] - 104:9
**criminal** [8] - 30:1, 49:12, 50:25, 64:8, 103:10, 110:24, 114:18, 114:19
**criteria** [11] - 19:16, 19:17, 25:19, 52:4, 53:4, 53:9, 56:8, 56:20, 63:13, 63:25
**criticizing** [1] - 87:20
**Crown** [1] - 31:21
**CSA** [32] - 10:22, 23:8, 24:14, 24:22, 28:8, 29:19, 29:24, 30:1, 49:11, 50:19, 55:6, 60:9, 64:13, 71:1, 83:16, 86:11, 86:19, 87:24, 102:11, 102:12, 102:16, 102:21, 107:9, 108:23, 109:1, 109:11, 116:2, 117:25, 126:2,

132:6, 134:21, 136:6
**cured** [1] - 120:11
**curious** [2] - 9:4, 57:1
**current** [4] - 82:24, 103:4, 103:9, 124:8
**curve** [2] - 9:12, 74:9
**cuss** [1] - 85:4
**custodial** [1] - 40:9
**custodian** [4] - 85:4, 85:5, 99:20, 138:20
**custodians** [5] - 82:14, 83:5, 83:6, 85:3, 138:15
**customer** [1] - 61:6

**D**

**D.I** [3] - 130:5, 131:1, 131:22
**Dale** [1] - 139:17
**data** [97] - 3:25, 4:11, 4:12, 4:13, 5:3, 7:17, 7:20, 8:3, 8:5, 8:8, 8:13, 8:18, 9:16, 10:12, 10:25, 11:6, 11:7, 11:14, 11:18, 11:20, 11:23, 11:25, 12:1, 12:4, 12:9, 23:5, 23:7, 23:16, 25:4, 25:12, 25:18, 27:3, 27:11, 27:14, 33:12, 33:14, 33:20, 34:19, 34:25, 35:3, 35:8, 35:15, 35:24, 36:2, 36:18, 36:19, 36:22, 37:4, 37:6, 37:7, 37:16, 40:8, 41:16, 44:4, 44:23, 45:4, 45:10, 45:11, 45:19, 46:2, 46:14, 46:16, 47:5, 48:10, 50:5, 50:7, 50:10, 53:8, 66:8, 66:9, 68:5, 68:6, 68:21, 69:16, 70:18, 72:11, 72:14, 74:8, 75:21, 76:15, 77:12, 77:14, 77:16, 80:5, 80:6, 80:12, 80:25, 81:16, 85:4, 85:5, 87:1, 87:13, 87:18, 129:5, 129:7
**databases** [1] - 34:10
**dataset** [3] - 45:7, 74:25, 75:1
**date** [7] - 4:24, 5:20, 8:19, 58:12, 82:12, 84:19, 84:21
**dated** [1] - 64:4
**dates** [1] - 137:15

**Dave** [1] - 3:3
**David** [2] - 36:15, 105:25
**DAY** [1] - 2:5
**day-to-day** [1] - 10:20
**days** [11] - 14:22, 54:3, 54:24, 69:9, 75:3, 92:18, 99:20, 99:21, 99:22, 121:5, 135:6
**days'** [1] - 54:16
**DD** [2] - 32:18, 36:14
**DEA** [20] - 63:20, 64:5, 64:11, 64:12, 64:13, 64:14, 64:17, 76:11, 82:15, 88:3, 102:2, 104:21, 105:8, 105:18, 108:25, 109:16, 125:5, 125:19, 136:22, 138:20
**dead** [1] - 89:17
**deadline** [3] - 92:18, 111:13, 125:3
**deadlines** [1] - 125:4
**deal** [5] - 88:10, 96:5, 101:4, 101:5, 119:7
**decade** [2] - 4:18, 129:18
**December** [8] - 36:23, 92:24, 93:14, 94:1, 107:22, 108:9, 115:22, 132:17
**decent** [1] - 57:4
**decide** [3] - 27:23, 41:4, 123:11
**decided** [2] - 48:3, 102:20
**decides** [1] - 123:17
**deciding** [2] - 41:10, 66:23
**decision** [8] - 47:9, 80:20, 83:13, 94:7, 95:17, 132:2, 135:1, 137:8
**deck** [2] - 60:21, 83:14
**declaration** [4] - 22:2, 36:15, 37:20, 40:25
**declare** [1] - 86:22
**declined** [2] - 7:24, 115:25
**deem** [3] - 99:11, 128:15, 132:11
**defend** [5] - 44:10, 46:10, 46:17, 47:1, 75:24
**defendant** [5] - 24:6, 28:22, 31:23, 47:17, 47:21
**Defendant's** [1] - 15:8

**Defendants** [2] - 1:7, 2:9
**Defendants'** [6] - 48:19, 67:15, 130:5, 130:6, 131:3, 131:21
**defending** [2] - 22:24, 75:21
**Defense** [6] - 92:19, 97:3, 104:9, 104:10, 107:12, 123:20
**defense** [1] - 61:22
**Defense's** [1] - 121:11
**define** [1] - 101:22
**defined** [2] - 22:22
**definitely** [3] - 20:12, 35:15, 44:16
**definition** [13] - 89:8, 89:14, 90:4, 91:21, 95:20, 98:21, 101:24, 102:3, 110:1, 112:17, 112:25, 126:18, 128:14
**definitive** [2] - 63:25, 122:22
**definitively** [2] - 67:3, 136:8
**DELAWARE** [1] - 1:1
**Delaware** [7] - 1:11, 7:21, 8:4, 8:6, 27:4, 50:8, 50:17
**demands** [1] - 82:23
**denoted** [1] - 76:18
**deny** [4] - 32:9, 106:22, 129:6, 130:6
**denying** [2] - 83:21, 116:1
**DEPARTMENT** [2] - 1:20, 1:23
**Department** [6] - 92:19, 97:3, 104:10, 107:12, 121:11, 123:20
**deposition** [4] - 33:6, 36:6, 82:2, 84:5
**depositions** [2] - 82:4, 84:9
**derive** [1] - 53:25
**describe** [2] - 78:20, 78:22
**described** [9] - 6:18, 11:9, 60:25, 68:10, 68:13, 73:23, 75:9, 78:21, 80:21
**description** [1] - 73:16
**descriptions** [2] - 9:7, 79:23
**designed** [1] - 109:22
**desk** [1] - 10:19
**desperately** [1] -

85:12
**determination** [2] - 135:6, 136:18
**determine** [2] - 10:20, 78:5
**determined** [1] - 23:4
**devolve** [1] - 83:19
**DI** [2] - 8:5, 129:5
**diagnosis** [3] - 61:6, 76:17, 77:12
**die** [1] - 42:21
**difference** [4] - 29:6, 29:7, 74:3, 124:6
**different** [35] - 5:22, 7:18, 13:13, 15:16, 18:6, 31:7, 32:8, 35:17, 37:11, 39:2, 39:13, 39:14, 39:19, 39:22, 42:17, 49:11, 54:11, 54:13, 54:20, 54:23, 68:15, 68:16, 69:3, 70:2, 73:12, 79:10, 91:8, 96:14, 99:18, 109:4, 113:10, 113:11, 123:21, 125:17
**differently** [4] - 8:25, 14:18, 88:14, 110:10
**difficult** [2] - 49:22, 93:24
**direct** [1] - 53:16
**directed** [2] - 43:11, 69:13
**directly** [2] - 4:21, 24:13
**disagree** [5] - 10:8, 19:16, 19:21, 57:13, 111:6
**disagrees** [2] - 38:14, 90:11
**discern** [1] - 132:20
**disclaimed** [1] - 34:4
**disclose** [3] - 79:3, 79:15, 137:2
**disclosed** [6] - 20:8, 55:20, 68:7, 115:15, 116:17, 117:15
**disclosure** [4] - 124:8, 124:11, 124:15, 133:10
**discount** [1] - 3:12
**discovery** [125] - 3:11, 3:17, 3:20, 4:3, 15:18, 17:3, 20:17, 21:2, 21:5, 21:23, 22:3, 22:25, 23:25, 24:2, 24:4, 24:10, 27:24, 31:4, 31:16, 32:3, 32:10, 38:1, 38:21, 39:23, 40:6,

40:7, 44:5, 44:6, 44:9, 44:16, 44:17, 46:1, 48:4, 48:6, 48:17, 49:21, 50:23, 51:6, 51:10, 52:5, 52:7, 52:16, 52:21, 52:22, 53:5, 53:12, 55:12, 56:18, 56:23, 57:17, 57:21, 57:25, 58:14, 58:21, 59:5, 59:8, 59:18, 60:1, 60:4, 61:12, 62:5, 62:6, 65:5, 65:23, 66:10, 67:6, 68:4, 68:16, 69:21, 70:22, 70:23, 70:24, 71:21, 72:1, 72:3, 72:8, 72:9, 75:7, 75:19, 76:3, 79:16, 80:20, 81:22, 82:8, 82:20, 82:24, 85:18, 89:9, 89:10, 92:4, 93:2, 99:15, 99:19, 99:20, 100:24, 103:3, 104:7, 105:8, 106:5, 107:14, 107:21, 109:23, 109:25, 110:19, 118:19, 122:18, 126:17, 127:3, 127:9, 129:3, 129:16, 130:2, 130:20, 131:14, 131:17, 131:18, 131:20, 133:23, 135:9, 136:18, 136:25, 137:13, 137:24
**discrete** [1] - 118:2
**discretion** [1] - 100:25
**discuss** [2] - 36:3, 134:7
**discussed** [2] - 13:15, 97:24
**discussing** [2] - 7:5, 63:12
**discussion** [7] - 5:8, 14:10, 40:18, 54:5, 58:19, 67:17, 87:7
**discussions** [4] - 5:11, 33:2, 61:4, 66:23
**dispatch** [2] - 124:25, 125:7, 134:2
**dispensed** [1] - 4:18
**dispensing** [15] - 3:25, 4:10, 4:12, 4:13, 5:3, 6:11, 7:19, 25:12, 33:20, 34:25, 35:15, 36:18, 63:21, 107:4, 129:7

**dispersed** [1] - 39:20
**disproportional** [1] - 37:24
**disprove** [1] - 79:5
**dispute** [20] - 3:18, 16:2, 16:3, 27:24, 41:4, 41:8, 42:6, 65:7, 66:18, 66:22, 67:13, 67:14, 67:20, 68:1, 72:6, 73:6, 87:9, 95:25, 112:22, 136:25
**disputes** [7] - 60:4, 98:9, 128:22, 134:5, 137:13, 137:24, 138:10
**distinct** [1] - 36:25
**distinction** [2] - 39:25, 50:19
**distinguish** [1] - 30:16
**distinguishable** [1] - 49:15
**distribution** [1] - 107:4
**district** [4] - 82:21, 83:15, 88:3, 111:10
**DISTRICT** [2] - 1:1, 1:1
**District** [6] - 1:13, 38:11, 83:20, 104:18, 105:14, 106:2, 120:10, 139:18
**Diversion** [2] - 64:11, 104:20
**divine** [1] - 135:23
**Division** [1] - 64:11
**docket** [1] - 51:4
**doctor** [14] - 28:16, 30:12, 30:21, 34:6, 56:15, 61:10, 62:19, 63:9, 84:20, 85:16, 88:22, 114:18, 114:20, 114:25
**doctor's** [1] - 115:2
**doctors** [18] - 17:8, 23:5, 25:13, 27:6, 27:17, 28:13, 30:3, 44:12, 49:4, 57:17, 58:8, 58:10, 61:13, 84:18, 84:25, 86:3, 88:9, 108:4
**document** [12] - 25:2, 36:6, 75:13, 84:12, 89:8, 96:20, 97:1, 97:2, 97:14, 120:25, 121:6, 121:9
**Document** [1] - 134:12
**documents** [23] - 40:8, 46:8, 73:16,

82:13, 82:19, 82:22, 84:14, 91:3, 91:6, 92:3, 96:12, 96:13, 96:24, 98:6, 98:23, 99:22, 123:12, 127:12, 127:14, 127:17, 128:2, 128:17

**DoD** [42] - 89:19, 97:16, 99:17, 101:12, 102:8, 103:13, 103:23, 104:15, 105:12, 105:17, 105:22, 105:25, 110:3, 110:7, 110:9, 110:13, 110:18, 110:21, 111:1, 111:5, 111:19, 113:3, 114:9, 117:14, 119:1, 119:22, 120:14, 122:6, 123:8, 123:22, 124:11, 125:5, 125:16, 127:5, 128:10, 128:15, 132:4, 132:15, 133:19, 138:21

**DOD's** [7] - 93:1, 111:3, 123:25, 124:4, 124:6, 124:8, 124:10

**DOJ** [8] - 93:15, 96:5, 97:8, 102:2, 105:19, 117:6, 138:21, 138:24

**don'ts'** [1] - 63:23

**done** [8] - 37:17, 70:17, 85:2, 88:12, 88:14, 98:19, 109:18, 130:11

**dosage** [2] - 9:13, 26:14

**dosages** [1] - 8:17

**dose** [3] - 61:7, 77:22, 77:23

**doses** [2] - 19:4, 20:20

**doubling** [1] - 71:17

**doubt** [2] - 28:19, 49:8

**down** [13] - 29:20, 32:14, 36:3, 36:25, 57:20, 58:9, 63:6, 64:22, 87:10, 98:19, 104:11, 114:1, 114:18

**draft** [1] - 137:14

**dragging** [1] - 32:3

**drawing** [1] - 56:22

**drop** [5] - 90:16, 91:2,

119:15, 122:8, 122:23

**dropped** [3] - 51:24, 51:25, 119:5

**dropping** [2] - 90:21, 122:25

**drug** [1] - 37:9

**Drug** [2] - 37:10, 64:6

**drugs** [9] - 6:17, 6:18, 14:1, 26:14, 26:19, 26:21, 54:3, 60:24, 107:5

**due** [2] - 96:1, 100:6

**duration** [1] - 64:19

**during** [8] - 5:12, 17:6, 48:4, 52:21, 65:4, 66:9, 102:25, 119:6

## E

**early** [6] - 22:22, 40:20, 56:7, 93:14, 94:1, 132:17

**easier** [3] - 5:6, 32:19, 53:18

**Easterbrook** [2] - 47:9, 47:20

**Easterbrook's** [1] - 49:14

**easy** [3] - 56:21, 128:1, 136:19

**eeked** [1] - 84:25

**effective** [1] - 30:6

**effectively** [7] - 4:4, 71:17, 74:20, 97:11, 112:2, 112:5, 123:20

**efficient** [1] - 12:10

**effort** [3] - 57:4, 101:22, 101:24

**egg** [1] - 79:6

**egregious** [1] - 93:2

**eight** [9] - 37:11, 53:6, 54:3, 54:16, 54:24, 56:19, 69:9, 75:3, 105:2

**eighteen** [2] - 58:10, 84:18

**either** [2] - 130:16, 132:13

**ELEANOR** [1] - 1:13

**elect** [1] - 74:7

**elected** [3] - 45:25, 84:3, 88:7

**electronic** [3] - 4:10, 4:11, 34:10

**element** [1] - 30:19

**eleven** [2] - 12:12, 129:18

**elicit** [2] - 47:5, 61:22

**ELIZABETH** [1] - 1:18

**Elizabeth** [1] - 2:19

**emphasis** [1] - 82:7

**emphasize** [2] - 46:18, 120:22

**empirical** [1] - 47:8

**employee** [1] - 103:9

**employees** [1] - 132:4

**encompass** [1] - 130:1

**encouraged** [1] - 87:8

**end** [4] - 54:25, 63:8, 90:11, 132:18

**endeavor** [1] - 37:14

**ends** [1] - 72:3

**enforcement** [1] - 121:8

**engage** [14] - 24:4, 43:16, 44:1, 91:5, 98:6, 98:10, 98:24, 98:25, 101:1, 111:25, 112:11, 124:22, 124:24, 126:17

**engaged** [4] - 92:14, 94:14, 97:14, 102:5

**engagement** [1] - 36:10

**engaging** [3] - 43:24, 94:16, 105:8

**enhance** [1] - 12:23

**enormous** [2] - 34:1, 36:22

**enormously** [5] - 35:18, 35:23, 36:11, 37:14, 37:21

**entered** [1] - 106:23

**entertain** [1] - 41:23

**entertained** [1] - 42:1

**entire** [2] - 39:13, 62:7

**entirely** [1] - 53:12

**entirety** [2] - 24:6, 64:3

**entitled** [2] - 67:5, 67:6

**entry** [1] - 51:4

**enumerated** [8] - 5:19, 15:18, 15:19, 38:22, 40:10, 41:21, 81:24, 138:14

**envisioned** [1] - 78:12

**epilepsy** [1] - 18:8

**equal** [1] - 88:1

**equivalent** [2] - 13:9, 64:14

**erasing** [1] - 38:3

**especially** [2] - 54:19, 83:9

**ESQ** [10] - 1:18, 1:20, 1:21, 1:24, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8

**essentially** [5] - 38:3, 39:4, 45:21, 131:11, 131:23

**establish** [3] - 10:6, 53:8, 80:12

**established** [1] - 46:7

**establishing** [1] - 10:4

**estimates** [1] - 37:15

**et** [1] - 1:6

**evaluated** [2] - 29:4, 64:2

**event** [1] - 133:15

**evidence** [13] - 45:16, 47:5, 47:6, 47:8, 47:23, 47:25, 48:1, 48:13, 74:15, 78:17, 82:5, 123:1, 123:2

**exact** [2] - 49:12, 69:25

**exactly** [5] - 16:20, 91:18, 92:25, 102:18, 111:15

**example** [10] - 6:5, 8:17, 9:10, 26:3, 53:13, 60:23, 77:20, 116:7, 124:5, 133:5

**examples** [6] - 11:4, 20:22, 25:20, 38:17, 39:5, 39:15

**excel** [5] - 49:17, 51:14, 85:20, 87:17, 130:12

**excels** [1] - 35:4

**except** [3] - 97:16, 98:20, 122:6

**exception** [8] - 29:13, 60:15, 77:24, 79:5, 80:8, 87:4, 135:15, 137:4

**exceptional** [1] - 111:17

**exceptions** [22] - 60:17, 61:11, 61:20, 62:4, 62:9, 62:21, 62:23, 74:19, 76:6, 76:9, 77:3, 77:4, 77:19, 79:24, 80:19, 81:9, 86:14, 131:8, 134:13, 135:23, 137:2

**excess** [1] - 82:12

**exchange** [2] - 86:20, 88:4

**exclude** [1] - 78:13, 123:13

**excused** [2] - 111:8

**executive** [1] - 126:20

**exemplary** [1] - 47:24

**exhaustive** [1] - 63:22

**Exhibit** [10] - 17:24,

20:3, 21:11, 32:18, 33:3, 36:14, 53:14, 103:7, 103:12

**exist** [6] - 72:21, 73:15, 80:12, 132:19, 134:15, 137:2

**exists** [1] - 136:11

**expand** [2] - 39:8, 68:24

**expanding** [1] - 44:13

**expect** [2] - 52:12, 68:17

**expedited** [1] - 100:13

**expedition** [2] - 24:4, 129:24

**expense** [1] - 40:8

**expert** [16] - 12:8, 48:1, 52:5, 52:6, 52:16, 53:12, 55:11, 55:15, 56:23, 62:6, 78:8, 79:10, 79:11, 85:10, 86:7, 136:18

**experts** [10] - 12:1, 12:5, 12:24, 13:15, 13:17, 14:10, 52:4, 57:19, 75:11, 79:22

**expired** [1] - 54:3

**explain** [4] - 7:11, 8:2, 64:24, 133:6

**explained** [2] - 37:7, 37:21

**explains** [1] - 37:5

**explanation** [2] - 94:19, 111:12

**explicitly** [1] - 81:24

**explore** [1] - 80:23

**expressed** [3] - 34:2, 74:20, 98:2

**expressly** [1] - 124:9

**extended** [1] - 45:13

**extent** [3] - 46:12, 107:11, 110:5

**extraordinarily** [1] - 34:8

**extremely** [2] - 9:14, 71:11

## F

**F.3d** [1] - 47:12

**face** [3] - 26:5, 120:18, 120:23

**facially** [1] - 26:21

**facilities** [1] - 27:16

**fact** [25] - 22:25, 30:17, 31:7, 32:3, 47:7, 48:4, 48:6, 51:6, 52:21, 53:5, 56:18, 63:13, 65:4,

66:10, 79:15, 80:19, 81:22, 86:10, 91:12, 102:20, 104:5, 118:4, 131:17, 131:20, 132:3

**factfinder** [3] - 47:25, 70:11, 74:6

**factors** [3] - 64:25, 76:10, 129:11

**facts** [7] - 15:24, 29:10, 61:9, 76:20, 88:5, 113:10, 125:16

**factual** [2] - 45:13, 45:24

**failure** [2] - 124:22, 128:7

**fair** [11] - 14:13, 31:24, 39:11, 42:18, 44:5, 46:10, 80:7, 80:10, 97:9, 106:14, 122:3

**fairly** [8] - 20:8, 55:20, 77:8, 81:10, 100:13, 135:8, 136:14, 136:19

**faith** [2] - 49:8, 120:18

**fall** [10] - 11:8, 24:21, 45:6, 46:3, 56:12, 57:14, 69:20, 90:13, 107:22, 111:3

**Fallon** [2] - 111:10, 111:16

**falls** [3] - 8:25, 15:20, 65:20

**False** [32] - 29:22, 30:16, 31:6, 31:12, 49:14, 50:18, 50:19, 85:14, 102:10, 107:7, 107:10, 108:24, 109:6, 109:7, 114:23, 115:8, 115:11, 115:16, 115:22, 115:23, 116:2, 116:8, 116:19, 117:5, 117:7, 117:16, 117:20, 118:1, 118:12, 118:15, 123:19, 132:5

**false** [1] - 31:8

**familiar** [1] - 54:2

**Family** [1] - 129:22

**far** [12] - 16:7, 43:5, 43:9, 45:8, 49:18, 51:16, 68:24, 75:9, 82:9, 84:15, 101:18, 103:23

**FARNAN** [26] - 2:3, 3:1, 89:1, 89:4, 89:19, 90:18, 90:23,

92:25, 94:9, 94:14, 97:9, 97:19, 98:1, 99:8, 99:14, 100:3, 100:24, 102:18, 107:21, 107:24, 108:1, 125:15, 125:24, 137:12, 138:5, 138:14

**Farnan** [4] - 2:25, 3:2, 113:7, 113:21

**fashion** [2] - 12:2, 12:9

**fault** [1] - 108:20

**favor** [1] - 124:10

**favors** [1] - 124:11

**FBI** [24] - 91:14, 92:17, 92:18, 97:2, 97:8, 110:18, 111:4, 111:19, 119:22, 120:14, 120:23, 120:24, 120:25, 121:3, 121:5, 121:6, 125:5, 127:10, 127:11, 127:19, 128:1, 128:7, 132:15

**FCA** [1] - 32:7

**FDA** [9] - 91:20, 102:16, 102:19, 109:11, 109:13, 109:21, 126:2, 126:5, 138:16

**FDA/CSA** [1] - 108:12

**February** [4] - 33:10, 98:4, 105:12, 105:24

**Federal** [6] - 55:10, 63:21, 95:7, 96:2, 123:10, 123:16

**federal** [10] - 27:5, 27:6, 27:16, 27:17, 64:13, 64:16, 89:7, 93:15, 124:13, 133:10

**few** [2] - 4:23, 33:4

**fewer** [1] - 51:19

**field** [9] - 5:23, 13:17, 17:17, 21:10, 73:15, 77:12, 77:14, 77:16, 78:24

**fields** [43] - 4:13, 11:6, 11:23, 11:25, 17:10, 18:12, 21:6, 21:8, 21:9, 21:13, 21:15, 21:25, 22:1, 33:14, 33:17, 33:23, 36:2, 36:4, 40:18, 72:19, 72:20, 72:24, 73:10, 73:18, 76:15, 77:8, 79:1, 79:2, 79:4, 79:11, 79:19, 79:20, 79:21, 80:25, 87:2,

87:6, 87:7, 87:8, 87:12

**fifteen** [2] - 39:13, 118:11

**fifth** [1] - 107:1

**fifty** [1] - 50:9

**fight** [2] - 60:15, 80:24

**fighting** [1] - 57:2

**figure** [5] - 14:8, 53:7, 60:16, 62:13, 72:5

**figured** [1] - 58:11

**filed** [20] - 3:18, 7:22, 31:18, 32:21, 48:20, 59:3, 59:22, 89:25, 90:24, 96:15, 98:5, 105:1, 105:6, 106:13, 115:21, 116:5, 116:9, 117:2, 126:4, 137:18

**files** [3] - 24:1, 61:13, 84:15

**filing** [9] - 13:20, 13:23, 17:7, 24:7, 45:8, 45:15, 50:16, 82:23, 105:21

**fill** [11] - 25:20, 27:5, 54:7, 54:9, 56:15, 62:19, 70:8, 74:5, 129:17, 129:18, 136:6

**filled** [14] - 4:15, 8:6, 8:11, 14:22, 15:2, 16:1, 20:9, 21:21, 24:17, 27:16, 30:24, 54:15, 115:1, 129:14

**filling** [11] - 8:21, 9:19, 9:25, 10:8, 27:8, 50:10, 58:16, 102:6, 102:18, 127:25

**fills** [13] - 8:14, 8:24, 10:6, 11:4, 19:5, 19:6, 27:2, 30:8, 36:20, 54:2, 58:18, 66:20, 129:22

**final** [11] - 52:8, 52:25, 53:1, 68:17, 72:8, 74:25, 75:8, 75:18, 77:11, 105:24, 130:14

**finality** [1] - 52:21

**finally** [4] - 52:15, 94:19, 107:1, 133:25

**findable** [1] - 15:25

**findings** [1] - 47:14

**fine** [5] - 20:18, 65:22, 87:11, 108:18, 113:1

**FINGER** [1] - 2:3

**Finger** [1] - 3:2

**finite** [1] - 88:20

**firm** [1] - 125:3

**first** [33] - 2:17, 3:7, 3:20, 4:9, 22:6, 27:20, 28:7, 33:7, 33:19, 38:9, 48:19, 51:3, 51:4, 51:16, 55:17, 61:25, 66:2, 68:1, 69:13, 78:1, 81:20, 87:25, 89:14, 103:19, 103:21, 107:1, 108:22, 109:9, 110:7, 114:13, 114:15, 118:9, 130:5

**fishing** [2] - 24:4, 129:24

**fit** [1] - 59:3

**five** [8] - 36:20, 80:22, 87:12, 114:6, 117:14, 122:7, 122:10, 138:15

**Flag** [41] - 9:1, 9:6, 9:22, 19:3, 19:23, 22:8, 25:14, 25:24, 26:1, 43:4, 43:8, 46:4, 51:14, 53:9, 54:5, 56:14, 60:14, 61:13, 62:11, 65:20, 69:18, 72:14, 72:23, 73:1, 73:21, 73:22, 74:4, 74:18, 76:19, 78:2, 78:15, 83:11, 83:16, 83:24, 88:1, 130:17, 131:3, 131:8, 136:11, 137:4

**Flag"** [1] - 10:9, 57:3, 77:25

**flags** [34] - 19:10, 19:13, 20:7, 20:20, 22:11, 22:15, 22:21, 23:4, 25:20, 34:6, 35:12, 38:4, 46:12, 49:18, 53:5, 53:22, 55:5, 55:18, 55:23, 57:1, 57:6, 59:1, 59:4, 61:1, 64:24, 73:21, 76:6, 76:9, 78:15, 80:9, 83:10, 83:15, 83:22

**flesh** [2] - 46:3, 80:25

**Florida** [3] - 104:18, 105:14, 106:2

**focus** [6] - 33:7, 54:14, 70:10, 74:13, 78:17

**focused** [3] - 6:1, 39:3, 132:5

**folks** [2] - 114:9, 126:5

**follow** [6] - 24:15, 26:8, 93:19, 97:13

**follow-up** [1] - 26:8

**followed** [2] - 26:20, 109:15

**foolproof** [1] - 63:23

**footnote** [2] - 121:19, 124:2

**FOR** [1] - 1:1

**foregoing** [1] - 139:15

**foreign** [1] - 124:13

**form** [6] - 68:17, 68:18, 68:19, 76:24, 121:15, 123:13

**formal** [3] - 63:20, 67:21, 67:25

**formally** [1] - 16:4

**former** [12] - 103:5, 103:9, 103:17, 105:3, 105:9, 105:13, 106:10, 106:13, 114:20, 115:1, 126:23, 127:6

**formula** [2] - 47:22, 86:21

**forth** [2] - 35:16, 46:22

**forthcoming** [1] - 136:25

**forty** [5] - 87:12, 96:19, 96:21, 98:12, 98:13

**forty-five** [1] - 87:12

**forward** [14] - 16:9, 40:21, 40:23, 45:15, 46:1, 48:17, 56:20, 58:2, 67:11, 96:7, 117:13, 123:3, 124:21, 136:24

**foundational** [1] - 30:17

**four** [24] - 7:18, 17:7, 18:24, 23:3, 37:25, 42:24, 46:4, 53:21, 54:11, 55:18, 55:22, 55:25, 56:1, 56:2, 56:4, 57:14, 68:10, 73:23, 75:22, 92:9, 98:19, 100:14, 115:14, 117:6

**four-year** [3] - 17:7, 37:25, 42:24

**fourteen** [1] - 99:21

**frame** [1] - 54:19

**frankly** [2] - 23:9, 36:9

**fraud** [3] - 38:18, 50:20, 128:4

**Fraud** [9] - 105:19, 106:15, 106:16, 106:17, 116:10, 116:18, 116:21, 117:1

**fraud-based** [1] - 38:18

**fraudulent** [1] - 85:14
**Fraund** [1] - 106:9
**Friday** [2] - 1:8, 137:21
**front** [19] - 23:1, 41:5, 41:8, 41:11, 42:10, 63:8, 66:19, 66:22, 67:13, 67:20, 72:6, 85:6, 99:6, 99:7, 100:4, 100:9, 115:13, 134:5, 137:20
**fruit** [1] - 85:1
**full** [5] - 8:14, 8:20, 45:17, 70:12, 70:13
**fully** [1] - 4:9
**fulsome** [6] - 18:2, 21:5, 32:10, 44:16, 81:15, 97:10
**fulsomely** [1] - 132:25
**functioning** [1] - 32:9
**fundamentally** [3] - 39:22, 52:1, 52:23

## G

**game** [1] - 44:5
**gather** [1] - 33:25
**gathered** [1] - 84:15
**general** [3] - 64:16, 112:9, 124:7
**General's** [1] - 117:19
**generally** [2] - 9:25, 124:11
**generate** [3] - 36:19, 45:4, 70:18
**generic** [1] - 13:9
**gently** [1] - 55:16
**geographic** [1] - 39:14
**geographically** [1] - 39:20
**given** [17] - 21:19, 43:4, 59:14, 60:11, 97:21, 98:18, 101:16, 104:6, 107:11, 110:2, 110:22, 110:23, 110:25, 111:14, 111:16, 112:14, 127:3
**governed** [1] - 92:5
**government** [112] - 2:17, 2:19, 3:18, 4:1, 10:24, 16:24, 17:2, 17:9, 17:22, 18:1, 18:4, 23:22, 24:18, 25:7, 25:19, 25:23, 26:25, 27:9, 27:22, 28:4, 28:15, 28:21, 29:2, 29:3, 29:17,

29:18, 31:22, 32:5, 32:6, 32:21, 33:12, 34:1, 35:22, 36:22, 37:8, 37:22, 38:14, 39:8, 45:7, 45:9, 47:23, 49:3, 49:5, 49:17, 49:22, 55:1, 55:9, 60:21, 61:4, 63:14, 64:8, 66:1, 76:7, 83:18, 84:2, 84:13, 85:8, 86:22, 87:15, 88:7, 89:12, 89:21, 90:8, 91:19, 92:20, 93:10, 94:5, 95:2, 95:16, 101:14, 101:17, 102:1, 102:5, 102:9, 102:20, 103:4, 103:8, 103:18, 106:14, 106:21, 106:24, 107:8, 108:10, 108:15, 108:17, 110:13, 110:22, 111:7, 112:21, 112:23, 117:10, 118:9, 121:15, 121:24, 127:23, 129:13, 130:8, 130:11, 130:14, 130:16, 130:23, 131:5, 131:7, 131:11, 131:15, 131:19, 134:8, 134:13, 137:1, 137:14, 138:8, 138:17
**government's** [17] - 2:20, 3:20, 15:15, 17:11, 17:12, 27:12, 38:10, 41:5, 46:22, 62:21, 101:17, 104:21, 110:15, 129:6, 129:21, 129:23, 130:7
**grab** [1] - 106:3
**Graf** [4] - 103:22, 113:13, 113:22, 115:18
**grant** [1] - 131:3
**granted** [1] - 17:2
**great** [3] - 3:9, 82:10, 91:3
**grossly** [1] - 37:23
**ground** [5] - 15:23, 16:5, 18:16, 67:19, 68:16
**grounding** [1] - 71:1
**grounds** [2] - 31:24, 111:20
**guess** [19] - 8:23,

11:12, 12:11, 38:9, 48:20, 51:12, 62:2, 66:1, 70:19, 79:6, 81:8, 84:10, 92:16, 100:10, 108:6, 127:17, 135:2, 136:24, 137:23
**guidance** [1] - 67:21, 67:25
**guided** [2] - 69:21, 129:11
**guidelines** [1] - 64:15
**gun** [1] - 43:13
**guy** [1] - 64:10
**guys** [3] - 15:25, 90:25, 137:6

## H

**habeas** [1] - 29:14
**halfway** [2] - 32:3, 56:18
**hand** [3] - 16:14, 32:18, 32:24
**Hand** [1] - 104:9
**handed** [2] - 36:6, 36:15
**handful** [2] - 64:5, 118:17
**handing** [2] - 55:24, 55:25
**handle** [1] - 3:7
**handled** [1] - 90:2
**handling** [2] - 3:8, 65:25
**hands** [1] - 84:24
**hanging** [1] - 85:1
**happy** [2] - 12:8, 91:2
**hard** [3] - 34:10, 72:10, 138:8
**harder** [1] - 7:1
**hat** [1] - 5:20
**Hawkins** [1] - 139:17
**head** [2] - 64:10, 138:19
**heads** [2] - 138:12, 138:24
**Health** [1] - 28:5
**hear** [21] - 14:11, 15:4, 15:9, 15:21, 16:2, 25:5, 27:21, 38:10, 49:23, 64:25, 70:8, 92:23, 98:9, 98:11, 100:10, 118:23, 118:25, 120:5, 122:25, 128:9, 137:17
**heard** [4] - 23:8, 89:23, 125:18, 132:7
**Hearing** [1] - 1:9

**hearing** [26] - 19:18, 20:17, 25:21, 26:8, 32:6, 43:11, 44:16, 52:12, 52:19, 60:25, 61:2, 61:3, 62:18, 92:6, 98:7, 100:7, 108:3, 108:15, 108:19, 110:2, 120:11, 120:12, 125:17, 127:19, 136:4, 136:21
**hearings** [1] - 137:25
**Heather** [3] - 104:9, 117:24, 117:25
**heightened** [1] - 50:20
**help** [6] - 7:12, 20:18, 29:21, 79:25, 81:17, 124:25
**helpful** [4] - 20:2, 28:2, 91:21, 123:6
**hem** [1] - 57:20
**hereby** [1] - 139:15
**hesitant** [1] - 67:12
**HHS** [47] - 93:1, 96:18, 97:21, 98:13, 99:17, 101:12, 102:8, 103:13, 103:20, 104:6, 104:15, 105:2, 105:7, 106:10, 107:11, 107:19, 108:4, 108:6, 110:3, 113:3, 113:7, 113:15, 113:24, 114:8, 114:9, 114:15, 114:24, 115:13, 115:15, 116:13, 116:14, 116:24, 117:6, 117:13, 118:11, 119:24, 120:3, 125:16, 125:19, 125:22, 127:4, 128:15, 132:4, 132:9, 133:4
**HHS's** [1] - 133:5
**hide** [1] - 22:21
**high** [12] - 8:17, 8:24, 12:23, 19:4, 19:9, 20:20, 20:21, 30:25, 75:22, 77:22
**high-level** [1] - 75:22
**higher** [1] - 9:21
**highlight** [3] - 8:3, 14:23, 103:15
**highlighted** [2] - 15:16, 68:11
**hill** [1] - 42:21
**hindered** [1] - 94:20
**hindsight** [4] - 107:15, 108:6, 108:14,

108:17
**history** [1] - 107:11
**hit** [3] - 72:14, 84:11, 86:2
**Ho** [2] - 26:3, 26:9
**hold** [3] - 74:17, 81:23, 108:13
**holistic** [1] - 84:1
**Honor** [59] - 2:18, 3:1, 3:22, 6:13, 11:2, 12:17, 16:12, 16:16, 32:19, 41:12, 46:6, 48:22, 50:4, 51:2, 66:7, 67:2, 68:11, 73:3, 73:10, 89:1, 89:4, 89:6, 89:22, 90:11, 90:12, 91:10, 91:20, 92:1, 93:11, 95:12, 99:16, 99:23, 100:25, 101:5, 101:12, 101:21, 106:4, 106:21, 108:18, 109:15, 110:5, 110:17, 110:20, 111:1, 111:15, 112:7, 112:10, 118:21, 125:15, 126:11, 126:14, 128:9, 134:9, 134:11, 134:25, 135:18, 137:12, 138:10, 138:23
**Honor's** [5] - 95:17, 95:23, 108:2, 125:6, 138:7
**HONORABLE** [1] - 1:13
**hook** [1] - 118:16
**hope** [1] - 125:20
**hopefully** [2] - 40:4, 128:21
**hoping** [1] - 17:24
**Hospice** [1] - 55:2
**hours** [2] - 82:2, 84:5
**Housekeeping** [1] - 123:10, 123:16
**huge** [2] - 11:13, 57:3
**hundred** [5] - 17:18, 71:16, 82:12, 82:22, 84:14
**hundreds** [3] - 11:25, 37:6, 130:1
**hung** [1] - 5:20
**hydroxy** [1] - 13:8

## I

**idea** [5] - 17:12, 29:6, 55:5, 96:23, 138:13

**identified** [18] - 8:5, 19:25, 20:2, 23:7, 49:5, 54:1, 59:15, 62:13, 65:21, 70:21, 87:12, 94:24, 121:1, 121:3, 127:14, 127:18, 127:24
**identify** [13] - 9:1, 25:11, 45:19, 48:10, 51:6, 51:9, 68:7, 71:13, 76:23, 88:17, 103:8, 131:5, 135:12
**identifying** [3] - 74:18, 86:14, 106:7
**identity** [1] - 21:9
**IHS** [4] - 96:18, 97:21, 119:24, 133:4
**II** [1] - 54:2
**III** [1] - 2:8
**ill** [4] - 77:21, 80:8, 80:11, 87:22
**illegal** [1] - 30:10
**illegitimate** [1] - 30:10
**illustrates** [2] - 87:25, 88:4
**imagine** [1] - 26:11
**immediate** [2] - 26:4, 26:10
**immediate-release** [2] - 26:4, 26:10
**immediately** [1] - 49:15
**immovable** [1] - 95:16
**immutable** [1] - 52:8
**imodium** [1] - 13:9
**impact** [1] - 17:22
**impasse** [4] - 40:21, 58:3, 73:15, 95:5
**important** [9] - 17:5, 25:18, 28:11, 39:24, 63:19, 89:20, 103:14, 104:6, 104:25
**importantly** [4] - 55:7, 97:2, 103:20, 126:8
**impose** [1] - 64:17
**impractical** [1] - 22:1
**improper** [1] - 74:5
**IN** [1] - 1:1
**INC** [1] - 1:6
**incidental** [1] - 118:13
**inclined** [1] - 110:6
**include** [5] - 34:10, 51:22, 95:9, 120:17, 137:5
**included** [3] - 36:7, 114:6, 115:7
**includes** [4] - 35:13, 57:9, 126:17, 126:19
**including** [8] - 27:16,

40:8, 81:6, 84:1, 102:7, 117:19, 127:14, 135:13
**inclusive** [1] - 115:5
**inconsistent** [1] - 38:15
**incorrect** [1] - 53:12
**increase** [1] - 17:1
**increases** [1] - 12:7
**incredible** [1] - 10:25
**incredibly** [1] - 25:1
**Indeed** [1] - 83:23
**indicated** [3] - 48:14, 53:3, 57:18
**indication** [2] - 61:5, 97:20
**indicative** [3] - 8:21, 13:16, 13:18
**indicators** [1] - 129:15
**indictments** [1] - 28:9
**individual** [10] - 30:20, 30:21, 30:22, 39:18, 46:21, 47:20, 88:5, 113:12, 133:9
**individualized** [4] - 31:9, 38:20, 86:20, 88:3
**individuals** [2] - 114:3, 117:20
**industry** [2] - 22:16, 27:8
**inform** [1] - 126:19
**information** [49] - 5:24, 9:17, 21:6, 24:3, 25:8, 33:25, 34:1, 34:17, 37:6, 37:14, 37:18, 38:2, 44:3, 58:23, 59:24, 60:7, 61:18, 61:22, 65:17, 66:11, 66:13, 76:16, 79:4, 80:17, 80:22, 80:25, 81:4, 81:16, 90:6, 94:21, 107:16, 113:7, 114:4, 124:12, 124:14, 125:19, 125:25, 126:6, 127:4, 127:7, 129:9, 129:12, 129:25, 130:9, 131:12, 131:13, 132:7, 133:8
**informative** [1] - 40:5
**informed** [2] - 107:2, 117:3
**infrequently** [3] - 8:20, 9:14, 9:15
**inherent** [1] - 121:14
**initial** [4] - 34:3, 94:24, 97:9, 136:1
**initiated** [1] - 14:11

**inquiries** [1] - 37:6
**inquiry** [3] - 63:8, 85:16, 86:21
**insane** [1] - 54:17
**insofar** [1] - 76:2
**inspired** [2] - 90:9, 109:22
**instance** [6] - 14:25, 15:1, 28:16, 28:17, 94:11, 120:23
**instances** [3] - 19:23, 34:6, 117:12
**instead** [5] - 28:19, 31:1, 38:2, 56:22, 58:2
**instructive** [1] - 24:25
**insufficient** [1] - 20:24
**intend** [2] - 65:9, 130:10
**intended** [1] - 64:20
**intends** [1] - 131:15
**intensive** [1] - 70:10
**intent** [4] - 30:19, 38:19, 50:21, 94:8
**interest** [1] - 34:2
**interested** [1] - 109:24
**interestingly** [1] - 110:12
**internal** [1] - 46:7
**interpretation** [1] - 102:3
**interpreted** [1] - 110:16
**interrelated** [1] - 67:23
**interrogatories** [4] - 82:20, 114:10, 125:22, 136:16
**interrogatory** [34] - 4:2, 51:7, 53:14, 53:19, 53:23, 61:25, 62:8, 62:14, 63:3, 65:4, 76:25, 78:20, 79:3, 79:24, 80:14, 81:4, 81:9, 81:10, 103:7, 103:25, 108:9, 113:8, 113:13, 114:2, 115:4, 117:15, 130:7, 131:2, 131:7, 134:12, 135:11, 136:10, 136:14, 137:3
**intervene** [1] - 115:25
**interview** [12] - 105:11, 105:23, 113:22, 114:4, 114:22, 115:6, 115:17, 115:19, 116:11, 116:14, 116:24

**interviewed** [4] - 104:25, 105:5, 114:20
**interviewing** [6] - 105:3, 105:9, 105:13, 106:10, 106:13, 126:23
**interviews** [35] - 103:17, 105:24, 106:8, 106:12, 107:20, 109:11, 113:9, 114:5, 114:7, 114:10, 114:15, 114:17, 114:23, 115:3, 115:5, 115:7, 115:10, 115:13, 115:14, 116:15, 116:18, 116:23, 117:1, 117:7, 117:10, 117:14, 117:17, 117:17, 117:22, 117:23, 118:3, 118:17, 125:20, 132:5
**introduce** [2] - 2:17, 82:5
**introductions** [1] - 2:16
**invalid** [26] - 8:12, 10:1, 21:20, 26:2, 30:23, 30:24, 31:3, 46:24, 46:25, 51:7, 62:3, 63:5, 63:7, 64:9, 64:24, 74:11, 77:24, 81:6, 85:10, 86:18, 87:24, 108:5, 127:25, 131:9, 135:12, 135:14
**invalidity** [12] - 62:12, 63:4, 63:14, 81:7, 81:11, 81:12, 129:15, 131:5, 135:16, 135:19, 135:24, 137:7
**investigated** [1] - 102:24
**investigating** [8] - 18:24, 23:3, 107:3, 108:4, 114:25, 121:3, 127:6, 127:20
**investigation** [68] - 17:7, 24:2, 38:1, 42:24, 45:8, 45:12, 50:17, 75:12, 75:13, 81:22, 90:7, 90:8, 93:4, 98:15, 101:15, 101:19, 102:4, 102:6, 102:8, 102:13, 102:14, 102:15, 102:22,

102:25, 103:2, 103:10, 103:19, 105:21, 106:19, 106:22, 106:24, 107:7, 107:9, 107:10, 107:13, 107:17, 108:7, 108:22, 109:1, 109:2, 109:4, 109:5, 109:17, 114:18, 114:19, 114:24, 115:9, 115:11, 115:16, 115:24, 116:3, 116:9, 116:19, 117:5, 117:6, 117:8, 117:13, 117:17, 117:25, 118:5, 118:13, 118:16, 121:7, 126:4, 126:25, 127:8, 127:13
**investigations** [9] - 45:21, 102:12, 107:9, 116:6, 117:21, 118:9, 126:2, 126:18, 127:2
**Investigative** [1] - 104:9
**investigative** [6] - 45:22, 46:2, 82:23, 104:22, 108:12, 108:25
**Investigator** [3] - 103:22, 104:17, 104:20
**investigator** [6] - 103:24, 104:3, 105:22, 106:1, 113:14, 115:19
**investigators** [1] - 117:11
**invited** [2] - 87:6, 98:8
**inviting** [1] - 60:3
**invoke** [2] - 90:20, 110:25
**invoking** [3] - 92:12, 95:17, 95:22
**involve** [5] - 12:19, 17:10, 36:23, 38:19, 47:3
**involved** [19] - 13:23, 37:13, 90:7, 93:4, 98:14, 102:8, 102:10, 105:21, 106:19, 107:12, 107:18, 108:4, 108:7, 114:9, 115:23, 116:7, 117:22, 127:19,

132:9
**involvement** [5] - 101:19, 103:13, 109:19, 112:16, 126:13
**involves** [1] - 13:6
**involving** [4] - 23:21, 37:2, 105:22, 111:1
**inward** [3] - 57:24, 59:17, 60:12
**ironic** [1] - 98:1
**Isaac** [1] - 3:6
**Isela** [1] - 104:8
**issue** [76] - 2:23, 3:8, 6:2, 7:4, 12:19, 14:21, 16:10, 21:7, 21:16, 23:6, 23:15, 24:14, 24:17, 24:18, 24:19, 24:20, 24:22, 27:20, 27:23, 28:10, 28:12, 32:11, 33:21, 34:11, 39:11, 40:3, 40:19, 40:21, 40:24, 41:14, 43:3, 44:11, 44:12, 45:2, 46:21, 48:8, 49:3, 51:10, 57:15, 58:8, 62:8, 64:15, 67:4, 67:11, 67:15, 69:14, 72:4, 73:14, 81:20, 81:25, 86:4, 87:8, 88:9, 89:6, 94:20, 96:10, 99:23, 100:24, 101:3, 110:4, 110:5, 110:21, 110:24, 111:4, 111:22, 111:24, 119:22, 121:10, 122:23, 122:24, 127:20, 132:14, 133:21, 135:4
**issued** [4] - 30:6, 30:9, 114:2, 116:8
**issues** [12] - 2:21, 3:7, 9:3, 15:13, 22:6, 47:16, 48:19, 51:4, 67:22, 77:15, 119:21, 129:3
**issuing** [3] - 30:11, 118:14, 120:20
**item** [1] - 51:4
**Item** [2] - 104:8, 134:12
**itself** [3] - 30:5, 44:10, 46:17

**J**

**jail** [2] - 28:17, 49:13
**JAMES** [1] - 2:7

**James** [2] - 3:4, 105:16
**January** [11] - 33:9, 40:15, 40:20, 73:14, 94:2, 94:3, 94:6, 94:16, 95:2, 95:6, 95:15
**Jasand** [1] - 104:13
**JASON** [1] - 2:6
**Jason** [3] - 3:3, 16:16, 105:7
**Jersey** [1] - 120:10
**joined** [2] - 2:19, 3:3
**joint** [5] - 101:22, 101:24, 125:20, 126:18, 126:25
**JONES** [1] - 2:5
**Jones** [1] - 3:3
**Joseph** [1] - 106:8
**JR** [1] - 2:6
**judge** [9] - 16:13, 18:20, 23:25, 47:16, 49:13, 51:9, 53:14, 83:20, 83:21
**Judge** [25] - 1:13, 20:2, 21:12, 22:10, 27:18, 32:12, 32:17, 33:3, 42:16, 43:20, 47:9, 47:20, 53:18, 54:4, 83:8, 83:20, 83:23, 84:10, 92:6, 95:18, 111:10, 111:16, 137:10, 139:7
**judge's** [1] - 47:18
**judgment** [5] - 20:15, 59:6, 60:6, 83:21, 83:25
**judicial** [1] - 16:8
**Julia** [1] - 3:6
**jump** [1] - 43:13
**junctures** [1] - 5:22
**June** [2] - 36:22, 73:11
**JUNKER** [1] - 2:7
**Junker** [1] - 3:4
**jury** [3] - 47:6, 74:12, 74:14
**JUSTICE** [2] - 1:20, 1:23

**K**

**Kasper** [14] - 2:20, 3:23, 16:20, 25:4, 25:9, 33:3, 38:9, 44:19, 48:23, 50:2, 66:1, 86:24, 90:17, 112:21
**KASPER** [75] - 1:20, 3:22, 4:20, 5:16, 6:8,

6:13, 7:10, 7:15, 9:8, 10:10, 11:1, 11:18, 12:13, 12:17, 13:4, 13:14, 13:22, 14:13, 14:19, 15:5, 15:11, 16:6, 16:12, 38:13, 40:2, 41:12, 41:25, 44:21, 45:3, 48:7, 50:4, 50:13, 66:6, 66:15, 67:2, 67:22, 68:3, 68:18, 68:20, 69:5, 69:15, 69:23, 70:16, 71:10, 71:18, 71:22, 72:10, 73:2, 73:9, 73:22, 74:2, 74:22, 75:10, 75:20, 76:4, 76:8, 77:1, 77:7, 78:1, 78:8, 78:22, 79:6, 79:9, 79:18, 80:2, 80:10, 80:16, 81:3, 81:14, 81:19, 82:10, 83:3, 134:9, 134:25, 135:18
**Kate** [1] - 113:2
**Kathleen** [1] - 2:22
**KATHLEEN** [1] - 1:21
**Katzen** [4] - 3:13, 118:23, 118:24, 134:1
**KATZEN** [16] - 1:24, 3:13, 112:23, 119:2, 119:6, 119:11, 119:14, 119:20, 121:23, 122:3, 122:9, 122:13, 123:10, 125:1, 125:13
**keep** [7] - 33:14, 42:5, 49:1, 78:23, 99:16, 125:16, 125:17
**KELLY** [1] - 2:3
**Kelly** [1] - 3:1
**kept** [1] - 95:17
**Kevin** [2] - 104:17, 117:24
**kill** [1] - 24:19
**killed** [2] - 24:20, 24:21
**kind** [5] - 17:12, 33:1, 79:12, 79:13, 100:11
**kinds** [1] - 112:4
**King** [1] - 1:11
**knowing** [1] - 50:21
**knowingly** [4] - 21:20, 30:8, 30:19, 129:14
**knowledge** [9] - 10:4, 10:21, 25:15, 58:9, 63:11, 70:4, 76:14, 84:18, 106:18

**known** [4] - 10:1, 35:9, 70:6, 130:19
**knows** [2] - 46:12, 76:7
**Kowiatek** [1] - 105:12

**L**

**lack** [2] - 23:16, 81:8
**lacks** [1] - 64:14
**laid** [2] - 19:16, 68:25
**land** [2] - 58:2, 85:21
**landscape** [2] - 100:16, 100:17
**language** [6] - 93:7, 110:11, 110:15, 121:11, 122:10, 123:24
**large** [8] - 11:20, 21:10, 23:8, 36:6, 47:3, 49:9, 58:22, 59:16
**largely** [4] - 65:7, 66:4, 74:16, 74:17
**larger** [4] - 7:2, 11:23, 23:10, 57:14
**last** [23] - 4:18, 15:10, 16:1, 19:17, 22:4, 25:21, 26:8, 43:11, 48:24, 52:12, 53:15, 60:23, 62:18, 63:19, 73:11, 84:12, 98:11, 108:15, 109:10, 110:2, 127:19, 136:4, 136:21
**lastly** [1] - 49:16
**late** [3] - 92:15, 93:5, 121:5
**lateness** [1] - 120:12
**law** [16] - 12:24, 28:10, 29:12, 29:15, 29:17, 30:14, 46:8, 64:16, 90:22, 93:6, 93:9, 112:3, 121:7, 133:10, 136:23
**lawsuit** [1] - 24:1
**lawyer** [2] - 93:15, 96:2
**lawyers** [7] - 49:6, 93:10, 93:13, 96:3, 96:7, 116:10, 127:6
**LAXTON** [1] - 2:6
**Laxton** [1] - 3:4
**lay** [2] - 28:15, 91:9
**laying** [1] - 63:25
**lays** [1] - 17:25
**LAYTON** [1] - 2:3
**Layton** [1] - 3:2
**lead** [3] - 103:23, 104:3, 104:22

**learn** [2] - 61:18, 78:24
**learned** [6] - 90:6, 102:23, 103:3, 103:13, 110:2, 114:19
**least** [19] - 9:3, 23:2, 28:2, 32:23, 39:13, 39:17, 49:23, 49:25, 54:16, 57:24, 58:1, 60:11, 60:15, 73:20, 82:14, 90:6, 100:10, 132:17, 133:3
**LEATHERS** [1] - 2:8
**Leathers** [1] - 3:5
**led** [4] - 16:10, 105:22, 109:1, 117:6
**left** [5] - 17:17, 53:5, 88:25, 92:6, 96:3
**legally** [1] - 64:1
**legitimate** [8] - 8:13, 8:15, 9:23, 26:5, 26:11, 26:16, 30:6, 78:12
**leniency** [1] - 132:22
**less** [7] - 18:18, 29:1, 36:5, 42:12, 43:17, 49:1, 82:18
**letter** [30] - 17:12, 25:10, 29:15, 33:5, 33:8, 33:9, 33:13, 36:1, 40:15, 40:17, 64:6, 64:10, 87:11, 90:1, 90:24, 91:8, 92:12, 94:16, 96:1, 96:16, 97:5, 98:5, 100:6, 103:7, 106:6, 106:15, 111:7, 122:2, 128:11, 132:17
**letters** [3] - 85:6, 93:6, 97:24
**level** [3] - 12:2, 75:22, 97:14
**levels** [1] - 19:9
**leverage** [2] - 4:3, 71:25
**liability** [4] - 4:6, 72:1, 86:11, 107:6
**light** [2] - 71:9, 122:14
**likely** [1] - 47:7
**limit** [6] - 5:23, 20:7, 45:18, 64:18, 72:1, 86:10
**limitations** [3] - 24:7, 54:24, 106:25
**limited** [9] - 4:14, 9:2, 15:17, 19:24, 29:16, 72:19, 118:3, 127:4, 127:15

**limiting** [1] - 5:8
**line** [6] - 25:19, 29:9, 40:11, 108:12, 108:18, 124:16
**lines** [10] - 11:19, 23:6, 49:4, 50:5, 50:6, 50:9, 71:12, 71:14, 71:17, 104:12
**list** [58] - 13:19, 21:13, 28:8, 34:19, 34:23, 36:4, 43:12, 45:4, 46:13, 48:9, 48:20, 49:25, 52:2, 52:14, 52:18, 52:24, 53:24, 53:25, 54:10, 55:25, 57:24, 59:14, 59:24, 60:11, 63:23, 64:25, 66:9, 71:3, 71:11, 72:18, 73:10, 73:14, 73:18, 76:1, 76:19, 77:8, 77:9, 79:19, 79:21, 85:19, 87:5, 114:3, 114:5, 114:9, 114:11, 115:5, 115:7, 116:17, 116:22, 130:7, 130:12, 130:15, 130:18, 130:20, 131:6, 134:13
**listed** [2] - 51:19, 103:21
**listing** [1] - 54:22
**lists** [2] - 55:8, 55:10
**literally** [3] - 24:14, 28:18, 52:17
**literature** [1] - 46:8
**litigate** [1] - 57:25
**litigation** [20] - 11:24, 24:1, 33:24, 35:19, 38:16, 75:12, 82:21, 87:14, 90:9, 93:8, 97:12, 103:10, 103:11, 109:21, 110:12, 110:14, 121:2, 121:4, 127:3, 127:12
**litigations** [1] - 110:22
**localized** [1] - 39:22
**location** [1] - 39:5
**locations** [1] - 34:9
**logistically** [2] - 11:13, 44:13
**long-running** [1] - 109:3
**look** [23] - 11:23, 34:3, 34:13, 36:7, 36:14, 37:20, 41:17, 49:19, 56:5, 56:16, 59:20, 60:22, 61:5, 61:12, 68:17, 68:18, 71:10,

71:11, 77:9, 112:2, 116:20, 124:2, 136:24
**looked** [3] - 28:4, 31:10, 57:1
**looking** [12] - 28:3, 29:19, 36:24, 45:11, 49:16, 60:20, 68:9, 69:4, 87:15, 102:10, 102:11, 134:24
**looks** [4] - 72:11, 80:6, 85:15, 86:7
**lost** [1] - 90:2
**low** [1] - 85:1
**lower** [2] - 9:10

## M

**machine** [1] - 85:14
**Magistrate** [1] - 1:13
**magnitude** [3] - 9:20, 39:19, 69:3
**mail** [1] - 128:4
**main** [4] - 57:8, 57:15, 57:20, 61:24
**maintained** [1] - 4:13
**maintaining** [1] - 119:1
**major** [1] - 35:11
**manual** [1] - 22:14
**manufacturer** [1] - 37:11
**March** [1] - 1:8
**Marcilla** [2] - 105:16, 117:17
**marketplace** [1] - 13:16
**Markets** [1] - 129:23
**massive** [1] - 43:12
**matching** [1] - 72:3
**material** [3] - 45:12, 76:11, 84:23
**materially** [1] - 71:23
**materials** [1] - 45:24
**math** [1] - 86:3
**mathematical** [1] - 86:21
**matter** [14] - 26:17, 31:11, 34:3, 34:5, 34:6, 61:14, 61:15, 79:13, 79:14, 95:20, 101:22, 113:15, 118:5, 121:2
**matters** [2] - 28:14, 61:19
**Matthew** [1] - 105:25
**maximum** [4] - 29:1, 29:2, 64:18, 88:18
**MDL** [1] - 37:12
**mean** [28] - 4:17, 8:23,

11:1, 22:20, 24:12, 24:13, 28:14, 29:8, 34:12, 50:11, 58:21, 70:16, 74:24, 75:10, 78:14, 78:16, 81:8, 88:20, 98:13, 98:22, 101:1, 113:7, 121:19, 125:16, 128:6, 128:11, 135:19, 138:11
**meaning** [3] - 22:21, 65:14, 125:19
**meaningful** [4] - 30:4, 124:24, 134:3, 137:8
**meaningfully** [2] - 67:9, 70:2
**meaningless** [4] - 66:5, 66:7, 74:21, 74:22
**means** [4] - 11:16, 50:10, 87:21, 132:22
**meat** [1] - 46:14
**mechanism** [1] - 24:5
**medical** [13] - 8:13, 8:15, 9:23, 26:5, 26:11, 26:16, 26:17, 30:7, 46:8, 60:23, 64:2, 64:14, 86:7
**Medicare** [1] - 133:9
**medication** [3] - 18:8, 55:4, 64:18
**medications** [1] - 37:12
**medicine** [2] - 64:16, 85:13
**meet** [28] - 5:12, 9:5, 17:2, 40:17, 41:19, 44:15, 67:9, 85:17, 91:9, 91:10, 93:17, 95:8, 95:10, 95:15, 96:2, 96:5, 96:23, 97:23, 98:12, 98:16, 101:24, 119:7, 120:8, 125:2, 135:25, 138:3, 138:6
**meet-and-confer** [24] - 5:12, 9:5, 40:17, 41:19, 67:9, 91:9, 91:10, 93:17, 95:8, 95:10, 95:15, 96:2, 96:5, 96:23, 97:23, 98:12, 98:16, 119:7, 120:8, 125:2, 135:25, 138:3, 138:6
**meeting** [1] - 138:1
**meetings** [2] - 102:25, 105:20
**member** [2] - 95:9, 95:11
**memorandum** [1] -

117:11
**mention** [6] - 24:23, 25:3, 25:17, 27:18, 31:14, 83:4
**mentioned** [7] - 46:6, 60:9, 84:4, 96:9, 106:9, 109:10, 121:1
**mentioning** [1] - 139:5
**merely** [1] - 111:25
**merit** [3] - 87:1, 90:19, 110:8
**meritless** [1] - 91:16
**met** [4] - 85:11, 86:9, 89:22, 120:21
**methadone** [1] - 54:14
**mg** [1] - 54:15
**Michael** [3] - 105:4, 114:16, 114:25
**Middle** [3] - 104:18, 105:14, 106:1
**middle** [7] - 15:23, 16:5, 18:16, 18:17, 67:19, 68:16, 72:5
**might** [18] - 8:24, 20:2, 22:5, 23:18, 43:9, 52:4, 54:9, 74:3, 74:11, 77:17, 77:18, 78:4, 78:5, 78:13, 78:23, 96:25, 115:17, 122:21
**mil** [1] - 70:7
**mildly** [1] - 132:7
**mill** [2] - 29:25, 70:3
**million** [27] - 11:25, 16:21, 16:22, 17:6, 17:18, 17:19, 18:25, 23:12, 23:13, 27:13, 32:16, 36:24, 37:1, 37:2, 37:3, 38:4, 49:4, 50:5, 50:7, 50:9, 50:11, 50:13, 82:13, 82:25, 86:4, 129:10
**millions** [6] - 11:19, 11:25, 34:12, 34:13, 130:1
**mind** [10] - 16:14, 48:22, 48:25, 54:12, 62:21, 89:24, 99:17, 114:11, 114:14, 134:20
**minimum** [2] - 64:18, 128:15
**minor** [2] - 18:9, 52:11
**minute** [4] - 32:1, 35:5, 49:1, 128:19
**minutes** [1] - 80:22
**misleading** [1] - 27:10
**missed** [2] - 92:18, 92:19

**missing** [1] - 88:15
**misspeak** [1] - 125:21
**Mitch** [1] - 105:17
**mix** [1] - 100:21
**MME** [10] - 9:10, 9:13, 9:14, 9:18, 9:20, 10:8, 54:25, 70:7, 78:2, 87:23
**Mock** [1] - 104:13
**modification** [1] - 52:11
**modifications** [1] - 52:11
**modify** [1] - 57:18
**moment** [1] - 52:8
**Monday** [2] - 137:18, 137:20
**monitoring** [1] - 7:18
**month** [4] - 73:13, 85:7, 92:20, 128:11
**months** [11] - 26:10, 37:15, 53:5, 85:3, 91:1, 91:17, 92:9, 98:19, 100:15, 105:2
**moorings** [1] - 24:11
**moreover** [1] - 132:21
**mortgage** [1] - 11:24
**mortgage-backed** [1] - 11:24
**most** [7] - 4:21, 6:17, 55:6, 82:15, 82:19, 85:1, 89:15
**mostly** [1] - 44:25
**Motion** [1] - 1:9
**motion** [50] - 2:21, 2:22, 3:7, 3:20, 3:24, 4:12, 15:6, 15:8, 15:9, 17:25, 18:3, 22:6, 23:2, 23:24, 31:15, 31:25, 32:10, 32:18, 34:20, 34:22, 37:22, 41:5, 43:13, 43:22, 45:2, 48:20, 83:13, 83:21, 88:24, 88:25, 89:5, 99:5, 99:6, 99:9, 99:25, 100:1, 100:4, 100:8, 100:16, 104:15, 129:6, 130:5, 130:6, 131:1, 131:23, 135:3, 135:9, 137:14
**motions** [3] - 3:18, 48:20, 51:3
**move** [9] - 40:21, 48:17, 48:19, 56:20, 58:2, 101:8, 123:3, 124:20, 139:4
**moved** [2] - 45:15, 45:25
**movement** [2] - 14:20,

95:3
**moving** [5] - 17:23, 45:16, 54:10, 91:22, 117:13
**MR** [162] - 3:13, 3:22, 4:20, 5:16, 6:8, 6:13, 7:10, 7:15, 9:8, 10:10, 11:1, 11:18, 12:13, 12:17, 13:4, 13:14, 13:22, 14:13, 14:19, 15:5, 15:11, 16:6, 16:12, 16:13, 16:16, 18:20, 19:8, 19:15, 20:1, 20:11, 20:14, 20:22, 21:4, 22:9, 22:15, 22:20, 23:12, 23:15, 24:20, 25:7, 28:1, 32:17, 32:21, 34:21, 34:24, 35:2, 35:10, 38:13, 40:2, 41:12, 41:25, 42:15, 42:19, 43:2, 43:19, 43:25, 44:21, 45:3, 48:7, 48:22, 48:25, 49:2, 50:4, 50:13, 51:2, 51:15, 51:20, 51:22, 52:1, 52:9, 53:3, 55:22, 56:2, 56:7, 56:12, 57:8, 57:13, 58:7, 58:19, 59:5, 59:10, 59:25, 60:5, 60:19, 61:24, 62:15, 63:2, 65:14, 65:17, 65:22, 66:6, 66:15, 67:2, 67:22, 68:3, 68:18, 68:20, 69:5, 69:15, 69:23, 70:16, 71:10, 71:18, 71:22, 72:10, 73:2, 73:9, 73:22, 74:2, 74:22, 75:10, 75:20, 76:4, 76:8, 77:1, 77:7, 78:1, 78:8, 78:22, 79:6, 79:9, 79:18, 80:2, 80:10, 80:16, 81:3, 81:14, 81:19, 82:10, 83:3, 83:8, 83:18, 84:10, 85:23, 87:5, 88:16, 112:23, 119:2, 119:6, 119:11, 119:14, 119:20, 121:23, 122:3, 122:9, 122:13, 123:10, 125:1, 125:10, 125:13, 134:9, 134:11, 134:16, 134:25, 135:2, 135:10, 135:17, 135:18, 136:2,
136:12, 137:9, 138:20
**MS** [36] - 2:18, 3:1, 73:8, 89:1, 89:4, 89:19, 90:18, 90:23, 92:25, 94:9, 94:14, 97:9, 97:19, 98:1, 99:8, 99:14, 100:3, 100:24, 102:18, 107:21, 107:24, 108:1, 113:2, 113:12, 113:18, 113:21, 114:1, 115:14, 118:21, 125:15, 125:24, 137:12, 138:5, 138:14, 138:23, 139:10
**multi** [2] - 73:13, 82:21
**multi-district** [1] - 82:21
**multi-month** [1] - 73:13
**multiple** [1] - 34:9
**multiplicity** [1] - 76:12
**muscle** [2] - 13:7, 69:8
**must** [6] - 31:23, 64:2, 121:6, 130:24, 131:20

## N

**name** [3] - 3:23, 104:2, 121:22
**named** [1] - 64:10
**names** [1] - 114:6
**Nancy** [4] - 103:19, 104:25, 115:17, 116:14
**narrative** [5] - 76:24, 86:25, 131:8, 135:22, 137:2
**narrow** [6] - 6:6, 6:24, 14:5, 18:12, 18:14, 71:23
**narrower** [2] - 7:2, 7:3
**narrowing** [4] - 5:12, 6:20, 33:17, 49:24
**Nashville** [1] - 114:18
**Natalie** [1] - 105:19
**National** [2] - 37:10, 64:6
**nationally** [3] - 12:15, 41:6, 66:23
**nationwide** [5] - 3:25, 4:10, 39:23, 45:14, 129:7
**nature** [3] - 46:12, 121:14, 133:2

**NDC** [1] - 37:10
**NDCs** [1] - 37:13
**near** [1] - 37:18
**nearly** [2] - 129:9, 129:18
**necessarily** [5] - 34:3, 41:3, 103:1, 115:3, 133:5
**necessary** [4] - 14:3, 46:16, 48:10, 49:24
**need** [52] - 9:9, 10:5, 12:3, 12:11, 12:25, 23:16, 26:18, 27:13, 27:23, 28:25, 44:2, 44:3, 52:21, 53:7, 53:8, 56:20, 60:24, 61:10, 61:20, 62:4, 62:10, 62:16, 65:4, 70:12, 73:12, 75:10, 75:24, 77:7, 77:16, 90:3, 91:13, 91:23, 93:18, 98:24, 99:25, 100:10, 100:12, 101:4, 108:24, 110:14, 111:3, 122:22, 124:23, 128:13, 134:1, 134:3, 134:7, 136:8, 137:12, 139:7
**needed** [2] - 8:2, 94:2
**needing** [1] - 81:21
**needs** [7] - 44:10, 46:10, 65:8, 70:25, 130:2, 131:13, 131:17
**negligence** [1] - 31:6
**negotiate** [3] - 14:3, 18:6, 41:13
**negotiated** [2] - 17:10, 49:7
**negotiating** [1] - 49:20
**negotiation** [1] - 67:9
**negotiations** [2] - 6:1, 116:7
**never** [23] - 4:24, 18:5, 23:8, 25:20, 32:22, 33:11, 37:17, 40:14, 41:25, 42:25, 49:10, 49:11, 62:19, 64:8, 73:13, 84:19, 84:20, 84:21, 84:22, 87:24, 91:11, 94:14, 98:3
**New** [1] - 120:10
**new** [19] - 22:8, 25:13, 25:14, 38:4, 52:4, 57:6, 57:19, 59:1, 65:19, 73:21, 73:22, 90:9, 96:3, 96:24, 130:17, 132:7, 136:15

**news** [2] - 90:25, 137:13
**next** [16] - 42:10, 44:20, 45:2, 54:21, 64:5, 85:7, 104:2, 104:23, 105:4, 105:8, 105:13, 105:16, 106:1, 115:17, 130:5, 131:1
**nexus** [1] - 72:21
**nice** [2] - 97:12, 139:12
**Nick** [1] - 104:20
**nine** [4] - 37:15, 53:5, 84:17, 84:25
**Noah** [1] - 3:13
**NOAH** [1] - 1:24
**nobody** [5] - 15:23, 72:6, 92:14
**non** [10] - 6:22, 50:6, 84:5, 88:25, 95:18, 129:8, 129:19, 131:22, 132:12, 133:23
**non-agency** [1] - 88:25
**non-controlled** [3] - 50:6, 129:8, 129:19
**non-opioids** [1] - 6:22
**non-parties** [2] - 84:5, 95:18
**non-party** [3] - 131:22, 132:12, 133:23
**noncontrolled** [11] - 4:14, 12:12, 12:13, 12:21, 12:22, 12:25, 13:12, 14:9, 14:16, 14:21, 17:15
**none** [6] - 49:5, 84:10, 85:7, 134:17, 135:4, 136:20
**nonetheless** [1] - 70:8
**nonopioids** [2] - 18:10, 18:11
**nonparty** [1] - 3:14
**norm** [1] - 10:7
**normal** [2] - 9:12, 29:23
**note** [4] - 17:5, 18:4, 37:9, 92:16
**notes** [10] - 34:2, 34:7, 34:15, 34:17, 35:17, 37:19, 53:20, 62:24, 63:5, 139:15
**nothing** [13] - 32:4, 36:4, 42:7, 44:7, 49:3, 75:8, 89:11, 91:16, 98:20, 99:5, 100:9, 104:3, 118:12
**notice** [5] - 31:24,

44:10, 46:10, 68:9, 75:24
**noticed** [1] - 84:9
**notion** [5] - 27:13, 82:2, 104:2, 127:1, 127:7
**novel** [1] - 84:22
**November** [5] - 40:17, 53:15, 92:10, 92:16, 93:5
**nowhere** [1] - 17:16
**number** [40] - 3:11, 3:17, 4:14, 5:22, 11:19, 11:20, 13:24, 15:16, 16:23, 21:14, 23:11, 33:19, 34:14, 36:20, 38:17, 51:8, 53:19, 54:11, 54:13, 54:14, 56:4, 62:1, 62:2, 62:9, 62:14, 63:3, 65:4, 76:25, 78:20, 79:3, 80:14, 88:20, 103:16, 105:11, 130:8, 131:2, 131:7, 135:11, 137:3
**numbers** [4] - 23:8, 47:3, 49:9, 136:16
**numbing** [1] - 54:13
**numerous** [1] - 21:22

## O

**o'clock** [2] - 96:17, 96:18
**O]ne** [1] - 63:22
**object** [1] - 98:20
**objected** [3] - 33:18, 91:19, 133:8
**objection** [14] - 3:19, 94:12, 95:14, 110:8, 119:1, 119:4, 119:10, 119:16, 123:1, 123:2, 124:17, 124:18, 133:5, 133:20
**objections** [63] - 53:24, 89:17, 90:13, 90:14, 90:16, 90:22, 91:2, 92:13, 92:15, 93:13, 96:17, 96:19, 96:21, 96:24, 97:3, 97:7, 97:15, 97:22, 98:8, 98:11, 98:14, 99:12, 100:5, 100:19, 101:8, 111:3, 111:18, 111:19, 111:22, 111:23, 111:24, 111:25, 112:4,

112:9, 112:11, 112:19, 119:3, 119:11, 119:14, 119:23, 119:25, 120:4, 120:5, 120:6, 120:8, 120:9, 122:8, 125:5, 128:16, 132:12, 132:14, 132:16, 133:1, 133:3, 133:4, 133:11, 133:14, 133:16, 133:17, 133:20
**obligation** [2] - 9:24, 46:22
**obligations** [1] - 17:3
**obstacle** [1] - 12:5
**obtain** [2] - 46:1, 68:4
**obtained** [5] - 7:25, 11:6, 45:12, 73:17, 76:16
**obviously** [17] - 11:19, 60:6, 74:24, 89:5, 90:10, 91:19, 96:9, 102:19, 103:25, 104:21, 108:2, 112:13, 127:9, 127:21, 128:6, 128:13, 138:9
**occasion** [1] - 67:18
**occur** [1] - 47:7
**occurred** [1] - 9:14
**occurring** [1] - 8:19
**October** [6] - 51:13, 54:1, 92:9, 98:19, 104:14, 132:18
**odd** [2] - 122:5, 123:6
**OF** [4] - 1:1, 1:3, 1:20, 1:23
**offer** [1] - 18:6
**offered** [8] - 5:23, 14:21, 21:5, 21:9, 33:18, 34:16, 42:25, 119:7
**offers** [1] - 9:5
**office** [3] - 7:25, 8:7, 117:20
**OFFICE** [1] - 1:17
**official** [2] - 63:20, 124:12
**Official** [1] - 139:17
**omit** [1] - 31:22
**once** [4] - 49:11, 105:5, 116:13, 117:2
**one** [67] - 2:21, 7:3, 8:3, 8:10, 8:17, 9:20, 13:5, 15:23, 19:15, 20:19, 23:22, 25:7, 25:18, 27:2, 28:23, 28:24, 33:19, 36:17,

38:14, 39:5, 39:7, 47:15, 47:17, 50:5, 50:9, 50:19, 54:7, 55:25, 56:4, 56:10, 56:15, 56:25, 57:14, 63:16, 64:25, 67:24, 72:20, 73:25, 74:8, 74:24, 80:8, 83:3, 85:6, 87:19, 87:25, 88:23, 89:18, 98:17, 103:19, 106:8, 109:10, 113:23, 115:16, 115:18, 116:23, 116:24, 122:15, 126:3, 126:11, 127:8, 127:12, 127:13, 134:17, 136:9, 136:19, 137:4, 138:18
**One** [1] - 112:8
**ones** [22] - 9:9, 13:11, 13:14, 13:15, 13:16, 14:3, 14:4, 14:5, 19:8, 56:15, 73:12, 74:13, 77:10, 78:10, 78:17, 84:7, 97:13, 100:17, 114:5, 117:24, 133:14, 138:15
**ongoing** [3] - 16:24, 105:10, 106:11
**open** [6] - 5:7, 6:19, 7:5, 62:24, 69:17, 99:17
**opened** [1] - 51:11
**opening** [1] - 32:2
**openness** [1] - 45:1
**operating** [1] - 22:14
**operation** [1] - 31:8
**operational** [1] - 75:23
**operationalized** [2] - 46:15, 72:15
**operationalizing** [2] - 68:14, 75:16
**operative** [1] - 29:9
**opinion** [5] - 47:16, 47:18, 47:21, 79:13, 79:14
**opioid** [13] - 12:20, 13:5, 26:4, 33:24, 55:3, 56:5, 69:8, 87:13, 102:6, 102:7, 102:19, 127:25, 128:3
**opioids** [8] - 5:2, 6:17, 6:21, 6:22, 8:18, 9:12, 26:10
**opportunity** [3] - 46:16, 90:2, 100:12

**oppose** [1] - 59:8
**opposed** [1] - 59:19
**opposing** [1] - 2:21
**opposite** [1] - 72:2
**order** [25] - 11:4, 18:15, 39:19, 45:5, 51:5, 53:11, 57:5, 66:12, 69:3, 83:14, 84:12, 91:24, 95:23, 99:10, 99:12, 99:14, 101:1, 120:2, 130:14, 131:6, 132:12, 133:1, 134:22, 135:22
**Order** [1] - 55:12
**ordered** [7] - 55:13, 65:8, 76:1, 112:19, 128:16, 130:8, 134:12
**orders** [3] - 9:20, 60:6, 84:11
**ordinary** [3] - 29:23, 29:25, 30:9
**organized** [1] - 57:2
**original** [1] - 93:13
**originally** [2] - 22:5, 133:3
**otherwise** [6] - 36:12, 59:2, 97:12, 124:15, 131:9, 136:21
**ourselves** [1] - 38:7
**outlier** [2] - 8:22, 123:9
**outliers** [6] - 8:16, 25:10, 25:11, 25:16, 27:14, 27:15
**outreach** [1] - 93:14
**outside** [3] - 8:12, 9:22, 10:6
**overbreadth** [2] - 120:22, 127:10
**overbroad** [4] - 25:1, 35:13, 120:18, 128:6
**overexpansive** [1] - 87:17
**overinclusive** [1] - 57:9
**overlapping** [4] - 54:16, 54:24, 69:9, 75:3
**overly** [1] - 43:5
**overreach** [1] - 21:17
**overrule** [2] - 112:7, 112:10
**owe** [1] - 53:11
**own** [5] - 46:7, 65:10, 85:18, 88:9, 121:21
**oxycodone** [2] - 20:10, 54:15
**OxyContin** [2] - 7:8,

77:21

## P

**p.m** [2] - 1:9, 139:13
**PA** [1] - 2:3
**page** [12] - 33:19, 34:8, 36:1, 53:16, 53:18, 54:21, 83:1, 92:11, 97:5, 114:13, 115:18
**pages** [9] - 33:8, 34:16, 82:13, 82:18, 82:25, 96:19, 96:21, 98:12, 98:13
**papers** [2] - 15:22, 32:22
**paragraph** [2] - 36:21, 122:4
**paragraphs** [3] - 20:23, 23:23, 31:19
**paralysis** [1] - 47:22
**parameters** [1] - 22:23
**parse** [1] - 107:9
**parsing** [1] - 90:8
**part** [41] - 15:10, 17:20, 20:16, 23:1, 29:14, 44:2, 49:6, 59:7, 60:17, 73:6, 76:20, 78:24, 87:9, 89:7, 89:13, 90:3, 91:21, 92:2, 94:2, 95:19, 96:5, 98:21, 99:1, 99:15, 99:18, 101:15, 102:2, 104:10, 107:13, 109:7, 110:1, 110:3, 126:25, 127:9, 128:14, 131:1, 134:16, 134:23, 135:2, 135:8, 136:14
**partially** [1] - 131:2
**participate** [3] - 100:11, 128:7, 128:13
**participated** [2] - 105:20, 128:12
**participating** [2] - 109:25, 125:20
**particular** [26] - 7:21, 9:16, 10:3, 19:22, 23:18, 26:14, 26:18, 36:5, 39:9, 39:10, 51:15, 52:22, 58:15, 60:24, 67:4, 67:7, 67:13, 70:1, 70:3, 70:10, 75:13, 76:1, 76:17, 81:4, 81:5, 112:7
**particularly** [4] -

10:17, 93:2, 112:8, 128:10
**parties** [11] - 17:10, 40:20, 52:12, 84:5, 95:18, 100:23, 118:7, 120:19, 131:13, 132:6, 132:22
**party** [33] - 90:20, 93:8, 95:21, 99:4, 99:15, 107:13, 110:12, 110:14, 118:18, 120:20, 121:13, 121:15, 121:24, 122:11, 122:18, 123:1, 123:2, 123:8, 123:15, 123:20, 123:22, 124:2, 124:4, 124:22, 126:16, 127:9, 131:22, 131:25, 132:10, 132:12, 132:13, 133:23
**pass** [1] - 106:20
**past** [3] - 12:16, 66:20, 80:22
**patient** [28] - 26:11, 26:18, 30:22, 34:5, 34:11, 34:15, 34:17, 37:18, 46:23, 55:2, 60:24, 61:10, 61:19, 62:25, 63:1, 63:8, 74:10, 76:17, 78:3, 80:8, 80:11, 82:3, 84:1, 85:16, 86:9, 86:15, 87:23
**patient's** [1] - 64:1
**patient-based** [1] - 34:11
**patients** [9] - 12:22, 34:12, 37:2, 39:4, 39:6, 39:10, 44:11, 54:25, 61:21
**pattern** [4] - 24:10, 31:2, 31:7, 39:7
**patterns** [1] - 9:12
**pause** [2] - 35:4, 66:4
**pay** [2] - 28:25, 111:13
**payment** [1] - 102:20
**PDMP** [7] - 8:2, 8:5, 25:4, 25:18, 26:25, 27:3, 27:14
**penalties** [14] - 10:18, 29:1, 29:4, 30:2, 30:13, 38:18, 47:14, 49:12, 51:1, 78:14, 78:16, 86:16, 86:17, 88:19
**penalty** [6] - 15:17,

29:24, 30:1, 74:6, 80:12, 87:21

**pending** [3] - 105:2, 105:7, 129:3

**Pennsylvania** [1] - 27:4

**people** [9] - 12:9, 49:13, 54:18, 72:13, 94:3, 105:18, 117:18, 117:19, 127:5

**per** [31] - 9:13, 9:18, 19:3, 19:18, 27:2, 29:4, 36:20, 55:5, 57:3, 60:21, 61:8, 61:15, 61:17, 61:19, 62:3, 62:16, 62:17, 63:14, 64:9, 64:24, 134:18, 134:19, 134:20, 135:4, 135:14, 135:16, 135:19, 135:24, 136:11, 136:20, 137:7

**percent** [2] - 72:13, 86:2

**perhaps** [6] - 6:17, 12:20, 43:5, 43:14, 58:1, 85:20

**peril** [1] - 85:18

**period** [4] - 24:7, 73:13, 88:2, 133:7

**permissible** [1] - 64:1

**person** [12] - 30:8, 30:11, 64:9, 103:1, 103:21, 113:8, 125:21, 137:25, 138:3, 138:24, 139:5

**perspective** [5] - 5:19, 28:3, 44:15, 57:9, 91:7

**pertains** [2] - 138:16, 138:17

**pharmacies** [7] - 4:15, 27:5, 27:7, 27:17, 35:24, 36:17, 109:3

**pharmacist** [31] - 9:16, 9:17, 9:25, 21:9, 21:21, 30:12, 30:22, 30:24, 34:2, 35:17, 36:8, 37:19, 44:3, 46:23, 46:25, 62:24, 62:25, 63:6, 63:10, 70:4, 72:22, 74:9, 76:18, 78:4, 82:4, 85:17, 86:8, 105:13, 114:21, 115:1, 136:5

**pharmacist's** [3] - 63:4, 76:13, 83:24

**pharmacists** [12] - 8:21, 28:13, 30:4, 103:5, 103:17, 105:3, 105:9, 106:11, 106:13, 109:12, 126:23, 127:7

**pharmacists'** [2] - 10:19, 25:15

**pharmacy** [7] - 8:5, 22:14, 28:17, 36:19, 39:5, 70:3, 88:22

**phase** [3] - 46:3, 75:12, 75:13

**phenomenal** [1] - 86:12

**picked** [1] - 17:9

**piece** [1] - 55:15

**pills** [6] - 19:6, 20:9, 24:17, 26:22, 77:23, 129:22

**pinning** [1] - 64:22

**place** [14] - 33:25, 49:24, 58:1, 60:11, 87:25, 106:8, 114:5, 114:7, 115:8, 115:11, 115:20, 117:2, 118:3, 139:2

**places** [1] - 126:12

**plain** [1] - 31:18

**Plaintiff** [2] - 1:4, 1:25

**Plaintiff's** [3] - 15:8, 15:9, 129:4

**plaintiff's** [1] - 31:24

**plan** [1] - 62:6

**planned** [1] - 97:23

**playing** [1] - 103:25

**plead** [1] - 20:24

**pleading** [4] - 20:8, 50:21, 53:14, 72:4

**pleadings** [2] - 33:4, 69:22

**pled** [14] - 17:19, 18:21, 18:22, 19:3, 31:16, 32:7, 35:16, 37:25, 42:24, 43:9, 44:8, 57:10, 60:8, 129:20

**plenty** [2] - 32:12, 56:16

**plus** [1] - 116:23

**point** [68] - 5:16, 5:17, 6:4, 7:4, 7:23, 10:20, 14:6, 15:12, 16:14, 21:12, 23:17, 24:13, 29:18, 30:17, 31:17, 32:17, 35:9, 38:23, 39:24, 40:13, 40:16, 43:2, 43:10, 43:14, 45:11, 49:20, 50:18,

56:18, 57:5, 57:24, 65:24, 66:1, 67:16, 70:5, 72:19, 76:7, 81:19, 82:7, 82:10, 86:25, 89:18, 91:11, 95:5, 95:10, 95:17, 97:17, 98:18, 101:7, 101:12, 104:24, 106:18, 107:8, 108:3, 109:24, 116:1, 118:8, 122:23, 123:5, 123:6, 124:22, 125:21, 125:24, 128:10, 130:21, 130:22, 132:9, 135:20, 137:25

**pointed** [4] - 18:7, 120:3, 122:9, 123:18

**pointing** [1] - 33:4

**points** [2] - 28:4, 50:4

**policies** [1] - 126:20

**policy** [3] - 124:7, 124:10

**posed** [1] - 16:20

**position** [53] - 5:18, 7:7, 8:9, 9:2, 15:15, 18:20, 22:7, 22:9, 24:12, 25:23, 26:7, 28:2, 38:10, 40:5, 40:12, 41:14, 42:22, 48:16, 52:7, 52:17, 53:10, 55:15, 55:16, 56:10, 58:4, 59:12, 60:8, 61:8, 62:15, 66:16, 89:21, 89:25, 90:9, 91:12, 91:16, 93:21, 93:24, 94:5, 94:10, 94:18, 95:1, 95:4, 95:11, 95:16, 95:24, 101:17, 108:11, 109:22, 113:4, 121:4, 122:22, 136:7, 136:9

**positions** [1] - 18:17

**possession** [4] - 45:16, 77:6, 120:25, 121:7

**possible** [3] - 5:5, 12:10, 66:10

**possibly** [3] - 18:22, 21:18, 73:19

**potential** [7] - 7:14, 11:25, 40:25, 49:20, 76:19, 102:15, 137:15

**potentially** [4] - 10:8, 38:20, 79:12, 139:3

**potentiators** [3] - 12:23, 13:1, 13:3

**pound** [2] - 125:9, 125:11

**PowerPoint** [3] - 33:5, 33:7, 36:7

**practically** [1] - 21:19

**practice** [12] - 8:13, 8:15, 9:23, 24:10, 30:10, 31:2, 39:7, 39:21, 39:22, 64:16, 77:13, 85:13

**pre** [7] - 24:1, 45:8, 50:16, 75:12, 82:23, 105:21, 132:4

**pre-filing** [4] - 45:8, 50:16, 82:23, 105:21

**pre-investigation** [1] - 75:12

**pre-litigation** [1] - 24:1

**pre-suit** [1] - 132:4

**precedent** [1] - 122:25

**preceding** [3] - 17:7, 24:7, 103:10

**precisely** [3] - 8:9, 10:11, 64:1

**prejudice** [1] - 48:11

**preliminary** [2] - 52:3, 55:8

**premature** [2] - 40:18, 136:17

**premises** [1] - 139:9

**prepare** [1] - 43:11

**prepared** [9] - 48:7, 48:15, 79:18, 81:3, 83:4, 91:3, 91:4, 91:5, 135:1

**preponderance** [3] - 28:20, 47:6, 74:14

**prescribed** [6] - 26:23, 54:18, 62:22, 64:19, 64:20, 77:21

**prescriber** [11] - 26:17, 45:6, 46:23, 61:18, 78:5, 82:3, 121:1, 121:3, 127:14, 127:24, 136:5

**prescribers** [8] - 19:22, 19:25, 20:1, 68:22, 77:13, 84:18, 127:18, 127:20

**prescribing** [4] - 9:12, 26:21, 50:10, 63:24

**prescription** [59] - 5:18, 7:18, 10:1, 10:2, 10:3, 21:20, 23:6, 26:15, 29:11, 30:5, 30:9, 30:11, 30:21, 30:23, 34:11, 36:18, 44:23, 46:21,

46:24, 48:5, 54:3, 54:9, 58:5, 63:5, 63:7, 63:9, 63:10, 64:19, 65:10, 65:20, 70:2, 70:3, 70:8, 70:21, 74:11, 76:13, 76:14, 77:5, 77:24, 78:2, 78:13, 81:5, 83:25, 84:1, 84:20, 84:21, 86:18, 86:19, 87:23, 87:24, 107:5, 129:5, 129:17, 130:9, 131:10, 131:15, 135:11

**prescription-by-prescription** [1] - 77:5

**prescriptions** [122] - 4:15, 6:24, 8:11, 9:14, 9:19, 10:17, 12:18, 12:19, 16:21, 16:22, 16:23, 17:6, 17:8, 17:18, 18:5, 18:25, 19:18, 21:7, 21:14, 21:15, 21:24, 22:24, 22:25, 23:13, 25:14, 25:24, 26:2, 26:4, 27:3, 27:5, 27:7, 27:8, 27:14, 27:15, 28:8, 28:10, 31:2, 32:11, 32:16, 33:21, 34:15, 34:23, 35:9, 35:13, 35:16, 36:24, 37:2, 37:3, 38:5, 39:6, 43:6, 43:8, 44:1, 44:11, 44:17, 44:23, 45:5, 45:19, 48:21, 49:4, 50:12, 50:13, 50:14, 50:15, 51:6, 51:19, 51:23, 52:23, 53:25, 54:6, 54:8, 54:14, 54:17, 56:14, 57:10, 57:17, 58:11, 58:17, 59:2, 59:12, 59:15, 59:17, 62:12, 62:19, 62:22, 64:7, 65:2, 65:15, 67:7, 68:4, 69:6, 69:10, 69:20, 70:7, 70:11, 72:13, 82:5, 85:9, 86:1, 86:4, 87:16, 88:6, 88:8, 88:17, 88:19, 88:21, 102:7, 102:19, 108:5, 115:2, 128:1, 129:10, 129:15, 130:1, 130:7, 130:13, 130:15, 130:22, 130:23, 131:6, 135:14, 136:4

**present** [7] - 49:6, 70:11, 79:10, 79:22, 83:24, 112:22, 116:4
**presentation** [1] - 40:4
**presented** [5] - 89:22, 101:13, 102:14, 111:15, 128:20
**press** [1] - 31:20
**pressing** [1] - 65:3
**presumably** [1] - 118:13
**pretty** [1] - 138:25
**previewed** [1] - 85:5
**previous** [1] - 11:3
**previously** [1] - 130:8
**Prevoznik** [1] - 64:10
**primarily** [1] - 33:13
**primary** [3] - 90:10, 108:25, 112:24
**Prime** [1] - 52:18
**prison** [2] - 28:14, 30:18
**privileged** [1] - 124:14
**problem** [11] - 16:10, 22:23, 41:2, 41:10, 41:12, 57:3, 57:7, 57:8, 66:3, 79:7, 88:9
**problematic** [1] - 6:23
**problems** [3] - 35:11, 43:12, 120:5
**Procedure** [1] - 55:11
**procedures** [1] - 123:11
**proceed** [4] - 90:3, 120:7, 124:18, 133:23
**proceeding** [4] - 97:17, 119:20, 123:22, 139:15
**proceeds** [1] - 86:6
**process** [27] - 4:4, 5:12, 5:21, 6:2, 7:4, 9:5, 11:14, 12:1, 12:8, 16:7, 16:9, 36:9, 37:21, 40:6, 41:19, 48:17, 49:6, 49:7, 58:21, 67:10, 85:21, 92:3, 94:15, 101:8, 112:15, 124:23, 131:14
**processing** [3] - 10:25, 85:14, 94:22
**produce** [39] - 3:24, 5:6, 7:2, 7:24, 11:4, 12:9, 14:4, 14:6, 19:5, 21:10, 32:15, 37:16, 40:8, 40:24, 41:6, 41:19, 45:10,

49:17, 57:23, 59:18, 60:7, 65:9, 66:11, 66:13, 66:19, 69:19, 70:15, 76:1, 82:22, 83:5, 96:13, 96:20, 96:25, 97:1, 98:6, 121:6, 128:2, 128:16, 130:14
**produced** [14] - 7:9, 17:6, 18:19, 33:24, 45:5, 45:7, 49:4, 50:5, 50:16, 71:8, 82:18, 82:25, 84:15, 85:5
**producing** [5] - 4:25, 34:7, 40:16, 42:1, 65:22
**product** [1] - 123:16
**production** [2] - 79:20, 99:22
**productions** [4] - 82:12, 82:16, 82:19, 84:13
**professional** [1] - 83:24
**program** [1] - 93:15
**Program** [1] - 96:2
**programs** [2] - 7:18, 7:19
**Programs** [1] - 95:7
**progressed** [2] - 16:8, 67:11
**proliferative** [1] - 137:24
**pronounced** [1] - 22:10
**proof** [3] - 28:19, 38:20, 84:6
**proper** [2] - 45:23, 133:12
**proportional** [1] - 130:2
**propose** [1] - 41:17
**proposed** [2] - 99:10, 99:14
**proposition** [3] - 29:7, 31:21, 122:1
**propounded** [1] - 136:13
**prosecute** [1] - 30:3
**prosecuted** [2] - 84:17, 128:3
**prosecution** [4] - 84:16, 114:21, 127:24, 128:3
**prosecutions** [1] - 127:18
**prospective** [1] - 4:6
**protected** [2] - 124:15, 133:9

**PROTECTION** [1] - 1:23
**Protection** [7] - 3:14, 96:4, 96:8, 103:22, 113:14, 115:19
**prove** [12] - 9:24, 21:20, 30:23, 31:1, 44:4, 47:4, 47:22, 49:22, 65:9, 74:6, 79:5, 84:8
**proved** [1] - 49:10
**proven** [1] - 86:23
**proves** [1] - 86:20
**provide** [38] - 9:16, 10:11, 10:15, 21:5, 21:23, 31:23, 33:22, 34:18, 34:24, 35:1, 38:18, 44:23, 46:16, 47:24, 48:4, 48:6, 48:9, 48:12, 62:11, 62:24, 63:22, 68:8, 75:23, 80:16, 81:3, 81:14, 87:18, 91:13, 91:14, 99:19, 99:20, 115:5, 130:8, 131:7, 131:9, 131:12, 134:13, 135:22
**provided** [20] - 8:7, 11:3, 17:23, 30:13, 45:20, 46:13, 49:25, 68:12, 73:13, 78:10, 82:20, 93:5, 93:6, 93:9, 101:20, 114:21, 116:19, 116:22, 132:1
**provides** [1] - 135:25
**providing** [1] - 66:9
**proving** [2] - 69:24, 70:6
**provision** [2] - 94:20, 121:8
**provisional** [1] - 52:3
**provisions** [1] - 30:13
**public** [1] - 124:15
**pull** [8] - 23:18, 30:4, 37:6, 53:17, 70:12, 83:12, 83:14, 127:11
**purely** [1] - 25:11
**purportedly** [1] - 133:2
**purpose** [7] - 21:1, 26:5, 26:11, 26:16, 30:7, 70:22
**purposes** [2] - 122:16, 126:16
**pursuant** [1] - 133:24
**pursue** [4] - 60:12, 61:20, 80:21, 131:11
**pursuing** [2] - 63:16, 89:9

**push** [1] - 37:13
**pushing** [3] - 16:9, 22:18, 96:6
**put** [23] - 19:21, 19:23, 20:15, 20:25, 21:7, 23:5, 23:10, 23:15, 46:22, 55:19, 63:18, 71:6, 79:24, 80:14, 86:3, 88:8, 99:9, 102:21, 104:8, 106:7, 111:7, 114:11, 122:1
**puts** [1] - 53:10
**putting** [3] - 85:23, 92:12, 101:3

**Q**

**quantitative** [1] - 64:17
**quantity** [1] - 19:20
**quash** [2] - 99:6, 100:1
**query** [1] - 34:11
**questioning** [1] - 61:21
**questions** [4] - 16:19, 24:24, 117:4, 118:22
**quick** [1] - 50:4
**quickly** [3] - 29:3, 63:3, 91:22
**quoted** [1] - 29:13
**quotes** [1] - 77:3
**quoting** [1] - 29:14

**R**

**races** [1] - 92:8
**raise** [2] - 6:3, 96:10
**raised** [11] - 7:3, 15:14, 67:14, 69:14, 90:15, 95:25, 100:19, 111:22, 121:21, 132:14, 133:22
**raising** [1] - 35:21, 122:23
**range** [3] - 58:12, 83:1, 102:5
**rarely** [1] - 70:6
**rate** [1] - 86:2
**rather** [4] - 5:6, 45:16, 74:13, 78:17
**rationale** [1] - 8:6
**re** [2] - 111:10, 111:16
**reach** [7] - 19:19, 34:14, 35:25, 59:11, 92:20, 92:25, 116:11
**reached** [2] - 73:14, 95:7

**reaching** [1] - 133:21
**read** [6] - 15:21, 15:22, 29:14, 52:19, 93:22, 93:23
**reading** [3] - 14:14, 39:11, 101:18
**ready** [4] - 38:2, 40:21, 52:18, 96:11
**real** [2] - 27:18, 121:20
**really** [49] - 4:17, 5:16, 5:25, 14:23, 15:14, 17:13, 17:19, 18:1, 23:17, 25:22, 26:16, 27:1, 30:15, 31:11, 33:6, 36:1, 39:3, 47:11, 56:21, 62:2, 63:2, 66:3, 67:17, 68:20, 71:25, 81:19, 85:19, 98:9, 98:10, 98:16, 98:17, 104:4, 104:16, 106:22, 108:5, 108:6, 108:18, 108:19, 109:8, 109:13, 111:14, 112:1, 117:6, 125:25, 128:9, 131:14, 137:6, 138:12
**realm** [1] - 30:15
**reason** [17] - 9:11, 17:20, 26:17, 30:19, 37:23, 41:2, 60:23, 74:9, 74:19, 79:1, 81:1, 87:14, 90:5, 94:2, 111:6, 111:14, 132:2
**reasonable** [6] - 6:7, 28:19, 34:14, 52:13, 52:16, 91:12
**reasonably** [3] - 7:14, 15:25, 124:12
**reasoning** [2] - 38:25, 39:1
**reasons** [9] - 7:20, 54:8, 60:9, 63:16, 69:15, 79:3, 89:13, 101:10, 112:18
**rebuttal** [1] - 27:23
**recalcitrant** [1] - 17:13
**receive** [2] - 12:6, 66:8, 75:1, 94:5
**received** [4] - 52:2, 72:22, 74:25, 95:2
**receives** [1] - 123:12
**receiving** [1] - 54:25
**recess** [1] - 128:24
**recognize** [3] - 4:22, 6:14, 110:9
**recognized** [4] - 12:24, 13:24, 63:25,

109:2
**recognizes** [1] - 124:2
**reconsider** [2] - 108:11, 131:24
**record** [7] - 104:14, 104:19, 105:15, 106:2, 134:4, 134:18, 136:2
**recordkeeping** [1] - 31:6
**records** [7] - 36:25, 40:9, 82:14, 83:4, 83:5, 86:8, 116:16
**red** [35] - 3:23, 19:9, 19:10, 19:13, 20:7, 20:20, 22:11, 22:15, 22:21, 23:4, 25:20, 34:6, 35:12, 38:4, 46:12, 49:18, 53:4, 53:22, 55:5, 55:18, 55:23, 56:25, 57:6, 59:1, 59:4, 61:1, 64:23, 73:21, 76:6, 76:9, 78:15, 80:9, 83:9, 83:15, 83:22
**Red** [44] - 8:25, 9:6, 9:22, 10:9, 19:3, 19:23, 22:8, 25:14, 25:24, 26:1, 43:4, 43:8, 46:4, 51:14, 53:9, 54:4, 56:14, 57:3, 60:14, 61:13, 62:10, 65:20, 69:18, 72:14, 72:23, 73:1, 73:21, 73:22, 74:4, 74:18, 76:19, 77:25, 78:2, 78:14, 83:11, 83:16, 83:23, 87:25, 130:17, 131:3, 131:8, 136:11, 137:4
**Redland** [1] - 121:16
**reduce** [1] - 4:5
**refer** [1] - 16:14
**reference** [5] - 13:2, 13:4, 14:1, 23:19, 113:19
**referenced** [1] - 113:16
**referencing** [1] - 113:21
**referring** [1] - 136:3
**refine** [1] - 42:11
**reflected** [1] - 76:15
**refusal** [1] - 48:12
**refuse** [1] - 43:16
**refused** [4] - 18:11, 18:12, 21:12, 45:10
**regard** [1] - 26:23
**regarding** [3] - 39:21, 76:17, 103:9

**regardless** [6] - 8:5, 78:3, 118:14, 121:1, 121:7, 121:8
**regions** [1] - 39:14
**register** [2] - 108:20
**Register** [1] - 63:21
**regular** [1] - 10:6
**regularly** [1] - 27:6
**regulation** [7] - 28:12, 28:13, 30:3, 30:5, 49:13, 122:14, 124:10
**regulations** [23] - 64:17, 90:19, 93:7, 93:22, 94:23, 95:21, 95:22, 110:9, 110:10, 110:18, 110:21, 121:11, 121:14, 122:10, 122:20, 122:21, 123:14, 123:25, 124:3, 124:5, 124:7, 124:8, 126:20
**regulatory** [1] - 24:5
**reinforcing** [1] - 40:12
**reiterate** [2] - 124:16, 133:25
**reiterated** [1] - 26:9
**reiterates** [1] - 55:8
**reject** [1] - 4:7
**rejected** [1] - 43:18
**relate** [4] - 4:22, 7:14, 71:5, 115:15
**related** [16] - 4:12, 6:16, 17:8, 21:6, 39:9, 39:12, 40:9, 61:9, 61:10, 61:25, 72:24, 107:3, 109:3, 109:13, 114:23, 127:17
**relaters** [2] - 117:16, 117:18
**relates** [3] - 118:9, 121:2, 131:21
**relating** [6] - 22:25, 30:14, 35:12, 64:16, 127:12, 127:14
**relative** [1] - 8:20
**relaxant** [2] - 13:7, 69:8
**release** [3] - 26:4, 26:10, 31:20
**relevance** [4] - 8:8, 69:23, 91:15, 129:12
**relevant** [22] - 5:14, 5:20, 7:8, 7:11, 7:16, 7:17, 8:8, 9:9, 10:4, 10:13, 10:20, 24:3, 27:9, 34:4, 69:24, 70:5, 70:18, 77:10,

89:10, 98:23, 112:10, 133:10
**relied** [1] - 101:13
**relief** [3] - 29:10, 90:10, 100:12
**relying** [1] - 75:22
**remain** [1] - 95:14
**remains** [1] - 113:4
**remedy** [1] - 133:12
**remember** [4] - 28:11, 63:19, 66:21, 69:23
**remembering** [1] - 138:18
**remind** [1] - 54:4
**removal** [1] - 65:11
**remove** [1] - 65:14
**removed** [1] - 130:23
**repeatedly** [5] - 4:6, 18:7, 25:13, 44:1, 108:10
**Reporter** [1] - 139:17
**reports** [2] - 114:22, 115:6
**represent** [1] - 65:23
**representation** [4] - 36:12, 78:9, 84:13, 116:4
**representative** [1] - 70:13
**representatives** [1] - 116:25
**represented** [2] - 84:4, 101:2
**representing** [2] - 3:14, 93:16
**request** [47] - 3:25, 4:10, 4:20, 5:12, 5:13, 5:25, 6:6, 6:8, 8:3, 8:4, 14:9, 17:1, 18:12, 20:6, 21:25, 24:19, 25:4, 37:23, 42:11, 47:21, 61:25, 70:18, 94:22, 99:1, 101:16, 112:12, 112:25, 118:9, 120:24, 123:12, 127:12, 129:4, 129:16, 129:19, 129:21, 129:23, 130:3, 131:3, 131:21, 132:11, 133:7, 134:16, 134:19, 135:3, 135:10, 137:1
**requested** [16] - 7:17, 7:23, 8:1, 11:2, 35:3, 45:9, 45:10, 50:8, 51:4, 51:7, 66:13, 129:6, 129:8, 129:12, 129:25,

130:9
**requesting** [2] - 10:24, 50:14
**requests** [14] - 25:2, 25:17, 73:11, 89:9, 92:13, 92:14, 93:3, 97:14, 104:7, 112:1, 118:10, 118:11, 120:18, 127:11
**require** [4] - 66:8, 94:21, 101:21, 101:24
**required** [4] - 10:21, 30:20, 31:17, 34:15
**requirement** [3] - 50:22, 101:19, 126:10
**requirements** [1] - 138:3
**requires** [1] - 101:21
**rerun** [1] - 75:14
**reserves** [1] - 55:9
**resolution** [3] - 38:15, 40:19, 40:23
**resolve** [4] - 42:6, 43:3, 72:6, 138:9
**resolved** [6] - 48:16, 67:10, 72:22, 73:1, 76:18, 78:15
**resolves** [1] - 94:20
**resolving** [1] - 67:4
**respect** [13] - 7:21, 15:5, 15:13, 17:3, 25:1, 33:21, 38:21, 51:3, 113:3, 117:7, 125:16, 132:15, 138:24
**respectively** [1] - 118:18
**respond** [11] - 48:23, 50:3, 94:9, 111:5, 112:19, 125:7, 128:1, 131:7, 132:12, 132:24, 134:2
**responded** [3] - 92:15, 94:12, 132:16
**Respondent** [2] - 94:21, 94:24
**responding** [1] - 92:22
**response** [29] - 11:3, 17:24, 43:22, 45:5, 45:20, 53:15, 54:1, 76:24, 78:19, 79:25, 80:14, 81:15, 82:17, 82:22, 89:16, 94:1, 96:15, 97:6, 103:12, 112:4, 117:15, 121:6, 131:19,

132:21, 134:23, 135:22, 136:1, 137:3, 137:5
**responses** [15] - 4:2, 82:20, 92:10, 94:25, 96:22, 97:10, 99:20, 103:25, 106:6, 107:22, 108:9, 113:8, 113:13, 125:5, 134:3
**responsible** [1] - 64:12
**responsive** [3] - 81:10, 87:3, 115:4
**rest** [4] - 31:25, 37:20, 118:10, 118:11
**restricting** [1] - 71:24
**restrictions** [3] - 85:18, 138:25, 139:2
**restrictive** [1] - 138:25
**result** [5] - 91:8, 91:24, 120:13, 120:16, 121:9
**resulting** [1] - 129:10
**results** [1] - 12:2
**retained** [2] - 12:1, 75:11
**reverse** [1] - 120:1
**review** [4] - 10:16, 12:10, 84:1, 94:3
**reviewed** [1] - 130:11
**revise** [1] - 55:10
**revision** [1] - 75:9
**revisionist** [1] - 107:11
**reward** [1] - 100:5
**rewarding** [1] - 45:21
**RFP** [1] - 69:12
**Richards** [1] - 3:2
**RICHARDS** [1] - 2:3
**Ridley's** [18] - 23:17, 23:20, 23:23, 24:15, 24:16, 24:24, 28:4, 29:17, 29:20, 38:10, 38:15, 38:25, 39:3, 39:20, 83:13, 83:21, 88:17, 129:22
**ripe** [1] - 87:9
**rise** [7] - 9:4, 29:10, 107:6, 108:22, 113:10, 128:23, 128:25
**road** [1] - 98:19
**roadblock** [2] - 89:11
**Rocque** [1] - 104:13
**role** [1] - 104:1
**rolling** [2] - 44:7, 99:21
**Romero** [1] - 104:20
**routinely** [1] - 27:16

rows [1] - 36:18
Roy [1] - 47:12
RPDs [3] - 4:9, 4:10, 82:17
Rule [26] - 29:15, 31:17, 37:24, 90:3, 90:12, 92:3, 92:5, 92:8, 93:11, 93:12, 95:13, 97:18, 99:1, 99:23, 100:1, 101:5, 101:16, 104:7, 110:5, 110:7, 112:18, 119:21, 124:21, 129:11, 130:24, 133:24
rule [6] - 16:4, 24:11, 27:24, 67:2, 67:18, 122:6
rule-based [1] - 24:11
ruled [2] - 52:9, 134:5
Rules [1] - 55:10
rules [3] - 82:6, 124:17, 126:20
ruling [13] - 42:17, 59:25, 61:16, 101:13, 107:25, 119:19, 122:15, 122:16, 128:21, 129:2, 131:24, 134:6, 137:9
run [6] - 29:25, 69:19, 70:3, 75:1, 76:21, 85:4
run-of-the-mill [2] - 29:25, 70:3
runarounds [1] - 98:17
running [2] - 108:11, 109:3
runs [1] - 3:23

S

safety [3] - 59:20, 65:11, 71:3
sale [1] - 7:7
sample [2] - 70:11, 70:13
sampling [2] - 70:9, 70:15
sand [2] - 125:9, 125:11
sat [1] - 87:10
satisfy [1] - 87:15
saw [3] - 70:7, 97:24, 126:3
scale [1] - 37:17
scattered [1] - 35:24
scenario [1] - 31:12
scene [1] - 96:3

scenes [1] - 103:2
Schedule [1] - 54:2
Scheduling [1] - 55:12
scope [9] - 5:1, 8:12, 9:22, 15:20, 46:4, 68:24, 71:17, 74:7, 92:4
screen [3] - 53:17, 55:20, 106:7
screw [1] - 100:14
screwing [1] - 91:1
scripts [2] - 51:10, 61:14
se [25] - 19:18, 27:2, 55:5, 60:22, 61:8, 61:15, 61:17, 61:19, 62:3, 62:16, 62:17, 63:14, 64:9, 64:24, 134:18, 134:19, 134:20, 135:4, 135:14, 135:16, 135:19, 135:24, 136:11, 136:20, 137:7
Sear [1] - 3:6
search [6] - 24:5, 82:14, 85:4, 99:21, 138:15, 138:20
searches [1] - 34:13
searching [1] - 83:4
seated [2] - 2:16, 129:2
Second [1] - 55:20
second [11] - 4:9, 38:24, 40:2, 50:18, 50:22, 63:12, 70:9, 90:5, 114:14, 120:24, 127:13
Section [4] - 116:10, 116:18, 116:22, 117:1
securities [1] - 11:24
Securities [1] - 126:12
see [15] - 11:5, 13:10, 22:1, 36:12, 68:23, 71:6, 71:25, 81:1, 93:22, 101:16, 104:1, 114:8, 116:21, 136:14, 138:2
seeing [6] - 9:17, 9:18, 9:21, 10:3, 36:9, 70:4
seek [7] - 14:21, 24:2, 78:16, 80:11, 86:16, 86:17, 87:21
seeking [12] - 4:3, 5:24, 6:25, 10:18, 14:23, 16:21, 25:8, 29:2, 37:24, 70:25,

78:14, 87:21
seeks [2] - 4:20, 129:16
seem [5] - 10:5, 13:12, 22:18, 63:15, 88:13
segregation [1] - 125:25
semantics [1] - 29:8
send [1] - 28:13
Senior [1] - 104:17
sensationalistic [1] - 31:20
sense [12] - 23:14, 48:19, 68:9, 69:25, 75:24, 76:22, 99:9, 104:4, 104:16, 120:20, 127:8, 138:18
sensitive [1] - 121:8
sent [6] - 33:9, 64:5, 92:11, 126:5, 128:11, 137:14
separate [3] - 34:11, 75:11, 138:15
separation [3] - 116:6, 117:3, 126:7
September [12] - 52:20, 56:14, 89:6, 90:6, 91:20, 101:13, 108:3, 108:19, 122:15, 125:18, 126:11, 126:15
serious [1] - 28:14
seriously [1] - 125:6
serve [8] - 81:8, 92:7, 92:9, 96:16, 97:3, 111:18, 111:21, 134:6
served [14] - 5:1, 40:7, 91:25, 96:19, 97:15, 98:13, 98:18, 103:7, 111:22, 111:23, 111:24, 120:9, 132:18, 133:4
Service [1] - 104:10
set [12] - 26:5, 29:9, 35:9, 35:16, 37:6, 56:20, 63:13, 68:16, 77:18, 113:9, 118:3, 126:21
setting [1] - 76:21
seven [8] - 34:16, 41:7, 66:20, 72:13, 80:22, 86:1, 99:20, 135:6
Seventh [1] - 47:9
seventy [1] - 87:5
several [7] - 51:16, 82:22, 91:17, 92:11, 97:5, 101:9, 106:23

several-page [1] - 97:5
Sevier [2] - 111:11, 111:16
share [2] - 33:16, 52:6
shared [2] - 125:25, 127:7
sharing [1] - 126:6
shock [1] - 54:6
short [4] - 31:17, 31:22, 55:24, 55:25
short-handing [2] - 55:24, 55:25
shorthand [1] - 129:5
shortly [1] - 35:10
Shoup [1] - 105:25
show [10] - 25:21, 27:9, 27:14, 27:15, 28:21, 48:1, 53:13, 63:17, 91:25, 112:6
showed [3] - 46:24, 54:5, 113:7
showing [1] - 111:9
shows [3] - 27:5, 27:6, 27:7
shut [2] - 29:20, 36:3
side [7] - 15:23, 116:13, 126:5, 127:5, 127:6
side-by-side [1] - 127:5
sides [4] - 10:14, 10:16, 67:19, 72:2
signed [1] - 116:3
significant [4] - 109:19, 117:9, 126:9, 126:13
significantly [4] - 4:5, 57:19, 113:5, 118:4
signified [1] - 5:4
signs [1] - 12:25
similar [4] - 6:17, 23:20, 71:12, 89:6
simplified [1] - 77:20
simply [1] - 26:15
single [16] - 3:23, 4:19, 5:15, 7:7, 12:16, 36:19, 64:19, 70:21, 85:4, 92:11, 96:20, 97:1, 97:2, 129:16, 129:18
sit [1] - 32:14
sitting [8] - 104:2, 105:8, 105:13, 106:1, 113:9, 125:22, 126:22, 127:5
situation [6] - 26:9, 64:2, 78:11, 84:2, 96:14, 99:18

situations [2] - 132:23, 136:22
six [12] - 26:10, 37:15, 82:16, 84:16, 84:25, 89:7, 104:12, 109:25, 114:7, 114:8, 122:7
sixth [1] - 109:9
sixty [3] - 14:22, 114:6, 114:7
sixty-five [1] - 114:6
sixty-six [1] - 114:7
size [2] - 12:4, 44:13
sliced [1] - 56:3
slide [19] - 23:18, 23:19, 25:24, 28:5, 30:4, 60:21, 60:22, 61:4, 63:17, 64:5, 83:13, 83:14, 92:1, 94:17, 103:16, 104:23, 105:4, 105:16, 108:16
slides [3] - 16:13, 54:5, 114:12
slightly [1] - 110:9
small [1] - 6:14
smaller [2] - 35:19, 45:9
someone [6] - 30:8, 77:20, 105:14, 106:1, 113:23
somewhere [2] - 50:1, 72:5
Sonja [2] - 103:20, 106:9
soon [1] - 66:10
sorry [13] - 3:12, 13:2, 23:13, 25:25, 32:24, 34:21, 35:2, 37:18, 50:15, 73:3, 113:18, 134:11
sort [78] - 5:4, 5:8, 5:20, 6:3, 6:15, 6:18, 6:20, 6:24, 7:2, 8:14, 9:9, 9:11, 9:13, 10:2, 10:18, 11:4, 11:8, 11:11, 11:12, 11:22, 13:1, 13:24, 14:4, 14:23, 15:12, 15:13, 15:14, 16:8, 16:9, 21:13, 22:21, 22:22, 38:18, 38:24, 39:17, 40:3, 40:9, 40:13, 41:17, 45:18, 45:23, 46:22, 47:5, 47:21, 48:3, 59:11, 68:13, 69:18, 69:25, 70:5, 70:9, 70:11, 71:2, 72:1, 72:14, 73:15, 73:23, 74:8, 75:2,

75:14, 75:15, 75:20, 77:7, 77:16, 77:17, 79:19, 79:21, 81:20, 81:23, 82:3, 82:5, 83:1, 86:11, 86:20, 118:13, 121:19, 127:15
**sought** [3] - 8:4, 130:2, 133:8
**sounds** [10] - 74:16, 76:2, 77:2, 77:20, 79:23, 126:3, 127:2, 132:23, 133:15, 135:25
**span** [1] - 39:13
**spans** [1] - 129:9
**speaking** [2] - 2:20, 21:19
**speaks** [4] - 8:14, 46:9, 70:4, 76:11
**Special** [4] - 104:9, 105:7, 105:17, 105:18
**specialty** [1] - 77:14
**specific** [18] - 5:9, 14:5, 18:3, 20:22, 24:18, 31:9, 39:6, 39:15, 39:17, 54:24, 64:17, 67:20, 83:25, 85:15, 85:16, 110:11, 112:11, 133:14
**specifically** [16] - 5:19, 6:18, 8:3, 15:18, 17:9, 20:7, 38:22, 39:16, 40:10, 41:20, 42:2, 47:19, 49:5, 57:10, 92:14
**specification** [1] - 69:18
**specifications** [12] - 8:19, 11:8, 46:14, 68:6, 68:12, 71:13, 72:16, 74:8, 75:2, 75:4, 75:23, 77:11
**specifics** [1] - 22:23
**specified** [3] - 8:18, 72:15, 75:3
**spectrum** [1] - 72:3
**spells** [1] - 36:16
**spent** [2] - 18:24, 23:3
**spit** [1] - 37:13
**spreadsheet** [23] - 11:2, 11:5, 43:4, 43:5, 49:17, 51:14, 51:15, 57:1, 57:4, 65:7, 65:18, 66:3, 66:4, 66:6, 71:9, 72:16, 73:16, 85:9, 85:20, 86:7, 87:17, 130:12, 131:4
**spreadsheets** [2] - 35:12, 62:11
**square** [1] - 109:8
**stage** [1] - 60:6
**standard** [6] - 8:9, 10:13, 27:10, 31:6, 54:20, 71:2
**standards** [1] - 50:21
**standing** [1] - 41:22
**stands** [1] - 17:4
**Star** [3] - 126:15, 126:16
**start** [16] - 2:16, 3:20, 9:6, 32:24, 33:3, 50:1, 51:13, 53:22, 57:16, 57:20, 57:25, 83:8, 89:2, 131:14, 137:23
**started** [2] - 61:4, 92:10
**starting** [20] - 5:17, 6:4, 14:6, 19:4, 20:20, 38:2, 38:3, 38:23, 40:13, 43:10, 43:14, 49:20, 49:24, 54:12, 57:23, 58:1, 60:11, 77:23, 130:22, 139:9
**state** [5] - 7:18, 8:7, 64:14, 82:24, 124:13
**State** [3] - 8:4, 50:8, 50:17
**statement** [9] - 26:13, 31:18, 31:22, 57:15, 63:20, 86:12, 91:14, 91:15, 121:19
**statements** [1] - 136:3
**states** [4] - 10:11, 39:13, 50:9, 124:9
**STATES** [3] - 1:1, 1:3, 1:17
**States** [43] - 1:13, 4:8, 24:1, 40:25, 45:10, 47:2, 47:12, 50:16, 51:5, 51:7, 55:7, 67:5, 67:6, 68:3, 82:11, 82:25, 90:20, 93:8, 95:21, 98:22, 104:12, 104:13, 107:2, 107:5, 110:12, 112:24, 115:25, 121:12, 121:21, 121:24, 122:11, 122:17, 123:1, 123:8, 123:14, 124:1, 124:4, 126:11, 126:17, 126:19, 131:25, 135:12
**States'** [3] - 3:24, 4:5, 82:17
**statistical** [4] - 8:16, 47:8, 47:23, 47:25
**statistically** [1] - 49:10
**statistician** [1] - 70:12
**statistics** [1] - 82:11
**Statute** [2] - 123:10, 123:17
**statute** [10] - 28:18, 29:25, 30:1, 32:9, 49:12, 50:20, 50:22, 85:15, 106:25
**statutes** [3] - 15:17, 38:17, 50:25
**statutory** [1] - 38:19
**stay** [1] - 17:21
**steadfast** [1] - 89:25
**stenographic** [1] - 139:15
**step** [4] - 9:8, 45:3, 48:15, 136:22
**steroids** [1] - 4:23
**Stewart** [2] - 83:20, 83:23
**stick** [1] - 42:22
**still** [24] - 20:15, 34:13, 35:20, 38:19, 43:5, 59:6, 60:16, 70:18, 74:11, 81:25, 88:19, 89:18, 90:12, 91:22, 92:3, 92:4, 97:4, 99:23, 110:6, 110:7, 112:17, 118:25, 120:6, 126:6
**stonewalled** [1] - 89:21
**stood** [2] - 56:13, 95:12
**stopped** [1] - 41:18
**stopping** [1] - 6:4
**store** [5] - 4:19, 9:16, 12:16, 58:16, 58:18
**Stores** [1] - 64:6
**stores** [1] - 129:9
**story** [2] - 35:18, 125:17
**Street** [1] - 1:11
**stress** [1] - 63:2
**strike** [1] - 4:4
**strong** [1] - 3:19
**stronger** [1] - 61:7
**strongest** [1] - 78:18
**struggling** [1] - 55:17
**stuck** [4] - 5:17, 16:9, 42:13, 84:2
**student** [1] - 112:3
**stuff** [1] - 23:24
**subject** [9] - 4:12, 30:12, 53:23, 74:19, 75:9, 75:18, 121:2, 130:18, 138:25
**submitted** [1] - 120:4
**submitting** [1] - 121:5
**subpoena** [15] - 45:17, 45:20, 49:2, 90:14, 92:22, 94:24, 99:13, 104:7, 112:4, 120:20, 120:24, 123:13, 127:11, 133:8
**subpoenaed** [1] - 120:19
**subpoenas** [22] - 17:11, 45:22, 91:25, 92:8, 92:9, 92:11, 93:2, 94:22, 97:6, 98:18, 100:4, 101:4, 111:5, 112:20, 118:8, 118:14, 120:23, 125:7, 132:17, 132:21, 132:25, 134:2
**subsequent** [2] - 32:6, 136:7
**subset** [3] - 5:7, 21:10, 47:19
**subsets** [1] - 35:20
**substance** [21] - 4:14, 4:15, 5:5, 5:15, 6:11, 7:7, 7:19, 12:20, 15:1, 15:2, 16:22, 19:6, 19:11, 37:2, 37:12, 58:18, 64:21, 66:20, 129:14, 129:16, 129:22
**Substances** [11] - 4:7, 6:12, 16:25, 32:8, 83:12, 88:2, 88:22, 107:6, 115:12, 129:20, 131:16
**substances** [40] - 4:18, 4:21, 5:1, 5:2, 5:6, 5:9, 6:9, 6:15, 6:23, 12:12, 12:13, 12:21, 12:22, 12:25, 13:12, 14:10, 14:15, 14:16, 14:22, 14:23, 17:16, 18:6, 18:8, 18:10, 18:11, 19:13, 20:9, 30:14, 37:1, 41:6, 50:6, 50:7, 50:15, 63:21, 63:24, 107:4, 129:7, 129:8, 129:19
**substantial** [3] - 101:20, 101:23, 103:25
**substantive** [1] - 133:20
**succeed** [1] - 24:19
**suddenly** [1] - 9:19
**sufficiency** [1] - 133:13
**sufficient** [3] - 129:12, 130:20, 132:1
**suggest** [3] - 35:22, 67:19, 136:21
**suggested** [2] - 19:17, 32:22
**suggests** [1] - 124:1
**suit** [1] - 132:4
**summarily** [1] - 33:18
**summary** [6] - 20:15, 59:6, 60:5, 82:11, 83:21, 116:24
**superseding** [1] - 109:9
**supervisors** [1] - 139:5
**supplement** [3] - 55:9, 99:19, 131:19
**supplemental** [3] - 106:5, 120:4, 125:4
**supplementation** [3] - 52:10, 130:24, 131:20
**supplementing** [1] - 4:1
**supply** [5] - 19:6, 54:16, 54:25, 69:9, 75:3
**support** [2] - 45:14, 45:25
**supported** [2] - 37:22, 39:23
**supports** [2] - 15:15, 74:15
**supposed** [4] - 54:6, 67:15, 90:25, 95:1
**surprise** [5] - 14:9, 46:11, 93:3, 108:6, 122:25
**surprised** [1] - 36:12
**surprising** [2] - 32:23, 101:25
**surrounding** [2] - 88:5, 116:7
**suspect** [2] - 26:21, 85:6
**sweeping** [1] - 31:3
**synonymous** [1] - 19:10
**system** [5] - 11:7, 69:19, 72:21, 77:9, 81:17
**systems** [3] - 4:13, 5:3, 41:17

# T

t]he [1] - 63:24
table [1] - 106:4
tables [1] - 37:7
tabs [6] - 11:7, 11:10, 57:2, 73:25, 131:4
tailor [2] - 5:25, 73:11
tailored [1] - 41:18
tailoring [1] - 20:6
talks [3] - 6:20, 33:13, 33:19
tardiness [3] - 111:8, 119:23, 120:15
targets [1] - 45:21
team [4] - 95:9, 95:12, 114:21, 116:25
telephonic [1] - 139:4
telephonically [1] - 139:9
ten [9] - 12:16, 16:1, 35:24, 41:7, 50:15, 66:20, 82:11, 83:6, 129:9
tendency [1] - 83:19
TENNYSON [1] - 1:13
tens [2] - 11:24, 34:12
tent [1] - 44:7
term [3] - 85:4, 112:22, 135:19
terminal [1] - 86:15
terminally [4] - 77:21, 80:7, 80:11, 87:22
terms [25] - 6:8, 10:25, 18:3, 21:14, 24:25, 28:3, 29:16, 39:14, 49:9, 49:16, 68:1, 68:19, 70:19, 72:3, 74:18, 76:5, 83:3, 86:14, 99:21, 101:4, 112:14, 125:4, 135:24, 138:16, 138:20
testified [2] - 78:5, 78:7
testimony [1] - 46:23
testosterone [1] - 18:8
tethered [1] - 9:3
Tharp [1] - 105:17
THE [197] - 1:1, 1:1, 1:13, 2:15, 2:24, 3:9, 3:16, 4:17, 5:11, 6:5, 6:10, 7:6, 7:12, 8:23, 10:5, 10:23, 11:12, 12:11, 12:15, 13:2, 13:8, 13:20, 14:8, 14:17, 15:3, 15:7, 15:21, 16:11, 16:15, 18:14, 19:1, 19:12, 19:24, 20:4, 20:13,

20:18, 21:1, 22:4, 22:13, 22:17, 23:10, 23:14, 24:16, 25:6, 27:22, 32:14, 32:20, 34:18, 34:22, 35:1, 35:6, 38:8, 40:1, 41:2, 41:22, 42:3, 42:18, 43:1, 43:15, 43:21, 44:18, 44:25, 48:2, 48:18, 48:24, 49:1, 50:2, 50:11, 51:12, 51:18, 51:21, 51:24, 52:6, 52:25, 55:14, 55:24, 56:6, 56:9, 56:25, 57:12, 58:4, 58:14, 58:25, 59:8, 59:19, 60:3, 60:14, 61:23, 62:8, 62:23, 65:6, 65:16, 65:19, 65:25, 66:12, 66:18, 67:12, 67:24, 68:15, 68:19, 68:23, 69:12, 69:21, 70:14, 70:19, 71:14, 71:21, 72:2, 72:25, 73:5, 73:20, 73:25, 74:16, 75:5, 75:18, 75:25, 76:5, 76:23, 77:2, 77:18, 78:7, 78:19, 78:25, 79:8, 79:15, 79:23, 80:7, 80:13, 80:18, 81:7, 81:18, 82:8, 83:2, 83:7, 83:17, 84:9, 85:22, 86:24, 88:11, 88:24, 89:3, 89:17, 90:15, 90:21, 92:23, 94:7, 94:11, 97:7, 97:16, 97:20, 99:2, 99:11, 99:25, 100:19, 102:17, 107:19, 107:23, 107:25, 112:21, 113:1, 113:6, 113:16, 113:19, 113:25, 115:10, 118:20, 118:23, 119:3, 119:9, 119:13, 119:17, 121:18, 121:25, 122:5, 122:12, 123:5, 124:19, 125:8, 125:12, 125:14, 125:23, 128:18, 129:1, 134:10, 134:14, 134:23, 135:8, 135:15, 135:21, 136:10, 136:24, 137:11, 137:22, 138:11, 138:22, 139:7,

139:11
theme [1] - 17:21
theoretically [1] - 61:7
theory [7] - 25:14, 25:16, 58:9, 84:20, 84:22, 135:17
therapeutic [1] - 20:21
thereby [1] - 4:5
thereof [1] - 81:8
they've [10] - 18:21, 42:9, 42:25, 52:17, 53:23, 58:8, 58:22, 59:14, 90:2, 136:6
thinking [5] - 13:8, 70:20, 92:6, 122:14, 122:17
thinks [1] - 99:23
third [2] - 2:22, 3:8
Third [2] - 29:12, 121:16
thirty [5] - 7:8, 19:6, 96:19, 96:21, 99:22
thirty-day [1] - 19:6
thousand [11] - 20:9, 23:12, 26:22, 41:20, 70:7, 71:14, 71:16, 78:2, 82:13, 82:22, 84:14
thread [1] - 3:23
three [17] - 35:4, 50:14, 91:1, 92:17, 96:18, 106:12, 114:10, 116:14, 116:22, 117:1, 117:23, 119:21, 120:3, 120:14, 120:20, 127:15, 139:1
threw [1] - 92:15
throat [1] - 77:22
throughout [4] - 5:21, 6:2, 27:8, 40:6
throw [1] - 109:7
thrown [1] - 100:21
Tier [1] - 112:8
ties [1] - 26:25
tighter [1] - 71:2
timeline [4] - 55:11, 100:11, 101:3, 115:21
timelines [2] - 99:10, 99:24
timeliness [1] - 111:20, 119:4, 132:14
timely [5] - 12:2, 111:5, 111:18, 111:24, 120:9
today [28] - 3:3, 3:11, 3:17, 23:1, 32:6,

40:12, 42:2, 50:1, 78:21, 78:23, 96:12, 99:4, 100:23, 101:2, 120:6, 125:18, 128:20, 130:16, 131:12, 132:2, 132:7, 133:19, 134:4, 134:7, 137:17, 137:19, 139:1
today's [1] - 98:7
together [4] - 6:21, 126:6, 126:22, 138:9
tolerant [1] - 55:3
toll [1] - 106:25
tolling [4] - 106:23, 107:1, 109:9, 116:3
Tom [1] - 64:10
tons [2] - 35:13
took [10] - 35:20, 89:21, 106:8, 114:5, 114:7, 115:8, 115:10, 115:19, 117:2, 118:3
top [2] - 54:12, 138:19
total [1] - 17:18
totally [2] - 35:17, 121:4
touched [1] - 25:4
Touhy [47] - 89:17, 90:13, 90:16, 90:20, 92:12, 92:15, 93:7, 93:19, 93:20, 94:7, 94:10, 94:12, 94:13, 94:14, 94:23, 95:13, 97:5, 97:13, 99:3, 100:19, 110:7, 110:9, 110:18, 110:21, 110:25, 111:2, 111:3, 119:1, 119:4, 119:10, 119:15, 119:18, 119:21, 121:10, 121:14, 121:20, 122:8, 122:20, 122:21, 123:7, 124:3, 124:18, 128:11, 132:20, 133:20, 133:21
track [1] - 54:23
transactional [7] - 33:14, 33:20, 34:24, 35:15, 37:16, 87:13, 87:18
transcript [3] - 52:19, 134:6, 139:15
transpired [1] - 112:14
travel [2] - 138:25, 139:2
traveling [1] - 54:10

treated [2] - 104:6, 112:15
treating [1] - 132:6
treatment [1] - 64:20
tremendous [1] - 35:20
tremendously [1] - 59:16
tri [1] - 117:21
tri-care [1] - 117:21
triable [1] - 46:20
trial [14] - 11:15, 24:21, 38:2, 38:7, 47:14, 47:16, 48:2, 65:9, 82:6, 82:7, 88:10, 95:9, 95:12, 131:11
tried [4] - 31:1, 35:25, 85:12, 138:7
trinities [1] - 54:22
Trinities [1] - 11:9
trinity [7] - 12:18, 13:5, 13:6, 13:10, 54:13, 64:7, 64:9
Trinity [1] - 11:9
troubling [1] - 132:8
true [5] - 6:10, 6:13, 48:2, 120:15, 139:15
trust [1] - 94:19
try [14] - 18:22, 21:18, 24:18, 25:8, 25:15, 25:17, 32:12, 42:12, 42:16, 43:17, 54:23, 74:5, 88:18
trying [22] - 11:16, 14:8, 14:20, 17:23, 22:23, 24:9, 39:8, 51:9, 60:16, 62:13, 71:7, 71:23, 71:25, 72:5, 79:2, 86:10, 109:6, 115:4, 117:4, 119:17, 123:3, 125:21
turn [2] - 15:9, 29:22
turning [4] - 120:14, 130:5, 131:1, 131:17
tussling [1] - 85:2
twenty [13] - 23:5, 34:16, 55:25, 56:4, 56:10, 56:25, 64:25, 73:25, 74:8, 74:24, 128:19, 134:17, 136:9
twenty-minute [1] - 128:19
twenty-one [10] - 55:25, 56:4, 56:10, 56:25, 64:25, 73:25, 74:8, 74:24, 134:17, 136:9

**twenty-seven** [1] - 34:16
**twice** [1] - 105:5
**two** [37] - 2:21, 3:7, 3:18, 3:20, 4:10, 18:17, 22:6, 26:4, 26:9, 28:25, 39:4, 39:5, 39:10, 48:19, 48:20, 50:4, 50:6, 51:3, 67:22, 82:16, 87:25, 89:13, 90:6, 102:12, 105:18, 105:24, 107:9, 113:10, 114:15, 116:6, 117:16, 121:5, 123:18, 127:1, 127:11
**type** [6] - 59:24, 61:22, 69:7, 73:13, 74:8, 136:4
**types** [6] - 11:10, 54:7, 57:6, 59:1, 59:11, 62:22
**typical** [3] - 9:13, 78:6, 78:11
**typically** [5] - 9:21, 10:3, 10:19, 28:15, 78:10

## U

**U.S** [2] - 110:17, 139:18
**UBS** [2] - 101:21, 126:11
**ultimately** [2] - 71:11, 132:8
**unbounded** [1] - 86:6
**uncertainty** [1] - 46:13
**unclear** [2] - 18:22, 121:19
**undated** [1] - 97:15
**under** [21] - 11:8, 26:5, 29:19, 37:24, 49:10, 59:25, 60:9, 90:3, 94:13, 97:18, 99:23, 101:5, 102:15, 107:6, 112:17, 119:21, 123:16, 123:22, 124:8, 124:21, 130:24
**underlying** [1] - 16:2
**undermine** [1] - 27:11
**understood** [6] - 44:19, 44:22, 102:14, 102:23, 107:16, 119:9
**unduly** [1] - 130:4
**uneasy** [1] - 113:6
**unfair** [1] - 98:16

**unique** [2] - 36:18, 64:2
**UNITED** [3] - 1:1, 1:3, 1:17
**United** [46] - 1:13, 3:24, 4:4, 4:8, 23:25, 40:25, 45:10, 47:2, 47:12, 50:16, 51:5, 51:6, 55:7, 67:5, 67:6, 68:3, 82:11, 82:17, 82:25, 90:20, 93:8, 95:21, 98:22, 104:12, 104:13, 107:2, 107:5, 110:11, 112:24, 115:24, 121:12, 121:21, 121:23, 122:11, 122:17, 123:1, 123:8, 123:14, 124:1, 124:4, 126:11, 126:17, 126:19, 131:25, 135:11, 135:12
**universe** [23] - 5:8, 5:23, 6:15, 6:24, 7:2, 8:2, 8:11, 8:14, 8:15, 8:20, 10:12, 39:6, 46:9, 70:1, 70:12, 70:13, 72:19, 76:20, 77:3, 77:4, 77:16, 130:18, 130:23
**unknown** [1] - 46:9
**unless** [4] - 3:19, 98:25, 118:21, 120:16
**unnecessary** [1] - 49:21
**unreasonable** [1] - 26:23
**unrelated** [1] - 121:4
**untenable** [2] - 94:19, 95:4
**untether** [1] - 24:10
**untethered** [1] - 129:19
**untimeliness** [1] - 133:1
**untimely** [2] - 92:17, 132:16
**untriable** [1] - 42:23, 44:14
**unusual** [5] - 111:9, 111:12, 120:16, 120:17, 132:18
**unusually** [4] - 19:4, 20:20, 20:21
**unwilling** [1] - 14:6
**up** [39] - 5:16, 16:14, 22:5, 23:4, 23:18,

26:8, 26:20, 27:1, 30:4, 32:2, 32:18, 32:24, 35:2, 36:15, 40:16, 41:22, 42:12, 44:7, 53:17, 55:19, 56:13, 62:24, 67:16, 76:21, 83:12, 83:14, 92:15, 94:17, 95:12, 106:7, 106:20, 108:16, 109:15, 114:11, 126:9, 127:11, 138:12, 138:24
**updated** [6] - 96:16, 97:3, 97:22, 98:8, 111:23, 133:15
**Utah** [2] - 38:11, 83:20

## V

**VA** [11] - 92:14, 92:18, 92:19, 97:2, 97:8, 97:9, 111:5, 111:19, 119:23, 120:15, 132:15
**vagueness** [1] - 133:6
**valid** [7] - 30:7, 63:5, 63:6, 63:10, 84:19, 84:21, 86:19
**validity** [2] - 76:13, 76:14
**valve** [1] - 59:20, 65:11, 71:4
**VARANDO** [1] - 57:13
**various** [7] - 7:20, 11:5, 11:10, 56:3, 112:18, 132:25
**VARNADO** [72] - 2:6, 16:13, 16:16, 18:20, 19:8, 19:15, 20:1, 20:11, 20:14, 20:22, 21:4, 22:9, 22:15, 22:20, 23:12, 23:15, 24:20, 25:7, 28:1, 32:17, 32:21, 34:21, 34:24, 35:2, 35:10, 42:15, 42:19, 43:2, 43:19, 43:25, 48:22, 48:25, 49:2, 51:2, 51:15, 51:20, 51:22, 52:1, 52:9, 53:3, 55:22, 56:2, 56:7, 56:12, 57:8, 58:7, 58:19, 59:5, 59:10, 59:25, 60:5, 60:19, 61:24, 62:15, 63:2, 65:14, 65:17, 65:22, 83:8, 83:18, 84:10, 85:23, 87:5, 88:16, 134:11, 134:16,

135:2, 135:10, 135:17, 136:2, 136:12, 137:9
**Varnado** [11] - 3:4, 3:6, 16:17, 41:3, 41:22, 42:8, 48:14, 66:2, 74:20, 78:5, 109:2
**Varnado's** [2] - 40:4, 44:22
**vastly** [1] - 21:17
**verified** [3] - 103:24, 113:12, 125:22
**verifying** [1] - 113:8
**version** [1] - 123:25
**versus** [11] - 6:2, 10:3, 10:18, 15:13, 40:19, 40:23, 41:14, 48:15, 50:19, 66:16, 67:3
**via** [1] - 130:24
**victory** [1] - 86:22
**video** [1] - 138:6
**view** [7] - 14:17, 41:3, 41:20, 44:14, 71:22, 118:2, 130:20
**VIEYRA** [2] - 1:18, 2:18
**Vieyra** [1] - 2:19
**vindicate** [1] - 38:7
**violate** [1] - 83:11
**violated** [1] - 28:10
**violating** [1] - 4:6
**violation** [32] - 6:2, 6:11, 7:14, 10:21, 15:13, 27:20, 40:10, 40:19, 40:24, 41:14, 47:7, 47:17, 48:5, 48:15, 50:23, 53:7, 58:6, 65:10, 66:17, 67:3, 69:25, 80:21, 83:16, 86:19, 87:22, 87:24, 88:1, 110:25, 130:10, 131:10, 131:16, 136:6
**violations** [47] - 9:4, 15:19, 16:25, 18:23, 19:11, 23:7, 23:21, 24:5, 27:2, 27:11, 28:16, 28:18, 29:7, 30:13, 30:18, 38:21, 39:18, 42:13, 46:3, 47:4, 47:15, 47:19, 47:22, 47:24, 49:10, 55:6, 58:10, 59:21, 60:22, 61:8, 61:15, 62:16, 62:17, 65:16, 68:7, 71:4, 71:5, 81:23, 82:1, 88:18, 102:16, 129:20, 130:19, 132:5,

134:21, 136:20
**violative** [3] - 11:4, 19:19, 58:16
**virtually** [1] - 32:4
**volume** [3] - 37:17, 68:19, 88:8

## W

**wait** [3] - 56:23, 62:5, 136:17
**waited** [1] - 128:11
**Waites** [1] - 105:19
**waiting** [2] - 98:7, 137:17
**waived** [19] - 90:14, 99:12, 101:8, 101:9, 111:18, 111:20, 112:18, 119:4, 119:12, 119:15, 119:23, 119:25, 124:17, 128:16, 132:12, 132:16, 133:1, 133:18, 133:21
**waiver** [8] - 101:7, 111:4, 120:13, 120:15, 120:16, 121:9, 128:10, 133:13
**waiving** [1] - 53:24
**walk** [3] - 20:3, 21:11, 103:14
**walked** [3] - 36:7, 87:11, 136:6
**walking** [1] - 108:18
**walled** [1] - 104:16
**WALMART** [1] - 1:6
**Walmart** [127] - 3:2, 3:5, 3:18, 3:24, 4:3, 4:9, 4:15, 4:19, 4:24, 5:17, 5:25, 7:1, 7:16, 8:1, 8:7, 8:13, 9:15, 9:17, 9:25, 10:7, 11:3, 12:6, 12:9, 12:16, 14:20, 15:4, 16:17, 16:21, 17:6, 17:13, 18:25, 19:4, 22:13, 25:8, 32:22, 33:11, 33:22, 36:17, 36:19, 37:7, 38:6, 42:8, 44:9, 45:7, 45:9, 45:19, 46:10, 46:16, 46:18, 47:1, 48:11, 49:3, 49:7, 53:8, 58:16, 66:8, 66:21, 68:4, 68:7, 70:14, 71:16, 75:7, 75:20, 76:10, 76:16, 77:6, 81:21, 81:25,

82:16, 82:21, 83:1, 86:10, 91:13, 94:23, 95:3, 96:23, 97:25, 98:2, 98:3, 100:8, 100:9, 102:1, 102:6, 102:14, 102:23, 102:25, 103:5, 103:9, 103:17, 105:3, 105:9, 105:13, 105:20, 106:10, 106:13, 106:17, 106:22, 107:3, 107:16, 108:7, 109:3, 109:12, 114:2, 114:16, 114:20, 114:24, 115:9, 115:11, 115:15, 115:24, 116:3, 116:16, 117:15, 118:10, 119:7, 126:3, 126:23, 127:6, 127:13, 129:14, 130:4, 130:21, 131:13, 132:24, 133:13, 134:1

**Walmart's** [18] - 2:21, 3:25, 4:13, 8:20, 22:7, 40:5, 45:2, 46:7, 77:9, 89:8, 94:20, 104:7, 107:3, 117:4, 121:4, 131:23, 132:11, 135:10

**Walmarts** [1] - 129:17

**wants** [5] - 15:23, 36:22, 38:6, 47:1, 60:12

**warranted** [1] - 61:7

**warranting** [1] - 74:6

**warrants** [2] - 118:6, 132:5

**wasted** [1] - 91:16

**water** [1] - 108:13

**Water** [1] - 50:24

**ways** [3] - 5:24, 30:17, 56:4

**wealth** [1] - 15:14

**Weathers** [1] - 105:25

**Wednesday** [1] - 35:4

**week** [3] - 36:20, 98:11, 138:6

**weekend** [1] - 139:12

**weeks** [1] - 92:19

**weigh** [1] - 79:22

**weighing** [1] - 48:3

**welcome** [2] - 5:10, 13:25

**well-established** [1] -

46:7

**Westlaw** [1] - 126:16

**whatsoever** [1] - 36:10

**whereas** [1] - 107:2

**Whereas** [1] - 107:2

**whole** [1] - 23:23

**wholesale** [3] - 52:14, 57:6, 57:18

**wholly** [1] - 26:22

**wide** [1] - 102:5

**wildly** [1] - 35:12

**WILLIAM** [2] - 2:6, 2:8

**William** [1] - 3:4

**willing** [14] - 6:24, 14:2, 16:7, 21:23, 33:22, 36:2, 43:25, 49:19, 57:23, 96:25, 119:8, 119:15, 122:23, 124:17

**willingness** [2] - 97:24, 98:2

**Wilmington** [1] - 1:11

**win** [1] - 43:24

**wish** [1] - 85:12

**withdraw** [2] - 124:18, 133:19

**withdraws** [1] - 123:2

**wither** [1] - 54:15

**woman** [1] - 95:7

**wondering** [1] - 73:5

**word** [5] - 48:24, 81:23, 82:1, 90:8, 102:4

**worded** [1] - 110:9

**words** [1] - 119:18

**Workman** [1] - 3:6

**worst** [1] - 98:17

**worth** [2] - 33:4, 96:19

**wrench** [1] - 100:20

**write** [8] - 27:6, 56:15, 62:20, 63:11, 64:8, 84:21, 117:11, 136:5

**writes** [1] - 63:6

**writing** [2] - 93:21, 127:25

**written** [3] - 27:17, 31:19, 56:17

**wrote** [5] - 58:11, 61:13, 61:15, 64:9, 84:19

## Y

**year** [5] - 17:7, 37:25, 42:24, 53:15, 73:11

**years** [12] - 12:16, 13:25, 16:1, 18:24, 23:3, 35:25, 41:7, 53:6, 56:19, 64:5,

66:20, 129:9

**yesterday** [10] - 96:17, 96:18, 96:24, 97:22, 98:12, 98:14, 100:7, 106:6, 111:23, 137:15

**you/your** [13] - 89:14, 90:3, 91:21, 92:2, 95:20, 98:21, 99:19, 102:3, 110:1, 110:4, 112:17, 112:25, 128:14

## Z

**zero** [1] - 85:5

EXHIBIT D

| From: | Laxton, Jr., William G. |
|---|---|
| To: | Brunson, Kathleen G; Varnado, Jason S.; Carlson, James W.; Junker, Andrew J.; Hewitt, Karen P.; Leathers, William; Farnan, Kelly E. |
| Cc: | Ho, Katherine; Kasper, Andrew (USANCE); Vieyra, Elizabeth (USADE); Stephens, Kimberly R.; Steinberg, Dylan (USADE) |
| Subject: | [EXTERNAL] RE: US v. Walmart - dispensing data |
| Date: | Tuesday, March 18, 2025 8:58:49 PM |

Kate –

We can discuss more during our meet and confer tomorrow, but a few points below to hopefully help guide our discussion.

First, we are willing to provide additional information to you about the MDL and state-court dispensing data productions.  But, the prescription data Walmart produced in other cases is not relevant here.  To the extent those productions included data for prescriptions that underly the claims the government pled in this case, Walmart will be producing that data to the government in this case.  Your email below, however, indicates that the government would like access to those MDL and state-court produced prescriptions to search for new claims.  That is not consistent with Magistrate Judge Tennyson's ruling.  In denying the government's motion to compel, the Court held that the government's request was improper because it was "untethered from the Controlled Substances Act violations pled in this case" and then explained that "[j]ust like the government's request for all controlled substance fills for 120 pills or more in the Ridley's Family Markets case, the government's request here seems to be a fishing expedition."

Second, the alternative "narrowed universes" of dispensing data suggested in your email below suffer from the same flaws.  They are untethered to the claims in the Complaint and are therefore inconsistent with Magistrate Judge Tennyson's Order.

Third, we disagree with your assertion that there is no burden associated with injecting data from dozens of other cases into this matter.  The case the government filed is already overly broad and burdensome for the parties to litigate.  Expanding it by adding in prescriptions outside the Complaint compounds that burden.  Furthermore, none of those productions included patient information, which is necessary for discovery in this matter.

William G. Laxton, Jr.
Partner
JONES DAY® - One Firm Worldwide℠
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
Office 202-879-3836
Cell 919-357-2094
wglaxton@jonesday.com

---

**From:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>
**Sent:** Tuesday, March 18, 2025 11:17 AM

**To:** Laxton, Jr., William G. <wglaxton@jonesday.com>; Varnado, Jason S. <jvarnado@jonesday.com>; Carlson, James W. <jamescarlson@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>; Hewitt, Karen P. <kphewitt@jonesday.com>; Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Cc:** Ho, Katherine <Katherine.Ho@usdoj.gov>; Kasper, Andrew (USANCE) <Andrew.Kasper@usdoj.gov>; Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>
**Subject:** RE: US v. Walmart - dispensing data

Billy,

We interpret your response to mean Walmart refuses to provide any information about the scope of the MDL and state-court dispensing data productions, beyond the fact that they "generally" related to eight opioid medications.  We are disappointed in Walmart's refusal, and we don't think it's within the spirit of Judge Tennyson's comment to Jason, "I want to make sure if I agreed with you, you're not going to then refuse to engage with them if they try to come back with something less than what I rejected," and Jason's response that "We'll certainly talk with them."

We were hoping to understand the scope before making a request related to the data already produced to plaintiffs in the MDL and related state-court litigation—to ensure we were tailoring our request to the unique issues posed in this case and to reduce any unnecessary burden on Walmart—but is Walmart willing to reproduce to the United States the dispensing data already produced to plaintiffs in these cases?  To the extent the dispensing data is in the MDL Repository, the United States is willing to obtain the data directly from the Repository in the same manner it has retrieved the other accessible MDL productions.  This process would impose no burden on Walmart.

If Walmart is unwilling to voluntarily make available relevant data it has already produced in other litigation, is there any additional dispensing data Walmart is willing to produce beyond the fills Walmart believes were explicitly referenced in the complaint?  For example, would Walmart be willing to produce all fills falling within the 21 data specifications previously disclosed by the government (along with a small sample of additional dispensing data to ensure Walmart correctly identified all such scripts)?  Or would Walmart be willing to produce all controlled substance dispensing data for specific geographic regions?  These potential narrowed universes of data are exemplary, not exhaustive.  The United States needs to understand whether Walmart is prepared to negotiate production of any dispensing data beyond the fills it believes are explicitly referenced in the Complaint, and, if so, what that additional data might include.  As I stated at the meet and confer last week, we'd like to discuss this further at tomorrow's meet and confer.

With respect to the fields, Special Master Cohen's discovery ruling stated that "Plaintiffs initially sought over 160 data fields" from defendants, including Walmart.  We were simply requesting that Walmart explain the information sought by plaintiffs.  But again, we interpret your response as Walmart's refusal to provide such information, and we will proceed with formulating our fields request without it.

Kate Gilchrist Brunson
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th St. NW, Washington, DC 20001
Office: (202) 305-0489

Cell: (202) 532-5391

---

**From:** Laxton, Jr., William G. <wglaxton@jonesday.com>
**Sent:** Monday, March 17, 2025 4:43 PM
**To:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>; Varnado, Jason S. <jvarnado@jonesday.com>; Carlson, James W. <jamescarlson@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>; Hewitt, Karen P. <kphewitt@jonesday.com>; Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Cc:** Ho, Katherine <Katherine.Ho@usdoj.gov>; Kasper, Andrew (USANCE) <Andrew.Kasper@usdoj.gov>; Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>
**Subject:** [EXTERNAL] RE: US v. Walmart - dispensing data

Kate –

The dispensing data productions in the nuisance matters were made in a variety of different cases.  Those productions generally related to eight opioid medications, were cabined to the time period at issue in the case, and covered the geographic area in the case (sometimes statewide and sometimes limited to particular counties).

Our understanding is that Special Master Cohen's reference to "160 specific data fields" is a reference to a variety of types of information the nuisance plaintiffs sought from pharmacy defendants in the nuisance cases.  It was not a list of "160 data fields."  Our January 31, 2025 letter already describes all of the transactional  dispensing data fields that came out of Special Master Cohen's order.

William G. Laxton, Jr.
Partner
**JONES DAY® - One Firm Worldwide℠**
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
Office 202-879-3836
Cell 919-357-2094
wglaxton@jonesday.com

---

**From:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>
**Sent:** Tuesday, March 11, 2025 11:16 AM
**To:** Laxton, Jr., William G. <wglaxton@jonesday.com>; Varnado, Jason S. <jvarnado@jonesday.com>; Carlson, James W. <jamescarlson@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>; Hewitt, Karen P. <kphewitt@jonesday.com>; Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Cc:** Ho, Katherine <Katherine.Ho@usdoj.gov>; Kasper, Andrew (USANCE) <Andrew.Kasper@usdoj.gov>; Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>

**Subject:** US v. Walmart - dispensing data

Billy,

We are working on a narrowed request for Walmart's dispensing data and associated fields. There are numerous entries on the list of MDL volumes that describe the production as dispensing data. Can you please describe the scope of the dispensing data produced in the MDL and related state-court litigation? We would like to know the drugs produced, geographic scope, and timeframe. Additionally, the attached docket entry (DI 3106) mentions 160 data fields initially sought by the plaintiffs in the MDL. Can you provide us with a list of those 160 fields? We would like this information by Monday, March 17.

Thank you,
Kate

Kate Gilchrist Brunson
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th St. NW, Washington, DC 20001
Office: (202) 305-0489
Cell: (202) 532-5391

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***
***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

EXHIBIT E

| From: | Carlson, James W. |
|---|---|
| To: | Brunson, Kathleen G; Ho, Katherine; Stephens, Kimberly R.; Vieyra, Elizabeth (USADE); Steinberg, Dylan (USADE) |
| Cc: | Hewitt, Karen P.; Varnado, Jason S.; Laxton, Jr., William G.; Junker, Andrew J.; Leathers, William; Farnan, Kelly E. |
| Subject: | [EXTERNAL] RE: U.S. v. Walmart - March 19 Meet and Confer |
| Date: | Thursday, April 3, 2025 6:24:59 PM |

Kate,

Walmart is available for an in-person hearing on April 23-25.  Note that Walmart will have issues that we think the Court should hear at the same time.  We have asked you several times to explain the alleged relevance of the MDL and state-court data and we take your response below as a refusal to do so.

Walmart is in the process of producing the transactional dispensing data fields for the prescriptions identified in the government's interrogatory response that were adequately pled in the complaint as identified in Exhibit A to Walmart's February 14 Discovery Dispute letter.  We expect that production to be ready next week.

While Walmart maintains its position that the government may only seek civil penalties for the prescriptions identified in the complaint (as described in Exhibit A), Walmart has offered to discuss the possibility of relevant and reasonable discovery related to the prescriptions in the broader red-flag Excel file you provided on October 25, 2024.  But the government has refused that offer and has instead insisted upon obtaining tens of millions of prescriptions from the MDL and state-court litigation in a fishing expedition that does not comport with the proportionality of Rule 26 and is in violation of Judge Tennyson's order.  Given that position, we do not intend to produce additional information related to the red-flag Excel spreadsheet.


James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

---

**From:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>
**Sent:** Wednesday, April 2, 2025 2:04 PM
**To:** Carlson, James W. <jamescarlson@jonesday.com>; Ho, Katherine <Katherine.Ho@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>
**Cc:** Hewitt, Karen P. <kphewitt@jonesday.com>; Varnado, Jason S. <jvarnado@jonesday.com>; Laxton, Jr., William G. <wglaxton@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>; Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Subject:** RE: U.S. v. Walmart - March 19 Meet and Confer

James,

We believe we are at an impasse on the United States' request for the MDL and state-court
dispensing data productions.  We are available between April 22-25 for a discovery hearing on this
issue.  Are you all available on those dates?

Separately, we understand from Walmart's December 13, 2024 letter that Walmart is willing to
produce the "transactional dispensing data" with additional fields for prescriptions dispensed from
June 26, 2013 to December 22, 2020, that were written by the 18 prescribers identified in the
complaint and for the other prescriptions Walmart has conceded were adequately pled in the
complaint, identified in Exhibit A to Walmart's February 14 Discovery Dispute Letter.  Is Walmart
willing to produce this data with the 45 transactional dispensing data fields listed in your January 31,
2025 letter?  If so, when can the government expect that production?

Further, in your March 26, 2025 letter, you stated that Walmart "is willing to discuss the broader set
of prescriptions identified in the government's red-flag Excel file."  Is Walmart willing to produce
the 45 transactional dispensing data fields (to the extent the government does not already have them)
for the prescriptions identified in the Red flag prescriptions Excel file produced to Walmart on
October 25, 2024?  If so, when can the government expect that production?

Thanks,
Kate

Kate Gilchrist Brunson
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th St. NW, Washington, DC 20001
Office: (202) 305-0489
Cell: (202) 532-5391

---

**From:** Carlson, James W. <jamescarlson@jonesday.com>
**Sent:** Wednesday, March 26, 2025 6:55 PM
**To:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>; Ho, Katherine
<Katherine.Ho@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Vieyra,
Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Steinberg, Dylan (USADE)
<Dylan.Steinberg@usdoj.gov>
**Cc:** Hewitt, Karen P. <kphewitt@jonesday.com>; Varnado, Jason S. <jvarnado@jonesday.com>;
Laxton, Jr., William G. <wglaxton@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>;
Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Subject:** [EXTERNAL] RE: U.S. v. Walmart - March 19 Meet and Confer

Kate,

Please see the attached correspondence.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

**From:** Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>
**Sent:** Monday, March 24, 2025 11:34 AM
**To:** Carlson, James W. <jamescarlson@jonesday.com>; Ho, Katherine <Katherine.Ho@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>
**Cc:** Hewitt, Karen P. <kphewitt@jonesday.com>; Varnado, Jason S. <jvarnado@jonesday.com>; Laxton, Jr., William G. <wglaxton@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>; Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Subject:** RE: U.S. v. Walmart - March 19 Meet and Confer

James,

Thank you for sending us a copy of the subpoena and the list of meetings.

Your response on the dispensing data appears to be backtracking from Billy's March 18 email, in which he wrote that "we are willing to provide additional information to you about the MDL and state-court dispensing data productions." We assume that if we do not receive the additional information by Wednesday, March 26 (two weeks and a day after we requested it), Walmart is not going to provide it.

Additionally, we request that Walmart reproduce the deidentified MDL and state-court dispensing data to the United States for all prescriptions filled beginning on June 26, 2013. Because the data has already been produced, we ask that Walmart make it available (either by producing it to us or authorizing us to obtain it from the vendor) within 14 days. The United States already has access to nearly all of the other MDL and state-court document productions from Walmart—a fact Walmart has relied upon as a basis to refuse to run additional searches in response to many of the United States' RFPs. We do not see a principled distinction for refusing to reproduce or make available the MDL and state-court productions that consist of deidentified dispensing data. We understand that the burden of reproducing the dispensing data would be minimal or nonexistent because we have offered to obtain it directly from the vendor. At the meet and confer, Jason said the production would be burdensome because the data is deidentified and Walmart would prefer to produce it with patient identifying information. Walmart's preference for how the data is produced cannot serve as the basis for Walmart's refusal to produce that data. Moreover, Walmart's effort to manufacture a burden objection by claiming a need to produce patient identifying information is inconsistent with Walmart's prior refusal to produce dispensing data on grounds that it would involve sharing identified personal health information. We understand from the meet and confer held last week that Walmart is not willing to reproduce this data. Please tell us by Wednesday, March 26, if Walmart has reconsidered its position and is willing reproduce this data. If it is not, we will raise this issue with the court.

Kate Gilchrist Brunson
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th St. NW, Washington, DC 20001
Office: (202) 305-0489
Cell: (202) 532-5391

**From:** Carlson, James W. <jamescarlson@jonesday.com>

**Sent:** Friday, March 21, 2025 4:10 PM
**To:** Ho, Katherine <Katherine.Ho@usdoj.gov>; Brunson, Kathleen G <Kathleen.G.Brunson@usdoj.gov>; Stephens, Kimberly R. <Kimberly.R.Stephens@usdoj.gov>; Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>; Steinberg, Dylan (USADE) <Dylan.Steinberg@usdoj.gov>
**Cc:** Hewitt, Karen P. <kphewitt@jonesday.com>; Varnado, Jason S. <jvarnado@jonesday.com>; Laxton, Jr., William G. <wglaxton@jonesday.com>; Junker, Andrew J. <ajunker@jonesday.com>; Leathers, William <wleathers@jonesday.com>; Farnan, Kelly E. <Farnan@RLF.com>
**Subject:** [EXTERNAL] U.S. v. Walmart - March 19 Meet and Confer

Kate, Kim,

I write regarding three requests the government made during our March 19 meet and confer.

First, as requested, we have attached here a copy of a subpoena the government sent to Walmart in 2012 requiring the production of data regarding prescriptions filled for Dr. ██████ from 2011 to 2012, which identified ██████ as the contact.

Second, as also requested, we have listed the dates of meetings attended by certain DEA agents Walmart has proposed as custodians related to the government's investigation of Walmart. The dates referenced below have been slightly revised based on further review of our records and may not capture all of the meetings these individuals attended as DEA personnel attending meetings often did not identify themselves.

- Tom Prevoznik: ████████████████████████
- Jason Capstraw: ███████████████████████
- Michael Ferry: █████████████████████
- Deborah Carrillo: ██████████████████

Third, the government requested that we provide Walmart's position about whether it will provide additional information about the MDL and state court dispensing data productions. We will get back to you next week on that request.


James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503


***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

EXHIBIT F

# JONES DAY

150 WEST JEFFERSON AVENUE, SUITE 2100 • DETROIT, MICHIGAN 48226.4438

TELEPHONE: +1.313.733.3939 • JONESDAY.COM

Direct Number: +1.313.230.7966
Rbrodsky@jonesday.com

February 20, 2025

BY E-MAIL

Eileen Kelly
Deputy Attorney General
Delaware Department of Justice
Eileen.Kelly@delaware.gov

Re:     *United States of America v. Walmart Inc. et al.*, Case No. 1:20-cv-01744-CFC (D. Del.)

Dear Counsel:

      I write on behalf of Walmart concerning its request for Delaware Prescription Monitoring Program ("PMP") data in the subpoena served on the Office of Controlled Substances ("OCS") on October 29, 2024 (the "Subpoena"). This letter addresses the concerns you relayed from OCS during our call on February 14, 2025, regarding the timeframe of Walmart's request for de-identified statewide PMP data and the inclusion of patient-identifying information in the two other PMP datasets requested by Walmart related to prescriptions written by Dr. █████████ and prescriptions dispensed by federal government pharmacies. As noted below, Walmart is amenable to narrowing certain aspects of its requests for the sake of reaching an agreement.

## 1.  Significance of the Requested PMP Data to Walmart's Defense

      During our call, you requested additional information regarding the relevance of Delaware PMP data to Walmart's defense. Walmart's requests for PMP data are tailored to address the federal government's sweeping allegations that Walmart committed numerous violations of the Controlled Substances Act ("CSA") starting on June 26, 2013. The government asserts the following relevant allegations:

- **Red Flag Prescriptions:** The government claims that Walmart pharmacists violated the CSA by filling prescriptions with certain alleged "red flags." These include, for example, certain combinations of a prescription opioid, benzodiazepine, and muscle relaxer, certain combinations of multiple immediate-release prescription opioids, and prescriptions for allegedly high doses. *See* Second Am. Compl. ¶¶ 476–537.

- **Dr. ████'s Prescriptions:** The government alleges that Walmart knew Dr. ████ was no longer practicing within the usual course of professional practice by January 10, 2014, and

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Eileen Kelly
February 20, 2025
Page 2

that every prescription a Walmart pharmacist filled after that date violated the CSA. *See id.* ¶¶ 355–366, 461–465.

Walmart obviously disagrees with these allegations and intends to defend itself at trial. Accordingly, Walmart tailored its requests for Delaware PMP data to defend against these claims:

       ***Request for De-Identified Statewide PMP Data from June 26, 2013, to February 1, 2024 ("Requested DE Data").*** We understand OCS has reservations about the timeframe of the Requested DE Data. This period aligns with the government's claims alleging violations starting on June 26, 2013. Further, the DE PMP is the only comprehensive source of information as to what prescriptions Delaware prescribers wrote and Delaware pharmacists actually dispensed. Thus, the Requested DE Data is vital to demonstrating the standard of care in Delaware for the types of prescriptions the government now alleges were essentially per se violations of the CSA. Walmart is nevertheless willing to narrow the timeframe of the Requested DE Data to June 26, 2013, to December 31, 2020, in the interest of compromise.

       ***Request for Dr. ███'s PMP Data with Patient-Identifying Information from Any Time Period ("Requested ███ Data").*** We understand OCS acknowledges the relevance of the Requested ███ Data but objects to including patient-identifying information (patient name, birthdate, and zip code). Walmart needs these identifiers to compare the dispensing information in the PMP data to the medical files in the government's productions, including for patients of Dr. ███ that the government has put at issue. Walmart also needs patient identifiers to be able to match PMP data with data from other parties such as Medicare and Tricare, which paid for the very same prescriptions from Dr. ███ that the government now says no pharmacy should ever have filled. Without this information, it would be impossible to track a patient across the different data sources.

       ***Request for PMP Data from Federal Government Pharmacies with Patient-Identifying Information from June 26, 2013, to February 1, 2024 ("Requested Government Data").*** We understand OCS also acknowledges the relevance of the Requested Government Data but objects to including patient-identifying information. Walmart is willing to forego its request for patient-identifying information in the Requested Government Data.

       Provided with this letter is an updated version of the proposed Stipulation and Order Authorizing Disclosure of Delaware Prescription Monitoring Program Data reflecting Walmart's proposed compromises narrowing the scope OCS's PMP data productions.

JONES DAY

Eileen Kelly
February 20, 2025
Page 3

**2.   The Protective Order Broadly Protects the Requested PMP Data**

You raised OCS's confidentiality concerns during our February 14 call. As noted, the Protective Order provides comprehensive protections for "Protected Health Information," including "information covered by the privacy laws of any individual states." Protective Order ¶ 27. It also expressly authorizes "entities subject to state privacy law requirements, or entities in receipt of information from such entities, . . . to disclose Protected Health Information pertaining to this Litigation." *Id.* ¶ 29. The Protective Order limits the use of such information to the litigation and places substantial restrictions on its disclosure. *See id.* ¶ 30. Significant amounts of Protected Health Information, including patient-identifying information, have already been produced under the Protective Order. The same protections will apply to any Protected Health Information produced by OCS or any other Delaware state agency.

**3.   State Privilege Law Does Not Apply**

Lastly, as previously noted, OCS cannot withhold PMP data based on Delaware confidentiality protections. Since this case is in federal court and involves federal claims, federal law of privilege overrides state confidentiality protections. *See Pearson v. Miller*, 211 F.3d 57, 65–66, 69–72 (3d Cir. 2000) (quoting Fed. R. Evid. 501) ("[F]ederal courts are to apply federal law of privilege to all elements of claims except those 'as to which State law supplies the rule of decision.'"). Under these circumstances, relevant case law supports the production of probative evidence despite state confidentiality protections. *See id.* (ordering production of foster-child records despite relevant state-law confidentiality protections due to the importance of promoting the availability of probative evidence and the existence of appropriate protective order); *see also Nash v. Connections CSP, Inc.*, 2018 WL 2012898, at *2 (D. Del. Apr. 30, 2018) (declining to extend state statutory peer-review privilege into federal common law citing *Pearson*). With no federal privilege restricting the disclosure of PMP data, there is no basis to withhold it here.

Even if Delaware's PMP statute applied, its numerous exceptions for disclosure (at least 14) indicate that its protections are not absolute. Rather, given the significance of Delaware PMP data to Walmart's defense and the comprehensive confidentiality protections under the Protective Order, we believe the Court would agree that Delaware law does not prohibit the production of PMP data here. In a similar case, a New Mexico court ordered the state board of pharmacy to produce statewide PMP data despite similar disclosure laws. *See New Mexico v. Purdue Pharma, LP, et al.*, Order Denying Pl.'s Mot. for Protective Order on PMP Data (1st Jud. Dist. May 24, 2021); *compare* 16.19.29.9(D) NMAC *to* 16 Del. C. 4798(l)(2).

\*        \*        \*

JONES DAY

Eileen Kelly
February 20, 2025
Page 4

        We hope this letter satisfies your concerns and will result in a compromise that allows us to obtain the requested PMP data and cease taking up your valuable time on this subpoena.  Thank you for your consideration and we look forward to our next discussion on February 21.

                                        Sincerely,

                                        */s/ Richard M. Brodsky*

                                        Richard M. Brodsky


cc:     James W. Carlson, Jones Day
        Bill Snyder, Jones Day
        Kelly Farnan, Richards, Layton & Finger, P.A.

EXHIBIT G

| From: | Kelly, Eileen (DOJ) |
|---|---|
| To: | Vieyra, Elizabeth (USADE) |
| Subject: | [EXTERNAL] Re: US v. Walmart, Subpoena re: PMP Data |
| Date: | Thursday, February 27, 2025 9:09:59 AM |

Liz,

I checked with the PMP Administrator in terms of how many records would be involved in 11 years of data. This was the response:

Almost 21 million dispensation records for almost 1.2 million patients from across the world.

Eileen

Eileen Kelly

Deputy Attorney General

Delaware Department of Justice

102 West Water Street

Dover, Delaware  19904

(302) 366-1927

eileen.kelly@delaware.gov

**From:** Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>
**Sent:** Wednesday, February 26, 2025 4:19 PM
**To:** Kelly, Eileen (DOJ) <Eileen.Kelly@delaware.gov>
**Subject:** RE: US v. Walmart, Subpoena re: PMP Data

Hi Eileen,
After reviewing the letter, I am a little surprised by the request for "De-Identified Statewide PMP Data from June 26, 2013, to February 1, 2024." I didn't read the subpoena as requesting statewide data (rather only data regarding ███ , ███ and federal pharmacies). Is it correct that Walmart requests PMP data for all prescriptions for the entire state? Do you know approximately how many prescriptions this would be? (i.e.: would it be in the millions or tens of millions?).

Happy to discuss if you'd prefer.

Thank you,

*Elizabeth F. Vieyra*
**Assistant United States Attorney**
**District of Delaware**
1313 N. Market Street, Suite 400

Wilmington, Delaware 19801

---

**From:** Vieyra, Elizabeth (USADE)
**Sent:** Wednesday, February 26, 2025 3:32 PM
**To:** Kelly, Eileen (DOJ) <Eileen.Kelly@delaware.gov>
**Subject:** RE: US v. Walmart, Subpoena re: PMP Data

Thanks, Eileen. I appreciate your sharing this letter. Please let me know if you need anything from me (for this or another matter).

Liz

*Elizabeth F. Vieyra*
Assistant United States Attorney
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Office: (302) 573-6148
Mobile: (302) 377-9463
elizabeth.vieyra@usdoj.gov

---

**From:** Kelly, Eileen (DOJ) <Eileen.Kelly@delaware.gov>
**Sent:** Wednesday, February 26, 2025 3:29 PM
**To:** Vieyra, Elizabeth (USADE) <EVieyra@usa.doj.gov>
**Subject:** [EXTERNAL] Re: US v. Walmart, Subpoena re: PMP Data

Liz,

A second opinion confirmed my initial thought that there is nothing preventing me from sharing Walmart's recent letter arguing why they need the PMP data. By the way, federal pharmacies aren't required to report to the Delaware PMP so any data there would be incomplete, which I have told Rick Brodsky. Let me know if you need anything else.

Eileen


Eileen Kelly
Deputy Attorney General
Delaware Department of Justice
102 West Water Street
Dover, Delaware 19904
(302) 366-1927
eileen.kelly@delaware.gov

**From:** Vieyra, Elizabeth (USADE) <Elizabeth.Vieyra@usdoj.gov>
**Sent:** Wednesday, February 26, 2025 3:03 PM
**To:** Kelly, Eileen (DOJ) <Eileen.Kelly@delaware.gov>
**Subject:** US v. Walmart, Subpoena re: PMP Data

Dear Eileen,

Nice to talk to you just now. I am hoping that you can share any emails or letters Walmart has sent offering reasons why the PMP data Walmart has subpoenaed are relevant. I am also available if you'd like to discuss.

Thank you,
Liz

*Elizabeth F. Vieyra*
Assistant United States Attorney
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Office: (302) 573-6148
Mobile: (302) 377-9463
elizabeth.vieyra@usdoj.gov

EXHIBIT H

| From: | Carlson, James W. |
|---|---|
| To: | Hoffman, Kevin; Jacobs, Cheryl P. |
| Cc: | Mara, Neil F.; Scott, Stephen C.; Leis, Eric P. |
| Subject: | RE: [External] RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas |
| Date: | Tuesday, December 31, 2024 5:15:06 PM |
| Attachments: | image001.png |
| | 2024-02-01 [0109.00] Second Amended Complaint.pdf |

Kevin,

In the second amended complaint (attached for reference), the DOJ alleges that Walmart violated the Controlled Substances Act ("CSA") by filling prescriptions (a) written by certain doctors; and (b) with certain characteristics, so-called "red flags." Under the CSA the DOJ must demonstrate, on a prescription-by-prescription basis, that each prescription did not have a legitimate medical purpose and that Walmart knew as much when a Walmart pharmacist filled the prescription. With respect to Dr. ███, the DOJ alleges that as of January 1, 2015, every controlled substance prescription Dr. ███ wrote lacked a legitimate medical purpose because he had abandoned the practice of medicine. Second Am. Compl. ¶ 378, at 106. The DOJ identifies more than 6,000 prescriptions written by Dr. ███ and filled by Walmart that violated the CSA under that theory. *Id.* With respect to the "red flags," the government's complaint includes 4 broad categories of prescriptions (certain dosage levels, certain combinations of prescriptions, early refills, etc.) that it contends demonstrate a prescription did not have a legitimate medical purpose. *Id.* ¶¶ 476-522, at 134-146. The focus on individual prescribers and prescriptions makes this case markedly different than the opioid cases where Pennsylvania previously produced data.

In order to defend against those allegations Walmart is seeking identified data for (a) all prescription fills for prescriptions written by Dr. ███; and (b) all prescription fills by federal government pharmacies from June 26, 2013 (the beginning of the alleged violations period) to February 1, 2024 (the filing of the government's second amended complaint). It is important that those relatively narrow pulls include patient identifying information. First, the government has produced medical records collected from Dr. ███ during the criminal investigation that Walmart expects the government to rely upon to demonstrate that all of Dr. ███ prescriptions violated the CSA. Walmart was only one of many pharmacies filling prescriptions for Dr. ███ patients and Walmart would not be able to match prescription records to medical records for most of Dr. ███ patients if they are de-identified. Not being able to assess Dr. K███ prescriptions against the related medical diagnosis and treatments would severely hinder Walmart's ability to respond to the government's categorical allegations about Dr. ███'s medical practice. Second, the government has already produced other prescription records and Walmart anticipates many more sources of data being produced, including from other states, Medicare, TRICARE, etc. It would be virtually impossible to track patients across various data sources if the patients are de-identified. The case will involve competing allegations about the appropriate standard of care, as both sides seek to show what a "legitimate medical purpose" means in particular circumstances, and being able to show that a patient was treated similarly by Walmart, other pharmacies, and federal pharmacies is vital to Walmart's defense. That is why we ensured that the protective order entered by the Court, which was attached to the subpoena, specifically contemplates the production of Protected Health Information and includes explicit protections for that information. The government has already produced medical records and various sources of patient-identified data pursuant to the protective order and we are expecting West Virginia and other states to do the same.

Please do not hesitate to reach out if you have any questions. Thanks.


James W. Carlson
Partner
JONES DAY® - One Firm Worldwide℠
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

---

**From:** Hoffman, Kevin <kjhoffman@pa.gov>
**Sent:** Monday, December 30, 2024 9:01 AM
**To:** Carlson, James W. <jamescarlson@jonesday.com>; Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [External] RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Thank you for this. We are still working through it. Would you mind summarizing your need for the identified PDMP again? I want to make sure I relay it correctly and fully.

 **Kevin Hoffman**
Deputy Chief Counsel

Department of Health | Office of Chief Counsel
625 Forster Street, 8th Floor | Harrisburg, PA 17120-0701
Phone: 717.783.2500
**health.pa.gov**

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers. Unintended transmissions shall not constitute waiver of the attorney-client or any other privilege.*

**From:** Carlson, James W. <jamescarlson@jonesday.com>
**Sent:** Friday, December 27, 2024 5:08 PM
**To:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** [External] RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

**ATTENTION:** This email message is from an external sender. Do not open links or attachments from unknown senders. To report suspicious email, use the *Report Phishing button in Outlook.*

Cheryl, Kevin,

I hope you had a nice Christmas. I wanted to pass along the order just entered by the Court today regarding West Virginia PDMP data. This is in substance the same as what we're proposing for PA, which I sent to you on December 10. I look forward to hopefully reaching resolution on the stipulated order during our next call on January 7. Thanks.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

**From:** Carlson, James W.
**Sent:** Tuesday, December 17, 2024 10:29 AM
**To:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Thank you – I just updated the call invite.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500

Pittsburgh, PA 15219-2514
Office +1.412.394.9503

---

**From:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Sent:** Tuesday, December 17, 2024 10:27 AM
**To:** Carlson, James W. <jamescarlson@jonesday.com>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Kevin and I can do 4 to 4:30 tomorrow if that still works for you.  Thanks.

---

**From:** Carlson, James W. <jamescarlson@jonesday.com>
**Sent:** Monday, December 16, 2024 10:46 AM
**To:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

I would think 30 minutes is enough – thanks.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

---

**From:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Sent:** Monday, December 16, 2024 10:45 AM
**To:** Carlson, James W. <jamescarlson@jonesday.com>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

James –

Let me check with Kevin Hoffman to see his availability.  Can you estimate how long the call will be? Thanks.

Cheryl P. Jacobs
Office of Pennsylvania Attorney General
Senior Deputy Attorney General
cjacobs@attorneygeneral.gov
T – 215.356.0734

---

**From:** Carlson, James W. <jamescarlson@jonesday.com>
**Sent:** Monday, December 16, 2024 10:40 AM
**To:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Thank you Cheryl – I had a conflict come up for our meet and confer on Wednesday morning.  Could we move to the

afternoon?  I should be able to be flexible from 3pm ET to the end of the day.  Thank you.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

---

**From:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Sent:** Wednesday, December 11, 2024 9:53 AM
**To:** Carlson, James W. <jamescarlson@jonesday.com>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

James —

Once we review the materials we'll have a better idea of how to proceed.

Thanks.

Cheryl P. Jacobs
Office of Pennsylvania Attorney General
Senior Deputy Attorney General
cjacobs@attorneygeneral.gov
T – 215.356.0734

---

**From:** Carlson, James W. <jamescarlson@jonesday.com>
**Sent:** Tuesday, December 10, 2024 11:41 PM
**To:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Cheryl, Kevin,

Thank you for the call last week.  As we discussed, I am attaching here a draft PDMP stipulated order specifically for the Pennsylvania PDMP data.

I am also attaching documents that were produced to us in the Delaware county state court coordinated opioid proceedings describing the data produced there.  As we discussed, we are requesting the DoH agree to the reproduction of that data into this case and have included it as the first item in the draft order.  The data is de-identified and we can handle the logistics of the reproduction ourselves once the order is in place, there would not be anything the DOH needs to do.

As we have discussed, the other two data sets described in the draft stipulation would be new pulls by the DoH specifically for this case, as they are not covered by the prior case.  We are requesting those two data sets be provided with at least patient names and zip codes to allow them to be cross-referenced to other records that have already been produced in the case by the Department of Justice, subject to the protective order which allows such data to be designated for appropriate protection.

We look forward to discussing further on December 18.  Thank you.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

**From:** Carlson, James W.
**Sent:** Friday, November 15, 2024 5:33 PM
**To:** 'Jacobs, Cheryl P.' <cjacobs@attorneygeneral.gov>; Hoffman, Kevin <kjhoffman@pa.gov>
**Cc:** 'Mara, Neil F.' <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Cheryl, Kevin,

Thank you for the call today.  As discussed, I am confirming an extension of time to January 10 for the Pennsylvania agencies to respond to Walmart's subpoenas.  We are, of course, willing to work with you should additional extensions be necessary. I will also send an invite for a follow-up call on December 5 at 2:30pm.

As we discussed, I am attaching here a copy of a stipulated order recently entered in our case regarding dispensing data produced by the DOJ from various state PDMP programs.  We propose using a similar order for any potential PDMP productions in response to Walmart's subpoenas.

Thank you again.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

**From:** Carlson, James W.
**Sent:** Wednesday, November 13, 2024 4:21 PM
**To:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Hi Cheryl,

Thanks for following-up.  If 11am on Friday works for you I will send an invite.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

**From:** Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Sent:** Tuesday, November 12, 2024 12:04 PM
**To:** Carlson, James W. <jamescarlson@jonesday.com>
**Cc:** Mara, Neil F. <nmara@attorneygeneral.gov>
**Subject:** RE: [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

Hi James –

After reviewing the subpoenas we would like to accept your offer to discuss them.  Please let me know a good time for a call – this week I have a relatively flexible schedule and would be able to accommodate most, if not all, of your available times.  If not, please let me know what is good for you.

Thanks,
Cheryl

Cheryl P. Jacobs
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
Public Protection Division
Special Litigation Section
1000 Madison Avenue #310
Norristown, PA  19403
C: 215-356-0734

---

**From:** Carlson, James W. <jamescarlson@jonesday.com>
**Sent:** Friday, October 25, 2024 4:18 PM
**To:** Mara, Neil F. <nmara@attorneygeneral.gov>; Jacobs, Cheryl P. <cjacobs@attorneygeneral.gov>
**Cc:** Bryan, Kelsey S. <kbryan@jonesday.com>; Scott, Stephen C. <scscott@jonesday.com>; Leis, Eric P. <eleis@jonesday.com>
**Subject:** [ EXTERNAL ] U.S. v. Walmart - Third Party Subpoenas

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Neil, Cheryl,

Thank you again for the call earlier today.  Please see attached for copies of the subpoenas we discussed.  I would appreciate if you could confirm that you are accepting service.

We are available to discuss the subpoenas once you've had a chance to review them and will work with your office to minimize the burden on the Commonwealth and its agencies.  Thank you.

James W. Carlson
Partner
**JONES DAY® - One Firm Worldwide℠**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Office +1.412.394.9503

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

Click here to report this email as spam.

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers.  Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

This message has been scanned for malware by Websense. www.websense.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***
***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***
***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***
***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***
***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

EXHIBIT I

# JONES DAY

500 GRANT STREET, SUITE 4500 • PITTSBURGH, PENNSYLVANIA 15219.2514

TELEPHONE: +1.412.391.3939 • JONESDAY.COM

DIRECT NUMBER: +1.412.394.9503
JAMESCARLSON@JONESDAY.COM

**CONFIDENTIAL**

March 26, 2025

BY E-MAIL

Dylan J. Steinberg                              Kate Gilchrist Brunson
Chief, Civil Division                           Trial Attorney
United States Attorney's Office                 Consumer Protection Branch
1313 N. Market Street                           U.S. Department of Justice
Wilmington, DE 19801                            450 5th St. NW
Dylan.steinberg@usdoj.gov                       Washington, DC 20001
                                                Kathleen.G.Brunson@usdoj.gov

Re:    *United States of America v. Walmart Inc., et al.*, Case No. 1:20-cv-01744-CFC (D. Del.)

Counsel:

I write in response to the government's March 24, 2025 request that Walmart "reproduce" in this case the dispensing data it produced in the MDL and state-court opioid nuisance cases "for all prescriptions filled beginning on June 26, 2013." 3/24/25 Email from K. Brunson to J. Carlson. As discussed during the parties' March 19 meet-and-confer, Walmart cannot agree to the government's request, which fails to comply with both Rule 26 and the Court's March 7 Order denying the government's motion to compel.

The Court denied the government's earlier request for more than 400 million Walmart prescription records because it was a "fishing expedition" that was "untethered from the Controlled Substances Act violations pled in this case." 3/7/25 Hearing Tr. at 129:15-24. *See also* Fed. R. Civ. P. 26(b)(1) (limiting discovery to information relevant to any "claim or defense and proportional to the needs of the case"). The government's revised request is no different. The government now demands Walmart produce *tens of millions of prescription records* that are just as unconnected to the claims it pled. And the government is making this demand before it has even attempted to comply with the Court's March 7 Order that the government provide a written description of each of the red flag categories it argues proves prescription invalidity and a list of all exceptions to those categories.

The government has made no attempt to justify its request for millions and millions of *additional* prescription records beyond stating that it knows the data exists and does not believe it would be burdensome for Walmart to reproduce it. But that is not the standard for discovery; the mere existence of data does not make it relevant to the claims in this case. As Walmart has previously made clear to the government, to the extent the MDL or state-court productions include data for prescriptions that underlie the claims the government pled in this case, Walmart

**CONFIDENTIAL**

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Dylan J. Steinberg
Kate Gilchrist Brunson
March 26, 2025
Page 2

will produce that data to the government.  The remaining tens of millions of prescriptions have no relevance to the government's pled claims.  In fact, even if the government were entitled to Walmart prescription data beyond the claims in its Complaint (it is not), the MDL and state-court data is mismatched to the government's allegations.  As detailed below, a number of the productions do not include medications that form the bases for the government's red flag categories; others use different metrics for defining a combination; and all of them are bound by a different temporal scope than what is at issue in this case.

The government is also wrong with respect to burden.  Introducing millions of new prescription records into this case is impracticable and would unfairly burden Walmart.  Moreover, as we previously noted, all of the MDL and state-court dispensing data productions are deidentified and so would not permit the necessary discovery into the patients who received the prescriptions.  In a CSA case, the government must prove invalidity and knowledge for each prescription for which it seeks penalties.  Patient identity and medical history are critical to those inquiries and to Walmart's ability to seek relevant discovery and defend itself.  Reproducing the tens of millions of prescription records in the MDL and state-court productions with patient information reinserted would be an extremely and unduly burdensome exercise.

While Walmart continues to maintain that the government should be limited to the claims it actually pled in its Second Amended Complaint—and which Walmart summarized in Exhibit A to D.I. 183—it has repeatedly told the government that, in a spirit of compromise, it is willing to discuss the broader set of prescriptions identified in the government's red-flag Excel file as an outer bound of additional prescriptions that might be the subject of discovery in this matter (even though Walmart's position is that only a small fraction of them are properly pled in this case).  But the government has flatly rejected that approach.

\*     \*     \*

As detailed above, the government's new request for MDL and state-court dispensing data seeks information that is neither relevant nor proportional to this case under Rule 26 and conflicts directly with the Court's March 7 Order denying the government's previous attempt to seek millions upon millions of dispensing records.  The respective scopes of these prior productions were negotiated between the parties to those cases and reflect the issues particular to those allegations.  The data contained in those productions is particularly untethered from the claims the government has brought in this case in that those productions (1) represent a dramatically different temporal scope; (2) do not include all the medications (including stimulants) forming the bases of many of the government's current red flag categories; and (3)

**CONFIDENTIAL**

JONES DAY

Dylan J. Steinberg
Kate Gilchrist Brunson
March 26, 2025
Page 3

use an entirely different metric for defining which medications underlie certain combination red flag categories.

Nevertheless, in response to the government's request for additional information regarding the scope of these productions, Walmart provides the following information.

The geographic scope of Walmart's dispensing data productions in the MDL and state-court matters included pharmacies from the following states and territories: ██████████████ ████████████████████████████████████████████████████████████ Some of the productions included data from all Walmart and Sam's Club pharmacies in the particular state. Some included only Walmart pharmacies. Some included only data from pharmacies in particular counties. Others were even more limited. For example, the production related to ████ included 10 randomly selected pharmacies.

The medication scope for the productions typically consisted of the MDL 8 drugs,[1] along with benzodiazepines and muscle relaxants dispensed within 14 days of an opioid. But there were exceptions. For example, data associated with ████████████ and ████████████ did not include any methadone or tapentadol prescriptions, respectively, and a number of productions, like those for ████ and ████████████, did not include any medications beyond the MDL 8. Moreover, the 14-day requirement for benzodiazepines and muscle relaxants is a completely different condition for production than the "at least 8 days' overlapping supply" metric used by the government in this case. And few, if any, productions included stimulants.

The temporal scope for the productions often begins in 2006, but some start at other points, including 2013 (████████████), 2014 (████████████), and 2015 (████████████ ████). The end dates also vary among the productions, with many extending to 2019 or 2020, but with some ending in 2018 or 2021. In other words, the temporal scope is both over- and under-inclusive for the dispensing violations period in this case.

*     *     *

---

[1] Fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, oxymorphone and tapentadol.

**CONFIDENTIAL**

JONES DAY

Dylan J. Steinberg
Kate Gilchrist Brunson
March 26, 2025
Page 4


      The government should be focused on ensuring it meets its deadline for substantial completion of document production, not on seeking tens of millions of additional prescription records that the Court has already said do not belong in this case.


          Regards,

          */s/ James W. Carlson*

          James W. Carlson

cc:    Katherine M. Ho, Consumer Protection Branch
       Kelly Farnan, Richards, Layton & Finger, P.A.
       Karen P. Hewitt, Jones Day
       Jason S. Varnado, Jones Day
       William G. Laxton, Jr., Jones Day

**CONFIDENTIAL**

EXHIBIT J

# IN THE UNITED STATES DISTRICT
# COURT FOR THE NORTHERN DISTRICT
# OF OHIO EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Cases[1]* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

## TRACK 1B RETAIL PHARMACY DEFENDANTS' OBJECTION TO DISCOVERY RULING REGARDING PHARMACY DATA PRODUCTION (DKT. 3106)

The Track 1B Retail Pharmacy Defendants ("Pharmacy Defendants")[2] object to certain

aspects of the Special Master's Discovery Ruling Regarding Pharmacy Data Production, issued

on January 27, 2020 (the "Ruling") (Dkt. No. 3106).[3] Special Master Cohen's Ruling requires

the Pharmacy Defendants to produce data not only for the relevant opioids but also for additional

non-opioid products in connection with an expansive definition of "cocktails" related to

---

[1] The Track One-B Cases are: *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.,* Case No. 18-op-45090 (N.D. Ohio); and *The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.,* Case No. 17-op-45004 (N.D. Ohio).

[2] CVS Pharmacy, Inc. and Ohio CVS, L.L.C. ("CVS"), Rite Aid of Maryland, Inc. d/b/a Mid-Atlantic Customer Support Center, Rite Aid of Ohio, Inc. and Rite Aid Hdqtrs. Corp. ("Rite Aid"), Walgreen Co. and Walgreen Eastern Co. ("Walgreens"), HBC Service Company, an unincorporated operating division of Giant Eagle, Inc. ("Giant Eagle"), Discount Drug Mart Inc. ("DDM"), and Walmart Inc. ("Walmart").

[3] The Pharmacy Defendants preserve all objections previously asserted and now pending before the Sixth Circuit Court of Appeals, including but not limited to the amended claims asserted in Track 1B, scope of discovery ordered in connection with the Track 1B cases, and production of private patient prescription information. *See* Writ of Mandamus, *In re CVS*, 20-3075 (6th Cir. Jan. 17, 2020). Further, it is the Pharmacy Defendants' position that Plaintiffs never should have been permitted to amend to add dispensing claims. *See id.*

Plaintiffs' combination-prescription "red flag" theory. The Ruling also sets forth an untenable timeframe for production of (a) the ordered dispensing data (by March 2) and (b) "any additional data fields which [Pharmacy Defendants] or their experts intend to rely on in defending against Plaintiffs' claims" after Plaintiffs have identified "the prescriptions they (and their experts) conclude should have been 'Red Flagged' as suspicious, and investigated or not filled" (14 days). Finally, the Ruling requires the production of additional sensitive patient identifying information in the form of patient's year of birth ("Birth Year") or age, which, when considered against the totality of the other information that the Pharmacy Defendants were ordered to produce (including, among other things, Zip Code, Diagnostic Code, and Physician Specialty), further increases the risk that the identity of individual patients could be revealed.

      To cure these errors concerning the scope, type, and timetable for the Pharmacy Defendants' production of dispensing data, the Pharmacy Defendants respectfully request that the Court modify the Ruling as follows: (a) additional non-opioid drugs to be included in the dispensing data to be produced should be limited as set forth below; (b) Birth Year shall be removed from the data set ordered for production; and (c) the deadlines for production of dispensing data should be extended as follows: (i) if the additional non-opioid drugs are not limited as the Pharmacy Defendants propose, then the March 2 deadline shall be stricken and re-evaluated after the Pharmacy Defendants have had sufficient time to determine how long it will take to implement the Special Master's ruling; and (ii) the 14-day deadline for the Pharmacy Defendants to identify additional data fields after receipt of Plaintiffs' red flag analysis and identified prescriptions shall be stricken and re-evaluated based on the nature and volume of prescriptions and analyses identified by Plaintiffs.

Case: 1:17-md-02804-DAP   Doc #: 3149   Filed: 02/09/20   3 of 18.   PageID #: 487798
Case: 1:20-cv-01744-DAP   Document 214   Filed: 05/09/25   Page 362 of 397   PageID
#: 6329

## I.   INTRODUCTION AND BACKGROUND

At issue here is the type and scope of dispensing data that the Pharmacy Defendants will be required to produce in connection with the Track 1B cases. Plaintiffs argue they will use the dispensing data in part to identify specific prescriptions containing purported "red flags" that Plaintiffs claim the Pharmacy Defendants should have further investigated prior to filling (Plaintiffs' "Red Flag Prescriptions").

Plaintiffs' requests for dispensing data have expanded and changed during the course of Track 1B discovery. Plaintiffs initially requested Pharmacy Defendants' dispensing data for approximately 20 data fields and specified that each "[p]atient's name and address shall be de-identified." Ex. A, Track 1B Combined Discovery Requests at n.2. Setting aside the Pharmacy Defendants' overarching objection to producing dispensing data, the Pharmacy Defendants were willing, subject to appropriate safeguards, to produce these fields for three years for the two Plaintiff counties, to the extent available. Within weeks of the initial Case Management Conference for Track 1B on December 4, 2019, each Defendant participated in a meet-and-confer with Plaintiffs and Special Master Cohen to finalize the fields and production logistics, including production timelines. The Pharmacy Defendants believed they could produce the 20 data fields that Plaintiffs were requesting as of that point for Cuyahoga and Summit Counties within six weeks of the date Plaintiffs confirmed that the list of fields was complete. *See* Dkt. No. 3029, Pharmacy Defendants' Motion for Reconsideration of the Court's Order Regarding Scope of Track One-B and Supporting Memorandum, dated January 28, 2020, at 14.

After that progress, however, Plaintiffs changed course and significantly expanded the scope of dispensing discovery that they requested. On January 3, 2020, Plaintiffs sent the Pharmacy Defendants a request for approximately 160 data fields, requiring additional review and consideration by the Pharmacy Defendants and conferences with the parties and Special

Master to evaluate positions and attempt compromise. Ex. B, excerpt of Plaintiffs' January 3, 2020 data field request listing the 160 fields requested). During an in-person conference with the Special Master on January 22, 2020, Plaintiffs changed course again, dropping the vast majority of the 160 data fields they had most recently requested, but insisting on the production of 34 data fields.

At the January 22 conference, the parties ultimately reached agreement on certain dispensing data fields that the Pharmacy Defendants would be willing to produce,[4] and the Special Master ordered that other fields be produced over the Pharmacy Defendants' Objections.[5] The parties also agreed upon a phased discovery approach whereby the Pharmacy Defendants could identify additional data fields they might rely on after Plaintiffs had identified the specific prescriptions that they allege contained "red flags" and should not have been filled absent further investigation. The specific time frame in which the Pharmacy Defendants would have to produce that additional data was not discussed, although the Pharmacy Defendants made clear that their previous estimates of being able to produce the requested data in six weeks was in jeopardy in light of the expanded scope of data fields that they were being ordered to produce.

On January 23, 2020, the parties held yet another discovery conference with the Special Master to discuss Plaintiffs' request that, in addition to producing dispensing data for opioids, the Pharmacy Defendants produce dispensing data for numerous other drugs that Plaintiffs claim present a "red flag" when prescribed in combination with an opioid (so-called "cocktail"

---

[4] The Pharmacy Defendants had expressed a willingness, pending the outcome of the decision of the Sixth Circuit, to proceed with the collection and production of these 34 fields of data for Summit County and Cuyahoga County stores for the relevant opioids, going back 3 years.

[5] Specifically, the data fields that the Pharmacy Defendants were ordered to produce over their objection were: Dispensing Pharmacist, Patient Age, Rejection Indicator, Patient DOB, and DEA Override.

prescriptions).  The Pharmacy Defendants objected to Plaintiffs' expansive request and stated

that if Plaintiffs are permitted to seek such discovery it should be limited to the so-called

"Trinity" or "Holy Trinity" combination consisting of (1) alprazolam (anti-anxiety medication);

(2) carisoprodol (muscle relaxant); and (3) either hydrocodone or oxycodone, all filled for the

same patient on the same day, at the same pharmacy and prescribed by the same prescriber.  *See*

Ex. C, Retail Pharmacy Defendants' Submission re "Trinity" Cocktails, dated January 27, 2020,

at 2-4.[6]  The Pharmacy Defendants further maintained that this additional data be limited to those

prescriptions filled 2013 and later, a few months after 2012 DEA industry guidance identified

such a combination as a potential "red flag" and more than two years before the Ohio Board of

Pharmacy in 2015 issued similar guidance.  *See id.* at n.3.

All of these discovery conferences culminated in the Special Master issuing his Ruling

Regarding Pharmacy Data Production (Dkt. No. 3106), which directs the Pharmacy Defendants

as follows:

- Dispensing data relating to the 34 fields must be produced by the Pharmacy
  Defendants by March 2, 2020.

- Any additional data fields that the Pharmacy Defendants intend to use to defend
  against Plaintiffs' claims must be produced by the Pharmacy Defendants within
  fourteen days of Plaintiffs' identification of the Red Flag Prescriptions.

- Data for 14 benzodiazepines and 4 muscle relaxants that Plaintiffs identified as
  non-opioids relevant to their analysis of potential "red flag" combinations must be

---

[6] Exhibits to the January 27, 2020 Pharmacy Defendants' submission are omitted here due to
size.

5

Case: 1:17-md-02804-DAP  Doc #: 3149  Filed: 02/09/20  6 of 18.  PageID #: 487798
Case: 1:20-cv-01744-CEF-ECT  Document 2-1  Filed: 05/09/25  Page 365 of 397  PageID
#: 6332

produced by the Pharmacy Defendants, to the extent prescriptions for those drugs

were filled within 14 days (either before or after) any opioid.

There is no basis for the timing and substance of these broad rulings.  Far outside the

confines of the Federal Rules, the Ruling serves only to further Plaintiffs' quest to fish through

the Pharmacy Defendants' dispensing data without connection to Plaintiffs' Track 1B claims.

Indeed, the addition of eighteen non-opioids, which, according to Plaintiffs, translates to

thousands of additional individual drug products ("NDCs")[7] that may have to be searched,

presents not only an additional burden on the Pharmacy Defendants but an additional intrusion

into patient privacy.  And the timetable set forth in the Ruling is simply untenable.  The

Pharmacy Defendants therefore request that the Ruling be reversed and amended as explained

below.

## II.     ARGUMENT

Federal Rule of Civil Procedure 26 requires the Special Master not only to limit

discovery to what is relevant, but also to consider whether the discovery sought is proportional to

the needs of the case.  *See, e.g.*, *In re Ohio Execution Protocol Litigation*, 845 F.3d 231, 236

(2016) ("[A] plaintiff [cannot] be permitted to go fishing and a trial court retains discretion to

determine that a discovery request is too broad and oppressive.").  By ordering discovery that is

overbroad, unduly burdensome, and neither relevant nor proportional to Plaintiffs' claims in the

---

[7] On February 1, 2020, Plaintiffs provided a list of over 15,000 NDCs and 4,000 NDCs, respectively, for the 14 benzodiazepines and 4 muscle relaxants for which they request additional dispensing data, and which we are not attaching here due to its size.  The Pharmacy Defendants are still investigating which NDCs may be implicated for the 18 new drugs for which they were ordered to produce dispensing data.

Case: 1:20-cv-01744-CEF-ECF Document: 21-4 Filed: 02/09/25 Page: 366 of 397 PageID #: 6333
Case: 1:17-md-02804-DAP Doc #: 3149-1 Filed: 02/09/20 of 18. PageID #: 4877 of 799
#: 6333

Track 1B litigation, and on an impractical, unduly burdensome timeline, the Special Master

abused his discretion in entering the Ruling.[8]

**A.    The Expansive Definition Of "Cocktail" Prescriptions Is Unsupported, Overly Burdensome, Not Proportional To The Needs Of The Case, And Untenable In Light Of The March 2 Production Deadline.**

The Ruling largely adopts Plaintiffs' position and orders the Pharmacy Defendants to

produce data for 18 non-opioid drugs (translating to thousands of additional NDCs, according to

Plaintiffs ) so that Plaintiffs can attempt to identify purported "red flag" "cocktail" combinations

in prescriptions that Pharmacy Defendants' pharmacists filled.  That ruling goes against the

typical guidance concerning opioid "cocktails," as well as the discovery rules, and thus must be

reversed.

**1.    An opioid "cocktail" has been defined by DEA as a three-drug combination of oxycodone or hydrocodone + alprazolam + carisoprodol.**

Plaintiffs claim certain drug combinations, or "cocktails," should have constituted "red

flags" to the Track 1B Defendants' pharmacists, who should have further investigated the

prescriptions and, possibly, refused to fill them.  Plaintiffs argued such a "cocktail" consists of

---

[8] The Ruling is styled as one governing discovery only, and the Pharmacy Defendants understand it as such.  Plaintiffs, of course, bear the ultimate burden of proof on all of their claims, including those related to dispensing.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4194272, at *1-*2 (N.D. Ohio Sept. 4, 2019) (citing *Cincinnati v. Beretta U.S.A.*, 768 N.E.2d 1136, 1141-44 (Ohio 2002)); *see also City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 621 F. Supp. 2d 513, 528, 531 (N.D. Ohio 2009) (defendants cannot be held liable in a public nuisance action challenging conduct that is subject to regulation unless the plaintiff pleads and shows that defendants did not comply with the applicable regulation), *aff'd*, 615 F.3d 496 (6th Cir. 2010); *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003) (plaintiff bears the burden of proof on public nuisance claim).  Pharmacy Defendants do not understand the production obligations identified on pages 6-7 of the Ruling to shift the burden of proof in any respect.  Any such burden-shifting would obviously be improper and would deprive the Pharmacy Defendants of due process.  *See Addington v. Texas*, 441 U.S. 418, 423 (1979); *Voigt v. Chicago & N.W. Ry. Co.*, 380 F.2d 1000, 1004 (8th Cir. 1967) ("It has long been generally recognized that it is reversible error to place the burden of proof on the wrong party or to place an unwarranted burden of proof on one party.").

certain opioids or opioid treatments taken in combination with one or more benzodiazepine, muscle relaxant, or sleep aid—regardless of whether prescriptions for those drugs were presented at the same pharmacy, presented on the same day, or written by the same prescriber.

Plaintiffs are wrong. The concept of "red flags" is not referenced in the Controlled Substances Act ("CSA") or its implementing regulations. Nor does the CSA or its regulations define a "cocktail." In the context of CSA enforcement, the DEA has used the concept of "red flags" to describe circumstances about which a reasonable pharmacist—in keeping with his or her "corresponding responsibility"—may want to be aware.

Further, there is no blanket regulatory prohibition of *any* opioid combination. Opioid combinations, including those implicated by the Ruling, can be common treatment for patients, for example, in active cancer treatment, experiencing acute sickle cell crises, or experiencing post-surgical pain. Ex. D, CDC Clarification of Opioid Guidelines; *see also* Ex. E, DEA Letter to NACDS, dated November 4, 2019 (responding to inquiry for position on "Trinity" prescriptions by advising that "[f]ederal regulations do not define the term legitimate medical purpose nor do they set forth the standards of medical practice. It is up to each DEA-registered practitioner to treat a patient according to his or her professional medical judgment . . . ."). Beginning in approximately 2012, industry guidance from the DEA and Ohio Board of Pharmacy has instructed that a very specific three-drug combination, commonly referred to as the "Trinity" or "Holy Trinity," is the "cocktail" most commonly abused: oxycodone or hydrocodone + alprazolam + carisoprodol. *See* Ex. F, Aug. 3 & 4, 2013 DEA presentation on DEA Perspective: Pharmaceutical Use & Abuse, during the Baton Rouge Pharmacy Diversion Awareness Conference, at 18, 20; Ex. G, Aug. 24, 2015 DEA presentation on Current Trends in DEA Compliance, to NACDS, at 3, 9; Ex. H, Mar. 19 & 20, 2016 DEA presentation on DEA

8

Case: 1:20-cv-01744-CEF-ECF   Document 214   Filed: 05/09/25   Page 368 of 397 PageID
Case: 1:17-md-02804-DAP   Doc #: 3149-2   Filed: 02/03/20  3 of 18.   PageID #: 487801
#: 6335

Trends and Update, to Delaware Pharmacy Diversion Awareness Conference, at 33-35; Ex. I,

2017 DEA presentation on DEA Trends and Update, to San Juan, Puerto Rico Pharmacy

Diversion Awareness Conference, at 12, 17, 18; June 2015 Ohio Board of Pharmacy website

video at 5:55-6:20.[9]  Importantly, these agencies do not argue that such a "cocktail" is per se

invalid or can never be prescribed or dispensed.  Additionally, several authorities that take a

broader position still define a "cocktail" as a three-drug combination of an opioid,

benzodiazepine, and muscle relaxant.  *See, e.g.*, *Trinity Pharmacy II*, 84 Fed. Reg. 7304 (2018);

*see also* Ruling at 3.

>    **2.     The Ruling is overbroad and unduly burdensome because it requires
>            production of data for fourteen benzodiazepines and four muscle
>            relaxants, which are neither relevant nor proportional to Plaintiffs'
>            claims.**

Despite this context, the Ruling largely follows Plaintiffs' position and requires the

Pharmacy Defendants to produce data for fourteen benzodiazepines and four muscle relaxants

(which, according to Plaintiffs, includes over 19,000 individual NDCs) that Plaintiffs argued

may constitute combination or "cocktail" prescriptions that should have been further

investigated.[10]  This is too broad.  These drugs are not appropriate for an analysis of "red flag"

combinations—in fact, many are not even controlled substances (let alone Schedule II drugs).

The Ruling's broad definition of "cocktail" is also unnecessary.  The Pharmacy

Defendants had agreed to provide Plaintiffs with additional data for two non-opioid products

(alprazolam and carisoprodol) in connection with DEA guidance pertaining to "Trinity"

combinations.  The Special Master's Ruling rejects the Pharmacy Defendants' position and

---

[9] The video can be found at https://www.pharmacy.ohio.gov/ or on the Ohio Board of Pharmacy
YouTube account at https://www.youtube.com/channel/UCidYeMX_wTBJsAVgafF076g.

[10] The Ruling does not require production of data for the sleep aids that Plaintiffs requested.

vastly expands the scope of discovery, associated burden on the Pharmacy Defendants, and intrusion into patient privacy by requiring production of data for 18 additional non-opioid drugs, which, according to Plaintiffs, translates to thousands of additional individual products, all to be included in the upcoming March 2 production.[11]

The Ruling does not, however, justify its breadth. At most, the Ruling reasons "it is known that patients receiving any combination of these categories of drugs (including only just two-drug combinations) are very often also drug-seeking." Ruling at 4. But this is not true— many patients that are prescribed opioids in combination with other drugs (particularly two-drug combinations) need those drugs for legitimate treatment. Indeed, it is for this reason that the DEA has declined to assert a blanket position that such combination prescriptions are improper, instead deferring "to each DEA-registered practitioner to treat a patient according to his or her professional medical judgment." Ex. E, DEA Letter to NACDS, dated November 4, 2019. Further, as DEA has advised, "DEA regulations do not impose a specific quantitative minimum or maximum limit on the amount of medication that may be prescribed on a single prescription, or the duration of treatment intended with the prescribed controlled substance." *Id.*

Nor does the Ruling provide support for the breadth of the non-opioid drugs it orders produced, since it relies heavily on authorities holding that the most commonly abused combination is the "Trinity" or "Holy Trinity." In fact, the Ruling does not cite any specific authorities to support that Pharmacy Defendants should produce data for all of the possible combinations of only two drugs provided in the Ruling. In contrast, the Pharmacy Defendants have shown that limiting an analysis of potential "red flag" combinations to three-drug "Trinity"

---

[11] *See* Dkt. No. 3029 & supporting affidavits.

combinations aligns with recent guidance from relevant agencies.  Ex. C, Retail Pharmacy

Defendants' Submission re "Trinity" Cocktails, dated January 27, 2020.

Any potential relevance that the additional non-opioid data may have must be balanced

with the significant discovery burden required for producing it.  This burden has since been

underscored by Plaintiffs' identification of *over 19,000* separate medications identified by

individual NDC codes for the newly-added non-opioid drugs that Plaintiffs argue are implicated

by the Ruling and must be included in the Pharmacy Defendants' productions of dispensing

data.[12]  The data corresponding to those NDC codes is far too voluminous to be necessary for the

"red flag" analysis for which Plaintiffs claim they need the data.[13]  Production of this data not

only requires significant Pharmacy Defendant resources, but it also implicates private patient

information for a massive volume of prescriptions that have nothing to do with opioids.  *See*

Ruling at 4 ("Defendants also note correctly that every addition to their data production increases

their discovery cost and to some extent the invasion of their customers' privacy.").

> ### 3. The 28-day rolling time window for purported "cocktail" combinations is unsupported and overly burdensome; the alternative option of producing all prescription data for all listed benzodiazepines and muscle relaxants is an intrusion on patient privacy.

The Ruling leaves the Pharmacy Defendants in an untenable situation (*see* Ruling at n.8):

> In other words, each Defendant has two choices. First, it may
> simply produce data for ***all*** of its prescriptions for the listed
> benzodiazepines and muscle relaxers, and let Plaintiffs figure out
> which were given to patients who also received recent
> prescriptions for opioids. Second, a Defendant may instead filter
> its data and produce only its prescriptions for the listed
> benzodiazepines and muscle relaxers that it dispensed to a patient
> who ***also*** received from it a prescription for opioids within a 14-

---

[12] Plaintiffs provided the NDC codes by email dated February 1, 2020.  We are not including that list as an exhibit hereto due to its significant volume.

[13] This is true even if all of the improperly added non-Schedule II opioids are removed from Plaintiffs' list of NDCs.

Case: 1:17-md-02804-DAP   Doc #: 3149   Filed: 02/03/20   1 of 18.   PageID #: 487804
Case: 1:20-cv-01744-CEF-EGT   Document 214   Filed: 05/09/25   Page 371 of 397   PageID
#: 6338

day plus-or-minus window. This gives each Pharmacy Defendant
options to tailor, in part, its own discovery burden. That said, the
deadlines discussed below may limit a Defendant's choice, if
applying the data filter causes data production to take longer.
The Special Master adds that giving Defendants the option of a
more complicated filter, such as producing non-opioid
prescriptions only when the patient received **both** a benzodiazepine
**and** a muscle relaxer within a 14-day plus-or-minus window of an
opioid prescription, is not warranted and possibly unworkable.
Last, as stated earlier, all prescription data shall date back to 2006.
*See* Dkt. No. 3055.

The Ruling's option to limit production of data for the benzodiazepines or muscle

relaxants to the 14-day period before or after a prescription for an opioid was dispensed (or a 28-

day window) only creates an additional burden—not to mention that it is overbroad and

impractical.  The option poses a logistical nightmare, requiring complex algorithms to

implement, all of which is exacerbated by the March 2 production deadline.  The alternative

option of producing all prescription data for patients prescribed only a muscle relaxant or only an

anti-anxiety medication at any time after 2006—by definition sweeping into this opioid litigation

the private patient information of individuals who have never been prescribed an opioid—is no

better.

The 14-day window before and after an opioid is dispensed (28 days) is both overly

broad and without justification.  That period is far too extensive to target the "red flags"

Plaintiffs say they seek for their claims.  It is also impractical, as it suggests pharmacists might

be expected to identify purported "red flag" prescriptions presented up to 28 days apart.  In

practice, unless the combination is presented to the pharmacist at the same time, it might not be

apparent to the pharmacist that there might be a red flag to resolve.  The Pharmacy Defendants

submit they should be able to limit their production of "cocktail" data to combination

prescriptions presented to the same pharmacy on the same day.

Case 1:20-cv-01744-CEC-ECT   Document 214   Filed 05/09/25   Page 372 of 397 PageID
Case 1:17-md-02804-DAP   Doc #: 3149   Filed: 02/03/20   3 of 18. PageID #: 487605
#: 6339

Accordingly, the Pharmacy Defendants respectfully request that the Court modify the Ruling to require Pharmacy Defendants to produce data for only the drugs commonly identified as a "Trinity" that were prescribed on the same day to the same patient and filled at the same pharmacy.

**B.    The Ruling Is Unfair And Unduly Burdensome Because It Limits The Time Available For Pharmacy Defendants To Defend The Purported Red Flag Prescriptions Identified By Plaintiffs To 14 Days.**

The Ruling states that, "no later than 14 days from the date of Plaintiffs' 'Red Flag' identification, Defendants shall produce, for all earlier-supplied prescriptions, any additional data fields upon which they or their experts intend to rely in defending against Plaintiffs' claims." Ruling at 7. This period is too short. Depending on the volume of purported Red Flag Prescriptions that Plaintiffs identify (which based on Plaintiffs' past analyses will likely be voluminous), the time period will likely be impossible for Pharmacy Defendants to meet. Before even assessing what additional data fields they may need to produce, the Pharmacy Defendants will have to analyze the prescriptions identified by Plaintiffs and try to understand Plaintiffs' methodology. Only after that is accomplished, can the Pharmacy Defendants determine what additional data fields they need and begin the process for extracting that data. And depending on the type of data that needs to be extracted, that process could be quite complicated, which is what prompted the parties to agree to a phased-discovery approach with the production of data in the first place. Accordingly, the Pharmacy Defendants respectfully request that the Court amend the Ruling to remove the 14-day deadline and allow for considered evaluation of the appropriate timetable following Plaintiffs' identification of Red Flag Prescriptions and related analyses, and the volume of prescriptions identified.

### C.   The Ruling Further Puts Patient Privacy At Risk By Requiring The Production Of Patient Birth Year Or Age.

As the Pharmacy Defendants have previously explained, certain required data constitutes an unwarranted invasion into patient privacy.  *See* Writ of Mandamus, *In re CVS*, 20-3075 (6th Cir. Jan. 17, 2020) at 26-27*; see also* Dkt. No. 3029, Pharmacy Defendants' Motion for Reconsideration of the Court's Order Regarding Scope of Track One-B and Supporting Memorandum, at 12-13.  The Ruling overrules Pharmacy Defendants' objections that the production of a patient's Birth Year (or Age) constitutes an improper privacy invasion and further increases the risk that particular patients could be identified based on the totality of the information being produced.  As previously explained, and acknowledged by Special Master Cohen in the Ruling, the more data that is produced about a particular patient, the greater the invasion of privacy, and the greater the risk that a patient's identify will be exposed.  *See, e.g*, Dkt. No. 3029 at 12-13; Reply in Support of Petitioners' Emergency Motion to Stay Certain Discovery at 9, *In re CVS*, 20-3075 (6th Cir. Jan. 31, 2020); Ruling at 4.  In the interests of judicial economy, rather than repeating arguments here that have been amply set forth in prior filings, the Pharmacy Defendants incorporate them by reference and object to the production of the additional data fields on privacy grounds. [14]

## III.   CONCLUSION

Special Master Cohen's Ruling would require the Pharmacy Defendants to produce expansive dispensing data with strict time constraints, without any justification for either.  As it

---

[14] The Pharmacy Defendants had objected to providing patient name, address, and other private patient information but had agreed that each Pharmacy Defendant would provide a unique identifier linked to each Patient ID number to protect patient privacy.  To the extent that the "new, unique identifying number" referenced in the Ruling is consistent with this agreement, the Pharmacy Defendants do not object to each Pharmacy Defendant providing such an identifier in their data.  To the extent that this issue requires further clarification, the Pharmacy Defendants request an opportunity to brief and be heard on the issue.

14

is unduly burdensome, overly broad, and not proportional to the Track 1B claims, the Ruling

Regarding Pharmacy Data Production should be modified as discussed herein.

Case 1:20-cv-01744-CEG-ECT Document 214 Filed 05/09/25 Page 375 of 397 PageID
Case 1:17-md-02804-DAP Doc #: 3149-1 Filed: 02/03/20 16 of 18. PageID #: 487809
#: 6342

Dated:  February 3, 2020                    Respectfully submitted,

                                            /s/   *Tara A. Fumerton*
                                            Tina M. Tabacchi
                                            Tara A. Fumerton
                                            JONES DAY
                                            77 West Wacker
                                            Chicago, IL 60601
                                            Phone: (312) 269-4335
                                            Fax: (312) 782-8585
                                            E-mail: tmtabacchi@jonesday.com
                                            E-mail: tfumerton@jonesday.com

                                            *Attorneys for Walmart Inc.*

                                            /s/   Eric R. Delinsky (consent)
                                            Eric R. Delinsky
                                            Alexandra W. Miller
                                            ZUCKERMAN SPAEDER LLP
                                            1800 M Street, NW
                                            Suite 1000
                                            Washington, DC  20036
                                            Phone: (202) 778-1800
                                            Fax: (202) 822-8106
                                            E-mail: edelinsky@zuckerman.com
                                            E-mail: smiller@zuckerman.com

                                            *Attorneys for CVS Pharmacy, Inc. and Ohio CVS
                                            Stores, L.L.C.*

                                            /s/   Kelly A. Moore (consent)
                                            Kelly A. Moore
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            101 Park Avenue
                                            New York, NY 10178
                                            Phone: (212) 309-6612
                                            Fax: (212) 309-6001
                                            E-mail: kelly.moore@morganlewis.com

                                            Elisa P. McEnroe
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            1701 Market Street
                                            Philadelphia, PA 19103
                                            Phone: (215) 963-5917
                                            Fax: (215) 963-5001
                                            E-mail: elisa.mcenroe@morganlewis.com

Case 1:20-cv-01744-CFC-EGT   Document 214   Filed 05/09/25   Page 376 of 397 PageID
Case 1:21-md-02804-DAP   Doc. #: 3149   Filed: 02/03/20   1 of 18. PageID #: 487800
#: 6343

*Attorneys for Rite Aid of Maryland, Inc., d/b/a Mid-Atlantic Customer Support Center, Rite Aid of Ohio, Inc., and Rite Aid Hdqtrs. Corp.*

/s/    Kaspar Stoffelmayr (consent)
Kaspar Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
E-mail: kaspar.stoffelmayr@bartlit-beck.com

*Attorney for Walgreen Co. and Walgreen Eastern Co.*

/s/    Timothy D. Johnson (consent)
Timothy D. Johnson
Gregory E. O'Brien
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, OH 44114
Phone: (216) 621-7860
Fax: (216) 621-3415
Email: tjohnson@cavitch.com
Email: gobrien@cavitch.com

*Attorneys for Discount Drug Mart, Inc.*

/s/    Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for HBC Service Company*

17

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system to all counsel of record on February 3, 2020.


/s/ *Tara A. Fumerton*
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01744-CFC |
| | ) | |
| WALMART INC. and | ) | **CONFIDENTIAL** |
| WAL-MART STORES EAST, LP, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendants. | ) | |

_____ )

## <u>PLAINTIFF UNITED STATES' RESPONSE TO</u>
## <u>DEFENDANTS' DISCOVERY DISPUTE LETTER</u>

Dear Judge Tennyson,

Walmart accuses the United States of, among other things, attempting to "ambush" the company, "subverting" subpoenas, and "playing games." Walmart's accusations are unsupported, and the straightforward application of the law to the facts here demonstrates that the United States has properly responded to Walmart's first and second interrogatories and that there is no basis for the Court to reconsider its ruling that the other agencies are not parties. Walmart simply is attempting to use its unfounded discovery disputes to frustrate the government's efforts to cooperatively pursue fact discovery, and more brazenly, to dictate the government's case.

**Issue 1**: The United States has produced to Walmart the preliminary lists of prescriptions that this Court directed the government to produce in its September 25, 2024 Order. In asking the Court to address again what was resolved on September 25, Walmart attempts to manufacture a new dispute by claiming that the United States wants to "start over" and has admitted that the preliminary lists of prescriptions "have nothing to do with the prescriptions" in the Complaint. D.I. 183, at 2. These assertions are untrue. Walmart nonetheless asks the Court to revisit its prior order and bar the United States—before Walmart has produced *any* dispensing data in this litigation and more than a year before the close of fact discovery—from supplementing the provisional lists the government has disclosed.

The Court previously directed the United States to produce a list of prescriptions that the United States had "provisionally put together" during its pre-filing investigation based on "a consulting expert's opinions" and the limited universe of dispensing data Walmart produced during the investigation. D.I. 151, at 15:18-16:3, 20:9-15. Because the list was provisional and because "[d]iscovery is ongoing," the United States would "certainly . . . have the ability to supplement" the list. *Id.* at 16:5-6. The Court therefore requested "the parties to be reasonable when it comes to necessary changes that may need to be made" to the list. *Id.* at 20:15-17.

In compliance with this Court's Order, on September 27 and October 22 and 25, 2024, the United States disclosed spreadsheets listing approximately 143,000 invalid prescriptions. Although not required by the Court's Order, the United States subsequently, on November 21, 2024, also disclosed a list of 21 data specifications that were used to generate the provisional lists. All these data specifications—and the prescriptions meeting those specifications—fell within the red flag combinations enumerated in the Complaint. D.I. 109, at 136-146. The United States expressly reserved its right supplement, clarify, revise, or correct the lists.

This Court's prior order—and the United States' compliance with it—are consistent with Rule 26(e) of the Federal Rules of Civil Procedure, under which "[l]itigants commonly supplement their discovery responses after reviewing discovery received from an opposing party." *Aaron, MacGregor & Assocs., LLC v. Zheijiang Jinfei Kaida Wheels Co., Ltd.*, 2017 WL 4875904, at *5 (N.D. Ind. Oct. 30, 2017); *see also, e.g.*, *Simpson v. Ocwen Loan Serv., LLC*, 2020 WL 1465740, at *4 (N.D. W.Va. Mar. 25, 2020) (authorizing plaintiff in civil penalty action to supplement its list of violations after obtaining additional information in discovery). Courts find it particularly appropriate to permit supplementation when, as here, the interrogatory relates

to anticipated expert testimony. *See Ziemack v. Centel Corp.*, 1995 WL 729295, at *2-3 (N.D. Ill. Dec. 7, 1995); *BB&T Corp. v. U.S.*, 233 F.R.D. 447, 450 (M.D.N.C. 2006) (quashing as "premature" "contention deposition" in tax case when government had yet to obtain "a sufficient, comprehensive view of the facts" through discovery and contentions would "touch on" expert matters). Courts also generally find supplementation appropriate in the case of contention interrogatories, like Interrogatory 1. *E.g. Capacchione v. Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 489 (W.D.N.C. 1998).

Walmart prematurely seeks a final list of invalid prescriptions but has refused, for months, to produce the dispensing data necessary for the United States to provide such a list. In effect, Walmart seeks to improperly and "artificially narrow" the universe of violations at issue by forcing the United States to "prematurely commit . . . to positions" before it has obtained meaningful discovery from Walmart. *Ziemack*, 1995 WL 729295, at *2; *see also Jimenez v. Smith & Nephew, PLC*, 2010 WL 11590923, at *3 (D.N.M. Jan. 25, 2010) (same).

Walmart's letter brief nowhere acknowledges, much less addresses, Rule 26(e) or this Court's prior instruction that permits supplementation. Rather, Walmart argues that this Court should bar the United States from amending the list (except to eliminate prescriptions) because, in Walmart's opinion, the United States may seek penalties only for the tens of thousands of violative prescriptions that Walmart believes are explicitly referenced in the Complaint.

That contention rests entirely on Walmart's theory that the meaning of the term "violation" in the CSA's civil penalties provision, 21 U.S.C. § 842(c)(1), is "coterminous" with the meaning of the term "claim" in Rule 26(b)(1). As the United States further detailed in its letter brief asking this Court to compel Walmart to produce dispensing data and associated fields, the only authority Walmart has offered in support of its argument are decisions providing generic definitions of the term "claim," *none* of which involve the CSA or any other civil penalty statute and *none* of which compare the meaning of "claim" and "violation," let alone equate the terms, as Walmart seeks to do. D.I. 184, Ex. 4, at 2; Ex. 5, at 2-3.

"Claim" in Rule 26(b)(1) refers to Rule 8's notice pleading standard that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and therefore does not require "that complaints contain all of the evidence needed to prevail at trial" or "all of the facts," as code-pleading demanded, *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017). Rather, "Rule 8 . . . authorizes notice pleading with discovery to follow." *Matter of Excello Press, Inc.*, 967 F.2d 1109, 1115 (7th Cir. 1992). Put differently, "plaintiffs need not prove their case at the pleading stage" because "it may not be until discovery that a plaintiff has access to the evidence it needs to detail" the facts supporting its claims. *BSD Crown, Ltd. v. Amazon.com, Inc.*, 684 F. Supp. 3d 993, 1002 (N.D. Cal. 2023).[1]

---

[1] Walmart speculates that "[h]ad the government actually pled the claim at the level of generality for which it is now trying to seek discovery, it would never have survived a motion to dismiss."

To require the government to specifically enumerate in the Complaint thousands of violations of the CSA and allege supporting facts for each such violation would contradict the purpose of Rule 8, which was to prevent plaintiffs from "larding their complaints with facts and legal theories," *Bennett*, 153 F.3d at 518, and would conflict with the Federal Rules' framework of notice-pleading followed by broad discovery. That is particularly true given that the information necessary to identify specific violations lies in the control of Walmart, and therefore is unavailable absent discovery.

Walmart challenges what courts routinely permit. As the United States did here, plaintiffs (including the government) frequently bring civil penalty actions in which a complaint provides specific examples of violations while also alleging more generally that a defendant's conduct resulted in additional violations. In such cases, courts routinely allow the plaintiff to engage in discovery related to violations closely related to the unlawful actions described in the complaint, even when the violations were not specifically referenced in the complaint. *See, e.g.*, *Orange Cnty. Coastkeeper v. Bodycote Thermal Proc., Inc.*, 2024 WL 174467, at *1-2 (C.D. Cal. Jan. 12, 2024) (Clean Water Act); *Corteva Agriscience LLC v. Monsanto Co.*, 2023 WL 6880348, at *1 (D. Del. Oct. 18, 2023) (patent infringement); *Simpson*, 2020 WL 1465740, at *4 (state consumer credit protection act); *U.S. ex rel. Bibby v. Wells Fargo Bank*, 165 F. Supp. 3d 1340, 1343, 1355-56 (N.D. Ga. 2015) (civil penalty action related to mortgage fraud); *In re RFC and ResCap Liquidating Trust Lit.*, 2015 WL 12819152, at *5-6 (D. Minn. Apr. 13, 2015) (contract representation and warranty violations); *U.S. ex rel. Hudalla v. Walsh Constr. Co.*, 834 F. Supp. 2d 816, 823 (N.D. Ill. 2011)[2] (False Claims Act); *United States v. Nat'l Dynamics Corp.*, 1981 WL 2070, at *1 (S.D.N.Y. Apr. 30, 1981) (Federal Trade Commission Act), *aff'g* 1981 WL 2054, at *2 (S.D.N.Y. April 8, 1981); *see also* D.I. 184, at 3 (citing additional cases). Courts authorize such discovery because "Rule 26 certainly contemplates" that "additional alleged violations could be unearthed during discovery." *Simpson*, 2020 WL 1465740, at *4 (citing Rule 26(e) and allowing plaintiff to identify additional statutory violations through discovery). All these cases necessarily reject Walmart's argument that, in the context of civil penalty statutes, "claims" are coextensive with "violations" and discovery is limited to specifically enumerated violations. Walmart never has articulated any reason why the CSA should be interpreted differently than penalty provisions in these other civil statutes or causes of action.[3]

---

D.I. 183, at 2. Walmart initially made that argument in its motion to dismiss, contending that the government was required to make "prescription-by-prescription allegations" and asking for dismissal of specific Complaint paragraphs that it did not believe included sufficiently particularized allegations. D.I. 84, at 16-19. The United States squarely addressed that argument in its motion-to-dismiss brief. D.I. 93, at 7, 18-21. Walmart withdrew its motion on that point, D.I. 110, at 1 n.1; thus, those allegations remain and the United States may take related discovery.

[2] The *Hudalla* Court had ordered the defendant to produce records related to projects not specifically referenced in the complaint. D.I. 78, No. 05 C 5930 (N.D. Ill. Nov. 23, 2010).

[3] Not only do courts allow discovery related to violations not specifically enumerated in a complaint, they also impose civil penalties related to such additional violations. *E.g.*, *S.E.C. v.*

That the United States was able to obtain a limited sample of dispensing data from Walmart—certain fields for prescriptions issued by several hundred prescribers—through an administrative subpoena issued during its pre-filing investigation does not serve to restrict this action to the violative fills explicitly enumerated in the Complaint. "The inquiry required by [the Federal Rules] is a brief pre-filing investigation, not pre-filing discovery." *Excello*, 967 F.2d at 1115. And, in fact, Walmart did not produce much of the dispensing data requested in the administrative subpoena. The limited data Walmart produced supported the United States' overarching claims, and therefore the government elected to move forward with filing its Complaint and into civil discovery rather than engage in prolonged efforts to obtain all of the subpoenaed data. Were this Court to accept Walmart's argument, it would improperly incentivize investigative targets to not comply with validly issued investigative subpoenas.

Walmart's recalcitrance distinguishes this case from the unreported discovery order in *U.S. v. Ridley's Family Mkts. Inc.*, No. 1:20-cv-173, D.I. 74, at 13-15 (D. Utah June 27, 2022). *Ridley's* nowhere suggests that the defendant did not fully comply with the government's pre-filing investigation such that the government could not identify all violations before filing. The scope of alleged wrongdoing also differed in *Ridley's*: whereas the government's allegations in *Ridley's* related almost exclusively to prescriptions filled by one location of the defendant pharmacy chain for two patients, *id.* at 2-3, Walmart concedes, as it must, that the United States' operative Complaint alleges tens of thousands of specific invalid prescriptions filled by Walmart at stores across the country. And whereas the *Ridley's* complaint included a single allegation that "the apparent absence of corporate policies and oversight" at the single location under investigation suggested that invalid fills likely occurred at other *Ridley's* locations, *Ridley's*, D.I. 2, ¶ 95, the Complaint here provides detailed allegations regarding invalid fills at Walmart pharmacies across the country, D.I. 109, at 126-150.

Walmart's refusal to produce nationwide dispensing data and associated fields also renders hollow its assertion that it will be prejudiced because, without a complete and final list of violations, it will be "impossible for Walmart to seek fact discovery." D.I. 183, at 3. To begin, any prejudice is of Walmart's own making based on its failure to produce dispensing data and is therefore not an appropriate basis for relief. Further, Walmart does not state exactly what "prescription-by-prescription" "fact discovery" it believes it needs to engage in; perhaps it would involve depositions of prescribers, patients, and pharmacists and subpoenas for patient-specific records. But the Scheduling Order to which Walmart agreed authorizes only 150 hours of third-party depositions—orders of magnitude fewer than the thousands of hours of depositions that its claimed need for prescription-by-prescription discovery would entail.

---

*Kokesh*, 884 F.3d 979, 984-85 (10th Cir. 2018); *United States v. Chen*, 402 Fed. App'x 185, 188 (9th Cir. 2010); *United States v. Krizek*, 111 F.3d 934, 940-41 (D.C. Cir. 1997); *S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 583-84 (S.D.N.Y. 2014); *Waterkeeper v. Corona Clay Co.*, 2024 WL 94112, at *23 (C.D. Cal. Jan. 2, 2024).

**Issue 2**:  Interrogatory 2, which was not part of the earlier discovery dispute brought to the Court, asks the United States to identify (a) the "reason(s)" it "contends" the prescriptions violated the CSA, (b) the "methodologies" used to identify the prescriptions and any "conclusions" about the prescription, and (c) "electronic scripts, codes, or analytical programs" used to implement the "methodologies."  D.I. 183, Ex. E, at 2.  The United States responded by providing exemplary and preliminary data specifications used to identify the prescriptions in the government's provisional lists provided to Walmart in response to Interrogatory 1.  All of these data specifications and the prescriptions they generated that fall within the red-flag combinations described in the Complaint.  In doing so, the United States explicitly reserved its right to supplement, clarify, revise, or correct the data specifications based on additional information obtained in discovery, including Walmart's dispensing data.

In meet-and-confer correspondence, the United States explained that Interrogatory 2 is a quintessential "contention interrogatory."  D.I. 183, Ex. N, at 4; *Novanta Corp. v. Iradion Laser, Inc.*, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2016) ("Contention interrogatories ask a party to state what it contends [or] all the facts upon which it bases a contention.").  A party generally need not answer a contention interrogatory until the end of or after discovery because discovery may reveal additional information that supports its contention.  *See, e.g.*, *Novanta*, 2016 WL 4987110, at *7 ("courts tend to deny contention interrogatories filed before substantial discovery has taken place, [and instead] grant them if discovery almost is complete" (quoting *Amgen Inc. v. Sandoz Inc.*, 2016 WL 1039029, at *3 (N.D. Cal. Mar. 15, 2016)); *BB&T*, 233 F.R.D. at 450; *see also* Fed. R. Civ. P. 33(a)(2).  Courts are particularly loath to enforce a contention interrogatory when the proponent has failed to produce discovery relevant to responding to the interrogatory.  *E.g. In re Wells Fargo Res. Mortg. Lending Discr. Lit.*, 2009 WL 1771368, at *6-7 (N.D. Cal. June 19, 2009) ("Neither Fed. R. Civ. P. 33(a)(2) nor applicable case law requires Plaintiffs to answer the contention interrogatories until [defendant] has produced the information necessary for them to do so.").

Under this well-established authority, the United States' response was more-than-adequate at this point in discovery.  Because contention interrogatories need not be answered until the end of fact discovery, the United States would be well within its rights to withhold *any* substantive response until later in discovery.  That is particularly true given Walmart's failure to produce dispensing data, which prevents the United States from responding in full.

Rather than relying on any legal authority, Walmart misleadingly quotes statements by the United States during the Court's discovery teleconference in a misplaced effort to assert that the government has "change[d] [its] course" with respect to the red-flag combinations.  Specifically, Walmart claims the government had advanced a "*per se* theory of invalidity" and then "changed course" by explaining to Walmart that the government may not pursue penalties for prescriptions in certain situations based on information known to Walmart, such as a patient's cancer diagnosis.  D.I. 183, at 3.  But during the teleconference, the United States made clear that validity of a particular fill depends "on the face of the prescription *and in some cases . . . other factors*."  D.I. 151, at 12:22-13:8 (emphasis added).  The United States' position with respect to its "red-flag" claim is, and has always been, that facts known to Walmart at the time it dispensed

a particular prescription are relevant to whether dispensing the prescription violated the CSA. To the extent Walmart's dispensing data system provided additional information bearing on the validity of the prescription—like whether a patient suffered from cancer or whether the pharmacist resolved a "red flag"—that information is relevant, and the United States never has asserted otherwise. Walmart's effort to manufacture a change in course on this issue is particularly misplaced when Walmart has refused to provide a complete list of data fields in its dispensing data system—information necessary for the United States to finalize the data specifications it will use to identify invalid prescriptions. It is also precisely why courts refuse to compel litigants to respond to contention interrogatories that would "prematurely commit Plaintiffs to positions and artificially narrow issues," like Interrogatory 2. *Ziemack*, 1995 WL 729295, at *2.

**Issue 3:** The Court should not reconsider its order requiring Walmart to seek discovery from the other Agencies through third-party subpoenas. It remains true that none of these non-party agencies were part of the prosecuting team or contributed significantly to the investigation leading to the filing of the Complaint. D.I. 151, at 55:6-9.

Walmart does not contend that anything has changed about CMS's, HSI's, VA's, or FBI's involvement in the investigation. With respect to HHS and DOD, Walmart points out that one of the United States' interrogatory responses provides information about interviews of Walmart witnesses and disclosed that HHS and DOD investigators attended certain interviews. Walmart has known for years that the United States conducted a False Claims Act (FCA) investigation into Walmart's dispensing of controlled substances. HHS and DOD were involved in the FCA investigation, and the government explained to Walmart that these particular interviews were conducted for purposes of the FCA investigation but attended by someone involved in the parallel CSA investigation. Ex. 1. That is consistent with the government's explanation at the hearing that HHS was involved in the FCA investigation. D.I. 151, at 46:9-14. And these joint interviews do not show that HHS and DOD contributed significantly to the CSA investigation that resulted in the filing of this Complaint.

Walmart further speculates that the Consumer Protection Branch (CPB) is engaged in a "joint effort to subvert the subpoenas," and thus, encourages the Court effectively to hold the case team responsible for the third-party agencies' responses to the subpoenas. To be clear, CPB is not engaged in such an effort. Other attorneys at CPB, who are not otherwise involved in this case, represent the non-party agencies in responding to Walmart's subpoenas (just as DOJ lawyers from another section or division would). Walmart has provided no authority to suggest that internal DOJ staffing decisions should have any impact on whether an agency should be considered a party for purposes of discovery.

6

Respectfully submitted,

SHANNON T. HANSON
Acting United States Attorney

BY:    */s/ Elizabeth Vieyra*
       Elizabeth Vieyra
       Assistant United States Attorney
       1313 N. Market Street
       P.O. Box 2046
       Wilmington, Delaware 19899-2046
       Telephone: 302-573-6148
       Facsimile: 302-573-6220
       Elizabeth.Vieyra@usdoj.gov

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01744-CFC |
| | ) | |
| WALMART INC. *et al.*, | ) | **CONFIDENTIAL** |
| | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2025 true and correct copies of the foregoing document were caused to be served on the following counsel of record via electronic mail:

Robert W. Whetzel, Esq.
Kelly E. Farnan, Esq.
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
Email: whetzel@rlf.com
Email: farnan@rlf.com

William G. Laxton, Jr., Esq.
Jeffrey R. Johnson, Esq.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Email: wglaxton@jonesday.com
Email: jeffreyjohnson@jonesday.com

Karen P. Hewitt, Esq.
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
Email: kphewitt@jonesday.com

Jason S. Varnado, Esq.
Andrew J. Junker, Esq.
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002-2172
Email: jvarnado@jonesday.com
Email: ajunker@jonesday.com

James W. Carlson, Esq.
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Email: jamescarlson@jonesday.com

Laura Jane Durfee, Esq.
JONES DAY
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215-2673
Email: ldurfee@jonesday.com

David W. Ogden, Esq.
Charles C. Speth, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20006
Email: david.ogden@wilmerhale.com
Email: charles.speth@wilmerhale.com

*/s/ Elizabeth Vieyra*

EXHIBIT 1

| From: | Brunson, Kathleen G |
| To: | Laxton, Jr., William G.; Hewitt, Karen P.; Farnan, Kelly E.; Carlson, James W.; Varnado, Jason S.; Junker, Andrew J. |
| Cc: | Vieyra, Elizabeth (USADE); Steinberg, Dylan (USADE); Ho, Katherine; Stephens, Kimberly R. |
| Subject: | U.S. v. Walmart - HHS & DOD |
| Date: | Tuesday, February 4, 2025 2:16:00 PM |

Billy,

We are responding to a question you raised at two recent meet and confer calls. You pointed out that in Exhibit A to the United States' Response to Defendants' Second Set of Interrogatories, which lists the Walmart employees the United States has contacted or attempted to contact, employees of HHS-OIG and the Defense Criminal Investigative Service (a component of the DOD) were present at a few interviews. You asked about the nature of these agencies' involvement in the investigation leading to this litigation and whether the United States will change its position regarding whether these agencies are considered parties for purposes of party discovery under the Federal Rules.

As you know, there was a parallel False Claims Act investigation. With one exception (███████ ████), the interviews listed in Exhibit A where someone from HHS or DOD was present were interviews conducted for purposes of the FCA investigation. At some of those interviews, Investigators Amanda Graf and Kevin Codol were present at the request of attorneys working on the CSA investigation. And two Diversion Investigators attended the interview of Relator James Marcilla. The interviews of ███████████ were conducted in connection with the criminal investigation of prescriber ███████████ and later provided to us.

We are not changing our position on the scope of party discovery because neither HHS nor the DOD contributed significantly to the investigation leading to this litigation.

Kate Gilchrist Brunson
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th St. NW, Washington, DC 20001
Office: (202) 305-0489
Cell: (202) 532-5391

EXHIBIT L

# JONES DAY

500 GRANT STREET, SUITE 4500 • PITTSBURGH, PENNSYLVANIA 15219.2514

TELEPHONE: +1.412.391.3939 • JONESDAY.COM

DIRECT NUMBER: +1.412.394.9503
JAMESCARLSON@JONESDAY.COM

**CONFIDENTIAL**

January 31, 2025

BY E-MAIL

Dylan J. Steinberg
Chief, Civil Division
United States Attorney's Office
1313 N. Market Street
Wilmington, DE 19801
Dylan.steinberg@usdoj.gov

Kathleen G. Brunson
Trial Attorney
U.S. Department of Justice Civil Division,
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
Kathleen.brunson@usdoj.gov

Re: *United States of America v. Walmart Inc., et al.*, Case No. 1:20-cv-01744-CFC (D. Del.)

Counsel:

I write on behalf of Walmart to provide additional information the government requested during our January 22, 2025 meet and confer regarding dispensing data fields.

## I.    Transactional Dispensing Data

As Walmart stated in its December 13, 2024 compromise proposal for the production of dispensing data, Walmart intends to utilize "the data fields Walmart produced in other opioid-related litigation or the government's investigation (including pharmacist name)" for the production of transactional dispensing data related to the Complaint prescribers and prescriptions identified in the Complaint.  That includes 45 transactional dispensing data fields as follows:



**CONFIDENTIAL**

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Dylan J. Steinberg
Kathleen G. Brunson
January 31, 2025
Page 2



**II.    Pharmacist Notes**

During the January 22, 2025 meet and confer, the government also requested additional information regarding pharmacist notes. As an initial matter, Walmart does not agree that pharmacist notes are relevant. The government has disclaimed any reliance on medical records and refused to produce documents on the basis that its claims are premised on prescriptions that it alleges are invalid regardless of what information might exist about the pharmacist, patient,

**CONFIDENTIAL**

**JONES DAY**

Dylan J. Steinberg
Kathleen G. Brunson
January 31, 2025
Page 3

prescription, and prescriber.  The production of pharmacist notes is also unduly burdensome. Pharmacist notes may be found in multiple locations, including electronic databases and on hard copies of the prescriptions themselves.  Each source presents challenges to search and produce. With respect to the electronic databases, because certain pharmacist notes fields are tied to patients rather than prescriptions, Walmart must conduct a separate patient-based query for each prescription at issue.  The government's dispensing data demands implicate tens of millions of patients, meaning millions upon millions of searches.  Similarly, hard copy prescriptions are stored either at individual stores or in archives.  Locating, retrieving, and copying prescriptions from all of Walmart's nearly 5,000 stores for the hundreds of millions of prescriptions implicated by the government's requests would be a monumental task that would take far longer than the time that remains in the current schedule.  For those reasons, Walmart has never produced pharmacist notes information for more than a limited subset of prescriptions in any case.  In the Track 3 matter in the MDL, which proceeded to trial and involved the production of transactional dispensing data for the entire state of Ohio, Walmart produced notes information for 1,800 sample prescriptions.

Without waiving Walmart's objections, Walmart provides below the six different data file sets that may reflect pharmacist notations that, in addition to hard copy productions, Walmart utilized in other opioid litigation matters and would use here for any production of pharmacist notes.



**CONFIDENTIAL**

JONES DAY

Dylan J. Steinberg
Kathleen G. Brunson
January 31, 2025
Page 4



III.    **Additional Data Fields**

         The government also requested a list of all fields available in Walmart's databases.  As
Walmart has previously explained, that is not a straightforward or reasonable exercise for Walmart
to undertake.  *See* 6/21/24 Email (attaching data fields from the federal MDL).  Moreover, there is
no basis for adding data fields to Walmart's intended productions.  The 72 fields referenced above
were the product of extensive negotiations, including under the supervision of the federal MDL
Special Master.  *See, e.g.*, 1/27/20 Discovery Ruling Regarding Pharmacy Data Production, *In re:
National Prescription Opiate Litigation*, No. 17-MD-2804, ECF 3106 (N.D. Ohio).   Any
additional fields would be of limited relevance and adding them both would be unduly burdensome
and significantly delay Walmart's data productions.  To add data fields, Walmart would need to,
on a field-by-field basis, locate the data table or data tables supporting the particular field, construct
or modify queries to pull information from those particular tables, and then assess the information

                                                                                      **CONFIDENTIAL**

JONES DAY

Dylan J. Steinberg
Kathleen G. Brunson
January 31, 2025
Page 5

retrieved to attempt to determine whether it is consistent and substantially complete.  Given the information at issue dates back over a decade and has been in several different systems over that time, it is very likely that process would have to be repeated multiple times for any new field until Walmart is able to pull and produce information, if it is able to do so at all.  There is simply no basis to add fields here.

Nevertheless, in the interest of compromise and to respond to the government's request for additional information regarding data fields, Walmart notes it has produced a number of documents outlining the Connexus workflow for pharmacists.  For example, Walmart pharmacist Lori Militello was deposed in the federal MDL and testified at length (3/19/21 L. Militello Tr. at 178-285, attached hereto as **Exhibit A**) regarding a 96-slide PowerPoint presentation from 2012 describing the Connexus Workflow (3/19/21 L. Militello Dep. Ex. 3, attached hereto as **Exhibit B**).  The screenshots in that presentation reference the types of information entered into Connexus contemporaneously that may correspond to data fields in Walmart's databases.  The fact that information is referenced in the document does not necessarily mean Walmart would be able to query, extract, and produce it today, thirteen years later, let alone that it would be relevant or discoverable in this case.

*        *        *

Of course, Walmart expects that any federal agency dispensing-related data productions will include at least the same fields as those Walmart ultimately produces.  Walmart is available to meet and confer.

Regards,

*/s/ James W. Carlson*

James W. Carlson

**CONFIDENTIAL**

JONES DAY

Dylan J. Steinberg
Kathleen G. Brunson
January 31, 2025
Page 6

Enclosures

cc:    Katherine M. Ho, Consumer Protection Branch
       Kelly Farnan, Richards, Layton & Finger, P.A.
       Karen P. Hewitt, Jones Day
       Jason S. Varnado, Jones Day
       William G. Laxton, Jr., Jones Day

**CONFIDENTIAL**